FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y

★   OCT 24 2007   ★

LONG ISLAND OFFICE

RPD:JGM:jgm
F. #2003R01830

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -

DAVID H. BROOKS and
SANDRA HATFIELD,

        Defendants.

- - - - - - - - - - - - - - - - X

S U P E R S E D I N G
I N D I C T M E N T

Cr. No. 06-550 (S-1)(JS)
(T. 15, U.S.C., §§
78m(a) and 78ff;
T. 18, U.S.C., §§ 371,
1341, 1343, 1346, 1348
1349, 981(a)(1)(C),
1512(c)(2), 1512(k), 2
and 3551 et seq.; T. 21,
U.S.C., § 853(p); T. 26,
U.S.C., §§ 7201 and
7206(1); T. 28, U.S.C., §
2461(c))

THE GRAND JURY CHARGES:

## INTRODUCTION

At all times relevant to this Superseding Indictment, unless otherwise indicated:

### I.  Background

#### A.  The Companies

1.  D.H.B. Industries, Inc. ("DHB") was incorporated in New York in 1992 under the name D.H.B. Capital Group, Inc.  In 1995, DHB re-incorporated in Delaware and ceased to be a New York corporation.  In 2001, DHB changed its name to D.H.B. Industries, Inc.  DHB operated from a corporate headquarters located, at different times, at various addresses in Nassau County, New York.

2.    DHB and its corporate subsidiaries, which included Point Blank Body Armor, Inc. ("Point Blank") and Protective Apparel Corporation of America, Inc. ("PACA"), manufactured and sold body armor.  A third DHB subsidiary, NDL Products, Inc. ("NDL"), manufactured protective athletic products, such as pads, bandages and braces.  Point Blank and NDL were located in Florida and PACA was located in Tennessee.  DHB's primary customers were branches of the United States Military and various federal and state law enforcement entities located throughout the United States.

3.    DHB was a publicly traded corporation, the common stock of which was initially traded on the "Over the Counter" ("OTC") market under the trading symbol "DHBT" and on the Boston Stock Exchange under the trading symbol "DHB," from September 1993 until 1998.  In 1998, DHB was listed on the North American Securities Dealers Association Quotation system ("NASDAQ") Small Cap Exchange.  In 1999, DHB was delisted by NASDAQ and was again traded on the OTC market until 2002, when DHB was listed on the American Stock Exchange ("AMEX") under the trading symbol "DHB."  In 2005, DHB was delisted from the AMEX and was again traded on the OTC market under the trading symbol "DHBT."  DHB's shareholders were located throughout the United States, including in the Eastern District of New York.

4.    Tactical Armor Products, Inc. (TAP") was a

3

privately owned company which supplied sewing services and armored plates to Point Blank and PACA. Point Blank and PACA were TAP's only customers. In 2003, Point Blank and PACA purchased more than $29 million dollars worth of goods and services from TAP, generating more than $9 million in profit for TAP.

5. Under the corporate law of both New York and Delaware, controlling officers and directors of a corporation owed the corporation a fiduciary duty of loyalty and honest services. That duty forbade officers and directors from using their position of trust and confidence to further their private interests. Furthermore, that fiduciary duty forbade controlling officers and directors from usurping corporate opportunities for their own personal benefit, or misleading or deceiving the corporation's Board of Directors.

B. The Defendants

DAVID H. BROOKS

6. The defendant DAVID H. BROOKS was the founder of DHB and the Chairman or Co-Chairman of the DHB Board of Directors from its inception until July 2006. BROOKS also served as the DHB Chief Executive Officer ("CEO") from its inception until 1998, and again from 2000 until July 2006. BROOKS held a Bachelor's Degree in accounting. During his tenure at DHB, BROOKS maintained offices at DHB's various New York headquarters.

4

BROOKS also maintained offices at his two residences, one located in Old Westbury, New York, and one located in Boca Raton, Florida.  BROOKS left DHB in July 2006.

7.    In addition to DHB, during the period from July 2000 to July 2006, the defendant DAVID H. BROOKS privately owned or controlled more than 30 corporate entities, including Brooks Industries of Long Island, Perfect World Enterprises, L.L.C., Corniche Capital, L.L.C., Wildfire Holdings, L.L.C., Vianel Industries, VAE Enterprises, L.L.C., RSJ Industries, Inc., and True Grit Holdings.  Some of these entities existed solely for the purpose of opening bank and brokerage accounts, or for tax planning purposes.  Others, however, such as VAE Enterprises and RSJ Industries, owned valuable property, including the Point Blank manufacturing facility leased by DHB, and a Learjet aircraft which BROOKS used for both personal and business travel.

8.    During the period from July 2000 to July 2006, the defendant DAVID H. BROOKS also managed more than 25 active stock market trading accounts, and controlled more than 30 bank accounts, some of which were held in the names of the corporate entities described above or in the names of various nominees, including BROOKS' family members.

9.    The defendant DAVID H. BROOKS was also a member of the United States Trotting Association ("U.S.T.A.") and his biography was included on the U.S.T.A. website under a list of

5

the sport's leading owners.  BROOKS or companies he owned or
controlled held title to approximately 100 trotting horses and
breeding horses.  BROOKS spent millions of dollars each year
training, housing, transporting, racing and caring for his fleet
of racehorses and breeding horses, and he was intimately involved
in the management of the business.  DHB had no interest in or
connection to BROOKS' horse business.

        10.  Beginning in April 2000, the defendant DAVID H.
BROOKS also oversaw the operation of TAP.  Although nominally
established and owned by BROOKS' elderly mother and his brother,
and later nominally owned by BROOKS' wife, in fact, all
significant management and financial decisions regarding TAP were
made by BROOKS or other DHB employees.  BROOKS and DHB personnel
hired the TAP employees and BROOKS set the prices that TAP
charged Point Blank and PACA.  BROOKS controlled the assets of
TAP and authorized all significant capital expenditures by TAP.
BROOKS and other DHB employees signed certain TAP checks.

                    SANDRA HATFIELD

        11.  The defendant SANDRA HATFIELD was employed by
Point Blank beginning in 1995.  In October 1996, HATFIELD became
the President of Point Blank.  In 2000, HATFIELD became the DHB
Chief Operating Officer, a position she held until approximately
August 2005.  HATFIELD's sister, Jane Doe #1, an individual whose
identity is known to the Grand Jury, was the Operations Manager

6

of TAP from 2000 until 2005. HATFIELD's son, John Doe #1, an individual whose identity is known to the Grand Jury, performed legal services for DHB and TAP, and was placed on the DHB payroll in August 2005. HATFIELD left DHB in November 2005.

C.  Certain Relevant Accounting and Finance Principles

12.  As a public company, DHB was required to comply with the rules and regulations of the United States Securities and Exchange Commission (the "SEC"). The SEC's rules and regulations were designed to protect members of the investing public by, among other things, ensuring that a company's financial information was accurately recorded and disclosed to the investing public.

13.  Under the SEC's rules and regulations, DHB and its officers were required to: (a) make and keep books, records and accounts which, in reasonable detail, fairly and accurately reflected the company's business transactions, including its revenues and expenses; (b) devise and maintain a system of internal accounting controls sufficient to provide reasonable assurance that the company's transactions were recorded as necessary to permit preparation of financial statements in conformity with Generally Accepted Accounting Principles ("GAAP"); (c) file with the SEC quarterly reports (on Form 10-Q) and annual reports (on Form 10-K) that included financial statements that accurately presented DHB's financial condition

and the results of its business operations in accordance with GAAP; and (d) file with the SEC any proxy statements distributed to shareholders relating to the annual election of members of DHB's Board of Directors, and ensure that any proxy statements accurately presented DHB's financial condition and the results of its business operations in accordance with GAAP.

14.   SEC regulations also required DHB to disclose, in its annual report on Form 10-K, in clear, concise and understandable terms, all compensation earned by or paid to the CEO as well as the next four most-highly compensated officers of the corporation, provided their total compensation exceeded $100,000.   Included within the definition of compensation for which clear, concise and understandable disclosure was required were perquisites and other personal benefits, if the aggregate value of such compensation exceeded $50,000 and 10% of such person's bonus and salary.   SEC regulations further required the disclosure of any transaction between DHB and a "related party," meaning any transaction between DHB and: (a) any officer or director of DHB; or (b) any holder of more than 5% of DHB's publicly traded stock; or (c) any member of such person's family, including their spouse, child, parent and sibling, provided that the amount involved in the related party transaction exceeded $60,000.   From July 2000 through July 2006, the defendant DAVID H. BROOKS was the CEO and a director of DHB, and owned more than

8

5% of DHB's publicly traded stock.   During that same period, the defendant SANDRA HATFIELD was the second highest paid officer of DHB, with compensation in excess of $100,000.  As such, DHB's quarterly and annual reports, as well as its proxy statements, contained disclosures purporting to reflect the compensation paid to the defendants DAVID H. BROOKS and SANDRA HATFIELD, and contained disclosures purporting to describe all "related party" transactions.

15.   "Gross profit margin" was a term often used by market analysts and investors in evaluating how efficiently a manufacturer like DHB produced its goods.   The term "gross profit margin" referred to the difference between a company's revenues from the sale of its goods and the cost of producing those goods. The term did not include costs associated with the actual sale of goods, such as, for example, the cost of providing free samples to customers, general administrative expenses, such as executive salaries, or the cost of research and development.

D.   Certain Tax Regulations

16.   Internal Revenue Service ("IRS") regulations required employers to report all compensation paid to employees to both the IRS and to their employees.   These regulations also required employers to withhold estimated federal income tax due, Medicaid insurance payments and Social Security payments.   The regulations covered all forms of compensation provided to the

employee, including salary, bonuses, commissions and perquisites, such as automobile and housing allowances or reimbursement for non-business expenses.

II. The Fraudulent Schemes:  Securities, Mail and Wire Fraud, Lying to Auditors, Obstruction of the SEC Investigation, and the False Proxy Statement

17.  Between July 2000 and July 2006, the defendants DAVID H. BROOKS and SANDRA HATFIELD, together with others, devised and carried out a variety of fraudulent schemes designed to defraud DHB shareholders and the investing public by materially misrepresenting DHB's gross profit margins, performance, revenues, expenses, earnings and inventory, and by concealing related party transactions and compensation provided to BROOKS, HATFIELD and their family members.  The ultimate goals of the schemes were to enrich BROOKS and HATFIELD by deceiving DHB shareholders and the investing public, abusing their positions of trust at DHB and preventing independent auditors or the SEC from detecting the schemes.

A.   Overstatement of Gross Profit Margins, Inventory and Earnings

18.  The defendants DAVID H. BROOKS and SANDRA HATFIELD, together with others, devised and carried out a scheme to defraud the investing public by overstating, and thereby materially misrepresenting, DHB's quarterly and annual gross profit margins, inventories and earnings reported on Forms 10-Q and 10-K.  As is set forth in greater detail herein, the scheme

involved the following components: (a) the use of fraudulent journal entries to reclassify expenses associated with the cost of producing goods as being related to research and development, samples, or other expenses which did not impact DHB's gross profit margin; (b) the overvaluation of DHB's inventory and inflation of its earnings; and (c) the creation of fraudulent entries in DHB's corporate books and records that accounted for non-existent inventory. The goal of this scheme was to ensure that DHB consistently reported gross profit margins of 27 percent or more and increased earnings, to correspond to the expectations of professional stock analysts.

<u>The Reclassification of Point Blank's Expenses</u>

19. Between 2003 and 2005, accounting personnel at Point Blank regularly compiled preliminary quarterly reports. The reports reflected, among other things, Point Blank's revenues, expenses and inventory calculations. The reports were provided to the defendant SANDRA HATFIELD. Point Blank was the largest of DHB's subsidiaries and, as such, its financial results had the greatest impact on DHB's overall financial results. Point Blank's quarterly financial results were included in consolidated financial statements for DHB that summarized the quarterly financial results of all of DHB's subsidiaries and they were included in DHB's quarterly reports on Form 10-Q and annual reports on Form 10-K.

20.   Professional stock analysts generally expected DHB's gross profit margin to be approximately 27 percent to 28 percent.   Prior to the finalization of DHB's quarterly financial reports, the defendant SANDRA HATFIELD reviewed Point Blank's preliminary quarterly reports.   In any period in which Point Blank's quarterly financial results caused DHB's gross profit margin to fall below 27 percent, HATFIELD provided the Chief Financial Officer of DHB with fraudulent adjustments to the reports which she claimed were required.   Thereafter, the defendant DAVID H. BROOKS, knowing that the adjustments were not accurate, approved of the changes.   DHB's Chief Financial Officer then directed Point Blank's various controllers to make the fraudulent entries in Point Blank's books and records.   These fraudulent entries reclassified expenses associated with the costs of producing goods as being related to research and development, samples or other expenses that did not impact Point Blank's or DHB's gross profit margins.   Those reclassifications of expenses consistently brought DHB's total gross profit margin above 27 percent.

21.   The fraudulently reclassified expenses for Point Blank totaled approximately $7 million in 2003, $6 million in 2004 and $9 million in the first three quarters of 2005.   In 2003, the reclassified expenses for Point Blank increased DHB's gross profit margin from approximately 24 percent to 28 percent.

In 2004, the reclassified expenses increased DHB's gross profit margin from approximately 26 percent to 28 percent.

<u>The Overvaluation of Inventory</u>

<u>Point Blank's Inventory at PACA</u>

22. In 2004, Point Blank entered into a contract with PACA to sew vest components. From December 31, 2004 through the first week of January 2005, PACA and Point Blank employees prepared a schedule of Point Blank's inventory of vest components that were located at PACA so that the inventory could be included in Point Blank's annual inventory calculation. The schedule valued Point Blank's inventory at PACA at approximately $2 million. After the schedule was provided to the defendant SANDRA HATFIELD, she and Jane Doe #2, a co-conspirator whose identity is known to the Grand Jury, fraudulently revised it and increased the value of Point Blank's inventory at PACA to approximately $9 million.

23. By fraudulently inflating the value of Point Blank's inventory at PACA, the defendant SANDRA HATFIELD and others: (a) increased DHB's pre-tax earnings in the fourth quarter of 2004 from approximately $5 million to $12 million; (b) increased DHB's 2004 fourth quarter gross profit margin from approximately 20 percent to 27 percent; (c) increased DHB's pre-tax earnings for the fiscal year 2004 from approximately $41 million to $48.2 million; and (d) contributed to the increase of

DHB's gross profit margin for the fiscal year 2004 from approximately 21 percent to 28 percent.

Interceptor Vest Inventory

24. Between 2003 and 2005, DHB's primary product was the "Interceptor" vest, an armored vest designed to withstand penetration by pistol and rifle ammunition, as well as explosive shrapnel fragments. DHB produced the Interceptor vest for various branches of the United States Military, including the United States Marines, the United States Army and the United States Navy. In the latter half of 2004, John Doe #2, a DHB employee whose identity is known to the Grand Jury, determined that DHB was overvaluing its Interceptor vests inventory. Beginning in November 2004, John Doe #2 repeatedly informed the defendant SANDRA HATFIELD that the Interceptor vests inventory was overvalued by $6 million to $8 million. In February 2005, HATFIELD told John Doe #2 that she would not change the Interceptor vests inventory valuation in the books and records of Point Blank, and directed John Doe #2 to have no contact with DHB's auditors regarding issues related to the valuation of Point Blank's inventory. On or about February 18, 2005, John Doe #2 informed HATFIELD that he was resigning from DHB, in part, because of the Interceptor vests inventory overvaluation. HATFIELD acknowledged to John Doe #2 that DHB's Interceptor vests inventory was overvalued, but told John Doe #2 that DHB could not

14

"take the hit" by reducing the valuation to the correct amount in the year 2004. HATFIELD told John Doe #2 that the value of the Interceptor vests would be corrected at some point in 2005.

25. The day before John Doe #2 resigned from DHB, he spoke to accountants from DHB's independent auditor. John Doe #2 relayed to the accountants some of his concerns regarding DHB's inventory valuation, although he provided little detail. One week before John Doe #2's last scheduled day of work at DHB, the defendant DAVID H. BROOKS confronted John Doe #2 at the Point Blank facility and screamed, among other things, that John Doe #2 was a "f___ing snake." BROOKS threatened John Doe #2, telling him that, when he attempted to get a new job, BROOKS would tell John Doe #2's prospective employer what a "f___ing snake" he was.

26. The overvaluation of the Interceptor vests inventory in fiscal year 2003 inflated DHB's pretax earnings from approximately $19.6 million to $26.2 million and contributed to the increase in DHB's gross profit margin from approximately 21 percent to 28 percent. The overvaluation of Point Blank's Interceptor vests inventory in fiscal year 2004 resulted in the inflation of DHB's pretax earnings for 2004 by approximately $6.8 million, contributed to a fraudulent increase in pretax earnings from approximately $34.4 million to $48.2 million and contributed to the increase in DHB's gross profit margin for 2004 from approximately 21 percent to 28 percent.

<u>Non-existent Inventory</u>

27.    In or about April 2005, prior to the filing of
DHB's quarterly report on Form 10-Q for the first quarter of
2005, the defendants DAVID H. BROOKS, SANDRA HATFIELD and others
received financial information indicating that DHB's earnings and
gross profit margins were far below the predictions of
professional stock analysts for the first quarter of 2005.
BROOKS and HATFIELD, together with others, concealed these
shortfalls by causing a fraudulent entry to be created in Point
Blank's books and records that showed the existence in Point
Blank's inventory of 62,975 Interceptor vest outer shell
components, valued at approximately $7 million ("the non-existent
vest components").  The inclusion of the non-existent vest
components in Point Blank's inventory increased DHB's pretax
earnings for the first quarter of 2005 from approximately $5
million to $12 million, and increased DHB's gross profit margin
for the first quarter of 2005 from approximately 18 percent to 27
percent.

28.    The non-existent vest components remained
in Point Blank's inventory, as reported in Point Blank's books
and records and in DHB's quarterly report on Form 10-Q for the
second quarter of 2005, until September 2005.  In September 2005,
DHB discontinued sales of products containing Zylon.  Zylon was
no longer marketable as of September 2005 and DHB decided to
voluntarily replace vests containing Zylon that were previously

sold by DHB. As part of the Zylon vest replacement program, DHB reduced the value of its inventory by $19.2 million to account for vests containing Zylon. However, Zylon was not used in the production of the Interceptor vests. Nevertheless, at the direction of the defendant DAVID H. BROOKS, DHB employees included the non-existent vest components as part of the September 2005 Zylon inventory reduction. The inclusion of the non-existent vest components in the Zylon inventory reduction increased the amount of that reduction from approximately $12.2 million to $19.2 million, as reported in DHB's quarterly report on Form 10-Q for the third quarter of 2005.

B.     Lying to Independent Auditors

29.  In March 2006, accountants from DHB's independent auditor questioned the defendant DAVID H. BROOKS and others about the non-existent vest components portion of the Zylon inventory reduction. In response to the accountants' inquiries, BROOKS and DHB personnel acting at the direction of BROOKS falsely told DHB's auditors that the non-existent vest components existed, contained Zylon, and were properly included in the Zylon inventory reduction. They claimed, however, that the non-existent vest components were mistakenly classified as Interceptor vests because, even though they were not Interceptor vests, they closely resembled a particular model of Interceptor vest. BROOKS later admitted to the accountants that the non-existent vest components did not contain Zylon, but falsely

claimed that they were Interceptor vests that were included in
the inventory reduction because the military modified the color
of vest they required, thus rendering the vest components
unmarketable.  BROOKS also falsely told the accountants that the
unmarketable vests were not available for inspection because they
had been destroyed in a hurricane.  Subsequently, after the
accountants requested shipping documents to verify the
transportation of the vests and evidence that they were in fact
destroyed, BROOKS and the defendant SANDRA HATFIELD admitted to
the accountants that the non-existent vest components did not
contain Zylon, were never actually observed, and were added to
DHB's inventory only after HATFIELD and others reviewed DHB's
financial information for the first quarter of 2005.

        C.    Unauthorized and Undisclosed Executive Compensation

        30.    The defendant DAVID H. BROOKS and SANDRA HATFIELD,
together with others, devised and carried out a scheme to defraud
the shareholders of DHB and the investing public by diverting
millions of dollars worth of DHB assets to the benefit of BROOKS,
his family, companies that BROOKS controlled, HATFIELD and
members of her family.  As is set forth in greater detail herein,
the scheme involved the following components: (a) the payment by
DHB or one of its subsidiaries of expenses related to BROOKS'
horse business; (b) the payment by DHB or one of its subsidiaries
of the personal expenses of BROOKS and his family, including
clothing, meals, jewelry purchases, housing expenses and

electronics equipment, made via check or wire transfer from the bank accounts of DHB or one of its subsidiaries, or through the use of one of several DHB American Express charge cards; (c) BROOKS and his family's use of DHB funds to finance personal trips and vacations; (d) BROOKS' receipt of compensation for purportedly "unused" vacation time; (e) BROOKS' use of DHB funds to purchase or lease luxury vehicles for himself and his family members; (f) BROOKS' use of DHB funds to pay bonuses to employees of TAP, a non-DHB corporation he controlled; (g) BROOKS' use of DHB funds to purchase vehicles for use by BROOKS' non-DHB business interests; (h) disbursement of checks to HATFIELD's husband and son for the benefit of HATFIELD; and (i) concealment of BROOKS' de facto ownership of TAP and the unjust enrichment of BROOKS and TAP at the expense of DHB.

31.   This compensation to BROOKS and HATFIELD, totaling in excess of five million dollars, was not disclosed to DHB's shareholders or to the investing public, and it was not accounted for in the books and records of DHB or in DHB's disclosures to the IRS as income to BROOKS or HATFIELD.

### BROOKS' 2000 Employment Contract

32.   In or about July of 2000, the defendant DAVID H. BROOKS and a representative of the DHB Board of Directors Compensation Committee signed an employment agreement.  The agreement was for a term of five years and it provided that, in exchange for his service as DHB's Chief Executive Officer, BROOKS

would be paid an annual salary of $500,000 with increases of

$50,000 per year, and that he would receive a bonus of an option

to purchase 750,000 shares of DHB stock each year at a price of

$1 per share. BROOKS' 2000 employment agreement also provided

that he was entitled to six weeks of paid vacation per year, that

DHB would pay the business expenses related to BROOKS' use of his

home office at in Old Westbury, New York, and that DHB would pay

all expenses related to BROOKS' Florida condominium.  Finally,

the agreement entitled BROOKS to a car and driver in New York and

Florida.

### Payment by DHB of the Expenses of BROOKS' Horse Business

33.  During the period from July 2000 through July

2006, the defendant DAVID H. BROOKS caused DHB to pay more than

$1 million of the expenses of his personal horse business,

including trainers' salaries, the cost of feed and vitamins for

the horses, stable fees and veterinary and legal fees.  Those

payments were not authorized by BROOKS' employment contract, they

were not disclosed to DHB's shareholders or to the investing

public, and they were not accounted for in the books and records

of DHB or in DHB's disclosures to the IRS as income to BROOKS.

The compensation included, but was not limited to:

| DATE(S) and SOURCE(S) OF PAYMENT | AMOUNT OF PAYMENT | PURPOSE OF PAYMENT |
|---|---|---|
| July and September 2000 NDL Checks and Wires | $ 42,761 | Horse Medical Treatments |
| January - December 2000 DHB American Express Card | $106,062 | Horse Vitamins |
| January - December 2001 NDL and Point Blank Checks and Wires | $109,600 | BROOKS' Horse Trainer's Salary and Expenses |
| February 2002 Point Blank Check | $ 34,000 | Attorneys Representing BROOKS in Matter Regarding his Horse Business |
| January - December 2002 DHB Check | $ 8,460 | BROOKS' Horse Trainer |
| December 2003 DHB Check | $ 10,000 | Bonus for BROOKS' Horse Trainer |
| July 2003 NDL Check | $ 10,000 | BROOKS' Horse Broker |
| December 2004 DHB Check | $ 20,000 | Bonus for BROOKS' Horse Trainer |
| December 2005 DHB Check | $ 10,000 | Bonus for BROOKS' Horse Trainer |

<u>DHB's Payment of the Personal Expenses of BROOKS and his Family and DHB Payments to HATFIELD's Family</u>

34.   During the period from July 2000 to July 2006, the defendant DAVID H. BROOKS held a number of American Express charge cards which were funded by DHB.   American Express cards were issued to BROOKS in the name of each of DHB's subsidiaries, Point Blank, PACA and NDL, as well as two cards in the name of

DHB.   The ostensible purpose of these cards was to aid BROOKS in conducting DHB business, and to permit him to charge amounts related to the legitimate business expenses of DHB and its subsidiaries.   However, BROOKS used the cards not only for expenses related to DHB business, but also for many of his personal expenses.   In fact, BROOKS gave DHB American Express charge cards or the card numbers to his wife and brother so that they could use them for their personal expenses.

35.   During that period, the defendant DAVID H. BROOKS also either personally wrote checks or directed DHB personnel to write checks to pay for BROOKS and his family's personal expenses, BROOKS' non-DHB business expenses, and to make undisclosed payments to the defendant SANDRA HATFIELD's husband and son.   None of those payments were authorized by BROOKS' employment agreement, they were not disclosed to DHB's shareholders or to the investing public, and they were not accounted for in the books and records of DHB or in DHB's disclosures to the IRS as income to BROOKS or HATFIELD.

36.  The compensation included, but was not limited to:

| DATE(s) and SOURCE of PAYMENT(s) | APPROXIMATE AMOUNT | PURPOSE |
|---|---|---|
| July 27, 2000 and October 26, 2000 American Express Card | $20,000 | Leather Bound Invitations to BROOKS' Son's Bar Mitzvah |
| October 2000 Point Blank Body Armor Check | $16,000 | Photographer for BROOKS' Son's Bar Mitzvah |
| January to December 2001 American Express Card | $11,240 | Acupuncture Treatments for BROOKS' Family Members |
| October 2001 Point Blank Body Armor Check | $101,500 | Armored Vehicle for BROOKS and his Family Member's Personal Use |
| March 2002 NDL Check | $14,233 | Real Estate Tax Payment for BROOKS' Mother's Florida Condominium |
| May 2002 PACA Body Armor Check | $10,300 | Summer Camp for BROOKS' children |
| June 15, 2002 DHB American Express Card | $12,835 | Gold Bracelet with Diamonds |
| August 6, 2002 DHB American Express Card | $101,190 | Belt Buckle Studded with Diamonds, Rubies and Sapphires |
| August 23, 2002 DHB American Express Card | $3,119 | Electronics/Stereo Equipment for BROOKS' Child |
| July to December 2002 Point Blank Checks | $59,000 | Checks Written to HATFIELD's Husband |

23

| DATE(s) and SOURCE of PAYMENT(s) | APPROXIMATE AMOUNT | PURPOSE |
|---|---|---|
| January to December 2003 NDL Check | $18,098 | Condominium Charges for BROOKS' Mother's Residence |
| March 5, 2003 DHB American Express Card | $7,900 | Face Lift for BROOKS' Wife |
| April 16, 2003 DHB Check | $95,000 | Check Payable to HATFIELD's Son |
| September 19, 2003 DHB American Express Card | $12,400 | Boca Raton Resort and Country Club Bill |
| July to October 2003 DHB, NDL and PACA Checks | $66,500 | Deck Construction, Renovation of Pool House and Home Improvements at BROOKS' Old Westbury Residence |
| November 2003 Point Blank Check | $24,345 | Real Estate Taxes for BROOKS' Westbury Estate |
| January 30, 2004 American Express Card | $50,000 | Flat Screen Television Entertainment System for BROOKS' Home |
| January to November 2004 DHB Checks | $4,847 | BROOKS' and Family's Dry Cleaning Bills |
| December 2003 December 2004 December 2005 DHB Checks | $110,000 $180,000 $56,000 | Year-End Bonus Payments to Employees of TAP |

| DATE(s) and SOURCE of PAYMENT(s) | APPROXIMATE AMOUNT | PURPOSE |
|---|---|---|
| November, 2005 DHB American Express Card | $122,000 | Purchase of Video i-pods and Digital Cameras to Distribute as Gifts at BROOKS' Daughter's Bat Mitzvah |

## Vacation Trips and the Learjet Aircraft

37.    During the period from July 2000 through July 2006, the defendant DAVID H. BROOKS financed his and his family's vacations with DHB funds.  While BROOKS and his family traveled to destinations including France, Italy, the Carribean, Las Vegas and California, BROOKS used a DHB charge card to purchase airplane tickets and to pay for hotels, meals and other expenses. Those payments were not authorized by BROOKS' employment agreement, were not disclosed to DHB's shareholders or to the investing public, and were not accounted for in the books and records of DHB or in DHB's disclosures to the IRS as income to BROOKS.

38.    In June of 2002, BROOKS, acting through one of his non-DHB corporate entities, purchased a Learjet 60 aircraft.  The jet has a capacity of 11 passengers and a flight range of approximately 3,500 miles.  At approximately the time BROOKS purchased the Learjet, the DHB Board of Directors passed a resolution authorizing reimbursement for BROOKS' DHB-related use

of the jet, up to the amount that a comparable charter flight would have cost. BROOKS used the plane extensively for personal travel, such as family vacations, as well as for business travel. No record distinguishing which of BROOKS' flights were business related and which were personal was maintained. Instead, BROOKS used DHB funds to pay 100 percent of the expenses of owning and operating the aircraft, including pilots' salaries, benefits and expenses, maintenance and repair of the plane, storage and fuel. While approximately 40 percent of the plane's flights were for BROOKS and his family's personal benefit and completely unrelated to DHB business, DHB paid for all costs related to the operation of the aircraft.

39.  The defendant DAVID H. BROOKS used a DHB corporate American Express card, one of which was issued to his pilot, to pay the plane expenses, or arranged direct payments for plane expenses to be made by DHB or one of its subsidiaries via check or wire transfer. During the years 2002 and 2003, BROOKS caused DHB to spend approximately $400,000 to finance flights by BROOKS and his family on BROOKS' private jet which were personal and unrelated to the business of DHB.

40.  When the defendant DAVID H. BROOKS and his family took vacations using BROOKS' Learjet, BROOKS also used DHB funds to pay for many of the general expenses of those trips, including hotel accommodations, meals and various other expenses. When

BROOKS and his family traveled to destinations not accessible by the Learjet, BROOKS charged airplane tickets on DHB charge cards. BROOKS also had checks written from the accounts of DHB or one of its subsidiaries, which he cashed so that he would have money for his personal trips.

41.    In 2002 and 2003, DHB funds were also used to pay the expense of transporting one of BROOKS' children to and from college via the Learjet aircraft, and, on two occasions, DHB funds were used to pay the expense of transporting one of BROOKS' children and her college friends to and from a Halloween party via the Learjet.

42.    Between July 2000 and August 2004, DHB paid in excess of $1 million to finance numerous vacations and personal trips taken by BROOKS and his family.  Those payments were not authorized by BROOKS' employment agreement, were not disclosed to DHB's shareholders or to the investing public, and were not accounted for in the books and records of DHB or in DHB's disclosures to the IRS as income to BROOKS.

27

43.   That compensation included, but was not limited to:

| DATES of TRAVEL and DESTINATION(S) | REASON FOR TRIP | EXPENSES | APPROXIMATE TOTAL TRIP COST to DHB |
|---|---|---|---|
| May 24 - 28, 2001<br><br>Long Island to Las Vegas and back to Long Island | Family Vacation | Airfare: $3,800<br><br>Bellagio Hotel: $3,000<br><br>Meals and Merchandise: $3,200 | Over $10,000 |
| August 18 - September 2, 2001<br><br>Long Island to Nice, France, Olbia, Italy, Milan, Italy, and back to Long Island | Family Vacation | Airfare: $3,785<br><br>Hotel Byblos: $7,474<br><br>Hotel Cala di Volpe: $27,547<br><br>Floris Coroneo Hotel: $20,300<br><br>Four Seasons Hotel: $3,200<br><br>Louis Vuitton, Guccio Gucci and Boutique Gianni Versace: $5,000<br><br>Travelers Checks: $10,000 | Over $75,000 |

| DATES of TRAVEL and DESTINATION(S) | REASON FOR TRIP | EXPENSES | APPROXIMATE TOTAL TRIP COST to DHB |
|---|---|---|---|
| June 29 - July 17, 2002<br><br>Long Island to Aspen, Los Angeles, Las Vegas, Cabo San Lucas, San Diego, Denver, Boston and back to Long Island | Family Vacation | Learjet: $19,090<br><br>Las Ventanas Hotel: $9,650<br><br>Bellagio Hotel: $11,000<br><br>St. Regis Hotel: $6,500<br><br>Peninsula Hotel: $4,630<br><br>Four Seasons Hotel: $980<br><br>Meals and other charges: $7,100 | Over $58,000 |
| August 28 - September 2, 2002<br><br>Long Island to Las Vegas, Los Angeles, Las Vegas and back to Long Island | Shopping Vacation | Learjet: $17,975<br><br>Shutters Hotel: $3,950<br><br>Bellagio Hotel: $3,335<br><br>Prada, Gucci, Stefano Ricci, Fred Segal and Armani: $15,000 | Over $40,000 |

| DATES of TRAVEL and DESTINATION(S) | REASON FOR TRIP | EXPENSES | APPROXIMATE TOTAL TRIP COST to DHB |
|---|---|---|---|
| October 31 – November 2, 2002<br><br>Atlanta to Madison, Wisconsin and back to Atlanta | Halloween Party Attended by BROOKS' Daughter and friends | Learjet: $17,000 | $17,000 |
| December 21, 2002 – January 4, 2003<br><br>Long Island to Boca Raton, St. Marten, St. Bart's, Las Vegas, Boca Raton and back to Long Island | Family Vacation | Learjet: $22,600<br><br>Guanahani Hotel: $2,000<br><br>Bellagio Hotel: $3,000 | Over $35,000 |
| October 30, – November 2, 2003<br><br>Boca Raton to Atlanta, Wisconsin, Atlanta and back to Florida | Halloween Party Attended by BROOKS' Daughter and friends | Learjet: $14,000<br><br>Hotels: $588<br><br>Car Rental: $214 | Over $14,000 |
| December 23, 2004 – January 1, 2005<br><br>Long Island to Boca Raton, St. Maarten, Boca Raton and back to Long Island | Family Vacation | Learjet: $32,000<br><br>Resort of the World, St. Maarten: $2,000 | Over $32,000 |

| DATES of TRAVEL and DESTINATION(S) | REASON FOR TRIP | EXPENSES | APPROXIMATE TOTAL TRIP COST to DHB |
|---|---|---|---|
| June 26 - July 13, 2005<br><br>Long Island to St. Johns, Shannon, Cannes, Shannon, St. Johns and back to Long Island | Family Vacation | Learjet: $40,000<br><br>Villa Rental: $60,000 | Over $100,000 |
| November 24, 2005<br><br>Boca Raton to Long Island | Transport BROOKS' Mother to Attend BROOKS' Daughter's Bat Mitzvah | Learjet: $5,000 | $5,000 |

### "Unused" Vacation Pay

44.   BROOKS also directed DHB personnel to issue him checks compensating him for purportedly "unused" vacation time during the years 2002, 2003, 2004 and 2005, claiming that he did not take a single day of vacation during that entire period.   In 2002, BROOKS was on vacation for 36 days, but he nevertheless collected more than $65,000 for "unused" vacation time that year. The total amount of "unused" vacation pay BROOKS fraudulently

obtained during the years 2002 through 2005 is $381,800, as shown below:

| Year | Amount | Date(s) |
|------|--------|---------|
| 2002 | $ 65,400 | July 1, 2002 |
| 2003 | $ 71,400<br>$ 78,000 | February 28, 2003<br>July 1, 2003 |
| 2004 | $ 84,000 | July 6, 2004 |
| 2005 | $ 83,000 | July 1, 2005 |
| **TOTAL** | **$381,800** | |

### Automobiles for BROOKS' Personal, Family and Non-DHB Business Use

45.   The defendant DAVID H. BROOKS' July 2000 employment contract provided that DHB would provide BROOKS with a car and driver in New York and Florida.  From July 2000 through July 2006, BROOKS leased or purchased numerous luxury cars and trucks at DHB's expense, titled and registered those vehicles in his name, and provided the cars to his wife and daughter.  In addition, BROOKS used DHB funds to provide trucks to his non-DHB business interests.

46.   For example, from 2000 through 2003, the defendant DAVID H. BROOKS' wife drove a series of leased Mercedes Benz automobiles that were paid for by DHB subsidiary PACA at a cost of approximately $1,500 per month.  BROOKS also used DHB funds to purchase a Mercedes Benz for one of his children in 2001, at a cost of approximately $50,000, and then used another $17,000 of DHB funds to enable her to trade the car in and upgrade to a new

Mercedes in 2003.  The defendant BROOKS used more than $50,000 of DHB funds to purchase trucks and equipment trailers that were used exclusively for the benefit of his non-DHB horse businesses.

47.  In January 2006, the defendant DAVID H. BROOKS was in possession of an armored 2002 Ford Excursion, a 2001 Mercedes Benz, and a 2004 Mercedes Benz titled to one of his children, all of which had been paid for by DHB.  On January 25, 2006, BROOKS used $194,044 of DHB funds to purchase a 2006 Bentley Continental Flying Spur, which he titled and registered in his own name.  Despite the fact that BROOKS' employment at DHB was terminated in July 2006, as of the date of this indictment, BROOKS remains in possession of all of those vehicles.

D.   Obstruction of Justice and False and Fraudulent Proxy Statement

SEC Investigation

48.  The SEC's Enforcement Division began an investigation into DHB in or about March of 2003 after receiving several letters of complaint from U.N.I.T.E., a union seeking to organize workers at the Point Blank facility.  In one of the letters, the union reported that DHB was doing substantial business with TAP and that TAP was owned by the defendant DAVID H. BROOKS' wife.  Such related party transactions had not been disclosed in any of DHB's SEC filings on Forms 10-Q, 10-K, or in DHB's proxy statement filings.

<u>DHB's TAP Disclosure</u>

49.   In July of 2003, DHB filed an amended Form 10-K for the year 2002, signed by BROOKS, disclosing DHB's relationship with TAP for the first time.   That disclosure read:

> The Company has been purchasing certain products, which are components of ballistic resistant apparel manufactured and sold by the Company from Tactical Armor Products, Inc. ("TAP"), a company owned by Terry Brooks, the wife of Mr. David H. Brooks. The total of such purchases during the years ended December 31, 2002, 2001, and 2000 were approximately $7,975,000, $2,760,000 and $477,000 respectively. The unit prices charged by TAP have been less than the prices charged to the Company by its previous outside suppliers, and TAP's products are available on demand.  To facilitate the delivery and integration of these components, beginning in May 2001, the Company permitted TAP to manufacture these components in a portion of the Company's manufacturing facility in Jacksboro, Tennessee, for which TAP paid to the Company occupancy charges of approximately $39,600 and $26,400 for the years ended December 31, 2002 and 2001, respectively. (The rent paid by TAP is an estimated allocable portion of the Company's total rent for the entire facility.) Terry Brooks also owned another company, US Manufacturing Corporation, that received revenues of $43,355 from the Company in 2002 for stitching work but has since been merged into TAP. TAP is an approved subcontractor under the applicable contracts between the Company and the United States federal government.

50.   The TAP disclosure was inaccurate and incomplete, and the omission of material facts from the disclosure rendered it false and misleading.   The central role played by the defendant DAVID H. BROOKS in administering the business affairs

of TAP and the assistance he received from DHB executives and
employees in doing so was completely omitted from the TAP
disclosure.  The amended Form 10-K did not reveal that
approximately 90 percent of TAP's material costs were financed by
DHB, that DHB and its subsidiaries were TAP's sole customers, or
that TAP's profit margin during 2003 was over 50 percent, far
greater than DHB's.  Finally, the disclosure did not include any
discussion of TAP's provision of sewing services to DHB or the
unique manner in which DHB paid for these services.  Unlike DHB's
other sewing contractors, to whom DHB paid a fixed price
according to the number of items sewn, TAP simply calculated its
sewing labor costs and overhead, added a substantial profit,
which at times exceeded 50 percent, and billed DHB for that
total.

        51.  In October of 2003, DHB submitted a report to the
SEC's Enforcement Division asserting that the non-disclosure of
DHB's related party transactions with TAP was an accidental
oversight.  In fact, DHB's failure to disclose the related party
transactions with TAP was part of a deliberate strategy by the
defendants DAVID H. BROOKS, SANDRA HATFIELD and others.  In
preparing materials for DHB's independent auditors in connection
with their audit of DHB's 2002 financial reports, BROOKS and
HATFIELD observed that TAP was on the list of Point Blank's ten
largest vendors.  Together with Jane Doe #2, a DHB executive,
BROOKS and HATFIELD discussed ways to avoid including TAP on that

list, such as adding PACA and NDL's vendors to the list, or listing only the five largest vendors.  Ultimately, DHB accounting personnel provided the auditors with a vendor list that did not include TAP.

52.  Shortly after the disclosure described above, BROOKS unilaterally increased the price that TAP charged Point Blank for armor plates by ten percent, despite the fact that TAP's labor, overhead and material costs had not increased.

53.  On March 9, 2004, the SEC issued a Formal Order of Investigation relating to DHB.  During the course of the SEC's investigation into DHB's relationship with TAP, the attorneys conducting the investigation became aware that certain payments made by DHB or its subsidiaries appeared to be for the benefit of BROOKS or BROOKS' horse interests.  On March 30, 2004, the SEC issued a subpoena to DHB calling for records reflecting all compensation paid to DHB's corporate officers, including expense payments, housing allowances and perquisites.  In discussions with representatives of DHB, the SEC attorneys made clear that the primary focus of their interest was BROOKS' compensation.

<u>DHB's Response and Disclosure Regarding BROOKS'
Compensation - The Audit Committee Report and
Proxy Statement</u>

54.  Shortly after DHB received the SEC subpoena regarding executive compensation, the Audit Committee of DHB's Board of Directors began an investigation into BROOKS' compensation.  On August 10, 2004, the defendant DAVID H. BROOKS

caused a detailed report to be submitted to the Audit Committee
of DHB's Board of Directors ("the Audit Committee Report"),
analyzing and describing compensation provided to BROOKS dating
back to 1997, and focusing on BROOKS' use of corporate American
Express cards, DHB's payment of BROOKS' housing expenses, and
DHB's payment for BROOKS' use of his personal aircraft.  The
Audit Committee Report was prepared by the defendant DAVID BROOKS
and others acting at his direction.  The report contained
numerous supporting exhibits, including schedules of American
Express card charges and payments, flight records, housing
expenses and comparisons with alternative methods of travel and
housing.

        55.  The conclusion presented in the Audit Committee
Report was that DHB paid only approximately 2.2 million dollars
of the defendant DAVID H. BROOKS' personal American Express
charges between 1997 and 2003, including approximately 1.6
million dollars of personal charges between 2000 and 2003.
Moreover, the report concluded that these amounts were completely
offset by BROOKS' payment of DHB business expenses for which he
was not reimbursed, including salary BROOKS earned but did not
take for the years 1997 through 2000, as well as other amounts
allegedly due to BROOKS.  The Audit Committee Report concluded
that, despite BROOKS' extensive use of DHB charge cards, once
those charges were offset by allegedly unreimbursed business
expenses that BROOKS paid on behalf of DHB, DHB actually owed

BROOKS more than $900,000.  The report also asserted that BROOKS
had reimbursed DHB for any personal expenses that were paid on
his behalf in 2004.  On August 12, 2004, the DHB Audit Committee
accepted the report.  BROOKS then waived his right to
reimbursement for the remaining amounts of unreimbursed business
expenses he had allegedly incurred, as well as the unpaid salary
from years earlier.

          56.  On September 10, 2004, the Audit Committee Report,
including the exhibits and BROOKS' waiver, was submitted to the
SEC.  On November 24, 2004, DHB filed a proxy statement (the
"Proxy Statement") with the SEC, which statement was mailed to
all shareholders of record of DHB.  The Proxy Statement pertained
to DHB's annual meeting and the election of DHB's Board of
Directors, scheduled to take place on December 30, 2004.  The
Proxy Statement contained a summary of the conclusions reached in
the Audit Committee Report and disclosed BROOKS' waiver.  As was
the case with the Audit Committee Report, the Proxy Statement
falsely asserted that DHB had paid only $2.2 million of BROOKS'
personal American Express charges between 1997 and 2003.  The
Proxy Statement, like the Audit Committee Report, failed to
address DHB's payments for BROOKS and his family's vacations and
vehicles.  The Proxy Statement's only reference to the millions
of dollars paid by DHB for BROOKS' and HATFIELD's personal
benefit was a sentence reporting that payments for BROOKS'
benefit made by check or wire during that period were for

"relatively small amounts." The false conclusion that DHB's payments for BROOKS' personal expenses were more than offset by unreimbursed business expenses paid by BROOKS was also repeated in the Proxy Statement.

57. Both the Audit Committee Report and the Proxy Statement were materially false and misleading, and omitted numerous facts necessary to make the disclosures therein complete and accurate. The defendant DAVID H. BROOKS and others who assisted in the preparation of the Audit Committee Report and the Proxy Statement knowingly excluded from the report and the statement more than $4 million of personal expenses or other compensation received by BROOKS, and falsely inflated by more than $1 million the amount that BROOKS was entitled to be reimbursed for expenses which he allegedly incurred on behalf of DHB.

DHB Payments for the Benefit of BROOKS, his
Family, and his Non-DHB Business Interests Omitted
from or Concealed in the Audit Committee Report
and Proxy Statement

58. The Audit Committee Report purported to classify and account for all compensation paid to the defendant DAVID H. BROOKS, particularly American Express charge card charges made for personal expenses. In fact, the report accounted for only a small portion of BROOKS' unauthorized compensation.

59. None of the payments made by check or wire

transfer from a DHB bank account or from one of DHB's
subsidiaries were mentioned in the Audit Committee Report.  The
Proxy Statement falsely asserted that "[t]he Company also paid by
check or cash relatively small amounts for other non-business
expenses of Mr. Brooks or his affiliates."  In truth, from July
2000 to August 2004, payments by check or wire totaling more than
$1 million were made by DHB for BROOKS' personal benefit,
including the payments described above.  Those payments were
omitted from the Audit Committee Report and the Proxy Statement
and the payments were never disclosed to the Audit Committee, the
SEC, DHB shareholders or the investing public.

60.   The Audit Committee Report and Proxy Statement
also failed to address the defendant DAVID H. BROOKS' routine use
of DHB funds to finance his vacations and personal travel, either
by paying the expenses of his personal aircraft or by paying for
airfare, hotels, meals and other miscellaneous expenses with DHB
funds.  The cost of BROOKS' personal travel during the period
from July 2000 through August 2004 was well in excess of $1
million.  Indeed, in 2003 alone BROOKS' personal travel cost DHB
in excess of $250,000 in expenditures related to the operation of
the Learjet and in excess of $100,000 in additional expenses such
as hotels and meals.  Similarly, the Audit Committee Report and
Proxy Statement made no disclosure of BROOKS' receipt, as of
August 2004, of $298,000 of "unused" vacation pay to which he was
not entitled.

61.   The Audit Committee Report and the Proxy Statement also failed to accurately disclose DHB's payment of the personal expenses of the defendant DAVID H. BROOKS and his family accomplished via BROOKS and his family's use of American Express cards paid for by DHB.   While the report and the statement admitted the payment of approximately $1.6 million of BROOKS' personal expenses through American Express cards during the period from July 2000 through December 2003, in truth, more than $1 million of BROOKS' personal expenses charged to DHB's American Express cards during that period were not included in that calculation.

62.   Many of the defendant DAVID H. BROOKS' personal expenses were misrepresented as being legitimate charges incurred on behalf of DHB or its subsidiaries.   Those included BROOKS' use of his American Express Card to pay for horse vitamins from a company called Supernatural Products.   The supporting documentation for the Audit Committee Report falsely classified that $100,000 expense as a payment to a vendor for goods received by NDL, not as a personal expense of BROOKS that was paid by DHB.   Similarly, BROOKS' use of a DHB American Express Card to pay $20,000 for invitations to his son's Bar Mitzvah was classified in the Audit Committee Report as a business expense related to advertising and, thus, it was also not included in the totals disclosed in the report or the Proxy Statement.   As described above at paragraph 36, BROOKS used DHB

American Express cards to pay for cosmetic surgery and
acupuncture treatments for family members, BROOKS' country club
dues and expensive entertainment equipment for his home, among
other expenses.  None of those American Express charges were
accurately reflected as BROOKS' personal expenses in the Audit
Committee Report or in the Proxy Statement.  Instead, they were
represented to be legitimate business expenses of DHB.

63.    The Audit Committee Report and the Proxy Statement
were also false and misleading in that they omitted any mention
of DHB's purchase or lease of luxury vehicles for the defendant
DAVID H. BROOKS and his family, as well as the purchase of trucks
and trailers for BROOKS' use in his non-DHB businesses.

64.    Also not disclosed in the Audit Committee Report
or the Proxy Statement was the defendant DAVID H. BROOKS' use of
DHB funds to pay in excess of $100,000 in bonus payments to
employees of TAP in 2003, a practice he continued through 2005.

65.    Finally, both the Audit Committee Report and the
Proxy Statement falsely asserted that, as of August 2004, the
defendant DAVID H. BROOKS had repaid DHB for all personal charges
on the DHB American Express card.  In fact, although BROOKS made
a payment to DHB in April of 2004, there were numerous charges
that BROOKS made on the DHB American Express card during 2004
which he did not repay DHB for, either because he made the
charges after his April repayment, or because the expenses were
fraudulently classified as legitimate DHB business expenses for

which repayment was not necessary.  Included among BROOKS' 2004

personal expenses for which he did not reimburse DHB are the

purchase of a flat screen television entertainment system for his

home in January 2004 at a cost of over $50,000, and the payment

of more than $7,000 for expenses related to his daughter's

Manhattan apartment.

### Misrepresentations in the Audit Committee Report and Proxy Statement Regarding BROOKS' Entitlement to Reimbursement From DHB

66.  In addition to failing to disclose more than $4

million of compensation paid to the defendant DAVID H. BROOKS for

the period July 2000 through August 2004, the Audit Committee

Report falsely claimed that the defendant DAVID H. BROOKS was

entitled to reimbursements that he was not entitled to, and the

report contained false and misleading calculations regarding the

amounts to which BROOKS was arguably entitled.  For example, the

report asserted that when BROOKS used his personal aircraft for

DHB business he was entitled to be paid the difference between

the actual cost of the trip (which DHB had paid), and what the

trip would have cost if BROOKS had used a comparable charter air

service.  In fact, the minutes of the DHB Board of Directors'

meeting at which such reimbursement was authorized specifically

provided that DHB "would pay for all business trips related to

the business use" of BROOKS' plane, but that the "total cost

should not exceed the costs of the typical charter services."

The Board of Directors did not authorize payments to BROOKS for

costs not actually incurred, as asserted in the Audit Committee Report.

67.    Moreover, the Audit Committee Report used a fraudulently inflated charter rate to calculate the reimbursement amount.    The rate used included $1,000 per day of "waiting time" between legs of round trip flights from New York to Florida, while charter services would not have included such charges.    The Audit Committee's inflated charter rate also included a charge of $500 per night for a flight crew's overnight expenses between flights while charter services would not have included such charges either.    The fictitious "waiting time" charges alone increased BROOKS' supposed unreimbursed airplane expenses for 2002 and 2003 by approximately $220,000.

68.    The Audit Committee Report also falsely alleged that the defendant DAVID H. BROOKS was entitled to be reimbursed for use of his aircraft at the fraudulently inflated charter rate for trips ostensibly related to DHB business when the trips, in fact, were personal trips taken by BROOKS and his family members. A schedule attached as an exhibit to the Audit Committee Report fraudulently classified every single flight taken by BROOKS' plane as having been for a DHB business purpose, including the family vacations and BROOKS' daughter's trips to Halloween parties. As a result, instead of truthfully reporting that BROOKS owed DHB approximately $400,000 for personal trips paid for by DHB, the Audit Committee Report falsely reported that DHB

owed BROOKS $952,797 for unreimbursed expenses he incurred in connection with his use of the aircraft.

69.   Another materially false and misleading statement in the Audit Committee Report was the claim that the defendant DAVID H. BROOKS spent $20,000 of his personal funds per year, from 1997 to 2003, on miscellaneous DHB expenses, such as entertainment and "business development efforts," and that BROOKS was entitled to reimbursement or to use this amount to offset his personal charges.  In fact, BROOKS regularly obtained cash advances for any anticipated DHB expense that could not be charged to the corporate American Express Card, and he routinely obtained reimbursement on occasions when he was required to use his personal funds for a DHB expense.  The total amount that the Audit Committee Report falsely asserted BROOKS was entitled to reimbursement for in this category was $140,000.

E.   Use of the Mails and Wires

70.   The Proxy Statement, and all of DHB's Annual Reports on Form 10-K, were distributed to DHB's shareholders through the United States Mail.  The Proxy Statement, Forms 10-K and Forms 10-Q were also filed with the SEC through the SEC's electronic filing system, known as the "EDGAR" system.

III. Insider Trading

71.   Between July 2000 and December 2004, DHB filed

fifteen quarterly reports on Forms 10-Q, four annual reports on Forms 10-K for the years 2000, 2001, 2002 and 2003, and Proxy Statements in 2000, 2001, 2002, 2003 and 2004. During that time period: (a) the defendants DAVID H. BROOKS and SANDRA HATFIELD executed the portion of the scheme identified above regarding the use of fraudulent journal entries to reclassify expenses and the overvaluation of inventory; (b) the quarterly reports and annual reports, as well as related press releases and public statements made by BROOKS, HATFIELD and other senior managers at DHB, contained materially false and misleading information regarding DHB's financial results; (c) DHB's true financial results for that time period were not disclosed to the investing public; (d) BROOKS' private company, TAP, earned exorbitant profits at DHB's expense; (e) BROOKS converted in excess of five million dollars in DHB assets for the benefit of himself, his family and HATFIELD; (f) DHB mailed to investors the Proxy Statement that contained numerous materially false and misleading statements and omitted material facts regarding BROOKS' compensation over the preceding four years; and (g) BROOKS and HATFIELD's fraudulent scheme to materially misrepresent DHB's reported financial results, BROOKS and HATFIELD's true compensation, and the circumstances surrounding it, were never disclosed to the investing public.

72. On or about the dates set forth below,

the defendant DAVID H. BROOKS sold shares of DHB stock and generated proceeds as set forth below:

| DATE | TRANSACTION | TOTAL PROCEEDS |
|---|---|---|
| November 29, 2004 | Sale of 3,700,000 shares of D.H.B. Industries, Inc. stock | $69,358,388 |
| December 22, 2004 | Sale of 400,000 shares of D.H.B. Industries, Inc. stock | $7,439,280 |
| December 23, 2004 | Sale of 84,100 shares of D.H.B. Industries, Inc. stock | $1,687,382 |
| December 27, 2004 | Sale of 2,538,744 shares of D.H.B. Industries, Inc. stock | $53,161,299 |
| December 28, 2004 | Sale of 858,267 shares of D.H.B. Industries, Inc. stock | $17,053,765 |
| December 29, 2004 | Sale of 1,916,914 shares of D.H.B. Industries, Inc. stock | $36,613,057 |

73.  On or about the dates set forth below the defendant SANDRA HATFIELD sold shares of DHB stock and generated profits as set forth below:

| DATE | TRANSACTION | TOTAL PROCEEDS |
|---|---|---|
| November 29, 2004 | Sale of 180,000 shares of D.H.B. Industries, Inc. stock | $3,532,133 |

| December 28, 2004 | Sale of 24,426 shares of D.H.B. Industries, Inc. stock | $482,574 |
| December 29, 2004 | Sale of 65,000 shares of D.H.B. Industries, Inc. stock | $1,277,016 |

IV.   The Tax Fraud Scheme

74.   Beginning in October 2003, the defendants DAVID H. BROOKS, SANDRA HATFIELD, and others, carried out a scheme designed to defraud the United States by preventing the collection of income tax due as a result of bonuses paid by DHB to BROOKS, HATFIELD, senior DHB employees and others, and by preventing the collection of income tax due as a result of dividends and interest paid by DHB to BROOKS.   In addition, BROOKS filed false and fraudulent personal income tax returns for the years 2003 and 2004, and HATFIELD evaded payment of substantial income tax due and owing.

75.   On July 31, 2003, the defendant DAVID H. BROOKS received an interest payment from DHB in the amount of $94,409.39, relating to a loan he had previously made to the company.   On October 1, 2003, BROOKS received a dividend check in the amount of $95,961.68, relating to shares of preferred DHB stock he owned.   At BROOKS' direction, accounting personnel at DHB did not issue Forms 1099 for those payments or otherwise

report them to the IRS.  BROOKS did not include those amounts in his income as reported to the IRS on Form 1040 for the year 2003.

76.  From its formation through November 2003, DHB did not pay year-end, performance based bonuses to its executives.  Only the defendant DAVID H. BROOKS received bonuses during that period, and those bonuses were awarded pursuant to a provision in his 2000 contract that entitled him to an annual warrant to purchase 750,000 shares of DHB stock at one dollar per share.  On or about October 14, 2003, BROOKS first raised the subject of awarding executive bonuses at a meeting of the DHB Board of Directors.  2003 was the first year since its formation that DHB was sufficiently profitable to have year-end tax liability, and BROOKS told the DHB Board that he thought it was better to give the money to the employees than to the government. The Board authorized bonus payments totaling approximately $3 million, with the Compensation Committee specifying on December 15 and 16, 2003, that BROOKS would receive $1 million and that the defendant SANDRA HATFIELD would receive $600,000. Determination of the recipients and the specific amounts of the remaining bonuses was left to the discretion of BROOKS and HATFIELD.

77.  At DHB's year-end holiday party, held in Miami Beach, Florida, the defendant DAVID H. BROOKS distributed bonus checks, drawn on a DHB bank account and signed by BROOKS, to

numerous DHB employees.  In some instances the bonus amounts
equaled or exceeded the employee's salary.

78.  Additionally, at the party, the defendant DAVID H.
BROOKS distributed bonus checks, drawn on a DHB bank account and
signed by BROOKS, to TAP employees and other non-DHB personnel,
such as his horse trainer.  The non-DHB personnel were awarded
more than $150,000 in bonuses.  Like the DHB personnel, the non-
DHB recipients were transported to Miami Beach and provided
accommodations at DHB's expense.

79.  Shortly after receiving their checks, several DHB
and TAP employees asked the defendants DAVID H. BROOKS, SANDRA
HATFIELD and others about the tax implications of the bonus
payments.  BROOKS and HATFIELD told those employees, in sum and
substance, that they did not have to pay taxes on the bonuses.

80.  Several days after the party, BROOKS
requested that Jane Doe #2 provide him with Forms 1099 for the
bonus payments.  BROOKS took the forms and threw the portion that
was required to be submitted to the IRS in a garbage can.

81.  In 2004 and 2005, the defendant DAVID H. BROOKS
arranged similar year-end bonus parties in Florida.  The bonus
totals for 2004 were $3.5 million, with $2 million going to
BROOKS, $750,000 going to the defendant SANDRA HATFIELD, over
$200,000 going to BROOKS' non-DHB employees and the remainder
going to DHB employees.  In 2005, DHB paid $3 million in bonuses,

including $2 million to BROOKS, over $100,000 to BROOKS' non-DHB employees, and the remainder going to DHB employees.

82. In 2004 and 2005, several DHB employees again questioned the defendants DAVID H. BROOKS, SANDRA HATFIELD and others about the tax implications of the bonuses and received responses similar to those provided in 2003. One employee reported to HATFIELD that he had paid taxes on his 2003 bonus. In response, HATFIELD asked him whether he liked his job.

83. Nearly all of the DHB employees who received bonuses in 2003, including BROOKS and HATFIELD, failed to report the bonuses as income on their tax returns and failed to pay any tax on the bonus payments. BROOKS' 2003 bonus check for $1 million was not issued until January of 2004, but he did not report it on either his 2003 or 2004 tax return. HATFIELD received her 2003 bonus in December 2003, in the form of a condominium in Florida purchased for her by DHB at a cost of approximately $600,000. At HATFIELD's request, title to the condominium was put in the name of her son. In 2004, HATFIELD moved into the condominium and had the title placed jointly in her name and her son's name. HATFIELD did not report the condominium as income on her tax returns for 2003, 2004 or 2005.

84. For the year 2004, HATFIELD received a bonus check in the amount of $750,000 dollars, which was issued to her in January of 2005. When her 2005 tax return was due in April of 2006, HATFIELD requested an extension of time to file her return.

At that time HATFIELD made an estimated tax calculation as
required by law.  HATFIELD estimated her tax due to be $114,741.
HATFIELD was indicted for Securities Fraud and Insider Trading in
August of 2006.  Two months later, when she filed her 2005 income
tax returns, HATFIELD included the $750,000 bonus as income, and
acknowledged that she in fact owed an additional $219,218 in tax,
plus a penalty of $11,391.

COUNT ONE
(Conspiracy to Commit Securities Fraud - BROOKS and HATFIELD)

85.  The allegations contained in paragraphs 1 through
84 are realleged and incorporated as if fully set forth in this
paragraph.

86.  In or about and between July 2000 and July 2006,
both dates being approximate and inclusive, within the Eastern
District of New York and elsewhere, the defendants DAVID H.
BROOKS and SANDRA HATFIELD, together with others, did knowingly
and intentionally conspire to execute a scheme and artifice (a)
to defraud persons in connection with securities of an issuer
with a class of securities that was registered under Section 12
of the Securities Exchange Act of 1934, to wit: the common stock
of D.H.B. Industries, Inc.; and (b) to obtain, by means of false
and fraudulent pretenses, representations and promises, money and
property in connection with the purchase and sale of securities
of an issuer with a class of securities that was registered under
Section 12 of the Securities Exchange Act of 1934, to wit: the

common stock of D.H.B. Industries, Inc., all in violation of Title 18, United States Code, Section 1348.

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

### COUNT TWO
### (Securities Fraud - BROOKS and HATFIELD)

87. The allegations contained in paragraphs 1 through 84 are realleged and incorporated as if fully set forth in this paragraph.

88. In or about and between July 2000 and July 2006, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants DAVID H. BROOKS and SANDRA HATFIELD, together with others, did knowingly and intentionally execute a scheme and artifice (a) to defraud persons in connection with securities of an issuer with a class of securities that was registered under Section 12 of the Securities Exchange Act of 1934, to wit: the common stock of D.H.B. Industries, Inc.; and (b) to obtain, by means of false and fraudulent pretenses, representations and promises, money and property in connection with the purchase and sale of securities of an issuer with a class of securities that was registered under Section 12 of the Securities Exchange Act of 1934, to wit: the common stock of D.H.B. Industries, Inc.

(Title 18, United States Code, Sections 1348, 2 and 3551 et seq.)

COUNT THREE
(Conspiracy to Commit Mail and Wire
Fraud - BROOKS and HATFIELD)

89.   The allegations contained in paragraphs 1 through

84 are realleged and incorporated as if fully set forth in this

paragraph.

90.   In or about and between July 2000 and July 2006,

both dates being approximate and inclusive, within the Eastern

District of New York and elsewhere, the defendants DAVID H.

BROOKS and SANDRA HATFIELD, together with others, did knowingly

and intentionally conspire to devise a scheme and artifice to

defraud DHB, to deprive DHB of the intangible right to the honest

services of its employees DAVID H. BROOKS, SANDRA HATFIELD, Jane

Doe #2, a co-conspirator whose identity is known to the Grand

Jury, and others, and to obtain money and property from DHB, by

means of materially false and fraudulent pretenses,

representations and promises, and for the purpose of executing

such scheme and artifice, to (a) place and cause to be placed in

a post office and authorized depository for mail matter, matters

and things to be sent and delivered by the United States Postal

Service, and to deposit matters and things to be sent and

delivered by private and commercial interstate carriers, in

violation of Title 18, United States Code, Section 1341, and (b)

cause writings, signs, signals, pictures and sounds to be

transmitted by means of wire communication in interstate and

foreign commerce, in violation of Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1349, 1346 and 3551 et seq.)

### COUNT FOUR
(Mail Fraud - BROOKS and HATFIELD)

91.  The allegations contained in paragraphs 1 through 84 are realleged and incorporated as if fully set forth in this paragraph.

92.  In or about and between July 2000 and July 2006, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants DAVID H. BROOKS and SANDRA HATFIELD, together with others, did knowingly and intentionally devise a scheme and artifice to defraud DHB, to deprive DHB of the intangible right to the honest services of its employees DAVID H. BROOKS, SANDRA HATFIELD, Jane Doe #2, a co-conspirator whose identity is known to the Grand Jury, and others, and to obtain money and property from DHB, by means of materially false and fraudulent pretenses, representations and promises, and for the purpose of executing such scheme and artifice, and attempting to do so, on or about November 26, 2004, did cause to be placed in a post office and authorized depository for mail, matters and things to be sent and delivered by the

United States Postal Service, to wit: the 2004 DHB Proxy
Statement.

(Title 18, United States Code, Sections 1341, 1346, 2
and 3551 et seq.)

COUNT FIVE
(Wire Fraud - BROOKS and HATFIELD)

93.   The allegations contained in paragraphs 1 through
84 are realleged and incorporated as if fully set forth in this
paragraph.

94.   In or about and between July 2000 and July 2006,
both dates being approximate and inclusive, within the Eastern
District of New York and elsewhere, the defendants DAVID H.
BROOKS and SANDRA HATFIELD, together with others, did knowingly
and intentionally devise a scheme and artifice to defraud DHB, to
deprive DHB of the intangible right to the honest services of its
employees DAVID H. BROOKS, SANDRA HATFIELD, Jane Doe #2, a co-
conspirator whose identity is known to the Grand Jury, and
others, and to obtain money and property from DHB, by means of
materially false and fraudulent pretenses, representations and
promises, and for the purpose of executing such scheme and
artifice, on or about November 24, 2004, did transmit and cause
to be transmitted, by means of wire communication in interstate
and foreign commerce, writings, signs, signals, pictures and

56

sounds, to wit: the electronic filing of DHB's 2004 Proxy
Statement through the EDGAR system.

(Title 18, United States Code, Sections 1343, 1346, 2
and 3551 et seq.)

COUNTS SIX THROUGH ELEVEN
(Insider Trading: DAVID H. BROOKS)

95.   The allegations contained in paragraphs 1 through
84 are realleged and incorporated as if fully set forth in this
paragraph.

96.   On or about the dates indicated below, within the
Eastern District of New York and elsewhere, the defendant DAVID
H. BROOKS, together with others, did knowingly and intentionally
execute a scheme and artifice (a) to defraud persons in
connection with securities of an issuer with a class of
securities that was registered under Section 12 of the Securities
Exchange Act of 1934, to wit: the common stock of D.H.B.
Industries, Inc.; and (b) to obtain, by means of false and
fraudulent pretenses, representations, and promises, money and
property in connection with the purchase and sale of securities
of an issuer with a class of securities that was registered under
Section 12 of the Securities Exchange Act of 1934, to wit: the
common stock of D.H.B. Industries, Inc., in that BROOKS sold

57

shares of DHB Industries, Inc. stock and generated the proceeds
listed below:

| COUNT | TRANSACTION | TOTAL PROCEEDS | DATE |
|---|---|---|---|
| SIX | Sale of 3,700,000 shares of D.H.B. Industries, Inc. stock | $69,358,388 | November 29, 2004 |
| SEVEN | Sale of 400,000 shares of D.H.B. Industries, Inc. stock | $7,439,280 | December 22, 2004 |
| EIGHT | Sale of 84,100 shares of D.H.B. Industries, Inc. stock | $1,687,382 | December 23, 2004 |
| NINE | Sale of 2,538,744 shares of D.H.B. Industries, Inc. stock | $53,161,299 | December 27, 2004 |
| TEN | Sale of 858,267 shares of D.H.B. Industries, Inc. stock | $17,053,765 | December 28, 2004 |
| ELEVEN | Sale of 1,916,914 shares of D.H.B. Industries, Inc. stock | $36,613,057 | December 29, 2004 |

(Title 18, United States Code, Sections 1348, 2 and
3551 et seq.)

### COUNTS TWELVE THROUGH FOURTEEN
(Insider Trading: SANDRA HATFIELD)

97.   The allegations contained in paragraphs 1 through
84 are realleged and incorporated as if fully set forth in this
paragraph.

98.   On or about the dates indicated below, within the
Eastern District of New York and elsewhere, the defendant SANDRA
HATFIELD, together with others, did knowingly and intentionally

execute a scheme and artifice (a) to defraud persons in connection with securities of an issuer with a class of securities that was registered under Section 12 of the Securities Exchange Act of 1934, to wit: the common stock of D.H.B. Industries, Inc.; and (b) to obtain, by means of false and fraudulent pretenses, representations, and promises, money and property in connection with the purchase and sale of securities of an issuer with a class of securities that was registered under Section 12 of the Securities Exchange Act of 1934, to wit: the common stock of D.H.B. Industries, Inc., in that HATFIELD sold shares of DHB Industries, Inc. stock and generated the proceeds listed below:

| COUNT | TRANSACTION | TOTAL PROCEEDS | DATE |
|---|---|---|---|
| TWELVE | Sale of 180,000 shares of D.H.B. Industries, Inc. stock | $3,532,133 | November 29, 2004 |
| THIRTEEN | Sale of 24,426 shares of D.H.B. Industries, Inc. stock | $482,574 | December 28, 2004 |
| FOURTEEN | Sale of 65,000 shares of D.H.B. Industries, Inc. stock | $1,277,016 | December 29, 2004 |

(Title 18, United States Code, Sections 1348, 2 and 3551 et seq.)

## COUNT FIFTEEN
### (Conspiracy to Obstruct Justice)

99.    The allegations contained in paragraphs 1 through 84 are realleged and incorporated as if fully set forth in this paragraph.

100.    In or about and between March 2003 and July 2006, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants DAVID H. BROOKS and SANDRA HATFIELD, together with others, did knowingly, intentionally and corruptly conspire to obstruct, influence and impede official proceedings, to wit: the SEC Investigation, in violation of Title 18, United States Code, Section 1512(c)(2).

(Title 18, United States Code, Sections 1512(k) and 3551 et seq.)

## COUNT SIXTEEN
### (Obstruction of Justice)

101.    The allegations contained in paragraphs 1 through 84 are realleged and incorporated as if fully set forth in this paragraph.

102.    In or about and between March 2003 and July 2006, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants DAVID H. BROOKS and SANDRA HATFIELD, together with others, did knowingly, intentionally and corruptly obstruct, influence and impede, and

attempt to obstruct, influence and impede, official proceedings, to wit: the SEC Investigation.

(Title 18, United States Code, Sections 1512(c)(2), 2 and 3551 et seq.)

### COUNT SEVENTEEN
(Material Misstatements to Auditors: DAVID H. BROOKS )

103. The allegations contained in paragraphs 1 through 84 are realleged and incorporated as if fully set forth in this paragraph.

104. In or about March 2006, in the Eastern District of New York and elsewhere, the defendant DAVID H. BROOKS, being an officer and director of DHB, an issuer with a class of securities registered pursuant to section 12 of the Securities and Exchange Act of 1934 and obligated to file reports pursuant to section 15(d) of the Securities and Exchange Act of 1934, together with others, unlawfully, willingly and knowingly, directly and indirectly (a) made and caused to be made materially false and misleading statements; and (b) omitted and caused others to omit material facts necessary to make statements made, in light of the circumstances in which they were made, not misleading, to DHB's independent accountants in connection with (i) audits, reviews and examinations of the financial statements of DHB required to be filed under the Securities and Exchange Act of 1934; and (ii) the preparation and filing of documents and reports required to be filed with the SEC pursuant to regulations

promulgated by the SEC, in violation of Title 17, Code of Federal Regulations, Section 240.13b2-2(a).

(Title 15, United States Code, Sections 78m(a) and 78ff; Title 18, United States Code, Sections 2 and 3551 et seq.)

COUNT EIGHTEEN
(Conspiracy to Impair, Impede, Obstruct and Defeat
the Internal Revenue Service: BROOKS and HATFIELD)

105.  The allegations contained in paragraphs 1 through 84 are realleged and incorporated as if fully set forth in this paragraph.

106.  On or about and between July 31, 2003 and October 31, 2006, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants DAVID H. BROOKS and SANDRA HATFIELD, together with others, did knowingly and willfully conspire to defraud the United States by impeding, impairing, obstructing and defeating the lawful government functions of the Internal Revenue Service of the United States Department of the Treasury, an agency and department of the United States, in the ascertainment, computation, assessment and collection of revenue, to wit: federal income taxes.

107.  It was a part of the conspiracy that the defendant DAVID H. BROOKS and others, acting in their capacity as members of the DHB Board of Directors, approved bonus payments to employees of DHB for the years 2003, 2004 and 2005.

108.   It was a further part of the conspiracy that
BROOKS and HATFIELD decided which DHB employees would receive
bonuses and how much the bonuses would be, with the exception of
bonuses for BROOKS and HATFIELD and other senior officers of DHB,
which were determined by the Compensation Committee of DHB's
Board of Directors.

109.   It was a further part of the conspiracy that
BROOKS or another DHB employee signed the bonus checks, and that
BROOKS, HATFIELD and other DHB employees distributed the checks
to DHB employees at DHB's year end holiday parties.

110.   It was a further part of the conspiracy that
BROOKS, HATFIELD and others agreed that the bonus payments would
not be reported to the IRS on either a Form W-2 or a form 1099.

111.   It was a further part of the conspiracy that
BROOKS, HATFIELD and others instructed DHB employees who received
bonus checks that they were not required to report the bonuses as
income or to pay taxes on the bonus amounts and advised them that
tax documents, such as Forms W-2 and 1099, would not be issued in
connection with the bonus checks.

112.   It was a further part of the conspiracy that a
co-conspirator, whose identity is known to the Grand Jury, made
and caused to be made in the books and records of DHB false
entries classifying the bonus payments as consulting fees or
payments for outside services.

113.   In furtherance of the conspiracy, and to effect

its objectives, within the Eastern District of New York and elsewhere, the defendants DAVID H. BROOKS and SANDRA HATFIELD, together with others, committed and caused to be committed, among others, the following:

<u>OVERT ACTS</u>

a.  On or about October 14, 2003, the defendant DAVID H. BROOKS proposed to the DHB Board of Directors that DHB pay approximately three million dollars in bonuses to DHB's senior executives and other valued employees.

b.  On or about December 12, 2003, the defendant DAVID H. BROOKS signed bonus checks drawn on DHB's operating account in an amount totaling approximately $1,985,000.

c.  On or about December 12, 2003, the defendants DAVID H. BROOKS, SANDRA HATFIELD and others distributed bonus checks to various DHB employees and others at the DHB year-end annual party.

d.  On or about December 12, 2003, the defendant DAVID H. BROOKS had a conversation with John Doe #3, an individual whose identity is known to the Grand Jury.

e.  In or about December 2004, the defendant DAVID H. BROOKS had a conversation with John Doe #4, an individual whose identity is known to the Grand Jury.

f.  On or about December 12, 2003, the defendant SANDRA HATFIELD had a conversation with Jane Doe #3, an individual whose identity is known to the Grand Jury.

64

g.   In or about December 2004, the defendant
SANDRA HATFIELD had a conversation with John Doe #5, an
individual whose identity is known to the Grand Jury.

h.   On or about October 20, 2004, the defendant
DAVID H. BROOKS caused to be filed with the IRS a 2003 joint
income tax return, which return contained a false statement
concerning the amount of compensation BROOKS received from DHB.

i.   On or about October 15, 2004, the defendant
SANDRA HATFIELD caused to be filed with the IRS a 2003 joint
income tax return, which return contained a false statement
concerning the amount of compensation HATFIELD received from DHB.

j.   On or about December 15, 2004, the defendants
DAVID H. BROOKS, SANDRA HATFIELD and others distributed DHB bonus
checks to various DHB employees and others at the DHB year-end
annual party.

k.   On or about October 20, 2005, the defendant
DAVID H. BROOKS caused to be filed with the IRS a 2004 joint
income tax return, which return contained a false statement
concerning the amount of compensation BROOKS received from DHB.

l.   On or about April 15, 2005, the defendant
SANDRA HATFIELD filed an application for an extension of time to
file her joint income tax return with the IRS.

(Title 18, United States Code, Sections 371 and 3551 et
seq.)

COUNT NINETEEN
(False Filing: DAVID H. BROOKS - 2003 Tax Return)

114.   The allegations contained in paragraphs 1 through 84 are realleged and incorporated as if fully set forth in this paragraph.

115.   On or about October 20, 2004, within the Eastern District of New York, the defendant DAVID H. BROOKS, a resident of Old Westbury, New York, did knowingly and willfully make and subscribe a United States Joint Income Tax Return, IRS Form 1040, for the calendar year 2003, which was verified by a written declaration that it was made under the penalties of perjury and filed with the Director, Internal Revenue Service Center, at Andover, Maryland, and which BROOKS did not believe to be true and correct as to every material matter, in that he omitted $189,400 in dividend and interest payments he received from DHB from the total income he reported.

(Title 26, United States Code, Section 7206(1); Title 18, United States Code, Sections 3551 et seq.)

COUNT TWENTY
(False Filing: DAVID H. BROOKS - 2004 Tax Return)

116.   The allegations contained in paragraphs 1 through 84 are realleged and incorporated as if fully set forth in this paragraph.

117.   On or about October 20, 2005, within the Eastern District of New York, the defendant DAVID H. BROOKS, a resident of Old Westbury, New York, did knowingly and willfully make and

subscribe a United States Joint Income Tax Return, IRS Form 1040,

for the calendar year 2004, which was verified by a written

declaration that it was made under the penalties of perjury and

filed with the Director, Internal Revenue Service Center, at

Andover, Maryland, and which BROOKS did not believe to be true

and correct as to every material matter, in that he stated that

he earned $762,500 in compensation from DHB, whereas, as he then

and there well knew and believed, his compensation for said

calendar year was more than $1,700,000.

(Title 26, United States Code, Section 7206(1); Title

18, United States Code, Sections 3551 et seq.)

### COUNT TWENTY-ONE
(Tax Evasion: SANDRA HATFIELD)

118.   The allegations contained in paragraphs 1 through

84 are realleged and incorporated as if fully set forth in this

paragraph.

119.   On or about and between December 2003 and the

date of this Superseding Indictment, within the Eastern District

of New York and elsewhere, the defendant SANDRA HATFIELD did

knowingly and willfully attempt to evade and defeat substantial

income tax due and owing by her to the United States of America,

by filing and causing to be filed with the Director, Internal

Revenue Service Center, Andover, Maryland, false and fraudulent

United States Joint Income Tax Returns, Forms 1040, for the years

2003, 2004 and 2005, wherein she failed to report in excess of $600,000 in income she received from DHB.

(Title 26, United States Code, Section 7201; Title 18, United States Code, Sections 3551 et seq.)

CRIMINAL FORFEITURE ALLEGATION
AS TO COUNTS ONE THROUGH FOURTEEN

120. The United States hereby gives notice to the defendants charged in Counts One through Fourteen that, upon their conviction of such offenses, the government will seek forfeiture in accordance with Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), which require any person convicted of such offenses to forfeit any property constituting or derived from proceeds obtained directly or indirectly as a result of such offenses, including but not limited to the following:

a. A sum of money equal to at least approximately $190,604,894 in United States currency, for which defendants are jointly and severally liable;

b. All right, title, and interest in the following:

(i) any and all interest in Goldman Sachs account 040-94665-9 in the name of David Brooks International, Inc.;

(ii) any and all interest in Goldman Sachs account 001-92471-1 in the name of True Grit Holdings LLC;

(iii)  any and all interest up to $9,740,625.02 in Jefferies & Company account 605-00046 in the name of Perfect World Partners;

(iv)  any and all interest in Scott Trade Inc account 18824110 in the name of David H. Brooks;

(v)  any and all interest in Laidlaw Company account 70974099 in the name of David Brooks International LLC;

(vi) any and all interest in Laidlaw Company account 74895065 in the name of David Brooks IRA;

(vii) any and all interest in Laidlaw Company account 65078716 in the name of Brooks Industries of Long Island - Profit Sharing;

(viii) any and all interest up to $9,314,854.00 in Laidlaw Company account 23992092 in the name of Brooks Industries of Long Island, Inc.;

(ix)  any and all interest in Laidlaw Company account 23503865 in the name of Victoria Brooks IRA;

(x)  any and all interest in Washington Mutual account 0356-612551-0 in the name of Vianel Industries, Inc.;

(xi)  any and all interest in Washington Mutual account 0444-213248-9 in the name of Terry Brooks;

(xii)  any and all interest in Washington Mutual account 0369-603518-4 in the name of David Brooks International, Inc.;

(xiii)   any and all interest in Washington
Mutual account 0356-612557-8 in the name of VAE Enterprises, LLC;

(xiv)   any and all interest in Lantern
Investments account 557-98262-14 in the name of Andrew Brooks
IRA;

(xv)   one Ferrari 612 Schagellti with Vehicle
Identification Number 2FFAA54A950141689;

(xvi)   one 2006 Bentley Continental Flying
Spur with Vehicle Identification Number SCBBR53W06C034834;

(xvii)   one 2002 Ford Excursion with Vehicle
Identification Number 1FMNU42S22EA53672;

(xviii)   any and all interest in, or derived
from, the certificate of deposit number 10034 for $1,007,750.00
held at U.S. Trust Company of New York in account number
0001079115 in the name of Sandra Hatfield Industries, Inc.;

(xix)   any and all interest in, or derived
from, the certificate of deposit number 10032 for $2,525,666.66
held at U.S. Trust Company of New York in account number
0001079115 in the name of Sandra Hatfield Industries, Inc.;

(xx)   any and all interest in U.S. Trust
Company of New York account 1079123 in the name of Sandra
Hatfield Industries, Inc. derived from certificate of deposit
number 10028 held at U.S. Trust Company of New York in account
number 1079115 in the name of Sandra Hatfield Industries, Inc.;
and

(xxi)   any and all interest in U.S. Trust
Company of New York account 1059742 in the name of Sandra
Hatfield Industries, Inc. derived from certificate of deposit
number 10027 held at U.S. Trust Company of New York in account
number 1079115 in the name of Sandra Hatfield Industries, Inc.

121.   If any of the above-described forfeitable
property, as a result of any act or omission of the defendants:

a.   cannot be located upon the exercise of due
diligence;

b.   has been transferred or sold to, or deposited
with, a third party;

c.   has been placed beyond the jurisdiction of the
court;

d.   has been substantially diminished in value; or

e.   has been commingled with other property which
cannot be divided without difficulty; it is the intent of the
United States, pursuant to Title 21, United States Code, Section
853(p), as incorporated by Title 28, United States Code, Section
2461(c), to seek forfeiture of any other property of such
defendants up to the value of the forfeitable property described
in this forfeiture allegation, including but not limited to the
following:

(i)   the real property and premises located
at 20 Red Ground Road, Old Westbury, New York;

(ii) the real property and premises located

at 812 North Ocean Boulevard, Pompano Beach, Florida; and

      (iii) the real property and premises located at 210

Summit Drive, La Follette, Tennessee.

      (Title 28, United States Code, Section 2461(c); Title

18, United States Code, Section 981(a)(1)(C); Title 21, United

States Code, Section 853(p))

 

                                        A TRUE BILL

 

                                        _____
                                          FOREPERSON

BENTON J. CAMPBELL
UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK

Criminal  Action  No.  06-550(S-1)(JS)

UNITED STATES DISTRICT COURT
Eastern District of New York

UNITED STATES OF AMERICA

- against-

DAVID H. BROOKS and
SANDRA HATFIELD,

Defendants.

## SUPERSEDING INDICTMENT

(T. 15, U.S.C., §§ 78m(a) and 78ff; T. 18,
U.S.C., §§ 371, 1341, 1343, 1346, 1348 and
1349, 981(a)(1)(C), 1512(c)(2), 1512(k), 2
and 3551 et seq.; T. 21, U.S.C., § 853(p); T.
26, U.S.C., §§ 7201 and 7206(1); T. 28,
U.S.C., § 2461(c))

_____    a true bill.

_____/ _____
                                    Foreman

Filed in open court this ___ day of
_____ , A.D. _____

_____
                              Clerk

Bail, $ _____

_____
John G. Martin
Assistant U.S. Attorney 631-715-7870