**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
---------------------------------------------------------X
UNITED STATES OF AMERICA,

        - against -

SANDRA HATFIELD, DAVID H. BROOKS,
and PATRICIA LENNEX,

                   Defendants.
---------------------------------------------------------X

**REPORT AND
RECOMMENDATION**
06-CR-0550  (JS)

**A. KATHLEEN TOMLINSON, Magistrate Judge:**

This matter was referred to me by Judge Seybert to conduct an immediate hearing

regarding Defendant David Brooks' prescribed medications, issues arising from changes to that

regimen, and the impact, if any, on Brooks' ability to assist his attorneys in his defense.  The

hearing was conducted on February 8, 2010 and the following information constitutes my Report

and Recommendation to Judge Seybert.

**I.      BACKGROUND**

On January 14, 2010, Defendant David Brooks ("Defendant" or "Brooks") was arrested

and placed in the custody of the Nassau County Correctional Center ("NCCC").[1]  Subsequently,

the issue of Defendant's medication was raised with the Court and, on January 20, 2010, after

reviewing a letter submission from Dr. Michael Liebowitz, Defendant Brooks' treating

psychiatrist, Judge Seybert entered an Order directing that NCCC provide Brooks with two

medications previously prescribed by Dr. Liebowitz.  The two drugs are Ativan and Ambien.

Apparently, these two medications were not given to Defendant while he was at NCCC.

---

[1]      The information set forth in this Background section is taken from the record of the
hearing I conducted on February 8, 2010, the exhibits introduced into evidence at that hearing,
and portions of the transcript of trial proceedings before Judge Seybert in this matter.

On January 27, 2010, after Defendant was found to be stockpiling his Ativan pills, Defendant Brooks was transferred to the Queen's Private Detention Facility ("QPDF") in Jamaica, New York, a facility operated by the GEO Group, Inc., whose headquarters are located in Boca Raton, Florida. The GEO Group has a private contract with the Federal Bureau of Prisons to house detainees.

Personnel at QPDF advised that they would not give Brooks Ativan and, instead, were administering three other drugs which the facility's psychiatrist determined were adequate to treat Defendant Brooks' condition. When Dr. Liebowitz was advised that Defendant Brooks was no longer receiving Ativan but instead was receiving the other three drugs, he wrote a letter dated February 3, 2010 addressed "To Whom It May Concern" and stating, among other things, that "stopping the Ativan. . . is highly dangerous to his [Brooks'] health." Because Dr. Liebowitz was away from his office, he forwarded the letter to Brooks' brother who, in turn, submitted it to Judge Seybert. The issue of Defendant Brooks' medications was addressed by Judge Seybert during the trial on February 4, 2010. *See* February 4, 2010 Trial Transcript at 1850 - 2115.[2] Specifically, Judge Seybert told Defendant's counsel "if you want a hearing on this issue, bring in Dr. Liebowitz, and there will be someone from Queens Men's House of Detention to testify with regard to what Mr. Brooks' medical needs are, not what Mr. Brooks' medical desires are. . . You can have Dr. Liebowitz come in and have a hearing before a magistrate judge on this issue." Trial Tr. at 1918, 1919.

---

[2] All subsequent references to the February 4, 2010 session of the trial before Judge Seybert are cited as "Trial Tr. at ___."

On February 6, 2010, Dr. Liebowitz had a telephone conversation with Dr. Lyubov Gorelik, a psychiatrist who evaluated Brooks at QPDF. That conversation included a discussion of Brooks' medications. The two psychiatrists were not able to reach an agreement regarding those medications.[3] When the trial resumed on February 8, 2010, Defendant's counsel again raised the issue with Judge Seybert and stated that Dr. Liebowitz was present in the courtroom and prepared to address the Court. Judge Seybert referred counsel for the Government and Defendant Brooks to me for a hearing on the issue at ll a.m. This Report and Recommendation sets forth the facts elicited at the hearing as well as my recommendations to Judge Seybert regarding resolution of this issue.

## II. THE FEBRUARY 8, 2010 HEARING

Defendant Brooks, his attorneys and counsel for the Government were present for the hearing. Counsel for both sides were given an opportunity to present a brief opening statement. Defendant Brooks' counsel expressed the concern that (1) there is an immediate danger to Brooks' health, and (2) as a result of the medication regimen at QPDF, Brooks is "unable to adequately and meaningfully assist in his own defense, both in communicating with counsel, reviewing, retaining information, memory issues and those sorts of things, even though he's obviously able to speak English and communicate." Transcript of the February 8, 2010 Hearing, at 7.[4] Counsel for the Government noted that the administrator of QPDF, Jason Maffia, had come to court at the request of the U.S. Marshal Service. Hrg. Tr. at 8, 9. Mr. Maffia is not a

---

[3]     I have been advised that further conversations occurred in this regard but without a resolution.

[4]     All subsequent references to the February 8, 2010 hearing before me are cited as "Hrg. Tr. at ___."

medical professional, but rather the administrator of QPDF.  He brought with him a copy of the

letter sent by psychiatrist Dr. Gorelik to Judge Seybert on Saturday, February 6, 2010 regarding

Defendant Brooks' medication.  Counsel for the Government referenced a notation in the letter of

a finding by Dr. Gorelik and the staff psychologist that Defendant was "oriented, aware,

coherent, appears anxious."  *Id*. at 8, Ex.DB-JM-3.  Dr. Gorelik went on to observe, according to

the Government, that the course of treatment recommended by Defendant Brooks' private

physician (Dr. Liebowitz) included "greater than the DEA-recommended amounts of Ativan."

*Id*.  Defendants counsel then called Dr. Liebowitz to the witness stand.

###        A.        Dr. Liebowitz's Testimony

Dr. Liebowitz testified that he is both a physician and a psychiatrist.  He received a B.A.

from Yale in 1965 and his medical degree from Yale in 1969.  Hrg. Tr. at 10, 12.  He is board-

certified in psychiatry and is licensed to practice in New York and New Jersey.  *Id*. at 12.

According to Dr. Liebowitz, he is a distinguished fellow of the American Psychiatric

Association, serves on the Scientific Advisory Board of the Anxiety Disorders Association of

America, is a member of the American College of Neuropsychopharmacology, and is Managing

Director of the Medical Research Network, a private clinical trials facility in New York City.  *Id*.

at 13.

In addition to his own practice, Dr. Liebowitz also conducts clinical research studies.

From 1979 until 2000, he was a professor in the medical school at Columbia University.  He

currently retains his faculty status as a professor of clinical psychiatry at Columbia although he is

not teaching classes.  Dr. Liebowitz ran a program called the "Anxiety Disorders Clinic" at the

New York State Psychiatric Institute for the research and diagnosis of anxiety disorders

beginning in 1982. This was the first anxiety disorders clinic in the United States that specialized in the research and treatment of anxieties. Along with others, he developed methods of diagnosis and treatment for a variety of anxiety disorders, panic disorders, posttraumatic stress, and obsessive-compulsive disorders. Colleagues whom Dr. Liebowitz mentored are still involved in that work at the clinic. *Id*. 11, 14.

Dr. Liebowitz was also a member of the task force which wrote the anxiety disorders section of the DSM-IV – the Fourth Edition of the Diagnostic and Statistical Manual published by the American Psychiatric Association which serves as the standard diagnostic classification used in the United States. *Id*. at 13. Dr. Liebowitz testified that

> [w]e developed a lot of the protocols for treating panic disorder, for treating social anxiety disorder, for helping people with obsessive-compulsive disorders, with what medications to use; participated in trials and drugs approved by the FDA for those treatments. We found ways to use them and not use them, to help people use them most effectively.

*Id*. at 14 - 15.

In addition to having 250 peer-reviewed publications for which he is either a first author or co-author with other colleagues, Dr. Liebowitz has received numerous honors in his field. *Id*. at 15. It appears that Dr. Liebowitz's curriculum vitae is 57 pages long – pages 1 through 7 were admitted into evidence as Defendant's Exhibit 1 (DB-ML-1).[5] Defendant's counsel offered Dr. Liebowitz as an expert on panic attacks and anxiety disorders. The Government asserted that testimony relating to Dr. Liebowitz's treatment of Defendant Brooks was relevant but objected to his being proffered as an expert because the issue at hand is "an order from the prison to give a

---

[5]       All of the hearing exhibits are attached to this Report and Recommendation.

specific course of treatment." *Id*. at 16.   Although noting that he did not object to Dr.

Liebowitz's qualifications, counsel for the Government voiced objection to the proffer of

Dr. Liebowitz as an expert on the grounds that expert testimony in the context of the hearing was

not relevant.  I overruled the objection and Dr. Liebowitz was qualified as an expert.

Stating that he had treated Defendant on and off for 20 years, Dr. Liebowitz testified that

Defendant suffers from a mental disorder, namely, panic disorder.  He described panic disorder

as "one kind of anxiety disorder where people experience very severe panic or anxiety attacks.

Their heart rate starts to rise, they get red, feel they can't breathe, they feel they will suffocate,

feel they will lose control or have a heart attack or die, and desperately need to flee the situation

they are in." *Id* at 17.  According to Dr. Liebowitz, panic disorder is distinct in terms of its

features and treatment from other kinds of anxiety disorders.  He described the circumstances as

follows:

> Q.     In what way is it distinct from other kinds of anxiety disorders?
>
> A.     Well, the treatment is quite different from others, because the central focus here is
>        to block the panic attacks so that patients no longer experience them.  And
>        gradually they lose their fear of having them, lose their fear of going places where
>        they might have them.
>
>        So you need to find a treatment, often a medication treatment, that blocks the
>        panic attacks.  And that can be and has a number of differences from treating
>        other different kinds of anxiety.

*Id*. at 17-18.   Dr. Liebowitz further stated that he has also treated Defendant for generalized

anxiety disorder  – distinct from panic disorder – which entails a heightened tendency to worry

chronically, to feel jumpy, tense, to have trouble sleeping and to be always on edge.  *Id*. at 18.

After several years of treatment during which he tried a number of differing medications in varying doses on Defendant, Dr. Liebowitz finally arrived at putting Defendant on Ativan in substantial doses. *Id*. Dr. Liebowitz testified that Defendant is not on the first line of approach with treating someone suffering from panic disorder. Initially, Defendant had been treated with imipramine, a tricyclic antidepressant, which typically works as an antianxiety medication. The drug was given to Defendant in substantial doses but was not effective. Subsequently, newer selective serotonin reuptake inhibitors ("SSRIs") came on the market, including Prozac, Zoloft, Paxil, Celexa and Lexapro. Because those drugs were shown to help panic disorder, Dr. Liebowitz tried them with Defendant, but noted that if you started a patient at too high a dose, you actually made them worse, not better, regardless of your intentions. For this reason, Dr. Liebowitz asserted, the prescribing individual must be very familiar with the treatment of panic disorder to do it properly. *Id*. at 19. Brooks was tried on substantial doses of Prozac which did not yield a satisfactory result.

At that juncture, Dr. Liebowitz switched Defendant to a different line of medications known as benzodiazepines. The first one utilized with Defendant was klonopin, which Defendant took for several years with some success. *Id*. at 20. In 2002, Defendant was switched over entirely to Ativan. Over the years, Defendant did well with the Ativan treatment, but some escalation of the dosage has been required and Defendant is now taking a higher than usual dose, 20 milligrams a day, which, according to Dr. Liebowitz, is "effective" and "well tolerated." *Id*. Dr. Liebowitz added that the dose currently prescribed for Defendant is not dangerous unless it is stopped abruptly. He noted that treatments have to be tailored to the individual, including

dosages.  Ativan is a benzodiazepine which poses no danger to Defendant if taken as prescribed.
*Id*. at 21.

Dr. Liebowitz testified he is aware that based upon a submission he made to Judge
Seybert in mid-January that an Order was issued to NCCC directing that Defendant be given both
Ativan and Ambien and is further aware that Defendant received neither one.  *Id*. at 22.  As to the
risk, Dr. Liebowitz stated that there is a danger where a patient taking Ativan in substantial doses
becomes physically dependent on the drug so that it cannot be stopped abruptly without a person
running the risk of a severe withdrawal reaction.  The drug must be tapered slowly.  Stopping
Ativan abruptly, without a suitable substitute, can result in "the shakes, tremors, increased
anxiety, increased heart rate, increased blood pressure.  And those are only the first minor
symptoms."  *Id.*   In severe cases, a person can have convulsions.  Moreover, a patient is likely to
suffer a relapse of the underlying illness, namely, vulnerability to panic attacks, fear of having the
panic attack, and the attack itself.  According to Dr. Liebowitz, Defendant's being imprisoned
and being in the middle of a trial heightens the anxiety and makes him more vulnerable to a
relapse of panic disorder.  Without the necessary medication, the situation becomes "more
terrifying and makes it harder to participate as fully as he might if he's properly medicated."  *Id*.
at 23.

A summary of medication that personnel at QPDF determined to be appropriate for
Defendant was reviewed by Dr. Liebowitz after being admitted into evidence.[6]   The exhibit
indicates that when the Defendant arrived at QPDF, a staff nurse performed an initial mental

---

[6]     The summary is contained in two interoffice e-mails from Jason Maffia to William
Zerillo, the chief administrator at QPDF.  The e-mails were admitted into evidence as
Defendant's Exhibit 2 and marked as DB-ML-2.

health evaluation. The document also states that the Defendant suffers from anxiety, depression, and anxiolytic dependence, was displaying benzodiazepine-seeking behavior, and "feels anxious, is shaking and has panic attacks." *Id*. at 25, 26. Dr. Liebowitz testified that these are symptoms he would expect under the circumstances because it seemed likely that Defendant was experiencing withdrawal from the Ativan as well as a relapse of his illness. According to Dr. Liebowitz, there is no sound medical justification, in his view, for taking Defendant off medication in this manner. *Id*. at 27. Dr. Liebowitz added that taking Defendant off the Ativan in this abrupt fashion was a "total disregard for the Federal Bureau of Prisons Guidelines for Mental Health Care." *Id*. As to the Bureau of Prisons Guidelines, Dr. Liebowitz testified that he found the Guidelines on the internet and noted that the Bureau of Prisons recognizes that people come into their custody on high doses of benzodiazepines and that their recommendation, if someone is deemed to be physically dependent on a benzodiazepine, is to withdraw the medication slowly, "and no more than 5 to 10 percent per day." *Id*. As to the Guidelines, Dr. Liebowitz went on to note that

> . . . they also state if you switch a patient to a, quote, antidepressant, as was done in Mr. Brooks' case, for the treatment of anxiety, the drug should be introduced slowly, the antidepressant brought up to a proper therapeutic dose, and only then should the benzodiazepine withdrawal be started.
>
> In other words, the new treatment should be put in place and established and shown to be tolerated and successful before you start taking away the old treatment. This was done completely backwards, according to the e-mail you showed me.

*Id*. at 28.

Dr. Liebowitz recounted the three medications prescribed by Dr. Gorelik for Defendant at QPDF, namely, Buspar, Vistaril and Celexa. In discussing Buspar, Dr. Liebowitz stated that this drug is a "quite old mild anxiolytic, not of the benzodiazepine family, and its efficacy is quite questionable." *Id*. Dr. Liebowitz prescribes Buspar only very rarely and asserted that the drug was introduced before the establishment of the anxiety disorders described in DSM-IV, so "it's never been proven effective for any of those." *Id*. at 29. Regarding Vistaril, Dr. Liebowitz testified that it is a sedating antihistamine, like Benadryl, which will "help you go to sleep at night but would do nothing for benzodiazepine withdrawal because it is not of the same family as benzodiazepine . . ." He noted that this is true of Buspar as well *Id*. Celexa is an SSRI that is marketed as an antidepressant according to Dr. Liebowitz and has some efficacy in anxiety and even panic disorder. However, Dr. Liebowitz recounted that Defendant was tried on Lexapro, a drug almost identical to Celexa. Even with a much lower dose, Defendant was not able to tolerate Lexapro and actually felt worse with it. Even if Celexa is used, and even if Defendant were to tolerate it, Dr. Liebowitz stated that it would take four to six weeks to work because it is much slower working than benzodiazepines. Moreover, that course of action would leave Defendant with no protection for his panic disorder for four to six weeks. Dr. Liebowitz maintained that prescribing Celexa in this manner is also a violation of the Bureau of Prisons Guidelines:

> . . . rational practice would say that you keep the benzodiazepine he's using, you build it up slowly, find out if he tolerates it, if it's helpful, find if it is helpful, and then go through that slow taper of the benzodiazepine if your intention is to cross him over. That would be the rational practice. What was done here is irrational.

Q.    When you say "irrational," in your view, medically irresponsible?

A.      Medically barbaric.

*Id*. at 30-31.

In his conversation with Dr. Gorelik on February 6, 2010, Dr. Liebowitz learned that Dr. Gorelik did not have access to the NCCC records for Defendant Brooks.  They discussed her approach of taking Defendant off Ativan immediately.  *Id*. at 31-32.  Dr. Liebowitz believes there are two faulty premises underlying Dr. Gorelik's approach.  First, Dr. Gorelik told Dr. Liebowitz that her area of specialization is substance abuse and she sees Defendant's primary problem as one of substance abuse.  Since Dr. Gorelik sees Defendant as an abuser of benzodiazepine, her goal is to get him off benzodiazepine  – or,  if he is already off the benzodiazepine, not to give him any more.  *Id*. at 32.  Second, while Dr. Gorelik recognizes that Defendant has an anxiety disorder, Dr. Liebowitz testified that she did not make a distinction in her own mind between panic disorder and other kinds of anxiety disorders and saw them essentially as one and the same. *Id*.   In relating the details of their conversation, Dr. Liebowitz added that Dr. Gorelik's belief is that if you treat anxiety, you treat panic, so if Buspar is indicated for anxiety, it should help the Defendant.   Likewise, Vistaril in Dr. Gorelik's view should help because it is sedating and has some antianxiety properties.  Similarly, Celexa over some period of time might help anxiety.  *Id*.

After hearing these statements from Dr. Gorelik, Dr. Liebowitz testified that he tried to talk to her more vigorously "about panic versus anxiety."  *Id*. at 33.   He explained that SSRIs had already been tried and were not helpful and that the Defendant had done well on benzodiazepine and was on a stable regimen.   If Dr. Gorelik was going to take Defendant off Ativan, Dr. Liebowitz urged her to consider putting him on a drug like Clonazepam, a sister drug to Ativan, which Defendant had been given in NCCC in 2008 and which was effective once they

were able to get Defendant to a suitable dose. *Id.* Dr. Liebowitz stated that Dr. Gorelik's call that morning took him by surprise since he was away visiting his grandson in Idaho. The conversation with Dr. Gorelik ended apparently without any resolution to the issue.

Dr. Liebowitz stated that Defendant was on a larger dose of Ativan because over the years, Defendant had built up an immunity or tolerance to the drug, and it took a larger dosage to have the same therapeutic effect. *Id* at 34. As Dr. Liebowitz observed, "[a] normal dose, for him, is an inadequate dose." *Id*. at 35. When asked if there is a cross-tolerance between Ativan and the three drugs that Dr. Gorelik thinks are appropriate for Defendant, Dr. Liebowitz responded no and added that there is "no pharmacological relationship with them, so they don't help any withdrawal symptoms . . . just the opposite. He would probably be overly sensitive to Celexa. . . a big dose of a foreign drug would be adverse." *Id*. Defendant's counsel then explored what impact the changing medications would have on Defendant's ability to assist his counsel:

> Q.	Dr. Liebowitz, will – in your opinion, will the complete withdrawal of Ativan for Mr. Brooks have any impact or potential impact on his ability to assist his lawyers in the defense of his criminal case?
>
> A.	I would say yes. I mean, it's like taking away the migraine medicine for someone who has extreme migraines. You are essentially stripping someone of a therapeutic tool and rendering him such severe anxiety on top of what anybody would normally feel in this situation, it would be very hard for him to function adequately.
>
> Q.	Similarly, by substituting the three drugs as a package for the Ativan and the Ambien, would that have an impact on his ability to assist in the defense of his own case?
>
> A.	I think you are compounding the problem. You are taking away medicines that work. You are introducing medicines not likely to be helpful and actually can exacerbate the condition, some of which he's already shown not to tolerate. His

> body will have to struggle with these foreign substances. It makes it much worse, not better.

*Id*. at 35-36.

Dr. Liebowitz was then asked to review the February 6, 2010 letter from Dr. Gorelik to the Court which the Government provided at the hearing. In that letter, Dr. Gorelik wrote "Mr. David Brooks was diagnosed with anxiety disorder – Not Otherwise Specified – and anxiolytic dependence on January 30, 2010. *Id*. at 37. Dr. Liebowitz stated that this was not a correct diagnosis because "anxiety disorder – not otherwise specified is . . . a residual term that's left with people with anxiety states not covered by the other disorders – the panic disorders, generalized anxiety, social anxiety, OCD." *Id*. at 38. Defendant has a very clear history of panic disorder and also generalized anxiety disorder which, according to Dr. Liebowitz, means that personnel at QPDF "missed the main diagnosis." *Id*. In addition, Dr. Liebowitz testified that by further diagnosing Defendant with anxiolytic dependence – a condition Dr. Liebowitz contends Defendant does not have – "they are essentially calling him a substance abuser" and claiming that Defendant is dependent on Ativan in a way that interferes with his functioning. *Id*. at 39, 40. Dr. Liebowitz emphasized that this is not the case and what interferes with Defendant's functioning is the lack of a benzodiazepine. Essentially, Dr. Liebowitz testified, QPDF is treating Defendant for what they view as a a trivial condition – anxiety disorder NOS, something not very serious and for which they are giving Defendant "lightweight drugs." *Id*.

In pointing to the interview notes from QPDF, Dr. Liebowitz stated that nothing is being done to treat Defendant's underlying condition, which the notes themselves reflect: "Detainee

reports episodes of anxiety, feels panicky at times, feels claustrophobic in the SEG cell." *Id.* at 41. Asserting that Defendant still needs an acceptable treatment, Dr. Liebowitz testified that he was not making an argument that QPDF has to give Defendant Ativan if that is not one of their approved drugs. Rather, Dr. Liebowitz stated that he is "100 percent certain that they have on their formulary drugs that would be appropriate, that would have cross-utility with the Ativan." *Id.* Defendant's counsel then drew Dr. Liebowitz's attention to the statement in the QPDF letter asserting that QPDF is "concerned that the dose of potentially dangerous DEA-controlled medication, Ativan, that was used by patient's private psychiatrist in the past, prior to the incarceration to the Nassau correctional facility, significantly exceeded the maximum daily dose recommended by the FDA as a safe dose." *Id.* at 42. Dr. Liebowitz responded that the FDA approves a generally accepted dose based upon information provided by the pharmaceutical company, but does no testing on its own. According to Dr. Liebowitz, the approved dosage does not operate as a constraint on a physician and because individuals have different metabolisms, doses often exceed the approved guidelines. *Id.*

Ultimately, Dr. Liebowitz concluded that to a reasonable degree of medical certainty, the current course of treatment at QPDF is not medically appropriate. Coming after that conclusion, he was asked the following question:

> Q. And finally, what would you conclude, to a reasonable degree of medical certainty, would be the appropriate course of medical treatment for Mr. Brooks at this time?
>
> A. Well, an intelligent opinion would require a consultation between myself and the treating doctor, with an openness to follow suggestions, and he should be on benzodiazepine, one like Klonopin, like he was before he was in the prison system. Get him to a dose that makes him comfortable and fully functional, and that would be fine.

*Id*. at 43.

On cross-examination, Dr. Liebowitz testified that the last time he had Defendant in a clinical setting was approximately 8 to 12 weeks ago. At that time, Defendant appeared "anxious, nervous, but not having panic attacks and mentally okay." *Id*. at 46. He was unable to remember the last panic attack which he documented. Dr. Liebowitz agreed that Defendant has a physical dependence on benzodiazepines and was aware of an incident in which Defendant was found bringing medication, which he had attempted to hide, into the prison. *Id* at 48, 49. When pressed on the issue of drug-seeking behavior, Dr. Liebowitz responded that he had treated Defendant for many years, had never found that Defendant exceeded the guidelines or run out of prescriptions ahead of time, saw him appropriately medicated and never saw him exhibit drug-seeking behavior. *Id*. at 49-50.

Dr. Liebowitz testified that he has not reexamined Defendant since he was taken off benzodiazepines. He agrees that Defendant is not having seizures. He also agreed that one can track benzodiazepine withdrawal by monitoring the vital signs of a patient and acknowledged that QPDF has represented that it is monitoring Defendant's vital signs. *Id*. at 57.

On re-direct, Dr. Liebowitz stated he was concerned that Defendant will be able to function adequately or participate in a meaningful way in his defense. *Id* at 70. He believes Defendant's current medical treatment at QPDF is not conducive to his being able to participate in his own defense and further believes that some of the treatment may exacerbate his condition, result in side effects or cause more severe panic attacks. *Id*. at 71.

### B.    Testimony of Jason Maffia

Jason Maffia is the health services administrator at QPDF.  He oversees the department of health services, program budgeting, evaluation of quality assurance, hiring, firing, and disciplinary actions. *Id*. at 75.  According to Mr. Maffia, detainees are screened for both medical and mental health issues by a nurse upon intake.  The nurses are trained by the department physician for usual physicals.  They also receiving training from the psychologists.  *Id*.  Intake is done in a questionnaire format with yes and no answers.  *Id*.   The nurses take vital signs and, if necessary, make appropriate referrals to mental health personnel or physicians. The evaluation of whether a detainee should see a physician is determined by the nurse.  If a mental health referral is made, a psychologist is at the facility on Thursdays, Saturdays and Sundays and a psychiatrist is available. *Id*. at 76

Based on QPDF's records, Mr. Maffia testified that David Brooks was evaluated at intake on January 29, 2010.  He was then seen by the psychologist on January 30 and February 7 and by the psychiatrist on February 6, 2010.  The Government offered the records brought by Mr. Maffia as an exhibit (Government Exhibit 1) . Defendant's counsel objected, asking to have the exhibit excluded or to have the proper witness brought in to testify regarding the contents of those records.  I overruled the objection, noting that this witness' appearance was for the purpose of providing some insight into how the Defendant was processed at QPDF, not to testify about medical information, observations or opinions in those records.  *Id*. at 77.  The exhibit was admitted into evidence with the understanding that it contained records kept in the ordinary course of business at QPDF during the intake process.

Mr. Maffia testified that Government Exhibit 1 also includes the record of when the Defendant received certain drugs and how they were dispensed. *Id*. at 78. Also contained in the exhibit were several consent forms, one of which was a consent to medication and the second a consent to mental health services. According to Maffia, he relied upon the findings of the professionals regarding Defendant's transition to QPDF. Mr. Mafia testified that Dr. Gorelik's specialty is addictions and substance abuse and that she does not have any specific expertise in the area of panic disorder or anxiety disorder. *Id*. at 79, 86. Dr. Gorelik provided the diagnosis of Defendant's condition and Mr. Maffia related that diagnosis to his supervisor, Warden Zerillo, who conveyed the information to the marshals. Mr. Maffia testified that the Defendant had been refusing to the medications prescribed by Dr. Gorelik. *Id*. at 80.

On cross-examination, Mr. Maffia stated that the intake form is evaluated by the Corporation (GEO), the corporate medical director and health services of the Corporation. *Id*. at 81. When asked if QPDF is required to follow the rules and guidelines of the Bureau of Prisons, Mr. Maffia testified that QPDF is not a BOP facility, so they do not follow BOP guidelines. Rather, GEO Group has a policy and procedures manual developed by the corporate medical director of the GEO Group. *Id*. at 82.

Notes from the Defendant's medical file at QPDF were identified by Mr. Maffia. These documents were marked as Defendant's Exhibit 3 (DB-JM-3) and were subsequently admitted into evidence. *Id*. at 92. These records reflect the following information. The departmental physician who first evaluated Defendant Brooks at QPDF was Dr. Depoux. *Id*. at 86. Mr. Maffia was aware that Dr. Depoux had met with the Defendant and had stated in his notes that Ativan or a similar medication would be appropriate for Defendant. *Id*. Dr. Gorelik thereafter overruled

Dr. Depoux's assessment regarding Defendant's taking Ativan. Mr. Maffia affirmed that the intake record contains notes in Dr. Depoux's handwriting indicating that Dr. Depoux called for a psychological evaluation by the attending psychiatrist. In particular, Mr. Maffia confirmed Dr. Depoux's written statement that "stopping Ativan abruptly might carry dreadful consequences." *Id.* at 91. Mr. Maffia stated that no medication followed Defendant from NCCC – therefore, personnel at QPDF did not *stop* giving Defendant Ativan, but rather never started administering Ativan to him in the first instance. *Id.* at 91.

On re-direct, the Government had Mr. Maffia read aloud the last paragraph of page 2 of the notes from the medical file which state "detainee observed sitting on his bed, oriented times three, quietly. No signs of huge stress. Detainee denies any discomfort." *Id.* at 92.

## III.     DISCUSSION

### A.     The Legal Context

Throughout the hearing, Defendant's counsel never specifically categorized the nature of Defendant's claim as falling under a particular statute or asserted constitutional violation. The closest approximation came through the last series of questions posed by Defendant's counsel to Dr. Liebowitz when counsel inquired whether the "complete withdrawal of Ativan" would have an impact on Defendant's ability to assist his attorneys in the defense of his criminal case. Dr. Liebowitz responded that he believed it would.

The medication issues raised by Defendant's counsel can be approached in two ways. First, the claim can be construed as one falling within the line of cases addressing "deliberate indifference to medical needs" pursuant to the standard applied under the Eighth Amendment.

Second, the claim can be construed as one encompassed by the line of cases dealing with a defendant's competency to understand and assist in the proceedings against him.

For a convicted prisoner, the right to adequate medical treatment derives from the Eighth Amendment. *See Bryant v. Maffucci*, 923 F.2d 979, 983 (2d Cir. 1991) (citations omitted). However, the Second Circuit "has often applied the Eighth Amendment deliberate indifference [to a serious medical condition] test to pre-trial detainees bringing actions under the Due Process Clause of the Fourteenth Amendment." *Lara v. Bloomberg*, No. 04 CV 8690, 2008 WL 123840, at * 2 n.4 (quoting *Cuoco v. Moritsugu*, 222 F.3d 99, 106 (2d Cir. 2000)). Since Defendant Brooks is currently on trial, he falls within the category of a pre-trial detainee. His rights concerning the conditions of his confinement, then, derive from the Due Process Clause of the Fourteenth Amendment and so the Court utilizes Eighth Amendment analysis to review such claim.

"Not every medical need is a serious medical need." *Shenk v. Cattaraugus County*, No. 07-4814-cv, 305 Fed. Appx. 751, 2009 WL 33611, at * 2 (2d Cir. Jan. 7, 2009). The Second Circuit has defined the term as "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996). "A finding of a serious medical need 'is necessarily contextual and fact-specific,' and thus, 'must be tailored to the specific circumstances of each case.'" *Shenk*, 2009 WL 33611, at * 2 (quoting *Smith v. Carpenter*, 316 F.3d 178, 185 (2d Cir. 2003)).

Although Defendant's counsel stated at the February 8, 2010 hearing that there are many cases supporting Defendant's request that a different course of treatment be implemented here, I have not been able to find any case squarely on point with the circumstances now before the

Court, nor have counsel supplied any. However, *Shenk* is somewhat instructive here. Plaintiff

in *Shenk* argued in his §1983 action that a county sheriff violated his Eighth Amendment rights

when officers deprived him of certain heart medication while he was temporarily detained in a

county courthouse holding cell. *Shenk*, 2009 WL 33611, at * 1. The Court noted that

> [w]hile Shenk's constitutional claim cannot rest on his heart condition, a reasonable juror could conclude, from evidence that Shenk was agitated and repeatedly asked for his medication, that the deputies were aware Shenk had *some* medical need. And from Melissa Shenk's statement during the family court proceedings that Shenk had an anxiety condition, a reasonable juror could conclude that the deputies had reason to identify the medical need as anxiety.
>
> We have never held that mental anxiety is a serious medical need, but the condition appears to satisfy at least two of the *Chance* factors, anxiety being a condition that a doctor would find important, and which can affect one's daily activities. *Cf. White v. Napoleon*, 897 F.2d 103, 111 (3d Cir. 1990) ("We are not prepared to hold that inflicting mental anxiety alone cannot constitute cruel and unusual punishment"). Assuming for these purposes that anxiety is a serious medical need, then, the question is whether the individual defendants were deliberately indifferent to that need. We agree with the magistrate judge that Shenk has proffered insufficient evidence to support a finding that they were.

*Id*. at * 3; *see also Reyes v. Gardener*, No. 02-0243, 93 Fed. Appx., 283, 2004 WL 601945, at * 2

(2d Cir. Mar. 25, 2004) (where inmate generally declined medications because institution

prescribed drug conservatively rather than order Demerol as inmate requested, no proof offered

that the prescribed medication deviated from reasonable medical practice for treatment of his

condition).

    *Shenk* stands in stark contrast to the instant case. No evidence has been presented that the

QPDF personnel charged with dispensing medications did not attempt to administer to Defendant

the Buspar, Vistaril and Celexa prescribed by Dr. Gorelik. To the contrary, evidence was

presented through QPDF administrator Maffia that the Defendant had been refusing to take the medications brought to him. Hrg. Tr. at 80. QPDF's business records reflect the same information. *See* Govt. Ex. 1. Consequently, Defendant was not deprived of all medication. Rather, he was prescribed medication by Dr. Gorelik whose determination of the appropriate medication for Defendant differed from that of Dr. Liebowitz. That difference of professional opinion does not constitute deliberate indifference to Defendant's medical needs. *Compare, Smith v. Sheahan*, No. 05 C 1264, 2008 WL 4276221, at * 8 (N.D. Ill. Sept. 16, 2008) (a reasonable jury could conclude that prison nurses were deliberately indifferent to risk from inmate not receiving anti-rejection medication for three days).

The second approach to deal with the issues addressed at the hearing can best be described as one directed to competency. "It is well established that the Due Process Clause of the Fourteenth Amendment prohibits criminal prosecution of a defendant who is not competent to stand trial." *Medina v. California*, 505 U.S. 437, 439 (1992) (citations omitted); *United States v. Quintieri*, 306 F.3d 1217 (2d Cir. 2002). It is also well established that if there is reasonable cause to believe that a defendant "may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him to assist properly in his defense," 18 U.S.C. § 4241(a), then the court is required to order a hearing *sua sponte* to determine the mental competence of the defendant. *Quintieri*, 306 F.3d at 1232-1233. The Second Circuit has noted, however, that "[t]here are, of course, no fixed or immutable signs which invariably indicate the need for further inquiry to determine fitness to proceed . . . " *Id*. at 1233 (quoting *Drope v. Missouri*, 420 U.S. 162, 180 (1975)).

21

In *Quintieri*, the Second Circuit went on to observe the following:

> A district court must consider many factors when determining whether it has "reasonable cause" to order a competency hearing. *Id.* [citation omitted]. The district court's own observation of the defendant's demeanor during the proceeding are relevant to the court's determination, but the court's observations alone "cannot be relied upon to dispense with a hearing on that very issue" if there is substantial other evidence that the defendant is incompetent [citations omitted].

*Id.* No such "reasonable cause" has been presented in the instant case, nor has there been any request for a competency hearing by Defendant's counsel.

The district court may rely upon a number of factors when issues are raised regarding competency, including medical opinion and the court's own observation of the defendant's comportment. *United States v. Nichols*, 56 F.3d 403, 411 (2d Cir. 1995). Judge Seybert has had the opportunity to observe Defendant's demeanor on multiple occasions prior to and during the two recent weeks of trial. As indicated in the trial transcript of February 4, 2010, Judge Seybert observed that "at least for three days, for several weeks, he's not had this medication, and he appeared to be fine each and every day, whether it was Monday, Tuesday, Wednesday, or Thursday, when he appeared in court." Trial Tr. at 1920. When the trial reconvened on February 8, 2010, the following colloquy took place:

| | |
|---|---|
| THE COURT: | How are you feeling Mr. Brooks? |
| THE DEFENDANT: | I didn't get any medicine today. |
| THE COURT: | Did you get it yesterday? |
| THE DEFENDANT: | Last night, they gave me half what they said they were going to give me. |
| THE COURT: | Were you able to sleep a little bit? |

| | |
|---|---|
| THE DEFENDANT: | No. |
| THE COURT: | How about on Saturday. How did you feel? |
| THE DEFENDANT: | Absolute torture, the entire weekend. |
| THE COURT: | How were you on the medication at Nassau County? |
| THE DEFENDANT: | I'm trying it, but they don't give it to you and they don't care. They walk away. It's a jail. |

*   *   *

| | |
|---|---|
| THE COURT: | Are you able to go forward this morning, Mr. Brooks? |
| THE DEFENDANT: | I'll do the best I can. |
| THE COURT: | You seem pretty lucid to me now. You answered my questions directly. You hear what the witnesses say. |

*Id*. at 2132-2133.

At the February 8, 2010 hearing before me, Dr. Liebowitz testified that he had seen Defendant in a clinical setting approximately 8 - 12 weeks ago, prior to his arrest, and that he seemed "anxious, nervous, but not having panic attacks and mentally okay." Hrg. Tr. at 46. Dr. Liebowitz could not recall when Defendant had had his last panic attack. In response to a question from Defendant's counsel asking whether Defendant, since he has been in prison, has experienced any panic attacks, Dr. Liebowitz responded that he had a brief conversation with Defendant while he was sitting at counsel table today, prior to the hearing, and that Defendant said he was having panic attacks. *Id*. at 70. On re-cross, Dr. Liebowitz was asked by counsel for the Government whether Defendant, in that exchange at counsel table, appeared logical and coherent. Dr. Liebowitz responded that Defendant appeared coherent, but that he did not test his logic. *Id*. at 71. According to Dr. Liebowitz, when he was caring for Defendant prior to his

incarceration, Defendant would spend hours and hours every day working on his case and that he did not know "what kind of shape he's in now *to be able to do that or not*" (emphasis supplied). The Defendant attended the hearing before me for several hours in the middle of the day and again at 5 p.m. when the hearing resumed. Defendant appeared able to sit through the extended proceedings and showed no outward manifestations of discomfort or inability to listen to the testimony. However, as both Judge Seybert and I have noted, neither of us is a physician or psychiatrist.

Once again, the instant circumstances are distinguishable from the line of cases in which detainees suffering from a mental disorder have been administered anti-psychotic medications that can inhibit the party's capacity to react and respond to the proceedings in which he is engaged and/or diminish his capacity to assist counsel. *See, e.g., Riggins v. Nevada*, 504 U.S. 127, 143-144 (1992) (finding that side effects of antipsychotic drug may have had an impact on defendant's outward appearance, the content of his testimony and his ability to follow the proceedings); *McGregor v. Gibson*, 248 F.3d 946, 956 (10th Cir. 2001) (where defendant had been diagnosed consistently with schizophrenia, paranoid type, and with anti-social personality disorder, conviction overturned where reasonable court should have had a bona fide doubt concerning continued competency in light of inconsistent evidence concerning whether defendant was properly receiving antipsychotic medication throughout trial and defendant's counsel contended that his client was unable to assist in his own defense); *compare Quintieri*, 306 F.3d 1233-1234 (where defendant complained at sentencing that he felt dizzy because prison officials administered the wrong psychiatric medication, court found that although defendant appeared to

be suffering unfortunate effects from the medicine, he was lucid and able to understand the proceedings).

Here, the disorder Defendant suffers from is being treated with anti-anxiety medication, not anti-psychotic drugs. The record evidence discloses that Defendant has been able to function effectively over time when maintained on the regimen prescribed by his psychiatrist. Moreover, Defendant's counsel has not stated at any time before this Court that Defendant is currently unable to assist in his defense. Rather, there are concerns expressed regarding what *might* happen if the medication issue is not resolved in the short term. Likewise, the Court has heard testimony from Defendant's personal psychiatrist and has reviewed the records from the psychiatric file at QPDF. At this time, there is no evidence before the Court that the Defendant is incompetent or unable to assist in his own defense.

### B.    The Bureau of Prisons Guidelines

During his testimony, Dr. Liebowitz maintained that the course of treatment being administered to the Defendant does not comport with BOP Guidelines. Neither side introduced those Guidelines prior to or during the hearing. However, as Dr. Liebowitz noted, the Guidelines are available on the internet. Having reviewed the August 2009 *Federal Bureau of Prisons Clinical Practice Guidelines* on "Detoxification of Chemically Dependent Inmates"[7] to shed some further light on the arguments presented by counsel for both sides, I find the following excerpts instructive:

---

[7]    The cover sheet for this section of the BOP Guidelines states that "The Federal Bureau of Prisons (BOP) does not warrant these guidelines for any other purpose, and assumes no responsibility for any injury or damage resulting from the reliance thereof. Proper medical practice necessitates that all cases are evaluated on an individual basis and that treatment decisions are patient-specific."

### 7.  Benzodiazepine Withdrawal

**Diagnosis of Benzodiazepine Dependence**

•       Benzodiazepine withdrawal syndrome can begin within a few hours of last drug
        use (especially when using short-acting drugs), but may take several weeks to
        resolve.  Because of the high risk of delirium, seizures, and death, benzodiazepine
        withdrawal should always be treated.

                                *     *     *

•       Physiological dependence on benzodiazepine is diagnosed through a careful
        determination of several factors: type of medications used, length of time used,
        amount used, reasons for use, symptoms that occur when doses are missed or
        medication is discontinued, and date and amount of drug last used.  Physiological
        benzodiazepine dependence can occur even when the medication is taken only as
        prescribed and may not include any significant biopsychosocial consequences.
        Physiological dependence develops within 3-4 weeks of regular use.

                                *     *     *

**Treatment of Benzodiazepine Dependence**

The general principle of substituting a long-acting medication for a short-acting one is
especially important in the treatment of benzodiazepine withdrawal.  Many inmates will
present with histories of chronic use of Xanax (alprazolam) or Ativan (lorazepam), both
high-potency, short-acting substances.  Attempts at tapering these substances for
detoxification often lead to significant withdrawal symptoms and can be unsuccessful,
resulting in a full-blown withdrawal syndrome.

Benzodiazepines with long half lives, such as clonazepam, are generally used for
benzodiazepine detoxification.  However, they can accumulate and cause excessive
sedation or intoxication.  Careful monitoring is absolutely necessary, especially in the
initial stages of changing the inmate to the longer-acting medication.

                                *     *     *

**The following guidelines should be taken into consideration**:

- **Clonazepam treatment**: Clonazepam[8] is a high-potency medication with a half-life of greater than 24 hours; it is well-tolerated and easy to administer.  Clonazepam can be substituted for other benzodiazepines, according to the dose equivalencies listed in Appendix 5, Benzodiazepine Dose Equivalents.  It is generally begun on a three-times-a-day schedule; however, because of the long half-life, some dosing schedules for tapering may be successfully accomplished through once-daily dosing.  The frequency can be adjusted according to appropriate withdrawal symptom monitoring.  Individuals metabolize Clonazepam at different rates; therefore, the dose equivalencies will not hold for all inmates and must be individualized according to the inmate's response.

*See* "Detoxification of Chemically Dependent Inmates," Chapter 7 at 9-12

### C.    Findings

After examining the evidence adduced at the hearing through testimony and exhibits,

reviewing the applicable Bureau of Prisons Guidelines, and analying applicable case law, I make

the following findings:

1.    Despite the January 20, 2010 Order from the Court, NCCC did not administer Ativan and Ambien to the Defendant.

2.    At some time in late January 2010, the Defendant was found to be stockpiling Ativan which he had purportedly obtained by prescription through his private treating psychiatrist, Dr. Michael Liebowitz.  As a result of that conduct, Defendant was transferred on January 27, 2010 to QPDF, a contract vendor for the federal Bureau of Prisons.

3.    Defendant has not experienced any seizures to date since being taken off Ativan

4.    It is undisputed that Dr. Michael Liebowitz is a highly credentialed physician and psychiatrist who is board certified, a distinguished fellow of the American Psychiatric Association, and a Professor of Clinical Psychiatry at Columbia University School of Medicine.

5.    Dr. Liebowitz established the first anxiety disorders clinic in the United States, has a lengthy list of peer-reviewed publications, helped author the anxiety disorders section of the DSM-IV, developed man of the protocols for treating

---

[8]    Clonazepam is also listed in the Federal Bureau of Prisons 2009 *National Formulary* (available online) which is a "list of medications that are considered by the organization's professional staff to ensure high quality, cost-effective drug therapy for the population served."

panic disorders and social anxiety disorders, including what medications to use, and participated in trials and drugs approved by the FDA.

6.      Dr. Liebowitz is qualified to render expert testimony on panic attacks and anxiety disorders and an expert opinion on the treatment of his patient David Brooks.

7.      I credit the following assertions by Dr. Liebowitz:

- Dr. Liebowitz has treated the Defendant off and on for 20 years
- Defendant suffers from a mental disorder, namely, panic disorder
- Based on Defendant's diagnosis, a medication treatment needed to be found to block Defendant's panic attacks which presents a different course of treatment than treating other kinds of anxiety
- After specific medication approaches such as SSRIs were utilized and deemed unsuccessful, Defendant was placed on Klonopin, a benzodiazepine which helped for several years
- In 2002, Defendant was switched to Ativan, another benzodiazepine
- Dosages have to be tailored to the individual and Defendant's dosage has been increased over the years because he has built up an immunity or tolerance to the drug and it took a larger doage to achieve the same therapeutic effect
- Until late January 2010, Defendant was prescribed 20 milligrams of Ativan a day, which has been effective and well-tolerated by Defendant
- There is nothing dangerous about the referenced dosage of Ativan prescribed unless it is taken away abruptly; a "normal" dose of Ativan for the Defendant would be an inadequate dose
- Stopping Ativan abruptly, without a suitable substitute, can result in "the shakes, tremors, increased anxiety, increased heart rate, increased blood pressure" and in severe cases, convulsions, along with a relapse of the underlying illness
- With Ativan removed, it makes it harder to participate as fully as the Defendant might if he's properly medicated
- The symptoms Defendant was experiencing as described in Defendant's intake form at QPDF are consistent with a person experiencing withdrawal reaction as well as a relapse of the underlying illness
- He disagrees with the determination to take Defendant off Ativan in the manner described
- Course of treatment at QPDF is not consistent with BOP Guidelines' method of withdrawing medication from one deemed to be physically dependent on a benzodiazepine
- Buspar which is being administered as one of the substituted medications is not of the benzodiazepine family, is used rarely and has not been proven effective for any of the anxiety disorders described in DSM-IV

- Vistaril, an antihistamine, does nothing for benzodiazepine withdrawal and is not of the same family although it might help sleeping at night
- Celexa is an SSRI which has some efficacy in anxiety treatment; however, Defendant was previously given a low dose of a similar drug, Lexapro, and was not able to tolerate it; if tolerated, Celexa takes 4 - 6 weeks to work
- In his conversation with Dr. Gorelik, she told him that she sees Defendant's primary problem as one of substance abuse and her goal is to get him off benzodiazepines
- Dr. Gorelik did not make a distinction between panic disorder and other types of anxiety disorders
- Dr. Liebowitz believes the Defendant has been misdiagnosed as having anxiety disorder – NOS and "anxiolytic dependence" on Ativan in a way that interferes with his functioning when such interference is actually the lack of a benzodiazepine
- If Dr. Gorelik was going to take Defendant off Ativan, Dr. Liebowitz urged her to consider putting him on Clonzaepam, a benzodiazepine and sister drug to Ativan
- QPDF likely has other drugs on their formulary that would be appropriate and have cross-utility with Ativan
- The complete removal of Ativan, without a suitable replacement, would make it very hard for the Defendant to function adequately and assist his lawyers in the defense of his criminal case.

8.  A nurse at QPDF did the initial intake of Defendant on January 29, 2010.

9.  Dr. Gorelik's speciality is addictions and substance abuse.

10. Dr. Gorelik overruled Dr. Depoux, the departmental physician who first saw Defendant at QPDF, and who proposed that Ativan or a similar medication would be appropriate

11. QPDF continues to monitor Defendant's vital signs

12. QPDF is not a BOP facility and follows its own policy and procedures manual developed by the corporate medical director of the GEO Group

13. According to the BOP Guidelines on "Detoxification of Chemically Dependent Inmates," Clonazepam is a benzodiazepine and when used in treating benzodiazepine dependence, it is well-tolerated and easy to administer

14. The documents from the QPDF psychiatric file for Defendant reflect a professional difference of opinion about the protocol and course of treatment for Defendant's historically diagnosed panic attacks and anxiety

## D.  Recommendation

Although to all outward appearances both before Judge Seybert and before me at the February 8, 2010 hearing, Defendant Brooks seemed to be alert, coherent, engaged, and without outward manifestations of withdrawal symptoms, the Court is neither physician nor psychiatrist and certainly is not in a position to assess Defendant's physical or mental condition.   Likewise, the Court is not empowered to order any physician or psychiatrist to embark on a particular course of treatment or to refrain from the same.  In making the following recommendation, it is important to emphasize to emphasize that this determination should not be construed as a referendum on the treatment received by Defendant at QPDF.  To the contrary, the evidence is clear that QDRF did an immediate intake on Defendant upon his incarceration and recommended appropriate follow-up, including a treatment regimen directed to both the underlying mental disorder and to a course of medication which the medical professional in charge deemed appropriate.  It should be further noted that the issues raised in these proceedings are not only inmate-specific, but fact specific, and the facts here arise from unique and specialized circumstances.

What the Court must consider here, therefore, is the sworn testimony of Defendant's treating psychiatrist who has been further qualified as an expert in the field of Defendant's diagnosed mental disorder  –   testimony which remains unrebutted and unrefuted.  That testimony, along with the BOP Guidelines for  "Detoxification of Chemically Dependent Inmates," compels me to recommend that Defendant be placed in an environment where (1) if the institution determines that it will not administer Ativan and Defendant must be weaned off it, that such action involve a protocol consistent with the BOP Guidelines as set forth in

"Detoxification of Chemically Dependent Inmates," or (2) he is prescribed a benzodiazepine such as Clonazepam (or an equivalent medication), which is on the BOP formulary and may well be on the QPDF formulary, in dosages that can be worked out in consultation between his treating psychiatrist and institutional personnel responsible for evaluating, treating and monitoring his underlying mental disorder. At this juncture, it may well be that the QPDF policy and procedures manual has a suitable protocol. The Court has no way of knowing if this is the case because the manual was not presented at the hearing, nor was Mr. Maffia questioned about the similarities or differences in the protocol vis-a-vis the BOP Guidelines. If the foregoing cannot be accomplished at QPDF because of the unusual circumstances of this case in particular, then I respectfully recommend that Defendant be transferred to a BOP facility such as the Metropolitan Detention Center which has the capability of implementing the protocol.

Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72 of the Federal Rules of Civil Procedure, the parties normally would have fourteen (14) days from service of this Report and Recommendation to file written objections. *See also* Fed. R. Civ. P. 6(a) and (e). However, given the nature of the circumstances involved presently, counsel are hereby on notice that they have **48 hours to file any objections**. Such objections shall be filed with the Clerk of the Court via ECF. A courtesy copy of any objections filed is to be sent to the chambers of the Honorable Joanna Seybert, and to the chambers of the undersigned . Any requests for an extension of time for filing objections must be directed to Judge Seybert prior to the expiration of the 48 hours. Failure to file objections will result in a waiver of those objections for purposes of appeal.

*Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Beverly v. Walker*, 118 F.3d 900, 901 (2d Cir.), *cert.*

*denied*, 522 U.S. 883 (1997); *Savoie v. Merchants Bank*, 84 F.3d 52, 60 (2d Cir. 1996).

**SO ORDERED.**

Dated: Central Islip, New York
February 13, 2010

/s/ A. Kathleen Tomlinson
A. KATHLEEN TOMLINSON
U.S. Magistrate Judge