```
<DOCUMENT>
<TYPE>10-K
<SEQUENCE>1
<FILENAME>file001.txt
<DESCRIPTION>FORM 10-K
<TEXT>
<PAGE>
```

==================================================================

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

-----------------

FORM 10-K

[X]      ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES
         EXCHANGE ACT OF 1934 For the fiscal year ended December 31, 2003
                                 OR

[ ]      TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES
         EXCHANGE ACT OF 1934 For the transition period from _____ to _____

COMMISSION FILE NUMBER 0-18863

-----------------

ARMOR HOLDINGS, INC.
(EXACT NAME OF REGISTRANT AS SPECIFIED IN ITS CHARTER)

```
<TABLE>
<S>                                                            <C>
```

|                                                          |                                     |
|----------------------------------------------------------|-------------------------------------|
| DELAWARE                                                 | 59-3392443                          |
| (STATE OR OTHER JURISDICTION OF INCORPORATION OR ORGANIZATION) | (IRS EMPLOYER IDENTIFICATION NO.) |
| 1400 MARSH LANDING PARKWAY, SUITE 112                    |                                     |
| JACKSONVILLE, FLORIDA                                    | 32250                               |
| (ADDRESS OF PRINCIPAL EXECUTIVE OFFICES)                 | (ZIP CODE)                          |

```
</TABLE>
```

(904) 741-5400
(REGISTRANT'S TELEPHONE NUMBER, INCLUDING AREA CODE)

SECURITIES REGISTERED PURSUANT TO SECTION 12(b) OF THE ACT:
Title of each class: Common Stock, $0.01 par value
Name of each exchange on which registered: New York Stock Exchange

SECURITIES REGISTERED PURSUANT TO SECTION 12(g) OF THE ACT:
None

     Indicate by check mark whether the Registrant: (1) has filed all
reports required to be filed by Section 13 or 15(d) of the Securities Exchange
Act of 1934 during the preceding twelve months (or for such shorter period that
the Registrant was required to file such reports), and (2) has been subject to
such filing requirements for the past 90 days. Yes [ x ] No [ ]

     Indicate by check mark if disclosure of delinquent filers pursuant to
Item 405 of Regulation S-K is not contained herein, and will not be contained,
to the best of the Registrant's knowledge, in definitive proxy or information
statements incorporated by reference in Part III of this Form 10-K or any
amendment to this Form 10-K [x]

     Indicate by check mark whether the registrant is an accelerated filer
(as defined in rule 12B-2 of the Act)

     Yes [ x ]   No [  ]


     The aggregate market value of voting and non-voting common equity held
by non-affiliates of the Registrant as of June 30, 2003, the last business day
of the Registrant's most recently completed second fiscal quarter (based on the
closing sale price of the Common Stock on the New York Stock Exchange on such
date) was $369,446,455.

     The number of shares of the Registrant's Common Stock outstanding as of
March 5, 2004 was 28,542,987.

DOCUMENTS INCORPORATED BY REFERENCE

Portions of our Proxy Statement for our Annual Meeting of Stockholders to be
held on June, 22, 2004, are incorporated by reference into Part III hereof.

```
<PAGE>
```

TABLE OF CONTENTS AND
CROSS REFERENCE SHEET

```
<TABLE>
<CAPTION>
                                                               Page Number
                                                               -----------
<S>            <C>       <C>                                       <C>

PART I                   Forward Looking Statements                  3
                         Factors That May Affect Our Future Business 3
               Item 1.   Description of Business                    10
                         Company Overview                           10
                         Material Developments                      11
                         Industry Overview                          12
                         Information Concerning Business Segments and
                         Geographical Sales                         13
                         Business Strengths                         14
                         Growth Strategy                            15
                         Acquisitions                               16
                         Products                                   16
                         Customers                                  22
                         Marketing and Distribution                 23
                         Product Manufacturing and Raw Materials    24
                         Backlog                                    25
                         Competition                                25
                         Employees                                  26
                         Patents and Trademarks                     26
                         Government Regulation                      27
                         Environmental Matters                      27
                         Available Information                      27
                         Discontinued Operations                    28

               Item 2.   Properties                                 29
               Item 3.   Legal Proceedings                          30
               Item 4.   Submission of Matters to a Vote of Security Holders  32


PART II        Item 5.   Market for Registrant's Common Equity and Related
                         Stockholder Matters                        33

               Item 6.   Selected Financial Data                    34

               Item 7.   Management's Discussion and Analysis of Financial
                         Condition and Results of Operations        35

               Item 7A.  Quantitative and Qualitative Disclosures About
                         Market Risk                                53

               Item 8.   Financial Statements and Supplementary Data 54

               Item 9.   Changes in and Disagreements with Accountants on
                         Accounting and Financial Disclosure        54

               Item 9A.  Controls and Procedures                    54

PART III                                                            55

PART IV        Item 15.  Exhibits, Financial Statements and Schedules,
                         and Reports on Form 8-K                     56
</TABLE>
```

<PAGE>

PART I

FORWARD LOOKING STATEMENTS

We believe that it is important to communicate our expectations to our
investors. Accordingly, this report contains discussion of events or results
that have not yet occurred or been realized. You can identify this type of
discussion, which is often termed "forward-looking statements", by such words
and phrases as "expects", "anticipates", "intends", "plans", "believes",
"estimates" and "could be". Execution of acquisition or divestiture strategies,
expansion of product lines and increase of distribution networks or product
sales are examples of issues whose future success may be difficult to predict.
You should read forward-looking statements carefully because they discuss our
future expectations, contain projections of our future results of operations or
of our financial position, or state other expectations of future performance.
The actions of current and potential new competitors, changes in technology,
seasonality, business cycles and new regulatory requirements are examples of
factors that impact greatly upon strategies and expectations and are outside our
direct control. There may be events in the future that we are not able
accurately to predict or to control. Any cautionary language in this report, and
the risk factors set forth below, provide examples of risks, uncertainties and
events that may cause our actual results to differ from the expectations we
express in our forward-looking statements.

FACTORS THAT MAY AFFECT OUR FUTURE RESULTS

In addition to other information in this Annual Report on Form 10-K, the
following risk factors should be carefully considered in evaluating our business
because such factors may have a significant impact on our business, operating
results, liquidity and financial condition. As a result of the risk factors set
forth below, actual results could differ materially from those projected in any

forward-looking statements. Additional risks and uncertainties not presently known to us, or that we currently consider to be immaterial, may also impact our business, operating results, liquidity and financial condition. If any of the following risks occur, our business, operating results, liquidity and financial condition could be materially adversely affected. In such case, the trading price of our securities could decline, and you may lose all or part of your investment.

RISKS RELATED TO OUR INDUSTRY

THE PRODUCTS WE SELL ARE INHERENTLY RISKY AND COULD GIVE RISE TO PRODUCT LIABILITY AND OTHER CLAIMS.

The products that we manufacture are typically used in applications and situations that involve high levels of risk of personal injury. Failure to use our products for their intended purposes, failure to use them properly, their malfunction, or, in some limited circumstances, even correct use of our products, could result in serious bodily injury or death. Our products include: body armor and plates designed to protect against ballistic and sharp instrument penetration; less-lethal products such as less-lethal munitions, pepper sprays, distraction devices and flameless expulsion grenades; various models of police batons; rotary and fixed-wing aircraft seating systems; parachutes; vehicle and hard armoring systems; and police duty gear.

Claims have been made and are pending against certain of our subsidiaries, involving permanent physical injury and death caused by self-defense sprays and other munitions intended to be less-lethal. In addition, the manufacture and sale of certain less-lethal products may be the subject of product liability claims arising from the design, manufacture or sale of such goods. If these claims are decided against us and we are found to be liable, we may be required to pay substantial damages and our insurance costs may increase significantly as a result. Also, a significant or extended lawsuit, such as a class action, could also divert significant amounts of management's time and attention. We cannot assure you that our insurance coverage would be sufficient to cover the payment of any potential claim. In addition, we cannot assure you that this or any other insurance coverage will continue to be available or, if available, that we will be able to obtain it at a reasonable cost. Our cost of obtaining insurance coverage has risen substantially since September 11, 2001. Any material uninsured loss could have a material adverse effect on our business, financial condition and results of operations. In addition, the inability to obtain product liability coverage would prohibit us from bidding for orders from certain governmental customers since, at present, many bids from governmental entities require such coverage, and any such inability would have a material adverse effect on our business, financial condition and results of operations.

Both private claimants and State Attorneys General have already commenced legal action against Second Chance Body Armor based upon its Ultima(R) and Ultimax(R) model vests. Second Chance Body Armor licenses from Simula, one of our indirect subsidiaries, a certain patented technology which is used in some of the body armor it manufactures, but to our knowledge, no lawsuit has yet been brought against Second Chance Body

                                 3

<PAGE>

Armor based upon this licensed technology, although a letter was received by Simula from an attorney representing a police officer who was injured while wearing a Second Chance Body Armor vest alleging potential liability against Simula. In addition, the U.S. Attorney General has asked the U.S. Department of Justice to investigate the claims regarding the Zylon(R) vests. As Simula has licensed its technology to Second Chance Body Armor, it may be impacted by the pending claims against Second Chance Body Armor and the investigation being conducted by the U.S. Department of Justice. If Simula is included in the claims pending against Second Chance Body Armor and the investigation being conducted by the U.S. Department of Justice, we cannot assure you that any judgment, settlement or resolution against Simula will not have a material adverse effect on Simula's business, financial condition and results of operations.

The National Institute of Justice (NIJ) is engaged in an ongoing inquiry and investigation of bullet-resistant vests and the protocol for testing used vests, as well as the reliability of Zylon and other fibers. We have consulted with and cooperated fully with the NIJ in this endeavor. To date, the NIJ has embarked only in its first phase of testing, which entails vests that have been heavily worn or exposed to adverse conditions, and which involves the ballistic standard applicable to new vests. Although some of the vests tested, including ours, experienced some level of penetration, the NIJ specifically warned against the misuse and misinterpretation of these results, emphasizing that the data produced so far is preliminary in nature, applies to a very small sample size and therefore it is not possible to draw any statistically-based conclusions from these results. The NIJ will continue to conduct further testing and analyze these issues in order to determine if any conclusions can be reached as to the performance and reliability of aged vests. We have requested the NIJ to provide us with its testing data, and we intend to evaluate and review the NIJ results in our continuing effort to assist the NIJ in developing uniform standards for certification of new vests and the testing of used vests. The NIJ continues to encourage law enforcement officers to wear body armor, in light of the fact that "the lives of more than 2,700 law enforcement officers have been saved by the use of bullet-resistant body armor over the past 30 years."

WE ARE SUBJECT TO EXTENSIVE GOVERNMENT REGULATION AND OUR FAILURE OR INABILITY TO COMPLY WITH THESE REGULATIONS COULD MATERIALLY RESTRICT OUR OPERATIONS AND SUBJECT US TO SUBSTANTIAL PENALTIES.

We are subject to federal licensing requirements with respect to the sale in foreign countries of certain of our products. In addition, we are obligated to comply with a variety of federal, state and local regulations, both domestically and abroad, governing certain aspects of our operations and workplace, including regulations promulgated by, among others, the U.S. Departments of Commerce, State and Transportation, the Federal Aviation Administration, the U.S. Environmental Protection Agency and the U.S. Bureau of Alcohol, Tobacco and Firearms. The U.S. Bureau of Alcohol, Tobacco, and Firearms also regulates us as a result of our manufacturing of certain destructive devices and by the use of ethyl alcohol in certain products. We also ship hazardous goods, and in doing so, must comply with the regulations of the U.S. Department of Transportation for packaging and labeling. Additionally, the failure to obtain applicable governmental approval and clearances could adversely affect our ability to continue to service the government contracts we maintain. Furthermore, we have material contracts with governmental entities and are subject to rules, regulations and approvals applicable to government contractors. We are also subject to routine audits to assure our compliance with these requirements. We have become aware that we are not in full compliance with certain regulations governing the export of equipment and related technology used for military purposes that are applicable to certain of our products. We have undertaken steps to comply with these regulations and to help ensure compliance in the future. We do not believe that such noncompliance will have a material adverse effect on our business. In addition, a number of our employees involved with certain of our federal government contracts are required to obtain specified levels of security clearances. Our business may suffer if we or our employees are unable to obtain the security clearances that are needed to perform services contracted for the Department of Defense, one of our major customers. Our failure to comply with these contract terms, rules or regulations could expose us to substantial penalties, including the loss of these contracts and disqualification as a U.S. government contractor.

Like other companies operating internationally, we are subject to the Foreign Corrupt Practices Act and other laws which prohibit improper payments to foreign governments and their officials by U.S. and other business entities. We operate in countries known to experience endemic corruption. Our extensive operations in such countries creates the risk of an unauthorized payment by one of our employees or agents which would be in violation of various laws including the Foreign Corrupt Practices Act. Violations of the Foreign Corrupt Practices Act may result in severe criminal penalties which could have a material adverse effect on our business, financial condition and results of operations.

WE HAVE SIGNIFICANT INTERNATIONAL OPERATIONS AND ASSETS AND ARE THEREFORE SUBJECT TO ADDITIONAL FINANCIAL AND REGULATORY RISKS.

We sell our products in foreign countries and seek to increase our level of international business activity. Our overseas operations are subject to various risks, including: U.S.-imposed embargoes of sales to specific countries (which could prohibit sales of our products there); foreign import controls (which may be arbitrarily imposed and enforced and which could interrupt our supplies or prohibit customers from purchasing our products); exchange rate fluctuations; dividend remittance restrictions; expropriation of assets; war, civil uprisings and riots; government instability; the necessity of obtaining government approvals for both new and continuing operations; and legal systems of decrees, laws, taxes, regulations, interpretations and court decisions that are not always fully developed and that may be retroactively or arbitrarily applied.

One component of our strategy is to expand our operations into selected international markets. Military procurement, for example, has traditionally had a large international base. Countries in which we are actively marketing include Germany, Canada, France, Italy, the United Kingdom, Norway, Japan, India, Korea and Australia. We, however, may be unable to execute our business model in these markets or new markets. Further, foreign providers of competing products and services may have a substantial advantage over us in attracting consumers and businesses in their country due to earlier established businesses in that country, greater knowledge with respect to the cultural differences of consumers and businesses residing in that country and/or their focus on a single market. We expect to continue to experience higher costs as a percentage of revenues in connection with the development and maintenance of international products and services. In pursuing our international expansion strategy, we face several additional risks, including:

4

<PAGE>

    o foreign laws and regulations, which may vary country by country, that
      may impact how we conduct our business;
    o higher costs of doing business in foreign countries, including
      different employment laws;
    o potential adverse tax consequences if taxing authorities in different
      jurisdictions worldwide disagree with their interpretation of various
      tax laws or their determinations as to the income and expenses
      attributable to specific jurisdictions, which could result in our
      paying additional taxes, interest and penalties;
    o technological differences that vary by marketplace, which we may not be
      able to support;
    o longer payment cycles and foreign currency fluctuations;
    o economic downturns; and
    o revenue growth outside of the United States may not continue at the
      same rate if it is determined that we have already launched our
      products and services in the most significant markets.

We may also be subject to unanticipated income taxes, excise duties, import taxes, export taxes or other governmental assessments. In addition, a percentage of the payments to us in our international markets are often in local currencies. Although most of these currencies are presently convertible into

U.S. dollars, we cannot be sure that convertibility will continue. Even if currencies are convertible, the rate at which they convert is subject to substantial fluctuation. Our ability to transfer currencies into or out of local currencies may be restricted or limited. Any of these events could result in a loss of business or other unexpected costs which could reduce revenue or profits and have a material adverse effect on our business, financial condition and results of operations.

We routinely operate in areas where local government policies regarding foreign entities and the local tax and legal regimes are often uncertain, poorly administered and in a state of flux. We cannot, therefore, be certain that we are in compliance with, or will be protected by, all relevant local laws and taxes at any given point in time. A subsequent determination that we failed to comply with relevant local laws and taxes could have a material adverse effect on our business, financial condition and results of operations. One or more of these factors could adversely effect our future international operations and, consequently, could have a material adverse effect on our business, financial condition and results of operation.

RISKS RELATED TO OUR BUSINESS

MANY OF OUR CUSTOMERS HAVE FLUCTUATING BUDGETS WHICH MAY CAUSE SUBSTANTIAL FLUCTUATIONS IN OUR RESULTS OF OPERATIONS.

Customers for our products include federal, state, municipal, foreign and military, law enforcement and other governmental agencies. Government tax revenues and budgetary constraints, which fluctuate from time to time, can affect budgetary allocations for these customers. Many domestic and foreign government agencies have in the past experienced budget deficits that have led to decreased spending in defense, law enforcement and other military and security areas. Our results of operations may be subject to substantial period-to-period fluctuations because of these and other factors affecting military, law enforcement and other governmental spending. A reduction of funding for federal, state, municipal, foreign and other governmental agencies could have a material adverse effect on sales of our products and our business, financial condition and results of operations.

THE LOSS OF, OR A SIGNIFICANT REDUCTION IN, U.S. MILITARY BUSINESS WOULD HAVE A MATERIAL ADVERSE EFFECT ON US.

U.S. military contracts account for a significant portion of our business. The U.S. military funds these contracts in annual increments. These contracts require subsequent authorization and appropriation that may not occur or that may be greater than or less than the total amount of the contract. Changes in the U.S. military's budget, spending allocations, and the timing of such spending could adversely affect our ability to receive future contracts. None of our contracts with the U.S. military have a minimum purchase commitment and the U.S. military generally has the right to cancel its contracts unilaterally without prior notice. We are the sole-source provider to the U.S. military for up-armoring of the U.S. military's High Mobility Multipurpose Wheeled Vehicles ("HMMWVs"). The HMMWVs are manufactured by AM General Corporation under separate U.S. military contracts. Should production or deliveries of HMMWVs be significantly interrupted, or should other single source suppliers significantly interrupt deliveries of our components for up-armoring the HMMWVs, we will not be able to deliver such up-armoring systems for the HMMWVs to the U.S. military on schedule, which could have a material adverse effect on our business, financial condition and results of operations. We also manufacture for the U.S. military helicopter seating systems, aircraft and land vehicle armor systems, protective equipment for military personnel and other technologies used to protect soldiers in a variety of life-threatening or catastrophic situations. The loss of, or a significant reduction in,

5

<PAGE>

U.S. military business for our helicopter seating systems, aircraft and land vehicle armor systems and other protective equipment could have a material adverse effect on our business, financial condition and results of operations.

WE MAY LOSE MONEY OR GENERATE LESS THAN EXPECTED PROFITS ON OUR FIXED-PRICE CONTRACTS.

Some of our government contracts provide for a predetermined, fixed price for the products we make regardless of the costs we incur. Therefore, fixed-price contracts require us to price our contracts by forecasting our expenditures. When making proposals for fixed-price contracts, we rely on our estimates of costs and timing for completing these projects. These estimates reflect management's judgments regarding our capability to complete projects efficiently and timely. Our production costs may, however, exceed forecasts due to unanticipated delays or increased cost of materials, components, labor, capital equipment or other factors. Therefore, we may incur losses on fixed price contracts that we had expected to be profitable, or such contracts may be less profitable than expected, which could have a material adverse effect on our business, financial condition and results of operations.

OUR BUSINESS IS SUBJECT TO VARIOUS LAWS AND REGULATIONS FAVORING THE U.S. GOVERNMENT'S CONTRACTUAL POSITION, AND OUR FAILURE TO COMPLY WITH SUCH LAWS AND REGULATIONS COULD HARM OUR OPERATING RESULTS AND PROSPECTS.

As a contractor to the U.S. government, we must comply with laws and regulations relating to the formation, administration and performance of the federal government contracts that affect how we do business with our clients and may

impose added costs on our business. These rules generally favor the U.S. government's contractual position. For example, these regulations and laws include provisions that subject contracts we have been awarded to:

    o protest or challenge by unsuccessful bidders; and
    o unilateral termination, reduction or modification by the government.

The accuracy and appropriateness of certain costs and expenses used to substantiate our direct and indirect costs for the U.S. government under both cost-plus and fixed-price contracts are subject to extensive regulation and audit by the Defense Contract Audit Agency, an arm of the U.S. Department of Defense. Responding to governmental audits, inquiries or investigations may involve significant expense and divert management's attention. Our failure to comply with these or other laws and regulations could result in contract termination, suspension or debarment from contracting with the federal government, civil fines and damages and criminal prosecution and penalties, any of which could have a material adverse effect on our business, financial condition and results of operations.

OUR MARKETS ARE HIGHLY COMPETITIVE AND IF WE ARE UNABLE TO COMPETE EFFECTIVELY, WE WILL BE ADVERSELY AFFECTED.

The markets in which we operate include a large number of competitors ranging from small businesses to multinational corporations and are highly competitive. Competitors who are larger, better financed and better known than us may compete more effectively than we can. In order to stay competitive in our industry, we must keep pace with changing technologies and client preferences. If we are unable to differentiate our services from those of our competitors, our revenues may decline. In addition, our competitors have established relationships among themselves or with third parties to increase their ability to address client needs. As a result, new competitors or alliances among competitors may emerge and compete more effectively than we can. There is also a significant industry trend towards consolidation, which may result in the emergence of companies which are better able to compete against us.

THERE ARE LIMITED SOURCES FOR SOME OF OUR RAW MATERIALS WHICH MAY SIGNIFICANTLY CURTAIL OUR MANUFACTURING OPERATIONS.

The raw materials that we use in manufacturing ballistic resistant garments and up-armored vehicles include: SpectraShield, a patented product of Honeywell, Inc.; Z-Shield, a patented product of Honeywell, Inc.; Zylon, a patented product of Toyobo Co., Ltd.; Kevlar, a patented product of E.I. du Pont de Nemours Co., Inc., or DuPont; and Twaron, a patented product of Akzo-Nobel Fibers, B.V. We purchase these materials in the form of woven cloth from five independent weaving companies. In the event Du Pont or its licensee in Europe cease, for any reason, to produce or sell Kevlar to us, we would utilize these other ballistic resistant materials as a substitute.

<center>6</center>

&lt;PAGE&gt;

However, none of SpectraShield, Twaron, Z-Shield or Zylon is expected to become a complete substitute for Kevlar in the near future. We enjoy a good relationship with our suppliers of Kevlar, SpectraShield, Twaron, Z-Shield and Zylon. The use of Zylon and Z-Shield in the design of ballistic resistant vests is a recent technological advancement that is subject to continuing development and study. Toyobo is the only producer of Zylon, and Honeywell is the only producer of Z-Shield. Should these materials become unavailable for any reason, we would be unable to replace them with materials of like weight and strength. Thus, if our supply of any of these materials were materially reduced or cut off or if there was a material increase in the prices of these materials, our manufacturing operations could be adversely affected and our costs increased, and our business, financial condition and results of operations could be materially adversely affected.

WE MAY BE UNABLE TO COMPLETE OR INTEGRATE ACQUISITIONS EFFECTIVELY, IF AT ALL, AND AS A RESULT MAY INCUR UNANTICIPATED COSTS OR LIABILITIES OR OPERATIONAL DIFFICULTIES.

We intend to grow through the acquisition of businesses and assets that will complement our current businesses. We cannot be certain that we will be able to identify attractive acquisition targets, obtain financing for acquisitions on satisfactory terms or successfully acquire identified targets. Furthermore, we may have to divert our management's attention and our financial and other resources from other areas of our business. Our inability to implement our acquisition strategy successfully may hinder the expansion of our business. Because we depend in part on acquiring new businesses and assets to develop and offer new products, failure to implement our acquisition strategy may also adversely affect our ability to offer new products in line with industry trends.

We may not be successful in integrating acquired businesses into our existing operations. Integration may result in unanticipated liabilities or unforeseen operational difficulties, which may be material, or require a disproportionate amount of management's attention. Acquisitions may result in us incurring additional indebtedness or issuing preferred stock or additional common stock. Competition for acquisition opportunities in the industry may rise, thereby increasing our cost of making acquisitions or causing us to refrain from making further acquisitions. In addition, the terms and conditions of our secured revolving credit facility and the indenture governing our 8 1/4% notes impose restrictions on us that, among other things, restrict our ability to make acquisitions.

OUR RESOURCES MAY BE INSUFFICIENT TO MANAGE THE DEMANDS IMPOSED BY OUR GROWTH.

We have rapidly expanded our operations, and this growth has placed significant
demands on our management, administrative, operating and financial resources.
The continued growth of our customer base, the types of services and products
offered and the geographic markets served can be expected to continue to place a
significant strain on our resources. In addition, we cannot easily identify and
hire personnel qualified both in the provision and marketing of our security
services and products. Our future performance and profitability will depend in
large part on our ability to attract and retain additional management and other
key personnel; our ability to implement successful enhancements to our
management, accounting and information technology systems; and our ability to
adapt those systems, as necessary, to respond to growth in our business.

WE ARE DEPENDENT ON INDUSTRY RELATIONSHIPS.

A number of our products are components in our customers' final products.
Accordingly, to gain market acceptance, we must demonstrate that our products
will provide advantages to the manufacturers of final products, including
increasing the safety of their products, providing such manufacturers with
competitive advantages or assisting such manufacturers in complying with
existing or new government regulations affecting their products. There can be no
assurance that our products will be able to achieve any of these advantages for
the products of our customers. Furthermore, even if we are able to demonstrate
such advantages, there can be no assurance that such manufacturers will elect to
incorporate our products into their final products, or if they do, that our
products will be able to meet such customers' manufacturing requirements.
Additionally, there can be no assurance that our relationships with our
manufacturer customers will ultimately lead to volume orders for our products.
The failure of manufacturers to incorporate our products into their final
products could have a material adverse effect on our business, financial
condition and results of operations.

WE MAY BE UNABLE TO PROTECT OUR PROPRIETARY TECHNOLOGY, INCLUDING THE
TECHNOLOGIES WE USE TO FURNISH THE UP-ARMORING OF HMMWVS.

We are dependent upon a variety of methods and techniques that we regard as
proprietary trade secrets. We are also dependent upon a variety of trademarks,
service marks and designs to promote brand name development

                                    7

<PAGE>

and recognition. We rely on a combination of trade secret, copyright, patent,
trademark, unfair competition and other intellectual property laws as well as
contractual agreements to protect our rights to such intellectual property. Due
to the difficulty of monitoring unauthorized use of and access to intellectual
property, however, such measures may not provide adequate protection. It is
possible that our competitors may access our intellectual property and
proprietary information and use it to their advantage. In addition, there can be
no assurance that courts will always uphold our intellectual property rights, or
enforce the contractual arrangements that we have entered into to protect our
proprietary technology. Any unenforceability or misappropriation of our
intellectual property could have a material adverse effect on our business,
financial condition and results of operations. Furthermore, we cannot assure you
that any pending patent application or trademark application made by us will
result in an issued patent or registered trademark, or that, if a patent is
issued, it will provide meaningful protection against competitors or competitor
technologies. In addition, if we bring or become subject to litigation to defend
against claimed infringement of our rights or of the rights of others or to
determine the scope and validity of our intellectual property rights, such
litigation could result in substantial costs and diversion of our resources
which could have a material adverse effect on our business, financial condition
and results of operations. Unfavorable results in such litigation could also
result in the loss or compromise of our proprietary rights, subject us to
significant liabilities, require us to seek licenses from third parties on
unfavorable terms, or prevent us from manufacturing or selling our products, any
of which could have a material adverse effect on our business, financial
condition and results of operations.

TECHNOLOGICAL ADVANCES, THE INTRODUCTION OF NEW PRODUCTS, AND NEW DESIGN AND
MANUFACTURING TECHNIQUES COULD ADVERSELY AFFECT OUR OPERATIONS UNLESS WE ARE
ABLE TO ADAPT TO THE RESULTING CHANGE IN CONDITIONS.

Our future success and competitive position depend to a significant extent upon
our proprietary technology. We must make significant investments to continue to
develop and refine our technologies. We will be required to expend substantial
funds for and commit significant resources to the conduct of continuing research
and development activities, the engagement of additional engineering and other
technical personnel, the purchase of advanced design, production and test
equipment, and the enhancement of design and manufacturing processes and
techniques. Our future operating results will depend to a significant extent on
our ability to continue to provide design and manufacturing services for new
products that compare favorably on the basis of time to introduction, cost and
performance with the design and manufacturing capabilities. The success of new
design and manufacturing services depends on various factors, including
utilization of advances in technology, innovative development of new solutions
for customer products, efficient and cost-effective services, timely completion
and delivery of new product solutions and market acceptance of customers' end
products. Because of the complexity of our products, we may experience delays
from time to time in completing the design and manufacture of new product
solutions. In addition, there can be no assurance that any new product solutions
will receive or maintain customer or market acceptance. If we are unable to

design and manufacture solutions for new products of our customers on a timely
and cost-effective basis, such inability could have a material adverse effect on
our business, financial condition and results of operations.

WE MAY BE ADVERSELY AFFECTED BY APPLICABLE ENVIRONMENTAL LAWS AND REGULATIONS.

We are subject to federal, state, local and foreign laws and regulations
governing the protection of the environment and human health, including those
regulating discharges to the air and water, the management of wastes, and the
control of noise and odors. We cannot assure you that we are at all times in
complete compliance with all such requirements. Like all companies in our
industry, we are subject to potentially significant fines or penalties if we
fail to comply with environmental requirements. Environmental requirements are
complex, change frequently, and could become more stringent in the future.
Accordingly, we cannot assure you that these requirements will not change in a
manner that will require material capital or operating expenditures or will
otherwise have a material adverse effect on us in the future. In addition, we
are also subject to environmental laws requiring the investigation and clean-up
of environmental contamination. We may be subject to liability, including
liability for clean-up costs, if contamination is discovered at one of our
current or former facilities, in some circumstances even if such contamination
was caused by a third party such as a prior owner. We also may be subject to
liability if contamination is discovered at a landfill or other location where
we have disposed of wastes, notwithstanding that its historic disposal practices
may have been in accordance with all applicable requirements. We use
Orthochlorabenzalmalononitrile and Chloroacetophenone chemical agents in
connection with our production of tear gas, and these chemicals are hazardous
and could cause environmental damage if not handled and disposed of properly.
Moreover, private parties may bring claims against us based on alleged adverse
health impacts or property damage caused by our operations. The amount of
liability for cleaning up contamination or defending against private party
claims could be material.

                                        8

<PAGE>


RISKS RELATED TO OWNERSHIP OF OUR COMMON STOCK

DELAWARE LAW MAY LIMIT POSSIBLE TAKEOVERS.

Our certificate of incorporation makes us subject to the anti-takeover
provisions of Section 203 of the General Corporation Law of the State of
Delaware. In general, Section 203 prohibits publicly-held Delaware corporations
to which it applies from engaging in a *business combination* with an
*interested stockholder* for a period of three years after the date of the
transaction in which the person became an interested stockholder, unless the
business combination is approved in a prescribed manner. This provision could
discourage others from bidding for our shares and could, as a result, reduce the
likelihood of an increase in our stock price that would otherwise occur if a
bidder sought to buy our stock.

OUR CERTIFICATE OF INCORPORATION AUTHORIZES THE ISSUANCE OF SHARES OF BLANK
CHECK PREFERRED STOCK.

Our certificate of incorporation provides that our board of directors is
authorized to issue from time to time, without further stockholder approval, up
to 5,000,000 shares of preferred stock in one or more series and to fix or alter
the designations, preferences, rights and any qualifications, limitations or
restrictions of the shares of each series, including the dividend rights,
dividend rates, conversion rights, voting rights, terms of redemption, including
sinking fund provisions, redemption price or prices, liquidation preferences and
the number of shares constituting any series or designations of any series. Such
shares of preferred stock could have preferences over our common stock with
respect to dividends and liquidation rights. We may issue additional preferred
stock in ways which may delay, defer or prevent a change in control of us
without further action by our stockholders. Such shares of preferred stock may
be issued with voting rights that may adversely affect the voting power of the
holders of our common stock by increasing the number of outstanding shares
having voting rights, and by the creation of class or series voting rights.

THE MARKET PRICE FOR OUR COMMON STOCK IS VOLATILE.

The market price for our common stock may be highly volatile. We believe that a
variety of factors, including announcements by us or our competitors, quarterly
variations in financial results, trading volume, general market trends and other
factors, could cause the market price of our common stock to fluctuate
substantially. Additionally, due to our relatively modest size, our winning or
losing a large contract may have the effect of distorting our overall financial
results.

WE MAY ISSUE A SUBSTANTIAL AMOUNT OF OUR COMMON STOCK IN CONNECTION WITH FUTURE
ACQUISITIONS AND THE SALE OF THOSE SHARES COULD ADVERSELY AFFECT OUR STOCK
PRICE.

As part of our acquisition strategy, we anticipate issuing additional shares of
common stock as consideration for such acquisitions. To the extent that we are
able to grow through acquisitions and issue our shares of common stock as
consideration, the number of outstanding shares of common stock that will be
eligible for sale in the future is likely to increase substantially. Persons
receiving shares of our common stock in connection with these acquisitions may
be more likely to sell large quantities of their common stock that may influence
the price of our common stock. In addition, the potential issuance of additional
shares in connection with anticipated acquisitions could lessen demand for our

common stock and result in a lower price than would otherwise be obtained.

OUR STOCK PRICE MAY BE ADVERSELY AFFECTED WHEN ADDITIONAL SHARES ARE SOLD.

If our stockholders sell substantial amounts of our common stock in the public market, the market price of our common stock could fall. These sales might make it more difficult for us to sell equity or equity-related securities in the future at a time and price that we deem appropriate and may require us to issue greater amounts of our common stock to finance future acquisitions. Additional shares sold to finance acquisitions may dilute our earnings per share if the new operations' earnings are disappointing.

9

<PAGE>

OUR DEBT AGREEMENTS RESTRICT OUR ABILITY TO PAY DIVIDENDS OR MAKE OTHER DISTRIBUTIONS TO OUR STOCKHOLDERS.

Our debt agreements, such as the indenture governing the 8 1/4% senior subordinated notes and the senior credit facility, contain covenants that limit our ability to pay dividends or make other distributions to our stockholders. We intend to seek an amendment to our senior credit facility so that we can pay dividends or make other distributions to our stockholders. However, we cannot assure you that we will obtain the amendment to our senior credit facility and be permitted pursuant to our indenture to pay dividends or make other distributions to our stockholders.

WE HAVE A HIGH LEVEL OF DEBT.

Our high level of debt could have important consequences to you and to us. For example:

    o  No payment of any kind may be made to our common stockholders
       without first meeting our obligations under our senior credit
       facility and the indenture governing our 8 1/4% notes;
    o  We may become more vulnerable to general adverse economic and
       industry conditions and adverse changes in governmental regulations;
    o  We may have to dedicate a substantial portion of our cash flow
       from operations to make payments required under our senior credit
       facility and the 8 1/4% notes, reducing the availability of cash
       flow to fund future capital expenditures, working capital,
       execution of our growth strategy, research and development costs
       and other general corporate requirements;
    o  We may have limited flexibility in planning for, or reacting to,
       changes in our business and our industry, which may place us at a
       competitive disadvantage compared with competitors that have less
       debt or more financial resources;
    o  We may have limited ability to borrow additional funds, even when
       necessary to maintain adequate liquidity; and
    o  The terms of our senior credit facility and the indenture governing
       the 8 1/4% notes will allow us to incur substantial amounts of
       additional debt, subject to certain limitations. We might incur
       additional debt for various reasons, including to pay for additional
       acquisitions that we may make and assuming debt of companies that we
       may acquire.

ITEM 1.  DESCRIPTION OF BUSINESS

COMPANY OVERVIEW

We are a leading manufacturer and provider of specialized security products; training and support services related to these products; vehicle armor systems; military helicopter seating systems; aircraft and land vehicle armor systems; protective equipment for military personnel; and other technologies used to protect humans in a variety of life-threatening or catastrophic situations. Our products and systems are used domestically and internationally by military, law enforcement, security and corrections personnel, as well as governmental agencies, multinational corporations and individuals. We are organized and operated under three business divisions: Armor Holdings Products, also referred to as our Products Division, Armor Mobile Security, also referred to as our Mobile Security Division, and Simula.

Products. Our Products Division manufactures and sells a broad range of high quality security products, equipment and related consumable items, such as concealable and tactical body armor, hard armor, duty gear, less-lethal munitions, anti-riot products, police batons, emergency lighting products, forensic products, firearms accessories, weapon maintenance products, foldable ladders and specialty gloves. Our products are marketed under brand names that are well established in the military and law enforcement communities such as AMERICAN BODY ARMOR(TM), B-SQUARE(R), BREAK FREE(R), CLP(R), DEFENSE TECHNOLOGY/FEDERAL LABORATORIES(R), DEF-TEC PRODUCTS(R), DISTRACTION DEVICE(R), FEDERAL LABORATORIES(R), FERRET(R), FIRST DEFENSE(R), IDENTICATOR(R), IDENTIDRUG(R), LIGHTNING POWDER(R), MONADNOCK(R), NIK(R), PROTECH(TM), QUIKSTEP LADDERS(TM), PORTAL LADDERS(TM), QUIKSHIELD(TM), SAFARILAND(R), SPEEDFEED(R), and 911EP(R) and DESIGN(TM). We sell our products through a network of over 350 distributors and sales agents, including approximately 200 in the United States. Our extensive distribution capabilities and commitment to customer service and training have enabled us to become a leading provider of security equipment to law enforcement agencies.

10

<PAGE>

Mobile Security. Our Mobile Security Division manufactures and installs ballistic and blast protected armoring systems for privately owned vehicles. Under the brand name O'GARA-HESS & EISENHARDT ARMORING COMPANY(R), we armor a variety of privately owned commercial vehicles, including limousines, sedans, sport utility vehicles, commercial trucks and cash-in-transit vehicles, to protect against varying degrees of ballistic and blast threats. Our customers in this business include international corporations and high net worth individuals. Under the brand name O'Gara-Hess & Eisenhardt, we are the sole-source provider to the U.S. military of the armor and blast protection systems for M1114 Up-Armored High Mobility Multi-Purpose Wheeled Vehicles (HMMWVs). We are also under contract with the U.S. Army to provide spare parts, logistics and ongoing field support services for the currently installed base of approximately 4,415 Up-Armored HMMWVs. Additionally, we provide blast and ballistic protection kits for the standard HMMWVs, which are installed on existing equipment in the field. Our Mobile Security Division is also subcontracted to develop a ballistic and blast protected armored and sealed truck cab for the High Mobility Artillery Rocket System (HIMARS), a program recently transitioned by the U.S. Army and U.S. Marine Corps from developmental to a low rate of initial production, deliveries of which commenced in 2003. We also supply armor sub-systems for other tactical wheeled vehicles. In addition, we supply ballistic and blast protected armoring systems to U.S. federal law enforcement and intelligence agencies and foreign heads of state.

Simula. Simula, a wholly-owned indirect subsidiary of Armor Holdings, supplies human safety and survival systems to the U.S. military, and major aerospace and defense prime contractors. Our core markets are military aviation safety, military personnel safety, and land and marine safety. Through Simula, we provide military helicopter seating systems, helicopter cockpit airbag systems, aircraft and land vehicle armor kits, body armor and other protective equipment for military personnel, emergency bailout parachutes and survival ensembles worn by military aircrew. The primary customers for our products are the U.S. Army, U.S. Marine Corps, Boeing, and Sikorsky Aircraft. Most of Simula's aviation safety products are provided on a sole source basis. The U.S. armed forces have adopted ceramic body armor as a key element of the protective ensemble worn by our troops in Iraq and Afghanistan. Simula was the developer of this specialized product called small arms protective insert (SAPI), and is the largest supplier to U.S. forces. Simula was acquired by Armor Holdings on December 9, 2003, and results have been included herein since the acquisition date.

MATERIAL DEVELOPMENTS

Sale of Services Division

On November 26, 2003, we announced that we completed the sale of ArmorGroup, our security service division, for $33,660,000 in total consideration to a group of private investors led by Granville Baird Partners of London, England and Management. We received $31,360,000 in cash at closing and are scheduled to receive another $2,300,000 by the end of 2004, of which we have received $375,000 through March 6, 2004.

Simula, Inc. Acquisition

On December 9, 2003, we completed our acquisition of Simula, an Arizona corporation, pursuant to the Agreement and Plan of Merger, dated as of August 29, 2003, by and among Armor Holdings, AHI Bulletproof Acquisition Corp., a wholly-owned subsidiary of Armor Holdings, and Simula. The consummation of the merger followed the Special Meeting of Shareholders of Simula held on December 5, 2003, at which the requisite shareholder approval was obtained. In the merger, we acquired all of the outstanding common stock of Simula and retired a majority of Simula's outstanding indebtedness for $110.5 million in cash. Of this amount, approximately $31 million principal amount of 8% debentures remained outstanding for approximately 30 days at which time we repaid these debentures, plus accrued interest, in their entirety. After payment of 100% of the outstanding indebtedness and transaction expenses, the merger consideration payable to Simula shareholders at closing pursuant to the merger agreement was approximately $43.5 million or approximately $3.21 per share. The source of the funds used in the acquisition was our working capital, which was derived from proceeds received from our private placement of $150 million aggregate principal amount of 8 1/4% Senior Subordinated Notes due 2013.

Hatch Imports, Inc. Acquisition

On December 16, 2003, we acquired all of the issued and outstanding common stock of Hatch Imports, Inc. for $8.0 million dollars in cash and $2.0 million in deferred consideration payable in April 2005, subject to adjustments. Hatch designs, imports and distributes a variety of specialty gloves and accessories, including goggles, hoods, riot gear and bags for law enforcement, military, corrections, medical, safety and other markets.

11

<PAGE>

Zylon(R) Investigation

Second Chance Body Armor, Inc., a body armor manufacturer and competitor to Armor Holdings, has notified its customers of a potential safety issue with its Ultima(R) and Ultimax(R) models. Second Chance Body Armor has claimed that Zylon(R) fiber, which is made by Toyobo, a Japanese corporation, and used in the ballistic fabric construction of those two models, degraded more rapidly than originally anticipated. Second Chance Body Armor has also stated that the Zylon(R) degradation problem affects the entire body armor industry, not just its products. Both private claimants and State Attorneys General have already

commenced legal action against Second Chance Body Armor based upon its Ultima(R) and Ultimax(R) model vests. Second Chance Body Armor licenses from Simula a certain patented technology which is used in some of the body armor it manufactures, but to our knowledge, no lawsuit has yet been brought against Second Chance Body Armor based upon this licensed technology, although a letter was received by Simula from an attorney representing a police officer who was injured while wearing a Second Chance Body Armor vest alleging potential liability against Simula.

We use Zylon(R) fiber in a number of concealable body armor models for law enforcement, but our design and construction are different. We have been testing our Zylon(R)-based vests since their 2000 introduction and to date these tests of our Zylon(R)-based vests show no unanticipated degradation in ballistic performance. In addition, to our knowledge, no other body armor manufacturer has reported or experienced similar problems as those cited by Second Chance Body Armor. Finally, the National Institute of Justice tests and certifies each of our body armor designs before we begin to produce or sell any particular model.

Following the Second Chance Body Armor assertions, several key law enforcement associations have raised the issue to the U.S. Department of Justice and Attorney General's Office. The U.S. Attorney General has asked the U.S. Department of Justice to investigate the concerns and produce information to clarify the issues. We support the Attorney General's directive and the investigation.

As Simula has licensed a soft body armor technology to Second Chance Body Armor, it may be impacted by the pending suits filed against Second Chance Body Armor and the on-going investigation being conducted by the U.S. Department of Justice. However, the licensed technology is not specifically related to use of Zylon(R) fiber in Second Chance Body Armor vests.

The National Institute of Justice (NIJ) is engaged in an ongoing inquiry and investigation of bullet-resistant vests and the protocol for testing used vests, as well as the reliability of Zylon and other fibers. We have consulted with and cooperated fully with the NIJ in this endeavor. To date, the NIJ has embarked only in its first phase of testing, which entails vests that have been heavily worn or exposed to adverse conditions, and which involves the ballistic standard applicable to new vests. Although some of the vests tested, including ours, experienced some level of penetration, the NIJ specifically warned against the misuse and misinterpretation of these results, emphasizing that the data produced so far is preliminary in nature, applies to a very small sample size and therefore it is not possible to draw any statistically-based conclusions from these results. The NIJ will continue to conduct further testing and analyze these issues in order to determine if any conclusions can be reached as to the performance and reliability of aged vests. We have requested the NIJ to provide us with its testing data, and we intend to evaluate and review the NIJ results in our continuing effort to assist the NIJ in developing uniform standards for certification of new vests and the testing of used vests. The NIJ continues to encourage law enforcement officers to wear body armor, in light of the fact that "the lives of more than 2,700 law enforcement officers have been saved by the use of bullet-resistant body armor over the past 30 years."

INDUSTRY OVERVIEW

We participate in the domestic and international markets for military and commercial security products and armoring systems. Our Products Division manufactures security equipment used by military, law enforcement, security and corrections personnel, and other first responders (e.g., fire and rescue personnel). Our Mobile Security Division provides armoring systems and mobile security systems used by militaries, government agencies, law enforcement personnel, corporations and private individuals. Increasingly, governments, militaries, businesses, and individuals have recognized the need for security products to protect them from the risks of terrorism, physical attacks and threats of violence. Simula is a provider of military helicopter seating systems, aircraft and land vehicle armor systems, protective equipment for military personnel, and other technologies used to protect humans in a variety of life-threatening or catastrophic situations.

The U.S. government has placed a high priority on fighting terrorism overseas and securing the homeland from future terrorist attacks. This effort has led many institutions within the government and private sector to redefine their strategies to protect against, respond to, and combat terrorism. The creation of the Department of Homeland Security is one significant step in a reformed and reorganized effort to make our homeland more secure and better able to respond in the event of an attack. The Bush Administration's fiscal 2004 budget request includes $41.3 billion for homeland security spending. While it is impossible to quantify the effects that spending by the U.S. government on homeland security will have on our businesses, we expect to benefit to the extent that spending is allocated to increase the number of law enforcement personnel, to purchase security equipment and consumables used in equipping and training these personnel, and the armoring of vehicles.

Law Enforcement Security Products Market. According to the most recent data available from the Department of Justice, direct expenditures for police protection services in the United States grew at a compound annual growth rate of 7.3% from 1984 through 1999, to a total of $65.4 billion in 1999. We currently believe that this growth rate will continue, as will the growth in the number of police officers and other first responders in the United States. The Bush Administration estimates that there are more than 1.9 million first responders in the United States, categorized as follows:

12

<PAGE>

- o Over 17,000 state and local law enforcement agencies employing more than 700,000 full-time sworn law enforcement personnel.

- o 69 federal law enforcement agencies employing more than 88,000 persons.

- o Over 1 million firefighters, of which approximately 750,000 are volunteers

- o Over 155,000 nationally registered emergency medical technicians.

Vehicle Armor Market. Recent conflicts, military actions, and protracted involvement in peacekeeping missions around the globe have increased the demand for rapidly deployable and highly mobile armored vehicles. The Up-Armored HMMWV has proven its ability to survive front-line combat action in Bosnia, Kosovo, Afghanistan, and Iraq. The Government Electronics and Information Technology Association, a defense budget forecasting service, estimates that between 2003 and 2007, over $2.2 billion will be spent by the U.S. military for HMMWV procurement and research and development efforts. The continuing terrorist attacks on U.S. forces deployed in Iraq and Afghanistan have created significant interest in providing armor protection for the full range of light, medium and heavy vehicles. Congressional testimony provided by the U.S. Army leadership has indicated a desire to procure armor kits for these vehicles that can be installed on the vehicle at its deployed location. Foreign governments and militaries are also investing in armored vehicle technology, including the Up-Armored HMMWV, and other armored vehicle alternatives. In addition, we believe that the use of lightly armored commercial vehicles in countries with high levels of crime, terrorism and violence ("high fright areas") around the world will continue to increase as corporations, foreign governments and wealthy individuals re-evaluate their personnel protection policies and procedures.

Military Personnel Body Armor Market. A revolution is taking place in the type and extent to which U.S. forces are being provided protective body armor. In 1998, the Army and Marines adopted a new body armor ensemble called Interceptor. This ensemble is made up of a soft armor vest for fragmentation protection (using similar materials and design concepts to law enforcement vests) and hard, ceramic body armor plates inserted into the soft vest to provide rifle protection over vital organs. The concept was first deployed in a combat zone in Afghanistan with tremendous success measured in the reduction of life-threatening chest wounds. During the invasion of Iraq, front line U.S. forces were widely equipped with the Interceptor system. The use of the Interceptor system was extended to cover all deployed troops in the combat zone by order of the Secretary of the Army in mid-2003. Extensive procurement actions by the Army and Marines are underway to outfit all active, Reserve and National Guard troops that could be deployed around the world. The market is substantial and is straining the capacity of the industry to support the need. The product has a life cycle in use and we expect there will be a sizable ongoing replacement market in the future. Worldwide military demand for similar body armor ensembles is in its early stages and offers promise for substantial future business.

Military Aviation Safety Market. The military aviation safety market is comprised of three distinct market segments: crash safety, ballistic survivability, and personnel safety equipment. The primary market for crash safety is in military helicopters. The marketplace for these features is a subset of the military helicopter market. The products include crashworthy seats, airbags, landing gear, fuel systems, and structures. Demand for these products is currently flat, although there is an expected upturn in the market over the next 10 years for upgrades to aircraft such as the U.S. Army's UH-60M Black Hawk and for replacement of a wide range of U.S. military helicopters that have been damaged in combat operations. The ballistic survivability market is both for helicopters and fixed wing aircraft. Many front line aircraft have some basic armor protection. There is a growing interest in new protective solutions that can offer more complete ballistic protection within the limited available weight on an aircraft. Foreign markets for crash safety and ballistic survivability products are similar in size to the U.S. market, although the types of aircraft and customer base are more fragmented. The personnel safety market for aviators and passengers of aircraft include equipment such as: body armor, uniforms and helmets, survival vests and survival equipment, inflatable life preservers, parachutes, and emergency oxygen. The market is experiencing some growth as new ensembles incorporating lessons learned from combat are introduced and replacement equipment is increased due to the increased pace of operations.

INFORMATION CONCERNING BUSINESS SEGMENTS AND GEOGRAPHICAL SALES

For information concerning our business segments and geographical sales, please refer to Item 7 Management's Discussion and Analysis of Financial Condition and Results of Operations and Note 12 to our Consolidated Financial Statements included elsewhere in this report.

13

<PAGE>

BUSINESS STRENGTHS

We believe that the following strengths are critical to our success as a leading provider of specialized security products, training and support services, human safety and survival systems, and vehicle armor systems.

Valuable Brands with Leading Market Positions. Our products and brands are well established and have developed a reputation for high quality and dependability.

Due to the life-protecting nature of many of our products, customers prefer premium, well-recognized brands with quality reputations. We believe that our strong brand recognition attracts customer loyalty and repeat customer business and helps us establish leading market share positions in many of our product offerings.

Broad Portfolio of Products. Our broad product portfolio and our ability to offer that portfolio in both domestic and overseas markets result in a balanced revenue mix. Our broad array of security products and armor systems allows us to be a single-source provider of comprehensive solutions for our customers' security needs. Cross selling among our products creates additional business opportunities and increases the value of our client relationships. We believe that our acquisition of Simula will increase our access to superior technology and know-how and will enhance our efforts to develop new products.

Extensive Distribution Network. We market and deliver our products through an extensive network of approximately 200 domestic distributors, 150 international distributors and through a sales force of 34 representatives and specialists. We believe that we have one of the largest distribution networks of security products, which provides a foundation for our continued growth and expansion. The diversity of the markets we serve and the strength of our distribution relationships reduces our dependence on any particular product, market, or customer.

Long-Term Relationships with Government and Military Customers. We derive the majority of our sales from domestic and foreign law enforcement, government and military customers. Over many years, we have developed strong relationships with military, law enforcement, security and corrections customers both in the United States and overseas. We believe that our solid reputation and longstanding relationships with customers support our continued growth.

Sole-Source Provider of M1114 Up-Armored HMMWVs. We are the sole-source provider of up-armoring for new M1114 Up-Armored HMMWVs procured by the U.S. military. Since August 2001, we have furnished the up-armoring for approximately 1,100 M1114 Up-Armored HMMWVs to the U.S. military. We are also currently under contract to provide spare parts, logistics and ongoing field support services for the U.S. military's M1114 Up-Armored HMMWV fleet. In addition, we have begun providing up-armoring of M1114 HMMWVs to a number of foreign military customers including Canada, Egypt and Israel.

Extensive Portfolio of Armor Kits for Military Trucks. The two predominate developers and manufacturers of mine blast and ballistic protection kits for military trucks over the last 10 years have been O'Gara-Hess & Eisenhardt and Simula. The acquisition of Simula brings these two organizations together as well as provides a very complete portfolio of kit designs for light, medium and heavy trucks used by the U.S. military and foreign militaries. Although the market has not been sizeable in the past, recent actions by the services and by Congress indicate that substantial quantities of vehicles will be armored in the near term and future vehicles will be designed to readily accept these kits. The combined capabilities of O'Gara-Hess & Eisenhardt and Simula also provide the complete capability of armor technologies from basic steel armors to sophisticated ceramic/composite armor systems that will be used to armor the fleet of trucks.

Industry-leading Market Position in Body Armor. Within the Armor Holdings family of companies is contained industry leading technology, manufacturing and supply relationships for all types of body armor. This includes soft armor vests used in the law enforcement marketplace, as well as soft armor vests and hard armor plates used by military forces. There are substantial technical synergies that enable us to stay at the forefront of the market. The combined buying power for ballistic fabrics and ceramics, which is the largest in the world, is being utilized today to manage costs and to gain preferred supply relationships.

Sole-Source Provider of Aviation Safety Products. We are the sole supplier of crew seats for 14 different helicopter models and other variants of these aircraft. We have also developed and patented the Cockpit Airbag System (CABS) that is currently being installed on two front-line helicopter platforms and has substantial U.S. and

14

<PAGE>

foreign market potential. Our reputation in these areas has enabled us to assume the systems integrator role for our customer base and allows us access to a range of new technologies.

Experienced Management Team. Our management team brings extensive knowledge of our customers and a proven ability to effectively manage our operations. The team has been augmented through acquisitions in the area of engineering and R&D to provide the capability to develop a range of new products. In addition, our management has a proven record of identifying, executing and integrating strategic acquisitions into our business, including our two largest acquisitions to date: Simula. in 2003 and the O'Gara group of companies in 2001.

GROWTH STRATEGY

We believe the demand for security products, vehicle armor systems and human safety and survival systems will continue to grow. We expect to address this growth by offering a comprehensive array of high quality branded security products to meet the needs of law enforcement and militaries around the globe. We also expect to continue to develop ballistic and blast protection for high-end commercial vehicles as well as for military vehicles. We intend to enhance our leadership position through additional strategic acquisitions by

creating a broad portfolio of products and services to satisfy all of our customers' increasingly complex security products needs. The following elements define our growth strategy:

Focus on Core Competencies. Our primary strength lies in our ability to manufacture and distribute high quality security products, vehicle armoring systems and human safety and survival systems. We plan to leverage this core strength by expanding our research and development efforts, developing new products and acquiring businesses that complement our existing technical base and manufacturing operations. We plan to continue to streamline our manufacturing process, aggressively integrate acquisitions and pursue additional operating efficiencies to maximize the profitability of our business.

Expand Distribution Network and Product Offerings. We plan to leverage our distribution network by expanding our range of branded law enforcement equipment through the acquisition of security products manufacturers and by investing in the development of new and enhanced products that complement our existing offerings. We believe that a broader product line will further strengthen our relationships with distributors and enhance our brand appeal with military, law enforcement and other end users.

Increase Exposure to Military Programs. As the sole-source provider of M1114 Up-Armored HMMWV for the U.S. military's HMMWVs, we believe that we are in a strong position to capture opportunities to provide armoring of additional vehicles for the Department of Defense. We believe the proven success of M1114 Up-Armored HMMWVs in combat has led to increased interest in armoring other vehicles. Examples include recent successful efforts to develop and supply armor kits for various types of light through heavy tactical trucks and the continued relationship with the original equipment manufacturers to explore up-armoring opportunities for the U.S. Army's tactical vehicle fleet. We have developed and own the proprietary technology for the M1114 Up-Armored HMMWV. We believe that the cost and time required for the development of an alternative protection system increases the likelihood that we will maintain our sole source position on this program.

Capitalize on Increased Homeland Security Requirements. The creation of the Department of Homeland Security has increased the U.S. government's focus on strengthening the infrastructure of homeland security. Our Products Division is well positioned to provide security equipment and materials required by military, law enforcement, and security personnel to combat terrorism, respond to attacks and counter homeland threats. Our Mobile Security Division is well positioned to provide armored vehicles for federal, state and local government agencies.

Pursue Strategic Acquisitions. Since January 1, 1999, we have completed 15 acquisitions and integrated the acquired businesses into our Products Division, Mobile Security Division, and Simula. We will continue to seek opportunities to make value-based acquisitions that complement our business operations or expand our product offerings, provide access to new geographic markets and provide additional distribution channels and new customer relationships. We have historically taken a disciplined value-based approach to evaluating acquisition opportunities, driven by a prudent use of our capital, rigorous due diligence standards and a targeted expected return on our investment. No assurances can be given that any such potential acquisitions will be consummated or, if any such acquisition is consummated, as to the terms of such acquisition, including price.

<div style="text-align:center">15</div>

<PAGE>


ACQUISITIONS

We pursue a strategy of growth through acquisition by acquiring businesses and assets that complement our existing operations. We exercise a high degree of financial discipline and strictly adhere to the following criteria to evaluate prospective acquisitions, including whether the business to be acquired:

    o broadens the scope of products we offer or the geographic areas we
      serve;

    o offers attractive margins;

    o is accretive to earnings;

    o offers opportunity to improve profitability by increasing the
      efficiency of our operations;

    o is managed in a manner consistent with our existing businesses; and

    o complements our portfolio of existing businesses by increasing our
      ability to meet our customers' needs.

We have completed 15 acquisitions since January 1, 1999. The following table sets forth information regarding each of these acquired businesses and their respective products:

<TABLE>
<CAPTION>

| BUSINESS OR ASSETS ACQUIRED | YEAR OF ACQUISITION | DIVISION | PRIMARY PRODUCT CATEGORIES |
|---|---|---|---|
| --------------------------- | ----------- | -------- | -------------------------- |

| <S> | <C> | <C> | <C> |
|---|---|---|---|
| Safariland | 1999 | Products | Duty Gear |
| Break Free | 2000 | Products | Weapons Maintenance Products |
| Lightning Powder | 2000 | Products | Forensics |
| Monadnock Lifetime Products | 2000 | Products | Police Batons |
| Guardian Products | 2001 | Products | Less Lethal Products |
| O'Gara-Hess & Eisenhardt Companies | 2001 | Mobile Security | Commercial and Military Vehicles |
| Identicator | 2001 | Products | Forensics |
| Speedfeed | 2002 | Products | Firearm Accessories |
| Evi-Paq | 2002 | Products | Forensics |
| Foldable Products Group | 2002 | Products | Safety Products |
| B-Square | 2002 | Products | Firearm Accessories |
| Trasco Bremen | 2002 | Mobile Security | Commercial Vehicles |
| 911 Emergency Products | 2002 | Products | Warning and Emergency  Lighting, Safety Products |
| Simula | 2003 | Simula | Human Safety and Survival Systems |
| Hatch Imports | 2003 | Products | Specialty Gloves and Accessories |

  </TABLE>


PRODUCTS

ARMOR HOLDINGS PRODUCTS

Body Armor. We manufacture and sell a wide array of armor products under the
leading brand names American Body Armor(R), Safariland(R) and PROTECH(TM) that
are designed to protect against bodily injury caused by bullets, knives and
explosive shrapnel. Our principal armor products are ballistic resistant vests,
sharp instrument penetration armor, hard armor such as anti-riot gear, shields
and upgrade armor plates, and bomb protective gear. Our line of ballistic
protective vests provides varying levels of protection depending upon the
configuration of ballistic materials and the standards (domestic or
international) to which the armor is built. We primarily sell ballistic
resistant vests, under the brand names Xtreme(TM), American Body Armor(TM),
Safariland(R), Protech(TM) and Zero-G(R). Our body armor products that are
manufactured in the United States are certified under guidelines established by
the National Institute of Justice. We also manufacture body armor in Manchester,
England that is certified under various international standards.

We offer two types of body armor, concealable armor and tactical armor.
Concealable armor, which generally is worn beneath the user's clothing, is our
basic line of body armor. These vests are often sold with a shock plate,

                                   16

  <PAGE>

which is an insert designed to improve the protection of vital organs from sharp
instrument attack and to provide enhanced blunt trauma protection. Tactical
armor is typically worn externally and is designed to provide protection over a
wider area of a user's body and defeat higher levels of ballistic threats. The
vests, which are usually manufactured with hard armor ballistic plates that
provide additional protection against rifle fire, are designed to afford the
user maximum protection and may be purchased with enhanced protection against
neck and shoulder injuries. Tactical armor is offered in a variety of styles,
including tactical assault vests, tactical police jackets, floatation vests,
high coverage armor and flak jackets.

Our sharp instrument penetration armor is designed primarily for use by
personnel in corrections facilities and by other law enforcement employees who
are primarily exposed to threats from knives and other sharp instruments. These
vests are constructed with special, blended fabrics, as well as flexible woven
fabrics and are available in both concealable and tactical models. In addition,
these vests can be combined with ballistic armor configurations to provide
"multi-threat protection" against both ballistic and sharp instrument
penetration.

We also distribute a variety of items manufactured by others, including helmets,
goggles, face shields and crowd management systems for protection from blunt
trauma.

Less-Lethal Products. Under the Defense Technology/Federal Laboratories(TM),
First Defense(R), MACE(R) for Law Enforcement and Guardian(TM) brands, we
manufacture and sell a complete line of less-lethal, anti-riot and crowd control
products designed to assist law enforcement and military personnel in handling
situations that do not require the use of deadly force. These products, which
generally are available for use only by authorized public safety agencies,
include pepper sprays, tear gas, specialty impact munitions and diversionary
devices. We market and distribute Chemical Biological Agent and Riot Control
Agent rated Mine Safety Appliance Advantage 1000 and Millennium model gas masks
to law enforcement and public safety agencies in the United States.

We hold an exclusive license to use the MACE(R) brand in connection with the
manufacturing and sale of MACE(R) aerosol sprays to law enforcement entities
worldwide. We also manufacture pepper sprays containing the active ingredient
Oleoresin Capsicum, a cayenne pepper extract. Our pepper spray formula is
patented and carries the trademark name of First Defense(TM). The products range
from small "key-ring" and hand held units to large volume canisters for
anti-riot and crowd control applications. Our tear gases are manufactured using
Orthochlorabenzalmalononitrile and Chloroacetophenome. These products are
packaged in hand held or launchable grenades, both pyrotechnic and
non-pyrotechnic, as well as in 37mm, 40mm and 12 gauge munitions. The munitions
include barricade rounds, blast dispersions and pyrotechnic canisters.

We manufacture a wide range of specialty impact munitions that can be used
against either individual targets or in anti-riot and crowd control situations.

These products, which range from single projectiles, such as bean bags, rubber balls, sponge rounds, wood and rubber batons, to multiple projectile products containing rubber pellets, rubber balls or foam, can be fired from standard 12 gauge shotguns, 37mm gas guns and 40mm launchers. We also manufacture a patented and trademarked device that is used for dynamic entries by specially trained forces where it is necessary to divert the attention of individuals away from an entry area. This product, which carries the trademark name of Distraction DeviceTM, emits a loud bang and brilliant flash of light when used.

Duty Gear. We are a leading supplier of duty gear to law enforcement personnel in the United States. Uniformed police officers require a wide assortment of duty gear, which typically includes items such as belts, safety holsters, handcuff and flashlight holders and related accessories. We manufacture and sell duty gear and accessories under the widely recognized brands Safariland(R) (Safari-LaminateTM) and NYLOK(R) (nylon). Duty gear represents a market in which brand appeal, safety and quality dictate demand. Replacement sales represent significant recurring demand for duty gear.

Tactical Products; Structural Armor Systems. We manufacture hard armor products under the PROTECH(TM) brand name. PROTECH(TM) products include ballistic shields and other personal protection accessories and armor products for aircraft, automobiles and riot control vehicles.

Following the terrorist attacks of September 11, 2001, we partnered with C&D Aerospace of California to produce armored commercial airline cockpit doors certified by the U.S. Federal Aviation Administration (FAA). To date, we have retrofitted approximately 8,307 cockpit doors on commercial aircraft; we expect any future orders to be associated with new aircraft production.

We also manufacture a variety of hard armor ballistic shields primarily for use in tactical clearance applications and ballistic resistant enclosures for use as guard booths, shacks and towers. These shields are manufactured

17

<PAGE>

using a variety of ballistic fibers, polyethylene ballistic materials, ballistic steel, ballistic glass or a combination of these materials. Other hard armor products include barrier shields and blankets. These products allow tactical police officers to enter high-threat environments with maximum ballistic protection.

Automotive Accessories. Through our Safariland subsidiary, we manufacture and supply automotive accessories such as tire covers, seat covers, cargo organizers and grill covers to automobile manufacturers, including Toyota, Ford, Honda, Nissan, Mitsubishi, Kia and Subaru.

Forensic Products. We assemble and market portable narcotic identification kits under the NIK(R) brand name that is used in the field by law enforcement personnel to identify a variety of controlled substances, including Ecstasy, cocaine, marijuana, heroin and methamphetamine. We also assemble and market evidence collection kits and evidence tape. We have the exclusive rights to distribute Flex-Cuf(R) disposable restraints and hold a license to use the Flex-Cuf(R) trademark. We believe we have earned a reputation as one of the most responsive companies in the forensic community.

We manufacture and distribute an extensive line of evidence collection equipment under our brand name Lightning Powder(R). These products, such as fingerprint powders, dusting brushes, and lifting tape, are used to collect latent fingerprints. We distribute other supplies for evidence collection including bags, tapes, stone casting equipment and high powered, distortion free magnifying glasses.

We design, manufacture and market proprietary cost-effective fingerprint products for business, government and law enforcement agencies under the Identicator(TM) brand name. These products are designed to deter fraud and produce positive identification in many different applications, and must be simple to operate, clean, and cost-effective. All products produce non-smearing, instantly permanent, black prints acceptable to the FBI for scanning, classification, search and retention. We also produce a variety of specialized products for various investigative and evidence collection applications under the brand name Evi-Paq(TM).

Batons. We manufacture batons of wood, alloy steel, acetate, aluminum and polycarbonate products under our brand name Monadnock(R). Branded products include our patented Auto-Lock(TM) baton and our Classic-Friction LockTM baton. Our batons are manufactured in a variety of lengths for different intended users, including patrol officers, detectives, corrections officers and other law enforcement personnel in smaller portable units and military and federal agencies. We believe that our manufacturing specifications are among the highest in the marketplace and set the standard in the industry.

Firearm Accessories. We manufacture non-destructive, non-gunsmith mounts as well as synthetic stocks and for ends. Our Speedfeed high quality synthetic stocks and for ends fit most makes and models. Our B-Square(TM) subsidiary is a leading designer, manufacturer and marketer of quality aluminum and steel sight mount, tools and accessories for the law enforcement, military and sporting goods (hunting and target shooting) markets.

Weapon Maintenance Products. We manufacture synthetic based lubricants, cleaners and preservative compounds for military weapon maintenance, law enforcement, civilian firearms/sports equipment and industrial machinery. Our flagship weapon maintenance product, Break Free CLP(R), was specifically developed to provide

reliable weapon lubrication in battlefield conditions; remove firing residues, carbon deposits and other firing contaminants; repel water and dirt and prevent corrosion; and keep weapons combat ready and functional in a wide variety of climates.

Warning and Emergency Lighting; Safety Products. We manufacture emergency lighting products using LED technology branded as 911EP(R). LED technology offers patrol car lighting systems that are energy efficient, safe and durable for use in primary and secondary warning lights. 911EP(R)'s unique design utilizes the patrol vehicle's existing 12-volt electrical system and consumes 70% less energy than traditional strobe or halogen systems. We also manufacture strong, lightweight, and compact ladders designed to be deployed quickly in emergency situations, branded as Quikstep(TM). Constructed with aluminum alloy and stainless steel, our 12-foot ladder weighs only 31 pounds and folds up to a briefcase size.

We are the exclusive U.S. distributor of the Thermal-Air(TM) Mask Engineered by Polar-Wrap. The Thermal-Air products are manufactured with a patented heat exchange module that captures the wearer's own breath and uses it to preheat cold air coming in the mouth and helps keep the body core temperature at a higher level, increasing the time law enforcement officers can effectively perform their duties outdoors, even in cold temperatures.

18

<PAGE>

Specialty Gloves & Protective Gear. The newly acquired Hatch is a leading supplier of high quality gloves and other protective gear serving the law enforcement, correctional, military, medical and industrial markets. We excel at providing new, innovative products using proprietary materials and designs to the law enforcement and military fields. Of note are our patented SOG Operator(TM) Kevlar(R) and Kangaroo leather series of gloves used by tactical personnel worldwide. The Exo-Tech(TM) disturbance control suit along with the Centurion(TM) single piece body protection provide law enforcement unrivaled protection for riots, prisoner extraction and civil disturbance. Duty gloves range from those lined with cut resistant Spectra(R) to Thinsulate(R) insulated fine leather gloves. To provide users in the field with optimum performance our high tech tactical products incorporate materials such as Kevlar(R), Nomex(R), Kangaroo leather, and Schoeller Dynamic Extreme(TM) textiles. In addition the Boss(TM) line of tactical eyewear yields a goggle with a hybrid and highly proprietary design. Hatch's Knee pads, elbow protection along with Nomex (R) and Kevlar(R) hoods give SWAT and other officers the protection they demand. Commercial offerings consist of the shooting, dress, industrial safety anti-vibration, motorcycle and ergonomic gloves.

ARMOR MOBILE SECURITY

We provide ballistic and blast protection-armoring systems for military vehicles and commercial vehicles, including the following:

Military Products. We are the sole-source provider to the U.S. military for up-armoring of the M1114 Up-Armored HMMWV. The HMMWV chassis is produced by AM General Corporation and shipped directly to our facility in Fairfield, Ohio, where up-armoring components are added. The M1114 Up-Armored HMMWVs provide exterior protection against various levels of armor piercing ammunition, overhead airburst protection and underbody blast protection against anti-tank and anti-personnel mines. In addition, we install other features designed to enhance crew safety, comfort and performance, such as air conditioning, weapon turrets and mounts, door locks and shock absorbing seats. During 2003, the Armor Mobile Security Division shipped 873 M1114 Up-Armored HMMWVs. We also supply engineering design and prototype services in support of the M1114 Up-Armored HMMWV program, and supply spare parts and logistics and ongoing field support services. None of our contracts with the U.S. military have a minimum purchase commitment and the U.S. military generally has the right to cancel its contracts unilaterally, at its convenience.

We are serving as a subcontractor to Stewart & Stevenson Services which is contracted with Lockheed Martin under a U. S. Army and U.S. Marine Corps program to supply a ballistically armored and sealed truck cab for the HIMARS. The truck is used to fire missiles that are a part of either the Multiple Launch Rocket System or the Army Tactical Missile System. This program consisted of shipping several prototypes in 2001 and 2002 for test and evaluation by the U.S. Army and U.S. Marine Corps, and has been transitioned to a low rate initial production in 2003.

We market armor sub-systems for other tactical wheeled vehicles, such as medium and heavy military trucks. We also produce various armor systems as a subcontractor to a number of large defense contractors. These products include armor for containers for fuels and missile launchers and for pilot protection. These specialized armoring products often involve the use of unique materials or methods.

Commercial Products. We armor a variety of vehicles, including limousines, sedans, sport utility vehicles, commercial trucks and cash-in-transit vehicles, to protect against varying degrees of ballistic and blast threats. The commercial vehicle armoring process begins with the disassembly of a new base vehicle. This disassembly normally involves the removal of the interior trim, seats, doors and windows. The passenger compartment then is armored with both opaque and transparent armor. Other features, such as run flat tires and non-exploding gas tanks, may also be added. Finally, the vehicle is reassembled as close to its original appearance as possible. The entire conversion process results in a low profile, integrated ballistic protective system. Our

relationship with various vehicle manufacturers has been valuable in permitting
us to armor certain vehicles while allowing the customer to maintain the
benefits of warranties issued by the vehicle manufacturer. The Mobile Security
Division shipped 1,127 commercial armored vehicles in 2003.

We produce fully armored vehicles and light armored vehicles. Fully armored
commercial vehicles, such as limousines, large sedans or sport utility vehicles,
typically are armored to protect against attacks from military assault rifles
such as AK-47s and M16s. These vehicles also can be blast protected by enhancing
the ballistic and underbody protection with proprietary materials and
installation methods that protect the occupants against a defined blast threat.
Blast protected vehicles defend against threats such as pipe bombs attached to
the exterior of the vehicle. Fully armored vehicles typically sell for $70,000
to $250,000, exclusive of the cost of the base vehicle.

                                    19

<PAGE>

Fully armored vehicles also include parade cars, which are formal limousines
used predominantly for official functions by a president or other head of state.
These vehicles are usually customized based upon a commercially available
chassis, which we essentially rebuild completely. Because the threat of
organized assassination attempts is greater for heads of state, these vehicles
normally incorporate more advanced armor and sophisticated protection features.
These features can include supplemental air and oxygen systems, air purification
systems to protect against chemical or biological contamination, underbody fire
suppressant systems, tear gas launchers, anti-explosive self-sealing fuel tanks,
electric deadbolt door locks, gun ports and bomb scanners. Parade Cars normally
sell for $300,000 to in excess of $1.0 million, inclusive of the cost of the
base vehicle.

Light armored vehicles are similar in all respects to fully armored vehicles
except that we add substantially less total weight to a light armored vehicle.
Therefore, it is possible to armor smaller vehicles such as the Volkswagen Jetta
and the General Motors Omega, as well as larger vehicles such as the Mercedes
Benz S600 and the Jeep Grand Cherokee. Light armored vehicles are designed to
protect against attacks from handguns. The price of a light armored vehicle
ranges from $5,000 to $60,000, exclusive of the cost of the base vehicle.

We also produce specialty vehicles and cash-in-transit vehicles. Specialty
vehicles are custom built for a specific mission. Examples of specialty vehicles
are escort cars, usually convertibles, and chase cars, usually closed top
vehicles, in which security personnel ride while in a head of state motorcade.
Cash-in-transit vehicles are used by banks or other businesses to transport
currency and other valuables. After starting with a van or small truck, we
modify the base vehicle to provide protection for the cargo and passengers from
ballistic and blast threats.

SIMULA

We are a provider of military helicopter seating systems, aircraft and land
vehicle armor systems, protective equipment for military personnel, and other
technologies used to protect humans in a variety of life-threatening or
catastrophic situations.

Our products are deployed on a wide range of high-profile military platforms
such as the AH-64 Apache and the UH-60 Black Hawk helicopters, the C-17
Globemaster III Transport Aircraft, the M1117 Guardian Armored Security Vehicle,
various versions of the HMMWV, and body-worn equipment for personal protection
of the United States Army, Marine Corps, and Air Force Special Operations
Forces. Primary Aerospace and Defense customers include Boeing, Sikorsky, Bell
Helicopter, Oshkosh Truck, General Motors, the U.S. military services, and the
U.S. Coast Guard.

Aviation Safety Systems.  Our core capabilities and technologies in the aircraft
safety market include protective  seating,  inflatable restraints, and armor.

We have been a major supplier of crash-resistant, energy-absorbing seating
systems for military helicopters and other military aircraft to various branches
of the United States military and its prime defense contractors, and foreign
customers for over 25 years. We currently supply approximately 75% of the new
and replacement crew seating systems for U.S. military helicopters. The seating
systems focus on reducing injury and increasing survivability in aircraft
crashes. Many of our seating systems incorporate our advanced armor systems. We
are the sole supplier of crew seats for 14 different helicopter models and other
variants of these aircraft. Military helicopters for which we have designed and
manufactured crew seat assemblies include the AH-64 Apache attack helicopter,
UH-60 Black Hawk utility helicopter, SH-60 Sea Hawk ASW helicopter, ASW and
Transport helicopters, Italy's EH101 MMI ASW and Transport helicopters, Canada's
CH-149 Cormorant Search-and-Rescue helicopter, and Norway's Sea King Multi-role
helicopter. Aircraft manufacturers in our customer base include Boeing
Helicopters, Sikorsky Aircraft Corporation, Bell Helicopter, Textron, Inc.,
Kaman Aerospace, Kawasaki Heavy Industries, Mitsubishi Heavy Industries,
Hindustan Aeronautics, and Agusta Westland. We also supply crew seats directly
to various agencies of the U.S. Department of Defense and various foreign
militaries

Our expertise in military seating systems also extends to troop seats for both
helicopters and fixed-wing aircraft. Simula is the sole-source provider of troop
seats for the C-17 Globemaster transport aircraft. We were selected as the sole
supplier by the U.S. Air Force to develop a common wall-mounted troop seat for
its C-130, C-141, and KC-135 aircraft. The common troop seat also has

application to a range of transport helicopters and various fixed-wing aircraft flown by other U.S. services and foreign militaries.

Our expertise in helicopter crash safety led to the development of cockpit airbag systems ("CABS") with U.S.

20

<PAGE>

Army funding over the last five years. Our role has evolved into the position as a system integrator incorporating airbags, gas generators, and complex three-dimensional crash sensors into helicopter cockpits. In 2001, we were awarded the first ever production contracts for aircraft airbag systems. These are currently being produced for the U.S. Army's UH-60 Black Hawk and OH-58 Kiowa Warrior helicopters. We received one production contract in 2002 and two production contracts in 2003, which represents less than 5 percent of the potential world market for CABS. Thus we believe there is substantial growth potential in this business area.

Ground Vehicles. Our expertise in military vehicle safety systems focuses on two areas: armor kits for the tactical vehicles, and ballistic armor systems for combat vehicles.

Our experience in high-performance, lightweight armor for aircraft has enabled us to build a business around armoring thin-skinned vehicles for priority missions during peacekeeping operations. Work in this area includes ballistic and mine-blast kits for HMMWVs, 5-ton trucks, and large off-road trucks such as the Heavy Expanded Mobility Tactical Truck (HEMTT). We have responded to urgent armor requirements in most major conflicts involving U.S. peacekeepers in the last 10 years. We are currently under contract to supply armor kits for HMMWVs and for four heavy transport trucks. Our customers for these kits are predominately the U.S. Army and Marine Corps.

Our ground vehicle armor business also includes production armor kits for the M1117 Guardian Armored Security Vehicle for the U.S. Army. This small armored personnel carrier is used by military police in a peacekeeping role. The armor kits consist of an array of ceramic composite armor panels that form the armor system with the vehicle hull and internal composite spall liner. We have completed more than 75 kits, which represents all ASVs produced to date. Simula has also provided similar ceramic composite armor kits for the U.S. Army's first Stryker vehicle deployments.

Military Personnel Safety Systems. Our core competencies and technologies in personnel safety include ballistic body armor, emergency bailout parachutes, flotation collars, survival vests, and integrated ensembles incorporating multiple capabilities.

Simula Inc.'s body armor business includes a range of hard armor plates used in conjunction with soft vests to minimize injury from handgun bullets, rifle bullets and fragments from explosive warheads. The primary product in the product line is the small arms protective insert (SAPI) plate, developed by Simula in 1998 and which has now become the standard product for all U.S. Army and Marine Corps ground troops. Simula is the largest producer of SAPI plates in the world. SAPI plates of similar design are also produced by Protech in the Armor Holdings Products Division. The combined production of Simula and Protech represents more than 40 percent of the U.S. military market share for these products. More than 275,000 SAPI plates have been produced to date.

We have applied our technologies and overall knowledge of materials and structures to develop a parachute system that solves numerous functional problems attendant to traditional military bailout parachutes. Our Thin-Pack Parachute (TPP) incorporates patented environmental sealing technology, which reduces repackaging and maintenance costs, and extends the service life of the parachute without jeopardizing user safety. To date, we have supplied over 5,000 TPPs to the U.S. Navy.

We have also developed a line of flotation collars that are designed to provide additional buoyancy for a person that enters water in an emergency. The basic configuration of the product, called the Low Profile Flotation Collar, can fit a wide range of applications. For example, aviators that eject or bailout can use it over water and rescue swimmers, divers and naval personnel can utilize it as well. In addition, it can be worn with a wide range of other equipment and clothing for ground troops being ferried over water and also by commercial personnel who work around water. The U.S. Navy, U.S. Marine Corps, and the U.S. Air Fore have adopted our system. To date, we have supplied over 20,000 collars.

We have seen a trend among our customers to integrate various armor, survival and flotation technologies in a common vest ensemble. We were selected to develop the U.S. Army's new Air Warrior ensemble and the product will begin sales in 2004. The Army has a stated need for 9,300 over systems. The Air Warrior ensemble may also be adopted by other services.

Technology Development and Licensing. An important part of our business is a growing portfolio of licensed technologies. Our principal licenses include soft armor and a patented family of transparent polymers. We currently license our patented SimuLITE(TM) material technology to Second Chance Body Armor, for use in concealable personal body armor used by police forces.

21

<PAGE>

Simula has developed a number of advanced transparent polymers, trademarked as

CleargardTM, and has introduced these materials to a variety of customers in numerous markets. These patented and proprietary transparent plastics are high-strength, impact resistant, lightweight and dye compatible materials, which possess the ability to withstand extreme temperatures and chemical attack. Potential uses for such materials include transparent armor, laser protective devices, aircraft canopies, high performance windows for aircraft and automobiles, industrial and protective lenses and visors, medical products and sun, sport and ophthalmic lenses. We have taken steps to commercialize the transparent polymer material through our own products and through licenses in other markets. We have licensed our optical polymer for use in ophthalmic lenses with PPG Industries, Inc. and for sun and sport lenses and motorcycle helmets with Intercast Europe. PPG introduced Simula's polymer in 2001 under the tradename of TrivexTM. Intercast introduced a product trade named NXT(TM) to the sunglass market in early 2002. In 2002, we completed a license with the prime contractor for the Joint Services General Purpose Gas Mask (JSGPM) to develop a Cleargard lens with chemical agent resistance and ballistic properties.

CUSTOMERS

Products Division. In 2003, we sold approximately 86.5% of our products in North America, with the balance sold internationally. The primary end users of our products are federal, state and local law enforcement agencies, local police departments, state corrections facilities, U.S. and allied militaries, highway patrols and sheriffs' departments. We reach these customers through a distribution strategy that utilizes a worldwide distribution network of approximately 200 domestic distributors and 150 international agents, as well as approximately 25 domestic sales representatives, three regional sales managers, and six technical sales specialists, who promote our products but refer customers to a local distributor for purchasing.

Mobile Security Division. In 2003, we sold approximately 60.6% of our products in North America, with the balance sold internationally. The market for military hardware products is worldwide in scope, including the U.S. military and foreign defense forces. The primary contract for delivery of Up-Armored HMMWVs is with the U.S. military, although smaller quantities are also sold overseas. We also serve as a subcontractor to provide ballistically armored and sealed truck cabs for HIMARS for use by the U.S. Army and the U.S. Marine Corps, a program recently transitioned to low rate initial production.

Our armored commercial vehicle customers include governmental and private buyers. U.S. and foreign governmental buyers who purchase both fully and light-armored vehicles. Governmental buyers and foreign royalty also comprise the market for parade cars. Typically, governmental buyers consist of ministries of foreign affairs, defense and internal affairs and offices of presidential security. These customers are not constrained in their purchasing decisions by considerations such as import duties and taxes and are free to search globally for the best product available. The procurement cycles of governmental buyers can range from relatively rapid, when the vehicles are for the use of the head of state or in response to a particular crisis, to prolonged highly documented bids and evaluations for normally budgeted items. Private customers for armored commercial vehicles include corporations and individuals. Private buyers tend to be more price-sensitive and will often purchase locally manufactured vehicles to reduce taxes and avoid import duties. Local servicing of the vehicle is also a critical concern to private buyers. Customers for cash-in-transit vehicles are generally companies that provide cash-in-transit services to financial institutions. Purchasing decisions for cash-in-transit vehicles depend on many criteria including insurance, regulatory requirements and costs, and whether the financial institution is private or governmental.

Simula. In 2003, Simula sold more than 95% of its products in North America, with the balance sold internationally. Sales of our products to all branches of the United States military and its prime contractors such as Boeing and Sikorsky Aircraft represented approximately 87% of our revenue. Our businesses have relied to a great extent on relatively few major customers, although 2003 saw the development of additional major users of our products within our existing customer base (e.g. other users within the U.S. Army). We believe that historical customers, such as the U.S. Army and other branches of the United States military, to whom we have supplied products for approximately 25 years, will continue to be major customers. Current commercial and licensing customers include Boeing, Bell Helicopter Textron, Second Chance Body Armor, PPG Industries, Intercast Europe, and Avon Rubber Company. The loss of or significant reduction in sales to a major customer could potentially harm our business, operations and financial condition.

Approximately 38.3% of our revenues were from our ten largest customers for the year ended December 31, 2003 ("Fiscal 2003"). Approximately 21.0% of our revenues came from U.S. military contracts. The Products Division's ten largest customers accounted for approximately 28.4% of total Products revenues for Fiscal 2003. The Mobile Security Division's ten largest customers accounted for approximately 59.5% of total Mobile Security

22

<PAGE>

Division's revenues for Fiscal 2003. Approximately 46.0% of the Mobile Security Division's revenues for Fiscal 2003 were derived from U.S. military contracts, and an additional 12.7% were derived from commercial contracts with non-military U.S. governmental agencies and foreign governments. Military and governmental contracts generally are awarded on a periodic or sporadic basis. If the Mobile Security Division were to lose the HMMWV contract, which continues through June 2005, the Division's financial performance would experience a materially negative impact. Simula's ten largest customers accounted for approximately 98.6% of total revenues for Fiscal 2003.

MARKETING AND DISTRIBUTION

Products Division. As a result of our history of providing high quality and
reliable concealable armor, tactical armor, hard armor, duty gear, less-lethal
munitions, anti-riot products and forensic products, we enjoy broad brand name
recognition and a strong reputation in the law enforcement equipment industry.
The central element of our marketing strategy is to capitalize on our brand name
recognition and reputation among our customers by positioning ourselves as an
international provider of many of the premier security risk management products
that our customers require. By positioning ourselves in this manner, we expect
to capitalize on our existing customer base and our extensive global
distribution network, and to maximize the benefits of our long history of
supplying security related products around the world.

We have designed comprehensive training programs to provide initial and
continuing training in the proper use of our various products. These training
programs, offered by The Training Academy for Technology and Tactics, are
typically conducted by trained law enforcement and military personnel that we
hire for such purposes. Training programs are an integral part of our customer
service strategy. In addition to enhancing customer satisfaction, we believe
that training also helps breed customer loyalty and brand awareness. Moreover,
many of our products are consumable and used in training, which generates
replacement orders. Our marketing efforts are further augmented by our
involvement with and support of several important law enforcement associations,
including the National Tactical Officer's Association, the International Law
Enforcement Firearms Instructors, the American Society of Law Enforcement
Trainers and the International Association of Chiefs of Police.

We further reinforce distributor loyalty by offering price discounts to high
volume distributors. We believe that we have strong relationships with our
distributors. The distributors benefit from their association with us due to the
quality of our products, the scope of our product line, the high degree of
service we provide and the distributor's opportunity to participate profitably
in the sale of our products. We continually seek to expand our distribution
network. As we identify and acquire businesses that fit strategically into our
existing product portfolio, we maximize our distribution network by offering
additional products, accessing new customers and penetrating new geographic
markets. We also sell a selected number of civilian products into mass
merchandise and sporting goods stores via a network of national sporting goods
wholesalers. These products include concealment holsters, hunting and sports
shooting accessories, cleaning equipment and pepper spray products.

In addition to our traditional distribution channels, we also sell our products
on the World Wide Web through a variety of sites. GSA-Buy.com contains an
on-line catalog and secured transaction platform for all Products Division
General Services Administration contracts targeting government agencies
exclusively. We also sell a small array of our concealable and competition
holsters to the consumer market on Holsters.com, limiting distribution of our
law enforcement equipment to law enforcement channels of distribution.

Mobile Security Division. On a worldwide basis, the Mobile Security Division
employs approximately 40 full-time sales professionals in connection with its
commercial sales. These employees operate out of Washington, D.C.; Fairfield,
Ohio; Sao Paulo, Brazil; Lamballe, France; Mexico City, Mexico; Bogota,
Colombia; Bremen, Germany, Geneva, Switzerland and Caracas, Venezuela. All
personnel have a geographic and/or product-specific responsibility. In most
cases, the sales personnel also recruit and maintain sales agents or
distributors. The agents or distributors have geographic and product specific
agreements, and compensation in most cases is based upon a commission
arrangement. Sales personnel use a consultative approach when offering solutions
to customers' security problems. Sales cycles for commercial physical security
products can range from several months to a matter of days, depending upon the
product and the urgency associated with the security problem being addressed.

The Mobile Security Division has positioned itself in the marketplace as a
commercial company with a military production capability. As such, the Mobile
Security Division emphasizes its ability to develop new products, or product
adaptations, quickly and more cost effectively than traditional defense
contractors. In marketing its products to the military, the Mobile Security
Division places strong emphasis on its superior antitank and

23

<PAGE>

antipersonnel mine protection for the occupants of tactical wheeled vehicles. We
market our military products through a combination of trade show exhibitions,
print advertising in military-related periodicals and direct customer visits. We
emphasize the cross-marketing of military and commercial products, which we
believe strengthens the image of each product group. We have also entered into
exclusive teaming and joint marketing agreements with various prime contractors
in connection with the Up-Armored HMMWV and up-armoring for HIMARS and Family of
Medium Tactical Vehicles (FMTV) for sales in domestic and international military
and commercial areas. Such agreements allow us to benefit from the prime
contractor's marketing network and save on certain selling costs.

Our military sales activities are directed toward identifying contract bid
opportunities with various U.S. government agencies and prime contractors.
International sales are made through the Department of Defense's Foreign
Military Sales Program and directly to foreign military organizations. We have
three full time business development managers who are responsible for this
activity and have contractual arrangements with several outside consultants who
assist the business development managers in their activities. Proposal
preparation and presentation for government projects is done by a team, which
normally consists of program managers, a contracting officer, a cost accountant

and various manufacturing and engineering personnel.

Simula Most of Simula's products are distributed as a component supplier to original equipment manufacturers (OEMs) or as a direct contractor to the U.S. Government. The products are built to order. We do not directly serve mass consumer markets and supply directly from manufacturing facilities. Thus, the distribution of Simula's products does not involve significant inventory, warehousing or shipping methodologies.

Depending upon the product, we typically employ one of four methods for marketing: (i) direct sales, (ii) technical teams, typically comprised of a combination of sales personnel and engineers, (iii) strategic alliances with OEMs and U.S. Government prime contractors, and (iv) responses to formal request for proposals in bidding for government contracts.

In marketing our safety restraint and seating products, we endeavor to maintain close relationships with existing customers and to establish new customer relationships. Ongoing relationships and repeat customers are an important source of business for our current and new products.

Our marketing and sales activities in the government sector focus primarily upon identifying research and development and other contract opportunities with various agencies of the United States government or with others acting as prime contractors on government projects. Key members of our engineering and project management staffs maintain close working relationships with representatives of the United States military and their prime contractors. Through these relationships, we monitor needs, trends, and opportunities within current military product lines.

PRODUCT MANUFACTURING AND RAW MATERIALS

The raw materials used in manufacturing ballistic resistant garments and up-armored vehicles include various ballistic fibers such as Kevlar, Twaron, SpectraShield, Zylon and Z-Shield. Kevlar is a patented product of E.I. du Pont de Nemours Co., Inc. ('Du Pont') and is only available from Du Pont and its European licensee. We purchase Twaron, SpectraShield, Zylon and Z-Shield fibers directly from the manufacturers, and from weaving companies who convert the raw fibers into ballistic fabric. We believe that we enjoy a good relationship with these suppliers. However, if necessary, we believe that we could readily find replacement weavers. We also use SpectraShield and Kevlar in our hard and vehicle armor products. Additionally, we use polycarbonates, acrylics, ballistic quality steel, ceramics, and ballistic glass. We are aware of multiple suppliers for these materials and would not anticipate a significant impact if we were to lose any suppliers.

We purchase other raw materials used in the manufacture of our various products from a variety of sources and additional sources of supply of these materials are readily available. We also own several molds, which are used throughout our less-lethal product line.

We adhere to strict quality control standards and conduct extensive product testing throughout our manufacturing processes. Raw materials are also tested to ensure quality. We have obtained ISO 9001 certification for our Wyoming manufacturing facility for less-lethal products, our facility in Pittsfield, Massachusetts for hard armor products, and our facility in Ontario, California for body armor and duty gear holsters and accessories. We have obtained ISO 9002 certification for our Westhoughton, England manufacturing facility for body armor and high

24

<PAGE>

visibility garments. ISO standards are promulgated by the International Organization of Standardization and have been adopted by more than 100 countries worldwide. We obtain ISO certification by successfully completing an audit certifying our compliance with a comprehensive series of quality management and quality control standards.

We emphasize engineering excellence and have an extensive engineering staff. Design engineers use state-of-the-art two-dimensional and three-dimensional computer aided design and engineering or CAD/CAE systems in conjunction with coordinate measuring machines to develop electronic models, which generally are converted to solid models or prototypes. Manufacturing engineers concentrate on improvements in the production process and on overall cost reductions from better methods, fewer components and less expensive materials with equal or superior quality. Applying these techniques, we reduced both the time and cost necessary to produce armored vehicles. Our ballistic engineers, in conjunction with our design and manufacturing engineers, develop and test new ballistic and blast protection systems that meet ever-changing threats.

Simula's production and manufacturing consist principally of the molding of armor and composite materials, ceramic tile cutting and grinding, adhesive bonding, sewing, component fabrication, and final assembly. Simula outsources substantial quantities of machining, metal fabrication and welding. Our manufacturing capability features computer-integrated manufacturing programs which, among other things, schedule and track production, update inventories, and issue work orders to the manufacturing floor. All products manufactured must meet rigorous standards and specifications for workmanship, process, raw materials, procedures, and testing, and in some cases regulatory requirements. Products are functionally tested on a sample basis as required by applicable contracts. Customers, and in some cases the United States government as the end user, perform periodic quality audits of the manufacturing process. Certain

customers, including the United States government, periodically send representatives to our facilities to monitor quality assurance. Simula's operations are certified to the ISO Standard by AS9001 and ISO 9001:2000 by British Standards Institution, Inc. (BSI).

BACKLOG

Products Division. At December 31, 2003, the Products Division had unfilled customer orders of approximately $57.7 million compared with approximately $7.8 million orders unfilled at December 31, 2002. Approximately $21 million of these orders will ship in the first quarter of 2004.

Mobile Security Division. At December 31, 2003, the Mobile Security Division had unfilled customer orders of approximately $129.2 million. Approximately $63.0 million of these orders will be shipped in the first quarter of 2004.

Simula. At December 31, 2003, Simula had unfilled customer orders of approximately $117.7 million. Approximately $26.0 million of these orders will ship in the first quarter of 2004.

COMPETITION

The market for our law enforcement products is highly competitive and we compete with competitors ranging from small businesses to multinational corporations. For example, in the body armor business, we compete by providing superior design, engineering and production expertise in our line of fully-integrated ballistic and blast protective wear. Our principal competitors in this market niche include Point Blank Body Armor, Inc. and Second Chance Body Armor, Inc. as well as several international competitors on a region-by-region basis. In the less-lethal product industry, we compete by providing a broad variety of less-lethal products with unique features and formulations, which, we believe, afford us a competitive advantage over our competitors. The principal competitive factors for all of our products are quality of engineering and design, reputation in the industry, production capability and capacity, price and ability to meet delivery schedules.

The markets for the Mobile Security Division's products and services are also highly competitive. We compete in a variety of markets and geographic regions, with competitors ranging from small businesses to multinational corporations. We believe that the our design, engineering and production expertise in providing fully integrated ballistic and blast protected vehicles gives us a competitive advantage over those competitors who provide protection against only selected ballistic threats.

A number of complete vehicle armorers in Europe, the Middle East and Latin America armor primarily locally manufactured automobiles. In the U.S., protected passenger automobile armorers include Scaletta Maloney, International Armor and Square One Armoring Services. In each of the South American markets in which we compete, we have a variety of different competitors. In the high-end luxury sedan market we compete with a

25

<PAGE>

variety of OEMs, as well as a variety of small independent automotive integrators such as Carat Du Chatelet in Europe. The principal competitive factors are price, quality of engineering and design, production capability and capacity, ability to meet delivery schedules and reputation in the industry. There are a large number of companies that provide specific armoring packages for tactical wheeled vehicles, helicopters and selected other military applications.

The market for Simula's products and services are also highly competitive. Numerous suppliers compete for government defense contracts as prime contractors or subcontractors. Competition relates primarily to technical know-how, cost, and marketing efforts. The competition for government contracts relates primarily to the award of contracts for the development of proposed products. Contracts for supply of products primarily tends to follow the development contracts because of the extensive investment necessary to develop and qualify new products. Our principal competitors in the crash-resistant military seating market are Martin-Baker (England) and Israeli Aircraft Industries (Israel). Our military product lines in armor, parachutes, and flotation collars have a number of competitors, with none dominating the market. Our competitive strategy is to be a technology innovator and strategic partner to first tier suppliers and OEMs. Our present or future products could be rendered obsolete by technological advances by one or more of our competitors or by future entrants into our markets.

EMPLOYEES

As of January 1, 2004, we have a total of approximately 2,516 employees in continuing operations, of which approximately 1,305 were employed in the Products Division, approximately 997 in the Mobile Security Division, approximately 214 in Simula and 13 in our corporate headquarters.

Approximately 48 employees in Armor Products International, our UK subsidiary, are represented by the General Municipal Boilermaker and Allied Trade Union. Approximately 32 employees in O'Gara-Hess & Eisenhardt de Mexico, S.A. de C.V., our Mexico subsidiary, are represented by union. Approximately 12 employees in O'Gara-Hess & Eisenhardt France S.A., our France subsidiary, are represented by C.F.D.T. Approximately 111 employees in Trasco-Bremen, our Germany subsidiary, are represented by IG Metall, Bezirk Kuste. None of our remaining employees are represented by unions or covered by any collective bargaining agreements. We

have not experienced any work stoppages or employee related slowdowns and
believe that the relationship with our employees is good.

RESEARCH AND DEVELOPMENT

We view our research and development efforts as critical to maintaining a
leadership position in the security products and vehicle armoring markets. Our
research and development occurs primarily under fixed-price or cost-plus,
government funded contracts as well as Company-sponsored efforts. We seek to
offer superior quality and advanced products and systems to our customers at
competitive prices. To achieve this objective, we engage in ongoing engineering,
research and development activities to improve the reliability, performance and
cost-effectiveness of our existing products. We also design and develop new
products in an ongoing effort to anticipate and meet our customers' evolving
needs.

We employ scientific, engineering and other personnel to improve our existing
product lines and to develop new products and technologies in the same or
related fields.

PATENTS AND TRADEMARKS

We currently own numerous issued United States and foreign patents and pending
patent applications for inventions relating to our product lines as well as
several registered and unregistered trademarks and service marks relating to our
products and services. The registered trademarks include AMERICAN BODY
ARMOR(TM), B-SQUARE(R), BREAK FREE(R), CLP(R), DEFENSE TECHNOLOGY/FEDERAL
LABORATORIES(R), DEF-TEC PRODUCTS(R), DISTRACTION DEVICE(R), FEDERAL
LABORATORIES(R), FERRET(R), FIRST DEFENSE(R), IDENTICATOR(R), IDENTIDRUG(R),
IMPAKTM, LIGHTNING POWDER(R), MONADNOCK(R), NIK(R), O'GARA-HESS & EISENHARDT
ARMORING COMPANY(R), PROTECH(TM), QUIKSTEP LADDERS(TM), SAFARILAND DESIGN(R),
SPEEDFEED(R), 911EP and DESIGN(TM), MOBILE DEFENDER(TM), SIMULITE(R),
REINVENTING THE TECHNOLOGY OF SAFETY(R), SIMULA SAFE(TM), PROTECTING PEOPLE IN
MOTION(R), DURACHUTE(R) and CLEARGARD(R). We also have an exclusive license to
use the MACE trademark in the law enforcement market and a non-exclusive license
to use the FLEX-CUF trademark. Although we do not believe that our ability to
compete in any of our product markets is dependent solely on our patents and
trademarks, we do believe that the protection afforded by our intellectual
property provides us with important technological and marketing

26

<PAGE>

advantages over our competitors. Although we have protected our technologies to
the extent that we believe appropriate, the measures taken to protect our
proprietary rights may not deter or prevent unauthorized use of our
technologies. In other countries, our proprietary rights may not be protected to
the same extent as in the United States.

GOVERNMENT REGULATION

We are subject to federal licensing requirements with respect to the sale in
foreign countries of certain of our products. In addition, we are obligated to
comply with a variety of federal, state and local regulations, both
domestically and abroad, governing certain aspects of our operations and
workplace, including regulations promulgated by, among others, the U.S.
Departments of Commerce, State and Transportation, the Federal Aviation
Administration, the U.S. Environmental Protection Agency and the U.S. Bureau of
Alcohol, Tobacco and Firearms. The U.S. Bureau of Alcohol, Tobacco, and Firearms
also regulates us as a result of our manufacturing of certain destructive
devices and by the use of ethyl alcohol in certain products. We also ship
hazardous goods, and in doing so, must comply with the regulations of the U.S.
Department of Transportation for packaging and labeling. Additionally, the
failure to obtain applicable governmental approval and clearance could
adversely affect our ability to continue to service the government contracts we
maintain. Furthermore, we have material contracts with governmental entities and
are subject to rules, regulations and approvals applicable to government
contractors. We are also subject to routine audits to assure our compliance with
these requirements. We have become aware that we are not in full compliance with
certain regulations governing the export of equipment and related technology
used for military purposes that are applicable to certain of our products. We
have undertaken steps to comply with these regulations and to help ensure
compliance in the future. We do not believe that such noncompliance will have a
material adverse effect on our business. In addition, a number of our employees
involved with certain of our federal government contracts are required to obtain
specified levels of security clearances. Our business may suffer if we or our
employees are unable to obtain the security clearances that are needed to
perform services contracted for the Department of Defense, one of our major
customers. Our failure to comply with these contract terms, rules or regulations
could expose us to substantial penalties, including the loss of these contracts
and disqualification as a U.S. government contractor.

Like other companies operating internationally, we are subject to the Foreign
Corrupt Practices Act and other laws which prohibit improper payments to foreign
governments and their officials by U.S. and other business entities. We operate
in countries known to experience endemic corruption. Our extensive operations in
such countries creates the risk of an unauthorized payment by one of our
employees or agents which would be in violation of various laws including the
Foreign Corrupt Practices Act. Violations of the Foreign Corrupt Practices Act
may result in severe criminal penalties which could have a material adverse
effect on our business, financial condition and results of operations.

ENVIRONMENTAL LAWS AND REGULATIONS

We are subject to federal, state, and local and foreign laws and regulations governing the protection of the environment and human health, including those regulating discharges to the air and water, the management of wastes, and the control of noise and odors. While we always strive to operate in compliance with these requirements, we cannot assure you that we are at all times in complete compliance with all such requirements. We are subject to potentially significant fines or penalties if we fail to comply with environmental requirements and we do not currently carry insurance for such noncompliance events. Although we have made and will continue to make capital expenditures in order to comply with environmental requirements, we do not expect material capital expenditures for environmental controls in 2004. However, environmental requirements are complex, change frequently, and could become more stringent in the future. Accordingly, we cannot assure you that these requirements will not change in a manner that will require material capital or operating expenditures or will otherwise have a material adverse effect on us in the future.

We are also subject to environmental laws requiring the investigation and cleanup of environmental contamination. We may be subject to liability, including liability for cleanup costs, if contamination is discovered at one of our current or former facilities, in some circumstances even if such contamination was caused by a third party such as a prior owner. We also maybe subject to liability if contamination is discovered at a landfill or other location where we have disposed of wastes, notwithstanding that our historic disposal practices may have been in accordance with all applicable requirements. The amount of such liability could be material and we do not currently carry insurance for such environmental cleanups should they be required of us. We use Orthochlorabenzalmalononitrile and Chloroacetophenone chemical agents in connection with our production of tear gas, and these chemicals are hazardous and could cause environmental damage if not handled and disposed of properly. Simula's principal environmental focus is the handling and disposal of paints, solvents, and related materials in connection with product finishes, welding, and composite fabrication.

AVAILABLE INFORMATION

Our Internet address is www.armorholdings.com. We make available free of charge on or through our Internet website our annual reports on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K, and amendments to those reports, and the proxy statement for our annual meeting of stockholders as soon as reasonably practicable after we electronically file such material with, or furnish it to, the Securities and Exchange Commission. Forms 3, 4 and 5 filed with respect to our equity securities under section 16(a) of the Securities Exchange Act of 1934, as amended, are also available on our Internet website. All of the foregoing materials are located at the "Investor Relations" tab. The information found on our website shall not be deemed incorporated by reference by any general statement incorporating by reference this report into any filing under the Securities Act of 1933, as amended, or under the Securities Exchange Act of 1934, as amended, and shall not otherwise be deemed filed under such Acts.

We have adopted a Code of Ethics for the Chief Executive Officer and Senior Financial Officers, a Code of Business Conduct and Ethics for directors, officers, employees, agents, representatives, subsidiaries and affiliates, an Audit Committee Charter, Compliant Procedures for Accounting and Auditing Matters, a Compensation Committee Charter, a Nominating/Corporate Governance Committee Charter, Corporate

27

<PAGE>

Governance Guidelines, and an Audit Committee Pre-Approval Policy, all of which are available at our Internet website at the tab "Investor Relations." We will provide to any person without charge, upon request, a copy of the foregoing materials. We intend to disclose future amendments to the provisions of the foregoing documents, policies and guidelines and waivers therefrom, if any, on our Internet website and/or through the filing of a Current Report on Form 8-K with the Securities and Exchange Commission. Materials we file with the Securities and Exchange Commission may be read and copied at the Securities and Exchange Commission's Public Reference Room at 450 Fifth Street, NW, Washington, D.C. 20549. You may obtain information on the operation of the Securities and Exchange Commission's Public Reference Room by calling the Securities and Exchange Commission at 1-800-SEC-0330. The Securities and Exchange Commission also maintains an Internet website that contains reports, proxy and information statements, and other information regarding issuers that file electronically with the Securities and Exchange Commission at www.sec.gov. Any requests for the foregoing documents from us should be made in writing to Todd Smith, our Vice President of Legal Affairs, at 1400 Marsh Landing Parkway, Suite 112, Jacksonville, Florida, 32250.

Information on our Internet website does not constitute a part of this Annual Report on Form 10-K.

DISCONTINUED OPERATIONS

On April 17, 2003, we announced that we had completed the sale of our ArmorGroup Integrated Systems business through the sale of 100% of the stock of ArmorGroup Integrated Systems, Inc. and Low Voltage Systems Technologies, Inc. to Aerwav Integration Systems, Inc. ("AIS"). AIS is a wholly owned subsidiary of Aerwav Holdings, LLC. As consideration for the integrated systems business, we received a $4.1 million collateralized note due in two years and a warrant for approximately 2.5% of AIS. We have recorded a loss of $366,000 on the sale.

On November 26, 2003, we announced that we completed the sale of ArmorGroup, our security service division, for $33,660,000 in cash to a group of private

investors led by Granville Baird Capital Partners of London, England and
Management. We received $31,360,000 in cash at closing and are scheduled to
receive another $2,300,000 by the end of 2004, of which we have received
$375,000 through March 6, 2004. We have recorded a loss of $8.8 million on the
sale in the fourth quarter of 2003.

At December 31, 2003, our litigation support services subsidiary remains as our
only operating entity in discontinued operations. We are actively attempting to
sell this business and expect to sell it during 2004.

                              28

<PAGE>


ITEM 2. PROPERTIES

The following table identifies and provides certain information regarding our
principal facilities.
CONTINUING OPERATIONS
<TABLE>
<CAPTION>

| LOCATION | ANNUAL RENT | OWNED/ LEASED | APPROXIMATE SIZE | PRODUCTS MANUFACTURED |
|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> |
| Jacksonville, FL | N/A | Owned | 14 Acres 70,000 sq. ft. | Body armor, forensic products, weapon cleaning lubricants |
| Jacksonville, FL | $ 131,000 | Leased | 6,930 sq. ft. | Corporate headquarters. |
| Casper, WY | N/A | Owned | 66 Acres 72,234 sq. ft. | Tear gas, pepper spray, less-lethal munitions |
| Westhoughton, England | N/A | Owned | 44,000 sq. ft. | Body armor |
| Ontario, CA | N/A | Owned | 117,500 sq. ft. | Body armor, duty gear, automotive accessories |
| Pittsfield, MA | $ 79,000 | Leased | 16,000 sq. ft. | Hard armor, vehicle armor |
| Pittsfield, MA | N/A | Owned | 19,700 sq. ft. | Hard armor, vehicle armor |
| Tijuana, Mexico | $ 159,000 | Leased | 31,452 sq. ft. | Duty gear, body armor, automotive accessories |
| Fitzwilliam, NH | $ 37,500 | Leased | 22,848 sq. ft. | Police batons |
| El Segundo, CA | $ 69,000 | Leased | 6,500 sq. ft. | Fingerprint equipment |
| Fort Worth, TX | $ 42,000 | Leased | 10,000 sq. ft. | Scope mounts & rings |
| Oxnard, CA | $ 147,000 | Leased | 25,000 sq. ft. | Specialty gloves |
| St. Cloud, MN | $ 60,000 | Leased | 10,000 sq. ft. | LED light bars |
| Fort Worth, TX | $ 19,000 | Leased | 5,000 sq. ft. | Scope mounts & rings |
| Bremen, Germany (1) | N/A | Owned | 11 Acres 161,500 sq. ft. | Armored vehicles |
| Fairfield, OH | N/A | Owned | 130,000 sq. ft. | Armored vehicles & ballistic glass |
| Fairfield, OH | $ 186,000 | Leased | 95,000 sq. ft. | Armored vehicles |
| Fairfield, OH | $ 139,000 | Leased | 40,000 sq. ft. | Armored vehicles |
| Lamballe, France (2) | $ 101,000 | Leased | 52,000 sq. ft. | Armored vehicles |
| Sao Paulo, Brazil | $ 224,000 | Leased | 56,000 sq. ft. | Armored vehicles & ballistic glass |
| Rio De Janeiro, Brazil | $ 35,000 | Leased | 11,406 sq. ft. | Armored vehicles |
| Bogota, Colombia | $ 77,500 | Leased | 35,000 sq. ft. | Armored vehicles & ballistic glass |
| Bogota, Colombia | $ 22,200 | Leased | 6,823 sq. ft. | Armored vehicles |
| Mexico City, Mexico | $ 62,500 | Leased | 20,000 sq. ft. | Armored vehicles |
| Mexico City, Mexico | N/A | Owned | 5,380 sq. ft. | Armored vehicles |
| Caracas, Venezuela | $ 128,000 | Leased | 15,360 sq. ft. | Armored vehicles |
| Plattsburgh, NY | $ 42,000 | Leased | 3,000 sq. ft. | Hard armor, vehicle armor |
| Champlain, NY | $ 18,500 | Leased | 7,000 sq. ft. | Hard armor, vehicle armor |
| Phoenix, AZ | $ 1,165,000 | Leased | 188,140 sq. ft. | Human Safety and Survival Systems |
| Phoenix, AZ | $ 306,000 | Leased | 25,312 sq. ft. | Commercial products |

</TABLE>

Note 1 - For accounting purposes, the land underneath our owned facility in
Bremen, Germany is financed by a capital lease that is recorded as a liability
on our financial statements.

Note 2 - For accounting purposes, the Lamballe, France facility is considered
owned and financed by a capital lease that is recorded as a liability on our
financial statements.

We believe our manufacturing, warehouse and office facilities are suitable and
adequate and afford sufficient manufacturing capacity for our current and
anticipated requirements. We believe we have adequate insurance coverage for our
properties and their contents.

DISCONTINUED OPERATIONS
<TABLE>

| <S> | <C> | <C> | <C> | <C> |
|---|---|---|---|---|
| Charlotte, NC (3) | $ 68,000 | Leased | 5,407 sq. ft. | Investigations |

```
Gresham, OR                    $  138,000        Leased        7,160 sq. ft.    Litigation Support Services
Note 3 - We have reached an agreement to terminate this lease of vacant space
for $140,000.
```
--------------------------------------------------------------------------------
</TABLE>

                              29

<PAGE>


ITEM 3. LEGAL PROCEEDINGS

In 1997 we terminated several agreements with a Dutch company, Airmunition
International, B.V. ("AMI"), and with a British company, Crown Limited
("Crown"). AMI and Crown started an action against us before the Netherlands
Arbitration Institute in Rotterdam, Holland claiming breach of contract,
unauthorized use of confidential information, inducing an AMI employee to leave
to work for us in competition with plaintiffs and further inducing him to breach
his confidentiality agreements with plaintiffs. Plaintiffs sought damages of
$20.5 million. On April 29, 2003, the Tribunal rendered an interim award in our
favor on the first three counts. However, it reserved the opportunity for
Plaintiffs to provide proof of damages noting that any damages AMI/Crown may
have suffered on this remaining issue would be "limited" based on the facts. On
March 4, 2004, the arbitrators found that the plaintiffs had failed to offer any
evidence of damages, and therefore, they dismissed all of the claims against us.
Further the arbitrators directed AMI/Crown to pay us our costs. Unfortunately,
AMI and Crown have filed for bankruptcy protection from creditors so recovery of
our costs is doubtful.

On January 16, 1998, our Services Division ceased operations in Angola and
subsequently became involved in various disputes with SHRM S.A. ("SHRM"), its
minority joint venture partner relating to the Angolan joint venture known as
Defense System International Africa ("DSIA"). On March 6, 1998, SIA (a
subsidiary of SHRM) filed a complaint against Defense Systems France, SA ("DSF")
before the Commercial Court of Nanterre (Tribunal de Commerce de Nanterre)
seeking to be paid an amount of $577,286 corresponding to an alleged debt of
DSIA to SIA. In October 2002, the Commercial Court of Nanterre stayed the
proceedings before it, pending the decisions of the Court of Appeal and the
Paris Commercial Court. In February 2003, the Court of Appeal ruled against SHRM
and its parent entity, Compass Group, effectively ending all further proceedings
on the merits of Compass' claims. Compass has appealed the decision before the
French Court of Cassation, which reviews only matters of law.

In 1999 and prior to our acquisition of O'Gara-Hess & Eisenhardt Armoring
Company (which has been converted to a limited liability company and is now
known as O'Gara-Hess & Eisenhardt Armoring Company, L.L.C.) ("OHEAC") in 2001,
O'Gara-Hess & Eisenhardt Armoring de Brasil Ltda. ("OHE Brazil") was audited by
the Brazilian federal tax authorities and assessed over Ten Million Reals
(US$3.4 million based on the exchange rate as of December 31, 2003). OHE Brazil
has appealed the tax assessment and the case is pending. To the extent that
there may be any liability resulting from the 2001 audit, we believe that we are
entitled to indemnification from Kroll, Inc. under the terms of our purchase
agreement dated April 20, 2001, despite the denial by Kroll, Inc. of any such
liability, because the events occurred prior to our purchase of the O'Gara
Companies from Kroll, Inc. However, to the extent that the appeal relating to
2001 activity results in an unfavorable ruling, we could be liable for unpaid
taxes incurred subsequent to the acquisition from Kroll.

In 1999 and prior to our acquisition of OHEAC in 2001, several of the former
employees of Kroll O'Gara Company de Mexico, S.A. de C.V. ("O'Gara Mexico"), a
subsidiary of OHEAC, commenced labor claims against O'Gara Mexico seeking
damages for unjustified termination. These cases are still pending before the
labor board in Mexico City. The terminated employees are seeking back pay and
benefits since the date of termination amounting to approximately US $2.9
million, and accruing at approximately US $50,400 per month. To the extent that
there may be any liability, we believe that we are entitled to indemnification
from Kroll, Inc. under the terms of our purchase agreement dated April 20, 2001,
despite the denial by Kroll, Inc. of any such liability, because the events
occurred prior to our purchase of the O'Gara Companies from Kroll, Inc. Although
we do not have any insurance coverage for this matter, at this time, we do not
believe this matter will have a material impact on our financial position,
operations or liquidity.

In August 2001, Defense Technology Corporation of America ("DTC"), one of our
subsidiaries, received a civil subpoena from the United States Environmental
Protection Agency requesting information pursuant to Section 104(e) of the
Comprehensive Environmental Response, Compensation and Liability Act regarding
the possible impact of the Casper, Wyoming tear gas facility on the environment.
DTC responded to the request, and to date the EPA has not taken any further
action with respect to the matter. At this time, we do not believe this matter
will have a material impact on our financial position, operations or liquidity.

In December 2001, O'Gara-Hess & Eisenhardt France S.A. ("OHE France") sold its
industrial bodywork business operated under the name Labbe/Division de O'Gara
Hess & Eisenhardt France/ Carrosserie Industrielle to SNC Labbe. Subsequent to
the sale, the Labbe Family Trust ("LFT"), owner of the leasehold interest upon
which the Carrosserie business is operated, sued OHE France and SNC Labbe
claiming that the transfer of the leasehold was not valid because the LFT had
not given its consent to the transfer as required under the terms of the lease.
Further, LFT seeks to have OHE France, as the sole tenant, maintain and repair
the leased building. The

                              30

<PAGE>

approximate cost of renovating the building is estimated to be between US $3.2 and US $6.4 million, based on the exchange rate as of December 31, 2003. The case is currently pending, and while we are contesting the allegations vigorously, we are unable to predict the outcome of this matter. Although we do not have any insurance coverage for this matter, at this time, we do not believe this matter will have a material impact on our financial position, operations or liquidity.

On or about March 22, 2002, OHEAC received a civil subpoena from the Department of Defense ("DOD") requesting documents and information concerning various quality control documentation regarding parts delivered by its subcontractors and vendors in support of the HMMWVs armored at its Fairfield, Ohio facility for the period October 1, 1999 through May 1, 2001. OHEAC has complied fully with the subpoena. In early 2003, OHEAC was advised that the Department of Justice ("DOJ") was also investigating separate claims against OHEAC filed by individuals that involve the same time frame and issues covered by the DOD subpoena. OHEAC has learned that the DOJ investigation relates to a certain unidentified action filed under the federal False Claims Act pursuant to which the United States government may intervene and recover damages. OHEAC has fully responded to, and cooperated with, the government's questions and investigation. The DOJ has since notified OHEAC that it has declined to intervene in the case. On September 30, 2003, the action filed under the federal False Claims Act was voluntarily withdrawn without prejudice.

On October 18, 2002, we were notified by the Internal Revenue Service that our tax return for the tax year ended December 31, 2000 had been selected for examination. Further, on January 30, 2003 we were notified that our tax return for the tax year ended December 31, 2001 had been selected for examination. The examinations are currently pending, and at this time we are unable to predict the outcome of these matters. However, we do not believe this matter will have a material impact on our financial position, operations or liquidity.

In October 2002, we were sued in the United States District Court for the District of Wyoming with respect to one of our subsidiaries' Casper, Wyoming tear gas plant. The plaintiffs in the lawsuit asserted various state law tort claims and federal environmental law claims under the Resource Conservation and Recovery Act and the Clean Air Act stemming from the tear gas plant. In February 2004, we agreed with the plaintiffs to settle the lawsuit for an amount of money that is not material to us and the plaintiffs have agreed to dismiss their lawsuit with prejudice.

In September 2003, Second Chance Body Armor, Inc., a body armor manufacturer and one of our competitors, has notified its customers of a potential safety issue with its Ultima(R) and Ultimax(R) models. Second Chance Body Armor has claimed that Zylon(R) fiber, which is made by Toyobo, a Japanese corporation, and used in the ballistic fabric construction of its Ultima(R) and Ultimax(R) models, degraded more rapidly than originally anticipated. Second Chance Body Armor has also stated that the Zylon(R) degradation problem affects the entire body armor industry, not just its products. Both private claimants and State Attorneys General have already commenced legal action against Second Chance Body Armor based upon its Ultima(R) and Ultimax(R) model vests and we have received investigative demands from state agencies in Texas and Connecticut. Second Chance Body Armor licenses from Simula a certain patented technology which is used in some of the body armor it manufactures, but to our knowledge, no lawsuit has yet been brought against Second Chance Body Armor based upon this licensed technology, although a letter was received by Simula from an attorney representing a police officer who was injured while wearing a Second Chance Body Armor vest alleging potential liability against Simula. In addition, the U.S. Attorney General has asked the U.S. Department of Justice to investigate the claims regarding the use of Zylon(R) in bulletproof vests, which we use in the manufacturing of certain of our body armor models for law enforcement personnel. As Simula has licensed its technology to Second Chance Body Armor, it may be impacted by the pending claims against Second Chance Body Armor and the investigation being conducted by the U.S. Department of Justice. If Simula is included in the claims pending against Second Chance Body Armor and the investigation being conducted by the U.S. Department of Justice, we cannot assure you that any judgment, settlement or resolution against Simula will not have a material impact on Simula's financial position, operations or liquidity.

The National Institute of Justice (NIJ) is engaged in an ongoing inquiry and investigation of bullet-resistant vests and the protocol for testing used vests, as well as the reliability of Zylon and other fibers. We have consulted with and cooperated fully with the NIJ in this endeavor. To date, the NIJ has embarked only in its first phase of testing, which entails vests that have been heavily worn or exposed to adverse conditions, and which involves the ballistic standard applicable to new vests. Although some of the vests tested, including ours, experienced some level of penetration, the NIJ specifically warned against the misuse and misinterpretation of these results, emphasizing that the data produced so far is preliminary in nature, applies to a very small sample size and therefore it is not possible to draw any statistically-based conclusions from these results. The NIJ will continue to conduct further testing and analyze these issues in order to determine if any conclusions can be reached as to the performance and reliability of aged vests. We have requested the NIJ to provide us with its testing data, and we intend to evaluate and review the NIJ results in our continuing effort to assist the NIJ in developing uniform standards for certification of new vests and the testing of used vests. The NIJ continues to encourage law enforcement officers to wear body armor, in light of the fact that "the lives of more than 2,700 law enforcement officers have been saved by the use of bullet-resistant body armor over the past 30 years."

31

<PAGE>

In addition to the above, in the normal course of business, we are subjected to various types of claims and currently have on-going litigations in the areas of products liability and general liability. Our products are used in a wide variety of law enforcement situations and environments. Some of our products can cause serious personal or property injury or death if not carefully and properly used by adequately trained personnel. We believe that we have adequate insurance coverage for most claims that are incurred in the normal course of business. In such cases, the effect on our financial statements is generally limited to the amount of our insurance deductible or self-insured retention. Our annual insurance premiums and self insurance retention amounts have risen significantly over the past several years and may continue to do so to the extent we are able to purchase insurance coverage. At this time, we do not believe any such claims or pending litigation will have a material impact on our financial position, operations and liquidity.


ITEM 4.  SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS

There were no matters submitted to a vote of security holders during the fourth quarter of the fiscal year covered by this report.

                                    32


<PAGE>


                                  PART II

ITEM 5. MARKET FOR REGISTRANT'S COMMON EQUITY AND RELATED STOCKHOLDER MATTERS

Our common stock, par value $.01 per share (the "Common Stock") is traded under the symbol "AH" on the New York Stock Exchange (the "NYSE"). The following table sets forth the range of high and low sales prices for our Common Stock on the NYSE for fiscal years 2003 and 2002 and for the first quarter of fiscal year 2004 (through March 5, 2004).

|  | HIGH | LOW |
| --- | --- | --- |
| 2004 | | |
| 1st Quarter - through March 5, 2004 | $ 30.30 | $ 24.80 |
| 2003 | | |
| 4th Quarter .......................... | $ 27.35 | $ 16.46 |
| 3rd Quarter .......................... | $ 17.80 | $ 12.83 |
| 2nd Quarter.......................... | $ 14.95 | $  9.91 |
| 1st Quarter.......................... | $ 14.60 | $  9.40 |
| 2002 | | |
| 4th Quarter .......................... | $ 16.50 | $ 12.50 |
| 3rd Quarter .......................... | $ 25.50 | $ 12.00 |
| 2nd Quarter.......................... | $ 29.55 | $ 22.00 |
| 1st Quarter.......................... | $ 28.25 | $ 20.45 |


HOLDERS

As of March 5, 2004, we had approximately 385 stockholders of record. Only record holders of shares held in "nominee" or street names are included in this number.

DIVIDENDS

We have never declared or paid cash dividends on our Common Stock. Our debt agreements, such as the indenture governing the 8 1/4% senior subordinated notes and the senior credit facility, contain covenants that limit our ability to pay dividends or make other distributions to our stockholders. We may pay dividends subject to the restrictions contained in our indenture and our senior credit facility. With respect to our senior credit facility, we intend to seek an amendment that permits us to pay dividends or make other distributions to our stockholders. However, we cannot assure you that we will be able to pay dividends to our stockholders in the future due to the restrictive covenants regarding our ability to pay dividends contained in our indenture and our senior credit facility. Furthermore, with respect to our senior credit facility, we cannot assure you that we will obtain the amendment necessary to allow us to pay dividends or make other distributions to our stockholders. See Item 7, "Management's Discussion and Analysis of Financial Condition and Results of Operations-Liquidity and Capital Resources" and Note 8 to Consolidated Financial Statements.

RECENT SALES OF UNREGISTERED SECURITIES

None.

RECENT PURCHASES OF OUR REGISTERED EQUITY SECURITIES

We did not purchase any shares of our common stock during the fourth quarter of 2003.

                                    33


<PAGE>

ITEM 6. SELECTED FINANCIAL DATA

FINANCIAL OVERVIEW

FIVE-YEAR SUMMARY

    The table below sets forth a summary of our results of operations and
financial condition as of and for the periods then ended.

<TABLE>
<CAPTION>

|  | 2003 | 2002 | 2001 | 2000 | 1999 |
|---|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> | <C> |
| | (AMOUNTS IN THOUSANDS, EXCEPT PER SHARE AMOUNTS) | | | | |
| Total revenues (1) | $365,172 | $305,117 | $197,100 | $139,904 | $ 96,706 |
| Operating income | $ 35,729 | $ 38,365 | $ 26,673 | $ 19,869 | $ 15,126 |
| Income from continuing operations | $ 17,006 | $ 21,337 | $ 14,684 | $ 10,847 | $ 11,217 |
| Net income (loss)(2) | $ 10,886 | $(17,689) | $ 10,128 | $ 17,048 | $ 13,196 |
| Basic income from continuing operations per common share | $ 0.61 | $ 0.70 | $ 0.61 | $ 0.48 | $ 0.53 |
| Diluted income from continuing operations per common share | $ 0.59 | $ 0.69 | $ 0.59 | $ 0.46 | $ 0.52 |
| Basic earnings (loss) per share | $ 0.39 | $ (0.58) | $ 0.42 | $ 0.75 | $ 0.63 |
| Diluted earnings (loss) per share | $ 0.38 | $ (0.57) | $ 0.41 | $ 0.73 | $ 0.61 |
</TABLE>

Note 1 - Revenue and operating income for all periods presented represents
revenue from continuing operations only, while net income includes income and
losses from discontinued operations.

Note 2 - 2003 and 2002 net income (loss) includes a pre-tax charge for
impairment of long-lived assets of discontinued operations of $12.4 million and
$30.3 million, respectively. 2001 net income (loss) includes a pre-tax
restructuring charge of $10.3 million in discontinued operations.

<TABLE>
<S>

|  | | | | | |
|---|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> | <C> |
| Total assets | $ 585,626 | $ 367,753 | $ 388,057 | $ 225,957 | $ 178,922 |
| Working capital | $ 168,644 | $ 100,591 | $ 142,723 | $ 67,937 | $ 53,993 |
| Long-term obligations | $ 168,508 | $ 5,240 | $ 4,640 | $ 38,288 | $ 2,453 |
| Stockholders' equity | $ 295,365 | $ 288,077 | $ 326,019 | $ 166,771 | $ 157,883 |
</TABLE>

                              34

<PAGE>


ITEM 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND
                  RESULTS OF OPERATIONS

This Management's Discussion and Analysis of Financial Condition and Results of
Operations contains forward-looking statements within the meaning of Section 27A
of the Securities Act of 1933, as amended, and Section 21E of the Securities
Exchange Act of 1934, as amended. Statements that are predictive in nature, that
depend upon or refer to future events or conditions or that include the words
such as "expects", "anticipates", "intends", "plans", "believes", "estimates",
"could be" and similar expressions are forward looking statements. Although we
believe that these statements are based upon reasonable assumptions, we can give
no assurance that our goals will be achieved. For more information, see "Forward
Looking Statements" contained elsewhere in this report.

Our actual results may differ from those expressed or implied in forward-looking
statements. We believe that we are subject to a number of risk factors,
including, without limitation: the inherent unpredictability of currency
fluctuations; competitive actions, including pricing; the ability to realize
cost reductions and operating efficiencies, including the ability to implement
headcount reduction programs timely and in a manner that does not unduly disrupt
business operations and the ability to identify and to realize other
cost-reduction opportunities; general economic and business conditions; our
ability to successfully execute changes to operations, such as integration of
recent and future acquisitions and the move of our corporate headquarters and
certain of our manufacturing operations, without disrupting our operations; and
our ability to obtain supplies and raw materials without disruption.

Any forward-looking statements in this report should be evaluated in light of
these and other important risk factors listed in this Management's Discussion
and Analysis of Financial Condition and Results of Operations and elsewhere in
this Annual Report on Form 10-K including the accompanying financial statements.

COMPANY OVERVIEW

We are a leading manufacturer and provider of specialized security products;
training and support services related to these products; vehicle armor systems;
military helicopter seating systems, aircraft and land vehicle safety systems;
protective equipment for military personnel; and other technologies used to

protect humans in a variety of life-threatening or catastrophic situations. Our products and systems are used domestically and internationally by military, law enforcement, security and corrections personnel, as well as governmental agencies, multinational corporations and individuals. We are organized and operated under three business divisions: Armor Holdings Products, also referred to as our Products Division, Armor Mobile Security, also referred to as our Mobile Security Division, and Simula.

CONTINUING OPERATIONS

Products. Our Products Division manufactures and sells a broad range of high quality security products, equipment and related consumable items, such as concealable and tactical body armor, hard armor, duty gear, less-lethal munitions, anti-riot products, police batons, emergency lighting products, forensic products, firearms accessories, weapon maintenance products, foldable ladders and specialty gloves. Our products are marketed under brand names that are well established in the military and law enforcement communities such as AMERICAN BODY ARMOR(TM), B-SQUARE(R), BREAK FREE(R), CLP(R), DEFENSE TECHNOLOGY/FEDERAL LABORATORIES(R), DEF-TEC PRODUCTS(R), DISTRACTION DEVICE(R), FEDERAL LABORATORIES(R), FERRET(R), FIRST DEFENSE(R), IDENTICATOR(R), IDENTIDRUG(R), IMPAK(TM), LIGHTNING POWDER(R), MONADNOCK(R), NIK(R), O'GARA-HESS & EISENHARDT ARMORING COMPANY(R), PROTECH(TM), QUIKSTEP LADDERS(TM), SAFARILAND DESIGN(R), SPEEDFEED(R), 911EP and DESIGN(TM). We sell our products through a network of over 350 distributors and sales agents, including approximately 200 in the United States. Our extensive distribution capabilities and commitment to customer service and training have enabled us to become a leading provider of security equipment to law enforcement agencies.

Mobile Security. Our Mobile Security Division manufactures and installs ballistic and blast protected armoring systems for privately owned vehicles. We armor a variety of privately owned commercial vehicles, including limousines, sedans, sport utility vehicles, commercial trucks and cash-in-transit vehicles, to protect against varying degrees of ballistic and blast threats. Our customers in this business include international corporations and high net worth individuals. Under the brand name O'Gara-Hess & Eisenhardt, we are the sole-source provider to the U.S. military of the armor and blast protection systems for HMMWVs. We are also under contract with the U.S. Army to provide spare parts, logistics and ongoing field support services for the currently installed

35

<PAGE>

base of approximately 4,415 Up-Armored HMMWVs. Additionally, our Mobile Security Division has been subcontracted to develop a ballistic and blast protected armored and sealed truck cab for the HIMARS, a program recently transitioned by the U.S. Army and U.S. Marine Corps from developmental to a low rate of initial production, deliveries of which commenced in 2003. We also supply armor sub-systems for other tactical wheeled vehicles. In addition, we supply ballistic and blast protected armoring systems to U.S. federal law enforcement and intelligence agencies and foreign heads of state.

Simula. Simula, acquired December 9, 2003, supplies human safety and survival systems to the U.S. military, and major aerospace and defense prime contractors. Our core markets are military aviation safety, military personnel safety, and land and marine safety. Through Simula, we provide military helicopter seating systems, aircraft and land vehicle armor systems, protective equipment for military personnel and technologies used to protect humans in a variety of life-threatening or catastrophic situations.

DISCONTINUED OPERATIONS

On April 17, 2003, we announced that we had completed the sale of our ArmorGroup Integrated Systems business through the sale of 100% of the stock of ArmorGroup Integrated Systems, Inc. and Low Voltage Systems Technologies, Inc. to Aerwav Integration Systems, Inc. ("AIS"). AIS is a wholly owned subsidiary of Aerwav Holdings, LLC. As consideration for the integrated systems business, we received a $4.1 million collateralized note due in two years and a warrant for approximately 2.5% of AIS. We have recorded a loss of $366,000 on the sale.

On November 26, 2003, we announced that we completed the sale of ArmorGroup, our security service division, for $33,660,000 in consideration to a group of private investors led by Granville Baird Capital Partners of London, England and Management. We received $31,360,000 in cash at closing and are scheduled to receive another $2,300,000 by the end of 2004. We have recorded a loss of $8.8 million on the sale in the fourth quarter of 2003. In accordance with generally accepted accounting principles, unrealized gains and losses, which are included in equity as accumulated other comprehensive income or loss, are not recognized until the period in which the related assets and liabilities are disposed of.

At December 31, 2003, our litigation support services subsidiary remains in discontinued operations. This subsidiary specializes in providing computer forensics consulting services, training and software tools to the civil litigation market and to government agencies and Fortune 500 corporations. Computer forensics is the preservation, identification, extraction and documentation of computer evidence. We are actively attempting to sell this business and expect to sell it during 2004.

CRITICAL ACCOUNTING POLICIES

Our significant accounting policies are described in Note 1 to the consolidated financial statements included in Item 8 of this Form 10-K. We believe our most critical accounting policies include revenue recognition, the use of estimates,

income taxes and impairment.

Revenue Recognition. We record products revenue at the time of shipment. Returns are minimal and do not materially affect the financial statements.

We record revenue from our Mobile Security Division when the vehicle is shipped, except for larger commercial contracts typically longer than four months in length and the contract for the delivery of HMMWVs to the U.S. government on which revenue is recognized on a units completed bases with completion occurring upon inspection and acceptance by the U.S. government. This contract continues through 2005. Revenue from such larger contracts is recognized on the percentage of completion, units-of-work performed method. HMMWV units sold to the U.S. government are considered complete when the onsite Department of Defense officer finishes the inspection of the HMMWV and approves it for delivery. Should such contracts be in a loss position, the entire estimated loss would be recognized for the balance of the contract at such time. We believe that our current contracts are profitable.

We record service revenue as services are provided on a contract-by-contract basis. Revenues from service contracts are recognized over the term of the contract.

Estimates. The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts in the financial

36

<PAGE>

statements and accompanying notes. Significant estimates inherent in the preparation of the accompanying consolidated financial statements include periodic testing of the carrying value of long-lived assets for impairment, valuation allowances for receivables, inventories and deferred income tax assets, liabilities for potential litigation claims and settlements; and contract contingencies and obligations. Actual results could differ from those estimates.

Income taxes. We account for income taxes pursuant to Statement of Financial Accounting Standards ("SFAS) No. 109, "Accounting for Income Taxes". Under the asset and liability method specified thereunder, deferred taxes are determined based on the difference between the financial reporting and tax bases of assets and liabilities. Deferred tax liabilities are offset by deferred tax assets relating to net operating loss carryforwards and deductible temporary differences. Future benefits obtained either from utilization of net operating loss carryforwards or from the reduction in the income tax asset valuation allowance existing on September 20, 1993 have been and will be applied to reduce reorganization value in excess of amounts allocable to identifiable assets. At December 31, 2003 and 2002, our consolidated foreign subsidiaries have unremitted earnings of approximately $9.0 million and $3.0 million, respectively, on which the Company has not recorded a provision for United States Federal income taxes since these earnings are considered to be permanently reinvested. Such foreign earnings have been taxed according to the regulations existing in the countries in which they were earned.

Impairment. Long-lived assets including certain identifiable intangibles, and the goodwill related to those assets, are reviewed annually for impairment whenever events or changes in circumstances indicate that the carrying amount of the asset in question may not be recoverable including, but not limited to, a deterioration of profits for a business segment that has long-lived assets, and when other changes occur which might impair recovery of long-lived assets. Management reviewed the Company's long-lived assets and has taken an impairment charge of $12.4 million in fiscal 2003 and $30.3 million in fiscal 2002 to reduce the carrying value of the Services Division to estimated realizable value. The method used to determine the existence of an impairment would be discounted operating cash flows estimated over the remaining useful lives of the related long-lived assets for continuing operations in accordance with SFAS No. 142, "Goodwill and Other Intangible Assets." Impairment is measured as the difference between fair value and unamortized cost at the date impairment is determined.

Discontinued Operations. In accordance with Statement of Financial Accounting Standards No. 144, "Accounting for the Impairment or Disposal of Long-Lived Assets" (SFAS 144), a component classified as held for sale is reported in discontinued operations when the following conditions are met: (a) the operations and cash flows of the component have been (or will be) eliminated from the ongoing operations of the entity as a result of the disposal transaction and (b) the entity will not have any significant continuing involvement in the operations of the component after the disposal transaction. In a period in which a component of an entity either has been disposed of or is classified as held for sale, the income statement for current and prior periods reports the results of operations of the component, including any estimated impairment gain or loss recognized in accordance with SFAS 144 paragraph 37, in discontinued operations. The results of discontinued operations, less applicable income taxes (benefit), is reported as a separate component of income before extraordinary items and the cumulative effect of accounting changes (if applicable). The assets and liabilities of a disposal group classified as held for sale are presented separately in the asset and liability sections, respectively, of the statement of financial position.

37

<PAGE>

RESULTS OF OPERATIONS

Effective June 30, 2002, we decided to sell the ArmorGroup Services Division (the sale was completed on November 26, 2003) through an organized and formal auction managed by outside advisors. In accordance with Statement of Accounting Standards 144, Accounting for Impairment or Disposal of Long-Lived Assets, the assets and liabilities of the Company's Services Division have been classified as held for sale, with operating results reported as discontinued operations in the our statement of operations for all periods prior to the sale of this division. Our US based training subsidiary, USDS, Inc. previously reported under the Services Division but not included for sale has been reclassified to the Products Division.

The following table sets forth selected statement of operations data as a percentage of total revenues for the periods indicated:

<TABLE>
<CAPTION>

|  | FISCAL YEAR | | |
|  | 2003 | 2002 | 2001 |
|  | ---- | ---- | ---- |
| <S> | <C> | <C> | <C> |
| Revenue from continuing operations | | | |
| Products | 54.5% | 59.0% | 76.0% |
| Mobile Security | 43.1% | 41.0% | 24.0% |
| Simula | 2.3% | 0.00% | 0.00% |
| Total revenues from continuing operations | 100.0% | 100.0% | 100.0% |
| Cost of sales | 69.4% | 69.1% | 64.1% |
| Operating expenses | 17.2% | 16.3% | 19.6% |
| Amortization | 0.1% | 0.1% | 1.1% |
| Integration and other charges | 3.4% | 1.9% | 1.7% |
| Operating income | 9.8% | 12.6% | 13.5% |
| Interest expense, net | 1.1% | 0.3% | 2.0% |
| Other income, net | 0.1% | 0.0% | 0.0% |
| Income from continuing operations before | | | |
| provision for income taxes | 8.5% | 12.3% | 11.6% |
| Provision for income taxes | 3.9% | 5.3% | 4.2% |
| Income from continuing operations | 4.7% | 7.0% | 7.5% |
| Loss from discontinued operations, net of income tax | (1.7)% | (12.8)% | (2.3)% |
| Net income (loss) | 3.0% | (5.8)% | 5.1% |

</TABLE>

38

<PAGE>

FISCAL 2003 AS COMPARED TO FISCAL 2002

Net income (loss). Net income (loss) increased $28.6 million, or 161.5%, to net income of $10.9 million for the year ended December 31, 2003 ("fiscal 2003") compared to a net loss of $(17.7) million for the year ended December 31, 2002 ("fiscal 2002"). Income from continuing operations and a loss from discontinued operations were $17.0 million and ($6.1) million, respectively, for fiscal 2003, compared to income from continuing operations and a loss from discontinued operations of $21.3 million and $(19.0) million, respectively, for fiscal 2002. The decrease in income from continuing operations relates primarily to a $7.3 million non-cash, non-recurring charge for stock based compensation in the fourth quarter of 2003, a $3.3 million (including a $2.1 million non-cash charge) severance charge related to the termination of our former Chief Executive Officer in the second quarter of 2003, an increase in interest expense relating to the company's $150.0 million subordinated debenture issued on August 12, 2003, and increases in bonus expense, legal and accounting fees, insurance and internal audit expenses.

CONTINUING OPERATIONS

Products Division revenues. Our Products Division revenues increased $19.1 million, or 10.6%, to $199.1 million in fiscal 2003, compared to $179.9 million in fiscal 2002. For fiscal 2003, Products Division revenue increased 7.6% internally, including year-over-year changes in acquired businesses, and 3.0% due to the acquisitions of Speedfeed, Inc., the Foldable Products Group, Evi-Paq, Inc., B-Square, Inc. and 911 Emergency Products, Inc., all of which were completed during 2002 and Hatch Imports, Inc., which was completed in the fourth quarter of 2003. Products Division revenues include $20.7 million and $16.8 million from USDS, Inc., our US based training company, for the years ended fiscal 2003 and fiscal 2002, respectively. In our filings prior to June 30, 2002, we reported USDS, Inc. as a part of our Services Division.

Mobile Security Division revenues. Our Mobile Security Division revenues increased $32.4 million, or 25.9% to $157.5 million in fiscal 2003, compared to $125.2 million in fiscal 2002. Mobile Security Division revenues for 2003 increased by $19.2 million due to the acquisition of substantially all of the assets of Trasco-Bremen on September 24, 2002. Excluding the $19.2 million of 2003 revenue increase relating to Trasco-Bremen, Mobile Security Division revenue increased $13.2 million, or 10.9%, in fiscal 2003 compared to fiscal 2002.

Simula revenues. Simula, which we acquired on December 9, 2003, generated

revenues of $8.5 million in fiscal 2003 for the 21-day period they were included in fiscal 2003.

Cost of sales. Cost of sales increased $42.8 million, or 20.3%, to $253.6 million for fiscal 2003 compared to $210.7 million for fiscal 2002. As a percentage of total revenues, cost of sales increased to 69.4% of total revenues for fiscal 2003 from 69.1% for fiscal 2002. The increase in cost of sales as a percentage of revenues was primarily due to an increased mix of Mobile Security Division revenues. The Mobile Security Division generates higher cost of sales as a percentage of revenues than does the Products Division.

Gross margins in the Product Division were 34.8% for fiscal 2003 compared to 36.4% for fiscal 2002. The decline in Product Division's gross margins resulted primarily from: (1) an increase in low margin gas mask sales; (2) an increase in lower margin international body armor sales produced overseas at Armor Products International; (3) lower production volumes within our less-lethal, automotive and hard armor product lines, which resulted in reduced fixed cost absorption and certain labor inefficiencies; and (4) moving costs and labor inefficiencies at ProTech associated with the relocation of its manufacturing facility. Excluding our Products training division subsidiary, the Products Division gross margins were 37.1%, compared to 38.7% in 2002.

Gross margins in the Mobile Security Division were 25.4% in fiscal 2003, compared to 23.0% for fiscal 2002. The increase in the Mobile Security gross margins was primarily attributable to: (1) favorable manufacturing overhead cost absorption relating to increased manufacturing volumes at our Cincinnati manufacturing facility, and (2) operational efficiencies at our Cincinnati manufacturing facility.

Gross margins in Simula were 25.8% for the 21-day period they were included in fiscal 2003. Simula's gross margins were negatively impacted by purchase accounting, and by the wrap-up of a low margin contract. 2003 operations are not necessarily indicative of future performance.

Operating expenses. Operating expenses increased $13.0 million, or 26.0%, to $62.8 million (17.2% of total revenues) for fiscal 2003 compared to $49.8 million (16.3% of total revenues) for fiscal 2002.

<div align="center">39</div>

<PAGE>

Products Division operating expenses increased $1.8 million, or 5.7%, to $33.1 million (16.6% of Products Division revenues) compared to $31.4 million (17.4% of Products Division revenues) for fiscal 2002. This increase is primarily due to the incremental operating expenses associated with acquired businesses completed during or subsequent to 2002.

Mobile Security Division operating expenses increased $4.8 million, or 39.3%, to $17.1 million (10.9% of Mobile Security Division revenues) for fiscal 2003 compared to $12.3 million (9.8% of Mobile Security Division revenues) for fiscal 2002. Excluding the increase in 2003 operating expenses resulting from the acquisition of substantially all of the assets of Trasco-Bremen on September 24, 2002, the operating expenses for fiscal 2003 increased $3.0 million versus fiscal 2002. The increase in operating expenses was primarily due to: (1) increased expenses associated with the start-up of operations in Caracas, Venezuela; (2) increased insurance costs; (3) the net effect of a weaker U.S. dollar against foreign currencies, and (4) normal wage inflation.

Simula operating expenses were $ 793,000 in fiscal 2003.

Corporate operating expenses increased $5.6 million, or 89.9%, to $11.8 million (3.2% of total revenues) in fiscal 2003 compared to $6.2 million in fiscal 2002 (2.0% of total revenues). This increase is due primarily to increased bonus expense, legal and accounting fees, insurance and internal audit expenses.

Amortization. Amortization expense increased $244,000, or 99.6%, to $489,000 for fiscal 2003 compared to $245,000 for fiscal 2002. SFAS 142, which we adopted on January 1, 2002, eliminated amortization of intangible assets with indefinite lives and goodwill for all acquisitions completed after July 1, 2001, as well as for all fiscal years ending after January 1, 2002. Remaining amortization expense is related to patents and trademarks with finite lives and to amortization on intangible assets, other than goodwill, associated with the Simula, Inc. and Hatch Imports, Inc. acquisitions in 2003.

Integration and other charges. Integration and other charges increased $6.7 million, or 112.2%, to $12.6 million for fiscal 2003 compared to $5.9 million in fiscal 2002. The increase in integration and other charges is primarily related to a $7.3 million non-cash charge for stock-based compensation for a performance plan for certain key executives and a $3.3 million severance charge (including a $2.1 million non-cash charge) related to the recent departure of our former Chief Executive Officer. Excluding these charges, integration and other charges were $2.0 million for fiscal 2003, a decrease of $3.9 million from fiscal 2002. This decrease was primarily due the elimination of expense associated with the 2001 acquisitions of O'Gara-Hess & Eisenhardt and Identicator.

Operating income. Operating income from continuing operations decreased $2.7 million, or 6.9%, to $35.7 million in fiscal 2003 compared to $38.4 million in fiscal 2002 due to the factors discussed above.

Interest expense, net. Interest expense, net increased $3.1 million, or 334.7% to $4.0 million for fiscal 2003 compared to $923,000 for fiscal 2002. This increase was due primarily to interest expense associated with the $150 million aggregate principal amount of 8.25% senior subordinated notes due 2013, which were issued on August 12, 2003. On September 2, 2003, we entered into interest

rate swap agreements that effectively exchanged the 8.25% fixed rate for a variable rate of six month LIBOR, set in arrears, plus a spread of 2.735% to 2.75%. At December 31, 2003, the six-month LIBOR rate was 1.22%.

Other expense, net. Other expense, net, was $508,000 for fiscal 2003, compared to $51,000 for fiscal 2002. The increase related primarily to foreign exchange currency losses and a write-down of certain fixed assets.

Income from continuing operations before provision for income taxes. Income from continuing operations before provision for income taxes decreased $6.2 million, or 16.5%, to $31.2 million for fiscal 2003 compared to $37.4 million for fiscal 2002 due to the reasons discussed above.

Provision for income taxes. Provision for income taxes on continuing operations was $14.2 million for fiscal 2003 compared to $16.1 million for fiscal 2002. The effective income tax rate was 45.5% for fiscal 2003 compared to 42.9% for fiscal 2002 based on our annual income amounts and jurisdictions in which such amounts were taxable. The 2003 effective income tax rate of 45.5% is higher than the 37.4% estimated effective income tax rate that was utilized in the first half of 2003 due to, among other things: (1) the non-tax deductible nature of the non-cash, non-recurring stock based compensation that was provided to certain key executives, and (2) a taxable gain that was realized in the second half of 2003 when certain intellectual property utilized in our discontinued operations was revalued in order to comply with tax code provisions. The impact of the incremental tax associated with the revalued intellectual property is recorded in continuing operations as required by generally accepted accounting principles, and resulted in an incremental non-cash tax expense, for which foreign tax

<PAGE>

credits are available to offset the tax otherwise payable. The previously mentioned negative impacts on the 2003 tax rate were partially offset by some state level tax strategies, which lowered the effective tax rate.

Income from continuing operations. Income from continuing operations decreased $4.3 million to $17.0 million for fiscal 2003 compared to $21.3 million for fiscal 2002 due to the factors discussed above.

DISCONTINUED OPERATIONS

Many of the items listed below involve accounting estimates. The loss and amounts below will be re-evaluated in the future for any changes which might be appropriate.

On April 17, 2003, we announced that we had completed the sale of our ArmorGroup Integrated Systems business through the sale of 100% of the stock of ArmorGroup Integrated Systems, Inc. and Low Voltage Systems Technologies, Inc. to Aerwav Integration Systems, Inc. ("AIS"). AIS is a wholly owned subsidiary of Aerwav Holdings, LLC. As consideration for the integrated systems business, we received a $4.1 million collateralized note due in two years and a warrant for approximately 2.5% of AIS. We have recorded a loss of $366,000 on the sale.

On November 26, 2003, we announced that we completed the sale of ArmorGroup, our security service division, for $33,660,000 million in consideration to a group of private investors led by Granville Baird Capital Partners of London, England and Management. We received $31,360,000 million in cash at closing and are scheduled to receive another $2,300,000 million by the end of 2004. We have recorded a loss of $8.8 million on the sale. In accordance with generally accepted accounting principles, unrealized gains and losses, which are included in equity as accumulated other comprehensive income or loss, are not recognized until the period of disposition of the related assets and liabilities (which was a large component of the loss).

At December 31, 2003, Network Technologies, Inc. ("NTI"), our litigation support services subsidiary, remains our only operating subsidiary in discontinued operations.

Note 2 of the consolidated financial statements contains comparative information for our discontinued operations.

Services revenues. Services Division revenues decreased $3.1 million, or 3.2%, to $95.1 million for fiscal 2003 compared to $98.3 million for fiscal 2002 as fiscal 2003 reflects revenues from ArmorGroup only through November 26, 2003, and revenues from ArmorGroup Integrated Systems only through April 17, 2003, their respective dates of sale as opposed to a full year in 2002. Exclusive of ArmorGroup Integrated Systems, revenue increased $8.5 million, or 10.3%, to $90.4 million for fiscal 2003 compared to $82.0 million for fiscal 2002. This increase is due to strong performance primarily in the Middle East with strong growth coming from Iraq along with ongoing strong training revenues from the Athens Olympics build up. These are tempered by weak revenues in mine action business, investigations business and the Latin American business and the lack of a full year's revenues in fiscal 2003.

Cost of sales. Cost of sales decreased $9.0 million, or 11.9%, to $66.8 million for fiscal 2003 compared to $75.8 million for fiscal 2002 as fiscal 2003 reflects cost of sales from ArmorGroup only through November 26, 2003, and cost of sales from ArmorGroup Integrated Systems only through April 17, 2003, their respective dates of sale. As a percentage of total revenue from discontinued operations, cost of sales decreased to 70.2% of total revenues from discontinued operations for fiscal 2003 from 77.1% for fiscal 2002. This decrease is a result of the sale of the ArmorGroup Integrated Systems business in April 2003, which has a comparatively low gross margin.

Exclusive of ArmorGroup Integrated Systems, cost of sales increased $3.9 million, or 6.8%, to $61.6 million for fiscal 2003 compared to $57.7 million for fiscal 2002. Exclusive of ArmorGroup Integrated Systems, cost of sales as a percentage of total revenue from discontinued operations decreased to 68.2% of total revenues from discontinued operations for fiscal 2003 from 70.4% for fiscal 2002. This decrease in cost of sales as a percentage of total revenue from discontinued operations was primarily a result of the proportion of the revenue growth coming from expatriate intensive security contracts in Iraq and continued high margin training contracts.

Operating expenses. Operating expenses decreased $10.7 million, or 34.9%, to $19.9 million (20.9% of total revenues from discontinued operations) for fiscal 2003 compared to $30.6 million (24.9% of total revenues from discontinued operations) for fiscal 2002 as fiscal 2003 reflects operating expenses from ArmorGroup only through November 26, 2003, and operating expenses from ArmorGroup Integrated Systems only through April 17, 2003, their respective dates of sale. Exclusive of ArmorGroup Integrated Systems, operating expenses decreased $7.6

41

<PAGE>

million, or 28.1%, to $19.4 million for fiscal 2003 compared to $26.9 million for fiscal 2002. This decrease was due to reduced foreign currency expenses, a reduction in salary costs as a result of the 2002 restructuring and the sale of ArmorGroup on November 26, 2003.

Charge for impairment of long-lived assets. Charge for impairment of long-lived assets was $21.5 million for fiscal 2003 compared to $30.3 for fiscal 2002. The fiscal 2003 charge related to a $12.4 million reduction in the carrying value of the Services division to its estimated realizable value, the $8.8 million loss on the sale of ArmorGroup and the $366,000 loss on the sale of ArmorGroup Integrated Systems. The 2002 charge was the result of $6.1 million in estimated disposal costs and a $24.2 million reduction in carrying value of the Services Division to the estimated realizable value as required by SFAS 144.

Integration and other charges. Integration and other charges decreased $1.8 million, or 70.4%, to $776,000 for fiscal 2003 compared to $2.6 million for fiscal 2002. This decrease is primarily due to severance payments to certain personnel in the prior year.

Operating loss. Operating losses were $(4.7) million for fiscal 2003, compared to an operating loss of $(41.0) million for fiscal 2002 due to the factors discussed above. Operating loss from the ArmorGroup Integrated Systems business was ($15.0) million for fiscal 2002 primarily due to the $11.9 million charge for impairment of long-lived assets. Excluding the ArmorGroup Integrated Systems business, the balance of the assets held for sale generated an operating loss of $(3.7) million for fiscal 2003 compared to an operating loss of ($26.9) million for fiscal 2002.

Interest expense, net. Interest expense, net decreased $330,000 or 95.4%, to $16,000 for fiscal 2003 compared to $346,000 for fiscal 2002. This decrease was due to decreased utilization of the Services Division's line of credit.

Other expense, net. Other expense, net, was $479,000 for fiscal 2003 compared to $99,000 for fiscal 2002 due primarily to an increase in foreign currency fluctuation losses in fiscal 2003.

Loss from discontinued operations before benefit for income taxes. Loss from discontinued operations before benefit for income taxes was $(14.4) million for fiscal 2003 and $(41.5) million for fiscal 2002 due to the reasons discussed above.

Benefit for income taxes. Income tax benefit was $8.3 million for fiscal 2003 compared to $2.4 million for fiscal 2002. The effective tax rate for fiscal 2003 was a benefit of 57.4% compared to a benefit of 5.9% for fiscal 2002. The income tax benefit of 57.4% for fiscal 2003 was primarily due to a taxable loss realized on the sale of ArmorGroup.

Loss from discontinued operations. Loss from discontinued operations was $(6.1) million for fiscal 2003 compared to a loss from discontinued operations of $(39.0) million for fiscal 2002 due to the factors discussed above.

FISCAL 2002 AS COMPARED TO FISCAL 2001

Net (loss) income. Net income decreased $27.8 million to a net loss of $17.7 million for fiscal 2002 compared to net income of $10.1 million for the year ended December 31, 2001 ("fiscal 2001"). Income from continuing operations and the loss from discontinued operations was $21.3 million and $39.0 million respectively for fiscal 2002, compared to income from continuing operations of $14.7 million and a loss from discontinued operations of $4.6 million for fiscal 2001. The increase in income from continuing operations relates primarily to the inclusion of the Mobile Security Division for a full year in 2002 versus four months in 2001

CONTINUING OPERATIONS

Products revenues. Our Products Division revenues increased $30 million, or 20.1%, to $179.9 million in fiscal 2002, compared to $149.9 million in fiscal 2001. For fiscal 2002, Products Division revenue increased 14.4% internally, including year over year changes in acquired businesses, and 5.7% due to a series of small strategic "tuck-in" acquisitions including Identicator, Inc. ("Identicator"), Guardian Personal Security Products, Inc. ("Guardian"),

Speedfeed, Inc. ("Speedfeed"), the Foldable Products Group ("Foldable"),
Evi-Paq, Inc. ("Evi-Paq") B-Square, Inc. ("B-Square") and 911 Emergency Products
("911"). Products Division revenues include $16.8

42

<PAGE>

million and $7.2 million from USDS, Inc., our US based training company, for the
years ended fiscal 2002 and fiscal 2001, respectively. In our filings prior to
June 30, 2002, we reported USDS, Inc. as a part of our Services Division.

Mobile Security Division revenues. Our Mobile Security Division revenues
increased $77.9 million, or 165.0% to $125.2 million in fiscal 2002, compared to
$47.2 million in fiscal 2001. Revenues for fiscal 2001 included only four months
of operations after the acquisitions of O'Gara-Hess & Eisenhardt Armoring
Company, The O'Gara Company, and O'Gara Security Associates, Inc. in August
2001. Revenues in fiscal 2002 include $3.3 million related to the acquisition of
Trasco Bremen in September 2002. Including the eight months of operations prior
to our ownership and excluding all revenue associated with assets that we either
did not purchase or sold, Mobile Security Division revenue increased 17.7%
internally from approximately $106.3 million during fiscal 2001.

Cost of sales. Cost of sales increased $84.4 million, or 66.8%, to $210.7
million for fiscal 2002 compared to $126.3 million for fiscal 2001. This
increase was due primarily to the acquisition of the Armor Mobile Security
Division as well as overall revenue growth for fiscal 2002 compared to fiscal
2001. As a percentage of total revenues, cost of sales increased to 69.1% of
total revenues for fiscal 2002 from 64.1% for fiscal 2001. This increase as a
percentage of total revenues was partially due to the full year inclusion in
2002 of the Mobile Security Division, which operates at lower average gross
margins than the Products Division and partially to reduced Products Division
margins as discussed below.

For fiscal 2002, gross margins in the Products Division were 36.4% compared to
39.3% reported in the same period last year, while the gross margins in the
Mobile Security Division were 23.0% in fiscal 2002, compared to 25.1% for the
four months of the December 31, 2001 fiscal year after the acquisition date. The
Products Division consists of a portfolio of law enforcement products, each of
which is manufactured and sold at different margins. In any given period, the
Products Division weighted average gross margins will fluctuate based upon the
relative volume of products sold during the period. Lower gross margins during
fiscal 2002 in the Products Division were partially attributable to product mix,
as well as to short term increases in manufacturing costs and a raw material
supply issues in the division's body armor operations during the first half of
2002.

During late 2001 and 2002, the Products Division combined its Jacksonville,
Florida based body armor operation into its body armor manufacturing facility in
Ontario, California. During 2002, the Division experienced difficulty in this
combination resulting in capacity constraints and increased manufacturing costs.
We believe that these capacity constraints have been alleviated and that certain
of our body armor manufacturing costs will decrease during the first half of
2003. However, during this time, we also experienced interruptions in the supply
of Zylon Shield, a certain ballistic fiber used in our leading concealable
ballistic vest. This particular supply problem was related to the ballistic
integrity of the fiber we received and not the actual availability of the
material. Nevertheless, our inability to receive quality Zylon Shield during
this period exacerbated our capacity constraints. As of December 31, 2002, the
Division is currently receiving adequate supplies of Zylon Shield and is
currently working to decrease its body armor manufacturing costs.

The Products Division gross margins also decreased because it realized higher
proportional revenue increases from its training division, which operates at
significantly lower overall gross margins than its manufacturing segment. The
decrease in gross margins in the Mobile Security Division was primarily due to a
less favorable mix of commercial vehicle sales compared to the same period the
prior year, a heavier mix of "lower margin" cash-in-transit vehicles in 2002
compared to 2001, and a larger number of base unit sales included in revenue in
the 2002 period.

Operating expenses. Operating expenses increased $11.2 million, or 28.9%, to
$49.8 million (16.3% of total revenues) for fiscal 2002 compared to $38.7
million (19.6% of total revenues) for fiscal 2001. This increase was primarily
due to the operating expenses associated with the operations of the Mobile
Security Division, acquired in August 2001, which were not included for the full
year ended December 31, 2001. Operating expenses also increased in the Products
Division primarily due to operating expenses associated with acquired companies
and from internal growth of the business. Operating expenses as a percent of
sales decreased because the Mobile Security Division operates with a lower level
of operating expenses as a percentage of sales than does the Products Division.
We expect to see an increase in corporate operating expense during 2003 because
we will incur significant increases in insurance expenses, government affairs
and lobbying efforts, internal audit, information technology and increased legal
and accounting costs associated with legal compliance.

Amortization. Amortization expense decreased $1.9 million, or 88.6%, to $0.2
million for fiscal 2002 compared to $2.1 million for fiscal 2001. This decrease
results from the implementation of SFAS 142, which eliminated

43

<PAGE>

goodwill amortization for all acquisitions completed after July 1, 2001, as well as for all fiscal years ending after January 1, 2002. Remaining amortization expense is related to patents and trademarks with finite lives.

Integration and other charges. Integration and other charges increased $2.6 million, or 79.8%, to $5.9 million for fiscal 2002 compared to $3.3 million in fiscal 2001. These charges relate primarily to the integration of the Mobile Security Division, as well as other acquisitions completed in 2001 and 2002. 2002 integration and other charges also included certain expenses related to the integration of our body armor operations, as well as direct costs and expenses associated with potential acquisitions that did not close.

Operating income. Operating income from continuing operations increased $11.7 million to $38.4 million for fiscal 2002 compared to $ 26.7 million in fiscal 2001 due to the factors discussed above. USDS, Inc. contributed operating income that was previously reported as a part of the Services Division of $1.7 million and $1.2 million for the years ended December 31, 2002 and 2001, respectively.

Interest expense, net. Interest expense, net decreased $2.9 million, or 76.1% to $0.9 million for fiscal 2002 compared to $3.9 million for fiscal 2001. This decrease was due primarily to the repayment of long-term debt under our revolving credit facility with the net proceeds of the secondary common stock offering completed in December 2001.

Other expense (income), net. Other expense (income), net, was $51,000 for fiscal 2002, compared to ($82,000) for fiscal 2001 due to a gain on sale of fixed assets during 2001.

Income from continuing operations before provision for income taxes. Income from continuing operations before provision for income taxes increased by $14.5 million to $37.4 million for fiscal 2002 compared to $22.9 million for fiscal 2001 due to the reasons discussed above.

Provision for income taxes. Provision for income taxes was $16.1 million for fiscal 2002 compared to $8.2 million for fiscal 2001. The provision for income taxes for fiscal 2002 included charges of approximately $1.5 million related to the establishment of valuation allowances for certain foreign deferred tax assets of our discontinued operations. The effect of these charges was to increase our effective tax rate for fiscal 2002 to 42.9% compared to 35.9% for fiscal 2001. Without these charges, our effective tax rate for fiscal 2002 would have been 39%. The increase in what our effective tax rate would have been without the tax charges related to our discontinued operations is due primarily to the higher percentage of income earned in the United States and the impact of state income taxes on this income. Our expected effective tax rate is not necessarily indicative of what our actual effective rate will be due to the changing concentration and mix of income in the various countries in which we continue to operate.

Income from continuing operations. Income from continuing operations increased $6.6 million to $21.3 million for fiscal 2002 compared to $14.7 million for fiscal 2001 due to the factors discussed above.

DISCONTINUED OPERATIONS

Many of the items listed below involve accounting estimates. The loss and amounts below will be revaluated in the future for any changes which might be appropriate.

Note 2 of the consolidated financial statements contains comparative information for our discontinued operations. Our ArmorGroup Services Division revenues increased $3.3 million, or 3.5%, to $98.3 million for fiscal 2002 compared to $94.9 million for fiscal 2001. For fiscal 2002, revenue increased 6.7% due to the acquisition of International Training, Inc. ("ITI"), which was acquired as part of the acquisition of our Mobile Security Division and is included in the Services Division from the date of acquisition. The 3.4% reduction in revenue exclusive of the ITI acquisition was a result of lower revenues in the Integrated Systems business in the United States and the Security consulting business both in Latin America and Russia due to the completion of several large contracts.

Cost of sales. Cost of sales increased $10.8 million, or 16.5%, to $75.8 million for fiscal 2002 compared to $65 million for fiscal 2001. This increase was due primarily to the acquisition of ITI. As a percentage of total revenue, cost of sales increased to 77.1% of total revenues for fiscal 2002 from 68.5% for fiscal 2001. This increase in cost of sales as a percentage of total revenue was primarily due to the weakness in our Integrated Systems business resulting in poor margins from increased inventory reserves, the loss of high margin oil industry security consulting work in Latin America and the scaling down of business in the Democratic Republic of Congo.

44

<PAGE>

Operating expenses. Operating expenses increased $6.1 million, or 24.9%, to $30.6 million (31.1% of total revenues) for fiscal 2002 compared to $24.5 million (25.8% of total revenues) for fiscal 2001. This increase was due primarily to increased accounts receivable reserves, other asset write-downs, and other charges in the Integrated Systems and Security consulting businesses, as well as additional operating expenses associated with ITI's operations, acquired in August 2001.

Amortization. Amortization expense decreased $1.5 million, or 100%, to $0 for fiscal 2002 compared to $1.5 million for fiscal 2001. This decrease was a result of the implementation of SFAS 142, which eliminated goodwill amortization for

acquisitions completed after July 1, 2001 and for fiscal years beginning on or after January 1, 2002.

Charge for impairment of long-lived assets. Charges for impairment of long-lived assets was $30.3 million for fiscal 2002 compared to $0 for fiscal 2001. The impairment charge is the result of the $24.2 million reduction in carrying value of the Services Division to the estimated realizable value as required by SFAS 144.

Restructuring and related charges. In January 2001, the our Board of Directors approved a restructuring plan to close the Services Division's U.S. investigative businesses, realign the Service Division's organization, eliminate excess facilities and reduce overhead in its business worldwide. In connection with this restructuring charge, the Services Division performed a review of its long-lived assets to identify potential impairments. Pursuant to this restructuring plan, we a) eliminated 26 employees, primarily from the Services Division investigative business; b) eliminated an additional 24 employees from its security consulting business; c) incurred lease and other exit costs as a result of the closure of the investigative businesses; and d) wrote-down the value of both tangible and intangible assets as a result of the impairment review.

As a result of the restructuring plan, we recorded a pre-tax charge of $10.3 million. At December 31, 2002 we had a restructuring accrual of $270,000 compared to $354,000 at December 31, 2001 relating to lease termination and other exit costs. This liability has been classified in accrued expenses and other current liabilities on our discontinued operations balance sheet and will be funded through cash provided by operating activities and our credit facility.

Integration and other charges. Integration and other charges increased $1.8 million, or 238.0%, to $2.6 million for fiscal 2002 compared to $776,000 for fiscal 2001. These charges reflect certain severance expenses, software write-off costs and other expenses associated with preparing the division for sale, as well as the expenses associated with integrating ITI into the Services Division.

Operating loss. Operating losses were $41.0 million for fiscal 2002, compared to an operating loss of $7.1 million for fiscal 2001 due to the factors discussed above.

Interest expense, net. Interest expense, net increased $203,000 or 142%, to $346,000 for fiscal 2002 compared to $143,000 for fiscal 2001. This increase was due to increased utilization of the Services Division's line of credit.

Other (income) expense, net. Other expense, net, was $99,000 for fiscal 2002, compared to other income, net of $218,000 for fiscal 2001. The increase expense in fiscal 2002 was a result of losses on the disposal of fixed assets and other asset write-offs.

Loss from discontinued operations before provision for income taxes (benefit). Loss from discontinued operations before provision for income taxes (benefit) was $41.5 million for fiscal 2002 and $7.1 million for fiscal 2001 due to the reasons discussed above.

Provision for income taxes (benefit). Income tax benefit was $2.4 million for fiscal 2002 compared to a benefit of $2.5 million for fiscal 2001. The effective tax rate for fiscal 2002 was a benefit of 5.9% compared to a benefit of 35.5% for fiscal 2001. The decrease in percentage benefit is primarily due to the inclusion in taxable income of certain expenses not deductible for tax purposes, including a $31.2 million charge for the impairment of long-lived assets.

Loss from discontinued operations. Loss from discontinued operations was $39.0 million for fiscal 2002 compared to a loss from discontinued operations of $4.6 million for fiscal 2001 due to the factors discussed above.

45

<PAGE>

QUARTERLY RESULTS

Set forth below are certain unaudited quarterly financial data for each of our last eight quarters and certain such data expressed as a percentage of our revenue for the respective quarters. The information has been derived from unaudited financial statements that, in the opinion of management, include all adjustments (consisting only of normal recurring adjustments) necessary to fairly present such quarterly information in accordance with generally accepted accounting principles. The operating results for any quarter are not necessarily indicative of the results to be expected for any future period.

46

<PAGE>

<TABLE>
<CAPTION>

QUARTER ENDED

|  | | | | (IN THOUSANDS, EXCEPT PER SHARE DATA) | | | |
| Dec 31, | Sept 30, | Jun 30, | Mar 31, | Dec 31, | Sept 30, | Jun 30, | Mar 31, |

|  | 2003 | 2003 | 2003 | 2003 | 2002 | 2002 | 2002 | 2002 |
|---|---|---|---|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| Revenues: | | | | | | | | |
| Products | $ 54,953 | $ 50,786 | $49,347 | $44,007 | $ 48,897 | $ 49,047 | $ 43,057 | $ 38,945 |
| Mobile Security | 48,673 | 40,096 | 32,312 | 36,467 | 34,454 | 31,510 | 28,548 | 30,659 |
| Simula | 8,531 | – | – | – | – | – | – | – |
| Total Revenue | 112,157 | 90,882 | 81,659 | 80,474 | 83,351 | 80,557 | 71,605 | 69,604 |
| Operating income | 8,381 | 12,512 | 6,010 | 8,826 | 10,815 | 10,337 | 8,168 | 9,045 |
| Interest expense, net | 1,721 | 1,475 | 437 | 379 | 254 | 343 | 284 | 42 |
| Other expense (income), net | 327 | 96 | 16 | 69 | 128 | (13) | – | (64) |
| Income from continuing operations before taxes | 6,333 | 10,941 | 5,557 | 8,378 | 10,433 | 10,007 | 7,884 | 9,067 |
| Provision for income taxes | 4,159 | 4,832 | 2,079 | 3,133 | 2,451 | 7,043 | 3,060 | 3,500 |
| Income from continuing operations | 2,174 | 6,109 | 3,478 | 5,245 | 7,982 | 2,964 | 4,824 | 5,567 |
| (Loss) income from discontinued operations, net of (benefit) provision for income taxes | (7,103) | 6 | 1,135 | (158) | (20,999) | (17,671) | (749) | 393 |
| Net (loss) income | $ (4,929) | $ 6,115 | $4,613 | $ 5,087 | $(13,017) | $(14,707) | $4,075 | $5,960 |
| Net income/(loss) per common Share-Basic | | | | | | | | |
| Income from continuing operations | $ 0.08 | $0.22 | $0.13 | $0.18 | $ 0.27 | $ 0.10 | $ 0.15 | $ 0.18 |
| Loss from discontinued operations | (0.25) | 0.00 | 0.04 | (0.01) | (0.71) | (0.60) | (0.02) | 0.01 |
| Basic (loss) earnings per share | $ (0.17) | $0.22 | $ 0.17 | $ 0.17 | $ (0.44) | $ (0.50) | $ 0.13 | $ 0.19 |
| Net income/(loss) per common share - Diluted | | | | | | | | |
| Income from continuing operations | $ 0.07 | $0.22 | $0.13 | $0.18 | $ 0.27 | $ 0.10 | $ 0.15 | $ 0.18 |
| Loss from discontinued operations | (0.24) | 0.00 | 0.04 | (0.01) | (0.71) | (0.59) | (0.02) | 0.01 |
| Diluted (loss) earnings per share | $ (0.17) | $0.22 | $ 0.17 | $ 0.17 | $ (0.44) | $ (0.49) | $ 0.13 | $0.19 |
| Weighted average common shares outstanding | | | | | | | | |
| Basic | 28,195 | 27,811 | 27,555 | 28,964 | 29,456 | 29,708 | 31,193 | 31,030 |
| Diluted | 29,364 | 28,249 | 27,836 | 29,111 | 29,623 | 30,037 | 32,110 | 31,986 |
| Revenues: | | | | | | | | |
| Products | 49.0% | 55.9% | 60.4% | 54.7% | 58.7% | 60.9% | 60.1% | 56.0% |
| Mobile Security | 43.4% | 44.1% | 39.6% | 45.3% | 41.3% | 39.1% | 39.9% | 44.0% |
| Simula | 7.6% | – | – | – | – | – | – | – |
| Total revenue | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| Operating income | 7.5% | 13.7% | 7.3% | 11.0% | 13.0% | 12.8% | 11.4% | 13.0% |
| Interest expense, net | 1.5% | 1.6% | 0.5% | 0.5% | 0.3% | 0.4% | 0.4% | 0.1% |
| Other expense (income), net | 0.3% | 0.1% | 0.0% | 0.1% | 0.2% | 0.0% | 0.0% | (0.1%) |
| Income from continuing operations before taxes | 5.6% | 12.0% | 6.8% | 10.4% | 12.5% | 12.4% | 11.0% | 13.0% |
| Provision for income taxes | 3.7% | 5.3% | 2.5% | 3.9% | 2.9% | 8.7% | 4.3% | 5.0% |
| Income from continuing operations | 1.9% | 6.7% | 4.3% | 6.5% | 9.6% | 3.7% | 6.7% | 8.0% |
| (Loss) income from discontinued operations before income taxes | (16.0%) | 1.8% | 2.3% | 0.1% | (28.6%) | (21.1%) | (1.1%) | 0.4% |
| (Benefit) provision for income taxes | (9.7%) | 1.8% | 0.9% | 0.3% | (3.4%) | 0.8% | (0.1%) | (0.2%) |
| (Loss) income from discontinued operations | (6.3%) | 0.0% | 1.4% | (0.2%) | (25.2%) | (21.9%) | (1.0%) | 0.6% |
| Net (loss) income | (4.4%) | 6.7% | 5.7% | 6.3% | (15.6%) | (18.3%) | 5.7% | 8.6% |

</TABLE>

47

<PAGE>


LIQUIDITY AND CAPITAL RESOURCES

On August 12, 2003, we terminated our prior credit facility and entered into a new secured revolving credit facility (the "Credit Facility") with Bank of America, N.A., Wachovia Bank, National Association and a syndicate of other financial institutions arranged by Bank of America Securities, LLC. The new Credit Facility consists of a five-year revolving credit facility and, among other things, provides for (i) total maximum borrowings of $60 million, (ii) a $25 million sub-limit for the issuances of standby and commercial letters of credit, (iii) a $5 million sub-limit for swing-line loans, and (iv) a $5 million sub-limit for multi-currency borrowings. All borrowings under the Credit

Facility will bear interest at either (i) a rate equal to LIBOR, plus an applicable margin ranging from 1.125% to 1.625%, (ii) an alternate base rate which will be the higher of (a) the Bank of America prime rate and (b) the Federal Funds rate plus 0.50%, or (iii) with respect to foreign currency loans, a fronted offshore currency rate, plus an applicable margin ranging from 1.125% to 1.625%, depending on certain conditions. The Credit Facility is guaranteed by certain of our direct and indirect domestic subsidiaries and is collateralized by, among other things, (i) a pledge of all of the issued and outstanding shares of stock or other equity interests of certain of our domestic subsidiaries, (ii) a pledge of 65% of the issued and outstanding voting shares of stock or other voting equity interests of certain of our direct and indirect foreign subsidiaries, (iii) a pledge of 100% of the issued and outstanding nonvoting shares of stock or other nonvoting equity interests of certain of our direct and indirect foreign subsidiaries, and (iv) a first priority perfected security interest on certain of our domestic assets and certain domestic assets of certain of our direct and indirect subsidiaries that will become guarantors of our obligations under the new credit facility, including, among other things, accounts receivable, inventory, machinery, equipment, certain contract rights, intellectual property rights and general intangibles.

As of December 31, 2003, we were in compliance with all of our negative and affirmative covenants.

On August 12, 2003, we completed a private placement of $150 million aggregate principal amount of 8.25% Senior Subordinated Notes due 2013 (the "Notes"). The Notes are guaranteed by all of our domestic subsidiaries, excluding for USDS, Inc., on a senior subordinated basis. The Notes have been sold to qualified institutional investors in reliance on Rule 144A of the Securities Act of 1933, as amended, and to non-U.S. persons in reliance on Regulation S under the Securities Act of 1933, as amended. The Notes were rated B1/B+ by Moody's Investors' Service and Standard & Poor's Rating Services, respectively. During 2003, we used a portion of the funds to acquire Simula, Inc. and Hatch Imports, Inc., and we intend to use the remaining proceeds of the offering to fund acquisitions, repay a portion of our outstanding debt and for general corporate and working capital purposes, including the funding of capital expenditures.

On September 2, 2003, we entered into interest rate swap agreements, designated as a fair value hedge as defined under Statement of Financial Accounting Standard No. 133, "Accounting for Derivative Instruments and Hedge Activities," ("SFAS 133") with a notional amount totaling $150 million. The agreements were entered into to exchange the fixed interest rate on the Notes for a variable interest rate equal to six-month LIBOR, set in arrears, plus a spread ranging from 2.735% to 2.75% fixed semi-annually on the fifteenth day of February and August. The agreements are subject to other terms and conditions common to transactions of this type. In accordance with SFAS 133, changes in the fair value of the interest rate swap agreements offset changes in the fair value of the fixed rate debt due to changes in the market interest rate. Accordingly, the other assets on the Consolidated Balance Sheets as of December 31, 2003 increased by $5.9 million, which reflected an increase in the fair value of the interest rate swap agreements. The corresponding increase in the hedge liability was recorded in long-term debt. The agreements are deemed to be a perfectly effective fair value hedge, and, therefore, qualify for the short-cut method of accounting under SFAS 133. As a result, no ineffectiveness is expected to be recognized in our earnings associated with the interest rate swap agreements.

In March 2002, our Board of Directors approved a stock repurchase program authorizing the repurchase of up to a maximum 3.2 million shares of our common stock. In February 2003, the Board of Directors increased this stock repurchase program to authorize the repurchase, from time to time depending upon market conditions and other factors, of up to an additional 4.4 million shares. Through March 12, 2004, we repurchased 3.8 million shares of our common stock under the stock repurchase program at an average price of $12.49 per share, leaving us with the ability to repurchase up to an additional 3.8 million shares of our common stock. Repurchases may be made in the open market, in privately negotiated transactions or otherwise. At December 31, 2003, we had 28.3 million shares of common stock outstanding.

We expect to continue our policy of repurchasing our common stock from time to time, subject to the restrictions contained in our Credit Facility and our indenture. Our Credit Facility permits us to repurchase shares of our

48

<PAGE>

common stock with no limitation if our ratio of Consolidated Total Indebtedness to Consolidated EBTIDA (as such terms are defined in the Credit Facility) for any rolling twelve-month period is less than 1.00 to 1. At ratios greater than 1.00 to 1, our credit agreement limits our ability to repurchase shares as $15.0 million. This basket resets to $0 each time the ratio is less than 1.0 to 1.

Working capital, excluding amounts relating to discontinued operations, was $168.6 million and $89.0 million as of December 31, 2003, and December 31, 2002, respectively.

Our fiscal 2003 capital expenditures for continuing operations were $8.7 million. Our fiscal 2003 capital expenditures for discontinued operations were $3.1 million. Such expenditures include leasehold improvements, information technology and communications infrastructure equipment and software, and manufacturing machinery and equipment.

We anticipate that the cash generated from operations, proceeds from the sale of discontinued operations, cash on hand and available borrowings under the Credit Facility will enable us to meet liquidity, working capital and capital expenditure requirements during the next 12 months. We may, however, require

additional financing to pursue our strategy of growth through acquisitions. If
such financing is required, there are no assurances that it will be available,
or if available, that it can be obtained on terms favorable to us or on a basis
that is not dilutive to our stockholders.

RECENTLY ISSUED ACCOUNTING STANDARDS

In June 2001, the FASB issued SFAS No. 142, "Goodwill and Other Intangible
Assets." SFAS No. 142 changes the accounting for goodwill from an amortization
method to an impairment-only approach. Amortization of goodwill, including
goodwill recorded in past business combinations, ceased upon adoption of this
statement. In addition, this statement requires that goodwill be tested for
impairment at least annually at the reporting unit level. We implemented SFAS
No. 142 on January 1, 2002. In connection with the adoption of SFAS 142, we
completed in the second quarter the transitional goodwill impairment test that
compared the fair value of each reporting unit to its carrying value and
determined that no impairment existed. The goodwill resulting from acquisitions
made by us subsequent to June 30, 2001 was immediately subject to the
non-amortization provisions of SFAS 142. Had we been accounting for goodwill
under SFAS 142 in 2001, our net income and earnings per share would have been as
follows:

<TABLE>
<CAPTION>

|  | DECEMBER 31, 2001 |
| --- | --- |
|  | (in thousands, except per share data) |
| <S> | <C> |
| Reported net income | $10,128 |
| Add back goodwill amortization, net of tax | 3,044 |
|  | ------- |
| Actual/pro forma adjusted net income | $13,172 |
|  | ======= |
|  |  |
| Basic earnings per share |  |
| Reported basic income per share | $  0.42 |
| Goodwill amortization, net of tax | 0.13 |
|  | ------- |
| Actual/pro forma basic income per share | $  0.55 |
|  | ======= |
| Diluted earnings per share |  |
| Reported diluted income per share | $  0.41 |
| Goodwill amortization, net of tax | 0.12 |
|  | ------- |
| Actual/pro forma diluted income per share | $  0.53 |
|  | ======= |

</TABLE>

In November 2002, the FASB issued FASB Interpretation No. 45, "Guarantor's
Accounting and Disclosure Requirements for Guarantees, Including Indirect
Guarantees of Indebtedness of Others, and Interpretation of FASB Statements No.
5, 57 and 107 and Rescission of FASB Interpretation No. 34" ("FIN 45"). FIN 45
elaborates on the disclosures to be made by a guarantor in its interim and
annual financial statements about its obligations under certain guarantees that
it has issued. It also clarifies that a guarantor is required to recognize, at
the inception of a guarantee, a liability for the fair value of the obligation
undertaken in issuing the guarantee. The

49

<PAGE>

initial recognition and initial measurement provisions of FIN 45 are applicable
on a prospective basis to guarantees issued or modified after December 31, 2002,
irrespective of the guarantor's fiscal year-end. We adopted the provisions of
this Statement on January 1, 2003, which did not have a significant impact on
our consolidated financial statements.

In January 2003, the FASB issued FASB Interpretation No. 46, "Consolidation of
Variable-Interest Entities - an Interpretation of ARB No. 51 (FIN 46). FIN 46
addresses consolidation by business enterprises of variable interest entities,
which have one or both of the following characteristics: (1) the equity
investment at risk is not sufficient to permit the entity to finance its
activities without additional subordinated financial support from other parties,
which is provided through other interests that will absorb some or all of the
expected losses of the entity and (2) the equity investors lack one or more of
the following essential characteristics of a controlling financial interest:

     o    The direct or indirect ability to make decisions about the entity's
          activities through voting rights or similar rights

     o    The obligation to absorb the expected losses of the entity if they
          occur, which makes it possible for the entity to finance its
          activities

     o    The right to receive the expected residual returns of the entity if
          they occur, which is the compensation for the risk of absorbing the
          expected losses.

This Interpretation applies immediately to variable interest entities created
after January 31, 2003, and to variable interest entities in which an enterprise

obtains an interest after that date. It applies in the first fiscal year or interim period beginning after June 15, 2003, to variable interest entities in which an enterprise holds a variable interest that it acquired before February 1, 2003. The adoption of FIN 46 did not have a significant impact on our consolidated financial statements.

In December 2003, the FASB issued FASB Interpretation No. 46, "Consolidation of Variable Interest Entities" (revised December 2003) (FIN 46(R)). The provisions of FIN 46(R) are as follows:

    o    Provides that the condition that would preclude an enterprise from applying the scope exception of FIN 46 for certain entities that are businesses if that enterprise and/or its related parties participated significantly in the design or redesign of the entity should not apply if the entity is a franchisee.

    o    An enterprise shall not consolidate a governmental organization and shall not consolidate a financing entity established by a governmental organization unless the financing entity (a) is not a governmental organization and (b) is used by the business enterprise in a manner similar to a variable interest entity in an effort to circumvent the provisions of Interpretation 46(R).

    o    A troubled debt restructuring, as defined in paragraph 2 of FASB Statement No. 15, Accounting by Debtors and Creditors for Troubled Debt Restructurings, as amended, shall be accounted for in accordance with that Statement and is not an event that requires the reconsideration of whether the entity involved is a variable interest entity or whether an enterprise with a variable interest in a variable interest entity is the primary beneficiary of that entity.

    o    Provide that an enterprise with an interest in an entity to which the provisions of FIN 46 have not been applied as of December 24, 2003, shall apply FIN 46 or FIN 46(R) to that entity in accordance with the effective date provisions of FIN 46(R) as described below.

    o    FIN 46(R) should be applied no later than the end of the first reporting period that ends after March 15, 2004 (as of March 31, 2004 for the Company). However, prior to the required application of FIN 46(R), the Company must apply FIN 46 or FIN 46(R) to those entities that are considered to be special-purpose entities no later than as of the end of the first reporting period that ends after December 15, 2003 (as of December 31, 2003 for the Company).

We do not have, nor have had, any interests in variable interest entities that are subject to the provisions of FIN 46 or FIN 46(R).

In October 2001, the FASB issued Statement of Financial Accounting Standard No. 144, "Accounting for the Impairment or Disposal of Long-Lived Assets" (SFAS 144). SFAS 144 establishes a "primary-asset" approach to determine the cash flow estimation period for a group of assets and liabilities that represents the unit of accounting for a long-lived asset to be held and used. SFAS 144 requires that a long-lived asset to be (1) abandoned, (2) exchanged for a similar productive asset, or (3) distributed to owners in a spin-off be considered held and used until it is abandoned, exchanged, or distributed. SFAS 144 requires (1) that spin-offs and exchanges of similar productive assets be recorded at the lower of carrying value or fair value, and that such assets be classified as held and used until disposed of and (2) that any impairment loss resulting from a spin-off

                                          50

<PAGE>

or exchange of similar productive assets be recognized upon asset disposition. SFAS 144 provides for total assets and total liabilities of discontinued business segments to be presented in separate captions in assets and liabilities and also provides that future losses, if any, of discontinued business segments shall be reported as incurred. We adopted SFAS 144 effective January 1, 2002. The reclassification of the Services Division to discontinued operations and subsequent reduction in its carrying value was in accordance with the provisions of SFAS 144.

In April 2002, the FASB issued Statement of Financial Accounting Standard No. 145, "Rescission on FASB 4, 44 and 64, Amendment of FASB Statement No. 13 and Technical Corrections" (SFAS 145). Under SFAS 145, gains and losses related to the extinguishment of debt should no longer be segregated on the income statement from continuing operations. The provisions of SFAS 145 are effective for fiscal years beginning after May 15, 2002.

In June 2002, the FASB issued Statement of Financial Accounting Standard No. 146, "Accounting for Costs Associated with Exit or Disposal Activities" (SFAS 146). SFAS 146 addresses financial accounting and reporting for costs associated with exit or disposal activities and nullifies Emerging Issues Task Force Issue No. 94-3, "Liability Recognition for Certain Employee Termination Benefits and Other Costs to Exit an Activity (including Certain Costs Incurred in a Restructuring)." SFAS 146 is effective for exit or disposal activities initiated on or after December 31, 2002. The effects of adopting this standard did not have a material effect on us.

In December 2002, the FASB issued Statement of Financial Accounting Standard No. 148, "Accounting for Stock-Based Compensation - Transition and Disclosure" (SFAS 148). SFAS 148 provides alternative methods of transition for a voluntary change to the fair value based method of accounting for stock-based employee compensation. In addition, SFAS 148 amends the disclosure requirements of

Statement of Financial Accounting Standard No. 123, "Accounting for Stock-Based Compensation" (SFAS 123), to require prominent disclosure in both annual and interim financial statements about the method of accounting for stock-based employee compensation and the effect of the method used on reported results. The disclosures required by SFAS 148 are included in this document.

In April 2003, the FASB issued Statement of Financial Accounting Standard No. 149, " Amendment of Statement 133 on Derivative Instruments and Hedging Activities" (SFAS 149). SFAS 149 amends and clarifies financial accounting and reporting for derivative instruments, including certain derivative instruments embedded in other contracts and for hedging activities under Statement of Financial Accounting Standard No. 133, "Accounting for Derivative Instruments and Hedging Activities" (SFAS 133). SFAS 149 is effective for contracts entered into or modified and hedging relationships designated after June 30, 2003, except for the provisions of SFAS 149 that relate to SFAS 133 Implementation Issues that have been effective for fiscal quarters that began prior to June 15, 2003, which should continue to be applied in accordance with their respective effective dates. Adoption of this standard had no effect on us.

In May 2003, the FASB issued Statement of Financial Accounting Standard No. 150, " Accounting for Certain Financial Instruments with Characteristics of both Liabilities and Equity" (SFAS 150). SFAS 150 establishes standards for how an issuer classifies and measures certain financial instruments with characteristics of both liabilities and equity. It requires that an issuer classify a financial instrument that is within its scope as a liability (or an asset in some circumstances). Many of those instruments were previously classified as equity. SFAS 150 is effective for financial instruments entered into or modified after May 31, 2003, and otherwise is effective at the beginning of the first interim period beginning after June 15, 2003. Adoption of this standard had no effect on us.

In May 2003, the FASB issued FASB Staff Position No. 146-1, "Determining Whether a One-Time Termination Benefit Offered in Connection with an Exit or Disposal Activity is, in Substance, an Enhancement to an Ongoing Benefit Arrangement." This Staff Position states that in order to be considered an enhancement to an ongoing benefit arrangement, the additional termination benefits must represent a revision to the ongoing arrangement that is not limited to a specified termination event or a specified future period. Otherwise the additional termination benefits should be considered one-time termination benefits accounted for under SFAS 146. The guidance in this Staff Position is effective for exit or disposal activities initiated in interim or annual reporting periods beginning after September 15, 2003. The adoption of this Staff Position is not expected to have a material impact on our consolidated financial statements.

51

<PAGE>

INFLATION

We believe that the relatively moderate rates of inflation in recent years have not had a significant impact on our revenue or profitability. Historically, we have been able to offset any inflationary effects by either increasing prices or improving cost efficiencies.

OFF BALANCE SHEET ARRANGEMENTS

We do not have any off balance sheet arrangements.

TABULAR DISCLOSURE OF CONTRACTUAL OBLIGATIONS

The following table presents our contractual obligations as of December 31, 2003:

<TABLE>
<CAPTION>

| CONTRACTUAL OBLIGATIONS | PAYMENT DUE BY PERIOD | | | |
| | Total | Less than 1 year | 1 - 3 years | 3 - 5 years | More than 5 years |
| --- | --- | --- | --- | --- | --- |
| <S> | <C> | <C> | <C> | <C> | <C> |
| Long-term debt obligations | $190,407 | $32,107 | $ 1,250 | $ 1,307 | $155,743 |
| Operating lease obligations | 19,719 | 3,417 | 3,908 | 3,073 | 9,321 |
| Other long-term liabilities | 10,208 | – | 1,614 | 7,558 | 1,036 |
| Total | $220,334 | $35,524 | $ 6,772 | $ 11,938 | $166,100 |

</TABLE>

52

<PAGE>

ITEM 7A.   QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK

QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK

As a result of our global operating and financial activities, we are exposed to changes in raw material prices, interest rates and foreign currency exchange rates, which may adversely affect our results of operations and financial position. In seeking to minimize the risks and/or costs associated with such

activities, we manage exposure to changes in raw material prices, interest rates, and foreign currency exchange rates through our regular operating and financing activities. We have entered into interest rate swap agreements to reduce our overall interest expense. We do not utilize financial instruments for trading purposes.

MARKET RATE RISK

The following discussion about our market rate risk involves forward-looking statements. Actual results could differ materially from those projected in the forward-looking statements. We are exposed to market risk related to changes in interest rates, foreign currency exchange rates, and equity security price risk.

Interest Rate Risk. Our exposure to market rate risk for changes in interest rates relate primarily to borrowings under our $150 million senior subordinated notes, our credit facilities and our short-term monetary investments. To the extent that, from time to time, we hold short-term money market instruments, there is a market rate risk for changes in interest rates on such instruments. To that extent, there is inherent rollover risk in the short-term money market instruments as they mature and are renewed at current market rates. The extent of this risk is not quantifiable or predictable because of the variability of future interest rates and business financing requirements. However, there is no risk of loss of principal in the short-term money market instruments, only a risk related to a potential reduction in future interest income.

On September 2, 2003, we entered into interest rate swap agreements in which we effectively exchanged the $150 million fixed rate 8.25% interest rate on the senior subordinated notes for variable rates in the notional amount of $80 million, $50 million and $20 million at six-month LIBOR, set in arrears, plus 2.75%, 2.75%, and 2.735%, respectively. The agreement involves receipt of fixed rate amounts in exchange for floating rate interest payments over the lives of the agreements without an exchange of the underlying principal amount. The variable interest rates are fixed semi-annually on the fifteenth day of February and August. The six-month LIBOR rate was 1.17% on February 24, 2004. The maturity dates of the interest rate swap agreements match those of the underlying debt. Our objective for entering into these interest rate swaps was to reduce our exposure to changes in the fair value of the senior subordinated notes and to obtain variable rate financing at an attractive cost. Changes in the six-month LIBOR would affect our earnings either positively or negatively. An assumed 100 basis point increase in the six-month LIBOR would increase our interest obligations under the interest rate swaps by approximately $750,000 for a six-month period.

In accordance with SFAS 133, we designated the interest rate swap agreements as perfectly effective fair value hedges and, accordingly, use the short-cut method of evaluating effectiveness. As permitted by the short-cut method, the change in the fair value of the interest rate swaps will be reflected in earnings and an equivalent amount will be reflected as a change in the carrying value of the swaps, with an offset to earnings. There is no ineffectiveness to be recorded. On December 31, 2003, we recorded the fair value of the interest rate swap agreements of $5.9 million and recorded the corresponding fair value adjustment to the 8.25% senior subordinated notes in the other assets and long-term debt sections of the Consolidated Balance Sheets, respectively.

We are exposed to credit-related losses in the event of nonperformance by counterparties to these financial instruments. However, counterparties to these agreements are major financial institutions and the risk of loss due to nonperformance is considered by management to be minimal. We do not hold or issue interest rate swap agreements or other derivative instruments for trading purposes.

Foreign Currency Exchange Rate Risk. The majority of our business is denominated in U.S. dollars. There are costs associated with our operations in foreign countries that require payments in the local currency. Where appropriate and to partially manage our foreign currency risk related to those payments we receive payment from customers in local currencies in amounts sufficient to meet our local currency obligations. We do not use derivatives or other financial instruments to hedge foreign currency risk.

<PAGE>

RISKS ASSOCIATED WITH INTERNATIONAL OPERATIONS

We do business in numerous countries, including emerging markets in Africa, Asia, South America, Russia and the former CIS. We have invested substantial resources outside of the United States and plan to continue to do so in the future. Our international operations are subject to the risk of new and different legal and regulatory requirements in local jurisdictions, tariffs and trade barriers, potential difficulties in staffing and managing local operations, potential imposition of restrictions on investments, potentially adverse tax consequences, including imposition or increase of withholding and other taxes on remittances and other payments by subsidiaries, and local economic, political and social conditions. Governments of many developing countries have exercised and continue to exercise substantial influence over many aspects of the private sector. Government actions in the future could have a significant adverse effect on economic conditions in a developing country or may otherwise have a material adverse effect on us and our operating companies. We do not have political risk insurance in the countries in which we currently conduct business, but periodically analyze the need for and cost associated with this type of policy. Moreover, applicable agreements relating to our interests in our operating companies are frequently governed by foreign law. As a result, in the event of a dispute, it may be difficult for us to enforce our rights.

Accordingly, we may have little or no recourse upon the occurrence of any of these developments.

ITEM 8.   FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA

The response to this item is incorporated by reference from our consolidated financial statements and notes thereto which are included in this report beginning on page F-1. Certain selected quarterly financial data is included under Item 7 of this Report.

ITEM 9.   CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND
          FINANCIAL DISCLOSURE

There have been no changes in or disagreements with accountants on accounting or financial disclosure matters during the periods covered by this Annual Report on Form 10-K.

ITEM 9A. CONTROLS AND PROCEDURES

As of the end of the period covered by this report, we evaluated the effectiveness of the design and operation of our disclosure controls and procedures. Our disclosure controls and procedures are designed to provide reasonable assurance that the information that we must disclose in our reports filed under the Securities and Exchange Act is communicated and processed in a timely manner. Warren B. Kanders, Chairman and Chief Executive Officer, and Robert R. Schiller, President, Chief Operating Officer and Chief Financial Officer, participated in this evaluation.

Based on such evaluation, Mr. Kanders and Mr. Schiller concluded that, as of the date of such evaluation, our disclosure controls and procedures were effective. During the most recent fiscal quarter, there have not been any significant changes in our internal controls or in other factors that could significantly affect those controls.

54

<PAGE>

PART III

The information called for pursuant to this Part III, Items 10, 11, 12, 13 and 14 is incorporated by reference from our definitive proxy statement, which we intend to file with the Securities and Exchange Commission no later than April 29, 2004.

55

<PAGE>

PART IV

ITEM 15.   EXHIBITS, FINANCIAL STATEMENTS SCHEDULES, AND REPORTS ON FORM 8-K

(a)        The following financial statements (which appear sequentially beginning
           at page number F-1) are included in this report on Form 10-K. Financial
           statement schedules have been omitted since they are either not
           required, not applicable, or the information is otherwise included.

           Reports of Independent Certified Public Accountants

           Consolidated Balance Sheets

           Consolidated Income Statements

           Consolidated Statements of Stockholders' Equity and Comprehensive
           Income (Loss)

           Consolidated Statements of Cash Flows

           Notes to Consolidated Financial Statements

(b)        Reports on Form 8-K

           During the quarter ended December 31, 2003, we filed the following
Current Reports on Form 8-K:

           (i)      Current Report on Form 8-K, date of report - November 4, 2003,
                    with respect to Items 7 and 12, filed with the Commission on
                    November 5, 2003 relating to a press release announcing our
                    earnings for the three-month period ended September 30, 2003;

(ii)    Current Report on Form 8-K, date of report - November 26, 2003, with respect to Items 2 and 7, filed with the Commission on December 11, 2003 relating to our sale of our Services Division; and

(iii)   Current Report on Form 8-K, date of report - December 9, 2003, with respect to Items 2 and 7, filed with the Commission on December 23, 2003 relating to our acquisition of Simula, Inc.

(c)    Exhibits

The following Exhibits are hereby filed as part of this Annual Report on Form 10-K:

EXHIBIT NO. DESCRIPTION

+2.1    Stock Purchase Agreement, dated as of April 20, 2001, by and among Armor Holdings, Inc., Bengal Acquisition Corp., The Kroll-O'Gara Company, O'Gara-Hess & Eisenhardt Armoring Company, The O'Gara Company, and O'Gara Security Associates, Inc. (filed as Exhibit 2.1 to our Current Report on Form 8-K dated April 20, 2001 and incorporated herein by reference).

+2.2    Amendment dated as of August 20, 2001 to the Stock Purchase Agreement, dated as of April 20, 2001, by and among Armor Holdings, Inc., Bengal Acquisition Corp., The Kroll-O'Gara Company, O'Gara-Hess & Eisenhardt Armoring Company, The O'Gara Company, and O'Gara Security Associates, Inc. (filed as Exhibit 2.2 to our Current Report on Form 8-K dated August 22, 2001 and incorporated herein by reference).

+2.3    Amendment dated as of August 21, 2001 to the Stock Purchase Agreement, dated as of April 20, 2001, by and among Armor Holdings, Inc., Bengal Acquisition Corp., The Kroll-O'Gara Company, O'Gara-Hess & Eisenhardt Armoring Company, The O'Gara Company, and O'Gara Security Associates, Inc. (filed as Exhibit 2.3 to our Current Report on Form 8-K dated August 23, 2001 and incorporated herein by reference).

56

<PAGE>

+2.4    Agreement and Plan of Merger dated as of August 29, 2003 by and among Armor Holdings, Inc., AHI Bulletproof Acquisition Corp., and Simula, Inc. (filed as Appendix A to our Registration Statement on Form S-4 filed with the Commission on September 23, 2003 and incorporated herein by reference).

+2.5    Purchase and Sale Agreement dated November 26, 2003, among Armor Holdings, Inc., Armor Group Limited Partnership, Armor Holdings Mobile Security, L.L.C., ArmorGroup Services, L.L.C. and ArmorGroup International Limited (filed as Exhibit 10.1 to our Current Report on Form 8-K dated November 26, 2003 and incorporated herein by reference).

*2.6    Stock Purchase Agreement dated as of December 16, 2003, by and among Armor Holdings, Inc., Safari Land Ltd., Inc., Mary and William E. Hatch Revocable Trust dated December 22, 1998, R & J Hatch Survivor's A-Trust u/d/t dated May 6, 1998, Lisa Hatch-Sciuto, David Sciuto, and Robert J. Hatch and William Hatch.

+3.1    Certificate of Incorporation of Armor Holdings, Inc. (filed as Exhibit 3.1 to our Current Report on Form 8-K, dated September 3,1996 and incorporated herein by reference).

+3.2    Certificate of Merger of American Body Armor & Equipment, Inc., a Florida corporation, and Armor Holdings, Inc. (filed as Exhibit 3.2 to Form 8-K, Current Report of the Company, dated September 3,1996 and incorporated herein by reference).

+3.3    Bylaws of Armor Holdings, Inc. (filed as Exhibit 3.3 to our Current Report on Form 8-K, dated September 3, 1996 and incorporated herein by reference).

+3.4    Amendment to Bylaws of Armor Holdings, Inc. (incorporated by reference to Exhibit 3.3.2 to our Form 10-K Annual Report for the fiscal year ended December 31, 1998).

+4.1    Indenture, dated as of August 12, 2003, among Armor Holdings, the subsidiary guarantors listed as signatories thereto and Wachovia Bank, National Association, as trustee, and form of Old Note attached as Exhibit A thereto (incorporated by reference to Exhibit 10.2 to our Form 10-Q Quarterly Report for the fiscal quarter ended June 30, 2003).

+4.2    First Supplemental Indenture, dated as of September 30, 2003, among Armor Holdings, Inc., the subsidiary guarantors listed as signatories to the Indenture, the subsidiaries listed in Schedule I to the First Supplemental Indenture and Wachovia Bank, National Association, as trustee (filed as Exhibit 4.2 to our Registration Statement on Form S-4 filed with the Commission on January 7, 2004 and incorporated herein by reference).

+4.3    Second Supplemental Indenture, dated as of December 9, 2003, among

Armor Holdings, Inc., the subsidiary guarantors listed as signatories thereto and Wachovia Bank, National Association, as trustee (filed as Exhibit 4.3 to our Registration Statement on Form S-4 filed with the Commission on January 7, 2004 and incorporated herein by reference).

+4.4     Third Supplemental Indenture, dated as of December 24, 2003, among Armor Holdings, Inc., the subsidiary guarantors listed as signatories thereto and Wachovia Bank, National Association, as trustee (filed as Exhibit 4.4 to our Registration Statement on Form S-4 filed with the Commission on January 7, 2004 and incorporated herein by reference).

+4.5     Registration Rights Agreement, dated August 12, 2003, among Armor Holdings, Inc., the subsidiary guarantors listed as signatories thereto and Wachovia Capital Markets, LLC (incorporated by reference to Exhibit 10.3 to our Form 10-Q Quarterly Report for the fiscal quarter ended June 30, 2003).

+4.6     Form of the new 8 1/4% Senior Subordinated Notes Due 2013 (filed as Exhibit 4.6 to our Registration Statement on Form S-4 filed with the Commission on January 7, 2004 and incorporated herein by reference).

57

<PAGE>

+10.1    Purchase Agreement, dated August 6, 2003, among Armor Holdings, Inc., the subsidiary guarantors listed as signatories thereto and Wachovia Capital Markets, LLC (incorporated by reference to Exhibit 10.1 to our Form 10-Q Quarterly Report for the fiscal quarter ended June 30, 2003).

+10.2    Credit Agreement, dated as of August 12, 2003, among Armor Holdings, Inc., each lender from time to time party thereto, Bank of America, N.A., as Administrative Agent, Swing Line Lender and L/C Issuer, Wachovia Bank, National Association, as Syndication Agent, and Key Bank National Association, as Documentation Agent (incorporated by reference to Exhibit 10.4 to our Form 10-Q Quarterly Report for the fiscal quarter ended June 30, 2003)

+10.3    Subsidiary Guaranty Agreement, dated as of August 12, 2003, by certain Subsidiaries of Armor Holdings, Inc. as identified on the signature pages thereto and any Additional Guarantor who may become party to this Guaranty, in favor of Bank of America, N.A., as Administrative Agent (incorporated by reference to Exhibit 10.5 to our Form 10-Q Quarterly Report for the fiscal quarter ended June 30, 2003).

+10.4    Collateral Agreement, dated as of August 12, 2003, by and among Armor Holdings and certain of its Subsidiaries as identified on the signature pages thereto and any Additional Grantor who may become party to this Agreement, in favor of Bank of America, N.A., as Administrative Agent (incorporated by reference to Exhibit 10.6 to our Form 10-Q Quarterly Report for the fiscal quarter ended June 30, 2003).

+10.5    Trademark Security Agreement, dated as of August 12, 2003, by the entities listed on the signature pages thereto, in favor of Bank of America, N.A., as Administrative Agent (incorporated by reference to Exhibit 10.7 to our Form 10-Q Quarterly Report for the fiscal quarter ended June 30, 2003).

+10.6    Patent Security Agreement, dated as of August 12, 2003, by the entities listed on the signature pages attached thereto, in favor of Bank of America, N.A., as Administrative Agent (incorporated by reference to Exhibit 10.8 to our Form 10-Q Quarterly Report for the fiscal quarter ended June 30, 2003).

+10.7    Promissory Note dated August 12, 2003 in the principal amount of up to $15,000,000 made by Armor Holdings, Inc. in favor of Keybank National Association (incorporated by reference to Exhibit 10.9 to our Form 10-Q Quarterly Report for the fiscal quarter ended June 30, 2003).

+10.8    Promissory Note dated August 12, 2003 in the principal amount of up to $22,500,000 made by Armor Holdings, Inc. in favor of Wachovia Bank, National Association (incorporated by reference to Exhibit 10.10 to our Form 10-Q Quarterly Report for the fiscal quarter ended June 30, 2003).

@*10.9   Separation Agreement and General Release dated as of May 22, 2003 by and between Armor Holdings, Inc. and Jonathan M. Spiller.

@+10.10  Employment Agreement between Robert R. Schiller and Armor Holdings, Inc., dated as of January 1, 2002 (incorporated by reference to Exhibit 10.2 to our Form 10-Q Quarterly Report for the fiscal quarter ended March 31, 2002).

@+10.11  Amendment dated November 4, 2003 to the Employment Agreement between Armor Holdings, Inc., Inc. and Robert Schiller (incorporated by reference to Exhibit 10.2 to our Form 10-Q Quarterly Report for the fiscal quarter ended September 30, 2003).

@+10.12  Employment Agreement between Stephen E. Croskrey and Armor Holdings, Inc., dated as of January 1, 2002 (incorporated by reference to Exhibit 10.3 to our Form 10-Q Quarterly Report for the fiscal quarter ended March 31, 2002).

@+10.13  Employment Agreement between Warren B. Kanders and Armor Holdings, Inc., dated as of January 1, 2002 (incorporated by reference to Exhibit 10.4 to our Form 10-Q Quarterly Report for the fiscal quarter ended

March 31, 2002).

58

<PAGE>

@+10.14  Letter agreement dated as of July 26, 2003 between Armor Holdings, Inc.
         and Warren B. Kanders (filed as Exhibit 99.1 to our Current Report on
         Form 8-K dated July 26, 2003 and incorporated herein by reference).

@+10.15  Amendment No. 2 dated November 4, 2003 to the Employment Agreement
         between Armor Holdings, Inc. and Warren B. Kanders (incorporated by
         reference to Exhibit 10.1 to our Form 10-Q Quarterly Report for the
         fiscal quarter ended September 30, 2003).

+10.16   Form of Indemnification Agreement for Directors of Armor Holdings,
         Inc., dated September 21, 1993 (filed as Exhibit 10.4 to Form 10-KSB,
         Annual Report of the Company for the fiscal year ended December 31,
         1993 and incorporated herein by reference).

+10.17   Form of Indemnification Agreement for Officers of Armor Holdings, Inc.,
         dated February 28, 1994 (filed as Exhibit 10.5 to Form 10-KSB, Annual
         Report of the Company for the fiscal year ended December 31, 1993 and
         incorporated herein by reference).

**+10.18 American Body Armor & Equipment, Inc. 1994 Incentive Stock Plan
         (incorporated by reference from Form S-8 filed on October 10, 1994,
         Reg. No. 33-018863).

**+10.19 American Body Armor & Equipment, Inc. 1994 Directors Stock Plan
         (incorporated by reference from Form S-8 filed on October 31, 1994,
         Reg. No. 33-018863).

**+10.20 Armor Holdings, Inc. Amended and Restated 1996 Stock Option Plan
         (incorporated by reference from our 1997 Definitive Proxy Statement
         with respect to our 1997 Annual Meeting of Stockholders, held June 12,
         1997, as filed with the Commission on May 27, 1997).

**+10.21 Armor Holdings Inc. Amended and Restated 1996 Non-Employee Directors
         Stock Option Plan incorporated by reference from our 1997 Definitive
         Proxy Statement with respect to our 1997 Annual Meeting of
         Stockholders, held June 12, 1997, as filed with the Commission on May
         27, 1997).

**+10.22 Armor Holdings, Inc. 1998 Stock Option Plan (incorporated by reference
         to Exhibit 10.19 to our Form 10-K Annual Report for the fiscal year
         ended December 31, 1998).

**+10.23 Armor Holdings, Inc. 1999 Stock Incentive Plan (incorporated by
         reference from Appendix A to our 1999 Definitive Proxy Statement with
         respect to our 1999 Annual Meeting of Stockholders, as filed with the
         Commission on May 21, 1999).

**+10.24 Armor Holdings, Inc. 2002 Stock Incentive Plan (incorporated by
         reference from Appendix A to our 2002 Definitive Proxy Statement with
         respect to our 2002 Annual Meeting of Stockholders, as filed with the
         Commission on April 30, 2002).

**+10.25 Amendment No. 1 to the Armor Holdings, Inc. 2002 Stock Incentive Plan
         (filed as Exhibit 4.3 to our Registration Statement Form on S-8 filed
         with the Commission on January 22, 2004 and incorporated herein by
         reference).

**+10.26 Armor Holdings, Inc. 2002 Executive Stock Plan (incorporated by
         reference to Exhibit 10.6 to our Form 10-Q Quarterly Report for the
         fiscal quarter ended March 31, 2002).

+10.27   Consulting Agreement between Kanders & Company, Inc. and Armor
         Holdings, Inc. dated as of January 1, 2002 (incorporated by reference
         to Exhibit 10.5 to our Form 10-Q Quarterly Report for the fiscal
         quarter ended March 31, 2002).

+10.28   Tax Deed dated November 26, 2003, by and among Armor Holdings, Inc.,
         ArmorGroup, International, Inc., and Armor Group (UK) Limited (filed as
         Exhibit 10.2 to our Current Report on Form 8-K dated November 26, 2003
         and incorporated herein by reference).

59

<PAGE>

+10.29   Promissory Note made by Armor Holdings Limited in favor of Armor
         Holdings, Inc. dated November 26, 2003 (filed as Exhibit 10.3 to our
         Current Report on Form 8-K dated November 26, 2003 and incorporated
         herein by reference).

+21.1    Subsidiaries of the Registrant (filed as Exhibit 21.1 to our
         Registration Statement on Form S-4 filed with the Commission on January
         7, 2004 and incorporated herein by reference).

*23.1    Consent of PricewaterhouseCoopers LLP.

*31.1    Certification of Principal Executive Officer, as required by Rule
         13a-14(a) of the Securities Exchange Act of 1934.

```
*31.2    Certification of Principal Financial Officer, as required by Rule
         13a-14(a) of the Securities Exchange Act of 1934.

*32.1    Certification of Principal Executive Officer, as required by Rule
         13a-14(b) of the Securities Exchange Act of 1934.

*32.2    Certification of Principal Financial Officer, as required by Rule
         13a-14(b) of the Securities Exchange Act of 1934.


-------------------------
*    Filed herewith.
+    Incorporated herein by reference.
@    This Exhibit represents a management contract.
**   This Exhibit represents a compensatory plan.
```

60

<PAGE>

INDEX TO CONSOLIDATED FINANCIAL STATEMENTS

<TABLE>
<CAPTION>

```
<S>                                                          <C>
ARMOR HOLDINGS, INC.

    Report of Independent Certified Public Accountants       F-2

    Consolidated Balance Sheets                              F-3

       Consolidated Statements of Stockholders' Equity and   F-5
              Comprehensive Income (Loss)

    Consolidated Statements of Cash Flow                     F-6

    Notes to the Consolidated Financial Statements           F-7 F-46
```
</TABLE>

F-1

<PAGE>


REPORT OF INDEPENDENT CERTIFIED PUBLIC ACCOUNTANTS
--------------------------------------------------

To the Board of Directors and Stockholders of Armor Holdings, Inc.:

In our opinion, the accompanying consolidated balance sheets and the related
consolidated statements of operations, stockholders' equity and comprehensive
income (loss), and cash flows present fairly, in all material respects, the
financial position of Armor Holdings, Inc. and its subsidiaries (the
"Company") at December 31, 2003 and 2002, and the results of their operations
and their cash flows for each of the three years in the period ended December
31, 2003 in conformity with accounting principles generally accepted in the
United States of America. These financial statements are the responsibility of
the Company's management; our responsibility is to express an opinion on these
financial statements based on our audits. We conducted our audits of these
statements in accordance with auditing standards generally accepted in the
United States of America, which require that we plan and perform the audit to
obtain reasonable assurance about whether the financial statements are free of
material misstatement. An audit includes examining, on a test basis, evidence
supporting the amounts and disclosures in the financial statements, assessing
the accounting principles used and significant estimates made by management, and
evaluating the overall financial statement presentation. We believe that our
audits provide a reasonable basis for our opinion.

As discussed in Note 1 to the consolidated financial statements, effective
January 1, 2002, the Company changed its method of accounting for goodwill
following adoption of Statement of Financial Accounting standard No. 142
"Goodwill and Other Intangible Assets."


PricewaterhouseCoopers LLP
February 20, 2004


F-2

<PAGE>


ARMOR HOLDINGS INC. AND SUBSIDIARIES

CONSOLIDATED BALANCE SHEETS
DECEMBER 31, 2003 AND DECEMBER 31, 2002
(IN THOUSANDS, EXCEPT FOR SHARE DATA)

<TABLE>
<CAPTION>

| | DECEMBER 31, 2003 | DECEMBER 31, 2002 |
|---|---|---|
| <S> | <C> | <C> |
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 111,850 | $ 12,913 |
| Restricted cash | 2,600 | – |
| Accounts receivable (net of allowance for doubtful accounts of $1,673 and $1,428) | 72,635 | 58,513 |
| Costs and earned gross profit in excess of billings | – | 234 |
| Inventories | 80,527 | 62,330 |
| Prepaid expenses and other current assets | 22,032 | 12,212 |
| Current assets of discontinued operations (Note 2) | 753 | 28,825 |
| | -------------- | -------------- |
| Total current assets | 290,397 | 175,027 |
| | | |
| Property and equipment (net of accumulated depreciation of $19,046 and $12,919) | 57,576 | 47,136 |
| Goodwill (net of accumulated amortization of $4,024 and $4,024) | 175,707 | 98,736 |
| Patents, licenses and trademarks (net of accumulated amortization of $2,627 and $2,169) | 44,174 | 7,521 |
| Long-term assets of discontinued operations (Note 2) | 1,603 | 30,285 |
| Other assets | 16,169 | 9,048 |
| | -------------- | -------------- |
| Total assets | $ 585,626 | $ 367,753 |
| | ============== | ============== |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| Current liabilities: | | |
| Current portion of long-term debt | $ 32,107 | $ 1,813 |
| Short-term debt | 498 | 599 |
| Accounts payable | 30,304 | 23,770 |
| Accrued expenses and other current liabilities | 58,218 | 25,116 |
| Income taxes payable | – | 5,913 |
| Current liabilities of discontinued operations (Note 2) | 626 | 17,225 |
| | -------------- | -------------- |
| Total current liabilities | 121,753 | 74,436 |
| | | |
| Long-term debt, less current portion | 158,300 | 5,072 |
| Other long-term liabilities | 10,208 | – |
| Long-term liabilities of discontinued operations (Note 2) | – | 168 |
| | -------------- | -------------- |
| Total liabilities | 290,261 | 79,676 |
| | | |
| Commitments and contingencies (Note 11) | | |
| | | |
| Stockholders' equity: | | |
| Preferred stock, $.01 par value, 5,000,000 shares authorized; no shares issued and outstanding | – | – |
| Common stock, $.01 par value; 50,000,000 shares authorized; 34,337,034 and 33,593,977 issued; 28,276,812 and 29,456,692 outstanding at December 31, 2003 and December 31, 2002, respectively | 344 | 336 |
| Additional paid-in capital | 318,460 | 307,487 |
| Retained earnings | 44,942 | 34,056 |
| Accumulated other comprehensive income (loss) | 3,936 | (4,169) |
| Treasury stock | (72,317) | (49,633) |
| | -------------- | -------------- |
| Total stockholders' equity | 295,365 | 288,077 |
| | -------------- | -------------- |
| Total liabilities and stockholders' equity | $ 585,626 | $367,753 |
| | ============== | ============== |

The accompanying notes are an integral part of these consolidated financial statements.

</TABLE>

F-3

<PAGE>

ARMOR HOLDINGS INC. AND SUBSIDIARIES
CONSOLIDATED STATEMENTS OF OPERATIONS
YEARS ENDED DECEMBER 31, 2003, 2002 AND 2001
(IN THOUSANDS, EXCEPT FOR PER SHARE DATA)

<TABLE>
<CAPTION>

| | DECEMBER 31, 2003 | DECEMBER 31, 2002 | DECEMBER 31, 2001 |
|---|---|---|---|
| <S> | <C> | <C> | <C> |
| **REVENUES:** | | | |
| | | | |
| Products | $ 199,093 | $ 179,946 | $149,868 |
| Mobile Security | 157,548 | 125,171 | 47,232 |
| Simula | 8,531 | – | – |
| | -------------------- | -------------------- | -------------------- |
| Total Revenues | 365,172 | 305,117 | 197,100 |

| | | | |
|---|---:|---:|---:|
| Cost of sales | 253,586 | 210,745 | 126,330 |
| Operating expenses | 62,795 | 49,836 | 38,659 |
| Amortization | 489 | 245 | 2,142 |
| Integration and other charges | 12,573 | 5,926 | 3,296 |
| OPERATING INCOME | 35,729 | 38,365 | 26,673 |
| Interest expense, net | 4,012 | 923 | 3,864 |
| Other expense (income), net | 508 | 51 | (82) |
| INCOME FROM CONTINUING OPERATIONS BEFORE PROVISION FOR INCOME TAXES | 31,209 | 37,391 | 22,891 |
| PROVISION FOR INCOME TAXES | 14,203 | 16,054 | 8,207 |
| INCOME FROM CONTINUING OPERATIONS | 17,006 | 21,337 | 14,684 |
| DISCONTINUED OPERATIONS (NOTE 2): LOSS FROM DISCONTINUED OPERATIONS, NET OF INCOME TAX BENEFIT | (6,120) | (39,026) | (4,556) |
| NET INCOME (LOSS) | $ 10,886 | $ (17,689) | $ 10,128 |
| NET INCOME (LOSS) PER COMMON SHARE - BASIC | | | |
| INCOME FROM CONTINUING OPERATIONS | $ 0.61 | $ 0.70 | $ 0.61 |
| LOSS FROM DISCONTINUED OPERATIONS | (0.22) | (1.28) | (0.19) |
| BASIC INCOME (LOSS) PER SHARE | $ 0.39 | $ (0.58) | $ 0.42 |
| NET INCOME (LOSS) PER COMMON SHARE - DILUTED | | | |
| INCOME FROM CONTINUING OPERATIONS | $ 0.59 | $ 0.69 | $ 0.59 |
| LOSS FROM DISCONTINUED OPERATIONS | (0.21) | (1.26) | (0.18) |
| DILUTED INCOME (LOSS) PER SHARE | $ 0.38 | $ (0.57) | $ 0.41 |
| WEIGHTED AVERAGE SHARES - BASIC | 28,175 | 30,341 | 23,932 |
| WEIGHTED AVERAGE SHARES - DILUTED | 28,954 | 30,957 | 24,768 |

The accompanying notes are an integral part of these consolidated financial statements.

</TABLE>

F-4

<PAGE>

ARMOR HOLDINGS INC. AND SUBSIDIARIES
CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY AND COMPREHENSIVE INCOME (LOSS)
YEARS ENDED DECEMBER 31, 2003, 2002 AND 2001
(IN THOUSANDS)

<TABLE>
<CAPTION>

| | COMMON STOCK | | ADDITIONAL PAID-IN CAPITAL | RETAINED EARNINGS | ACCUMULATED OTHER COMPREHENSIVE (LOSS) INCOME | TREASURY STOCK | TOTAL |
|---|---|---|---|---|---|---|---|
| | SHARES | PAR VALUE | | | | | |
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| Balance, December 31, 2000 | 25,064 | $250 | $150,254 | $43,663 | $(1,684) | $(25,712) | $166,771 |
| Exercise of stock options and distribution of stock awards | 1,063 | 11 | 10,101 | | | | 10,112 |
| Tax benefit from exercises of options | | | 3,116 | | | | 3,116 |
| Issuance of treasury shares for exercises of options | (119) | (1) | (123) | (2,046) | | 2,856 | 686 |
| Issuance of common stock | 5,765 | 58 | 117,969 | | | | 118,027 |
| Issuance of stock for acquisitions and additional consideration for earnouts | 1,293 | 13 | 20,678 | | | | 20,691 |
| Repurchase of stock | | | | | | (723) | (723) |
| Comprehensive income: Net income | | | | 10,128 | | | 10,128 |
| Foreign currency translation adjustments, net of taxes of $713 | | | | | (2,789) | | (2,789) |

| | | | | | | |
|---|---|---|---|---|---|---|
| Total comprehensive income | | | | | | | 7,339 |
| Balance, December 31, 2001 | 33,066 | 331 | 301,995 | 51,745 | (4,473) | (23,579) | 326,019 |
| Exercise of stock options and distribution of stock awards | 528 | 5 | 4,135 | | | | 4,140 |
| Tax benefit from exercises of options | | | 832 | | | | 832 |
| Sale of put options | | | 525 | | | | 525 |
| Repurchase of stock | | | | | | (26,054) | (26,054) |
| Comprehensive loss: | | | | | | | |
| Net loss | | | | (17,689) | | | (17,689) |
| Foreign currency translation adjustments, net of taxes of $364 | | | | | 304 | | 304 |
| Total comprehensive loss | | | | | | | (17,385) |
| Balance, December 31, 2002 | 33,594 | 336 | 307,487 | 34,056 | (4,169) | (49,633) | 288,077 |
| Exercise of stock options and distribution of stock awards | 743 | 8 | 9,028 | | | | 9,036 |
| Tax benefit from exercises of stock options | | | 1,136 | | | | 1,136 |
| Extension of stock options related to termination of former Chief Executive Officer | | | 809 | | | | 809 |
| Repurchase of stock | | | | | | (22,684) | (22,684) |
| Comprehensive income: | | | | | | | |
| Net income | | | | 10,886 | | | 10,886 |
| Sale of ArmorGroup | | | | | 3,231 | | 3,231 |
| Foreign currency translation adjustments | | | | | 4,874 | | 4,874 |
| Total comprehensive income | | | | | | | 18,991 |
| Balance, December 31, 2003 | 34,337 | $344 | $318,460 | $44,942 | $3,936 | $ (72,317) | $295,365 |

The accompanying notes are an integral part of these consolidated financial statements.

</TABLE>

F-5

<PAGE>

ARMOR HOLDINGS INC. AND SUBSIDIARIES
CONSOLIDATED STATEMENTS OF CASH FLOW
YEARS ENDED DECEMBER 31, 2003, 2002 AND 2001
(IN THOUSANDS)

<TABLE>
<CAPTION>

| | YEAR ENDED | | |
|---|---|---|---|
| | DECEMBER 31, 2003 | DECEMBER 31, 2002 | DECEMBER 31, 2001 |
| <S> | <C> | <C> | <C> |
| CASH FLOWS FROM OPERATING ACTIVITIES: | | | |
| Income from continuing operations | $  17,006 | $ 21,337 | $ 14,684 |
| Adjustments to reconcile income from continuing operations to cash provided by operating activities: | | | |
| Depreciation and amortization | 7,608 | 5,580 | 5,614 |
| Loss on disposal of fixed assets | 327 | 200 | 191 |
| Deferred income taxes | 5,025 | 359 | (373) |
| Non-cash termination charge | 2,093 | – | – |
| Non-cash restricted stock unit award | 7,266 | – | – |
| Changes in operating assets and liabilities, net of acquisitions: | | | |
| Increase in accounts receivable | (995) | (2,554) | (14,880) |
| Increase in inventories | (2,501) | (9,381) | (3,948) |
| (Increase) decrease in prepaid expenses and other assets | (2,381) | (2,246) | 1,049 |
| Increase (decrease) in accounts payable, accrued expenses and other current liabilities | 17,043 | (3,754) | 7,181 |
| Increase in income taxes payable | 361 | 6,745 | 6,667 |

| | | | |
|---|---|---|---|
| Net cash provided by operating activities | 50,852 | 16,286 | 16,185 |

CASH FLOWS FROM INVESTING ACTIVITIES:

| | | | |
|---|---|---|---|
| Purchase of patents and trademarks | (185) | (69) | – |
| Purchase of property and equipment | (8,684) | (5,902) | (5,644) |
| Increase in restricted cash | (2,600) | – | – |
| Additional consideration for purchased businesses | (1,026) | (9,375) | (3,270) |
| Proceeds from sale of equity securities | – | – | 843 |
| Proceeds from sale of business | 31,361 | – | – |
| Purchase of businesses, net of cash acquired | (90,512) | (8,818) | (39,365) |
| Net Cash used in investing activities | (71,646) | (24,164) | (47,436) |

CASH FLOWS FROM FINANCING ACTIVITIES:

| | | | |
|---|---|---|---|
| Proceeds from the issuance of common stock | – | – | 117,979 |
| Proceeds from the exercise of stock options | 8,471 | 4,227 | 10,160 |
| Repurchases of treasury stock | (22,684) | (26,054) | (723) |
| Proceeds from the sale of put options | – | 525 | – |
| Proceeds from issuance of treasury shares for the exercise of stock options | – | – | 686 |
| Cash paid for deferred loan costs | – | – | (545) |
| Cash paid for financing costs | (4,599) | (326) | – |
| Borrowings of long-term debt | 148,278 | – | – |
| Repayments of long-term debt | (1,688) | (730) | (676) |
| Repayments of debt assumed in acquisitions | – | – | (1,315) |
| Borrowings under line of credit | 31,830 | 32,372 | 98,286 |
| Repayments under line of credit | (32,098) | (32,447) | (130,981) |
| Net cash provided by (used in) financing activities | 127,510 | (22,433) | 92,871 |
| Effect of exchange rate changes on cash and cash equivalents | 833 | (126) | (1,459) |
| Net cash used in discontinued operations | (8,612) | (4,139) | (14,336) |
| NET INCREASE (DECREASE) IN CASH AND CASH EQUIVALENTS | 98,937 | (34,576) | 45,825 |
| CASH AND CASH EQUIVALENTS, BEGINNING OF PERIOD | 12,913 | 47,489 | 1,664 |
| CASH AND CASH EQUIVALENTS, END OF PERIOD | $ 111,850 | $12,913 | $ 47,489 |
| CASH AND CASH EQUIVALENTS, END OF PERIOD | | | |
| CONTINUING OPERATIONS | $ 111,850 | $12,913 | $ 47,489 |
| DISCONTINUED OPERATIONS | 76 | 3,638 | 6,230 |
| | $ 111,926 | $16,551 | $ 53,719 |

The accompanying notes are an integral part of these consolidated financial statements.
</TABLE>

F-6

<PAGE>

ARMOR HOLDINGS INC. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

1.   BACKGROUND AND SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

The Company and nature of business. Armor Holdings, Inc. (the "Company" or "Armor") is a leading manufacturer and provider of specialized security products; training and support services related to these products; vehicle armor systems; military helicopter seating systems, aircraft and land vehicle armor systems; protective equipment for military personnel; and other technologies used to protect humans in a variety of life-threatening or catastrophic situations. Our products, vehicle armor systems and human safety and survival systems are used domestically and internationally by military, law enforcement, security and corrections personnel, as well as governmental agencies, multinational corporations and individuals. We are organized and operated under three business divisions: Armor Holdings Products, also referred to as our Products Division, Armor Mobile Security, also referred to as our Mobile Security Division, and Simula. Simula was acquired on December 9, 2003. ArmorGroup Services has been classified as discontinued operations. The amounts disclosed in the footnotes are related to continuing operations unless otherwise indicated.

CONTINUING OPERATIONS

Products. Our Products Division manufactures and sells a broad range of high quality security products, equipment and related consumable items, such as concealable and tactical body armor, hard armor, duty gear, less-lethal munitions, anti-riot products, police batons, emergency lighting products, forensic products, firearms accessories, weapon maintenance products, foldable ladders and specialty gloves. Our products are marketed under brand names that are well established in the military and law enforcement communities such as AMERICAN BODY ARMOR(TM), B-SQUARE(R), BREAK FREE(R), CLP(R), DEFENSE TECHNOLOGY/FEDERAL LABORATORIES(R), DEF-TEC PRODUCTS(R), DISTRACTION DEVICE(R), FEDERAL LABORATORIES(R), FERRET(R), FIRST DEFENSE(R), IDENTICATOR(R), IDENTIDRUG(R), IMPAK(TM), LIGHTNING POWDER(R), MONADNOCK(R), NIK(R), O'GARA-HESS

& EISENHARDT ARMORING COMPANY(R), PROTECH(TM), QUIKSTEP LADDERS(TM), SAFARILAND DESIGN(R), SPEEDFEED(R), and 911EP and DESIGN(TM). We sell our products through a network of over 350 distributors and sales agents, including approximately 200 in the United States. Our extensive distribution capabilities and commitment to customer service and training have enabled us to become a leading provider of security equipment to law enforcement agencies.

Mobile Security. Our Mobile Security Division manufactures and installs ballistic and blast protected armoring systems for privately owned vehicles. We armor a variety of privately owned commercial vehicles, including limousines, sedans, sport utility vehicles, commercial trucks and cash-in-transit vehicles, to protect against varying degrees of ballistic and blast threats. Our customers in this business include international corporations and high net worth individuals. Under the brand name O'Gara-Hess & Eisenhardt, we are the sole-source provider to the U.S. military of the armor and blast protection systems for M1114 Up-Armored HMMWVs. We are also under contract with the U.S. Army to provide spare parts, logistics and ongoing field support services for the currently installed base of approximately 4,415 Up-Armored HMMWVs. Additionally, we provide blast and ballistic protection kits for the standard HMMWVs, which are installed on existing equipment in the filed. Our Mobile Security Division is also subcontracted to develop a ballistic and blast protected armored and sealed truck cab for the HIMARS, a program recently transitioned by the U.S. Army and U.S. Marine Corps from developmental to a low rate of initial production, deliveries of which commenced in 2003. We also supply armor sub-systems for other tactical wheeled vehicles. In addition, we supply ballistic and blast protected armoring systems to U.S. federal law enforcement and intelligence agencies and foreign heads of state.

Simula. Simula supplies human safety and survival systems to the U.S. military, and major aerospace and defense prime contractors. Our core markets are military aviation safety, military personnel safety, and land and marine safety. Through Simula, we provide military helicopter seating systems, helicopter cockpit airbag systems, aircraft and land vehicle armor kits, body armor and other protective equipment for military personnel, emergency bailout parachutes and survival ensembles worn by military aircrew. The primary customers for our products are the U.S. Army, U.S. Marine Corps, Boeing, and Sikorsky Aircraft. Most of Simula's aviation safety products are provided on a sole source basis. The U.S. armed forces have adopted ceramic body armor as a key element of the protective ensemble worn by our troops in Iraq and Afghanistan. Simula was the developer of this specialized product called small arms protective insert (SAPI), and is the largest supplier to U.S. forces. Simula was acquired December 9, 2003, and results have been included herein since the acquisition date.

                                    F-7

<PAGE>


                        ARMOR HOLDINGS INC. AND SUBSIDIARIES
                NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (CONTINUED)


DISCONTINUED OPERATIONS

On April 17, 2003, we announced that we had completed the sale of our ArmorGroup Integrated Systems business through the sale of 100% of the stock of ArmorGroup Integrated Systems, Inc. and Low Voltage Systems Technologies, Inc. to Aerwav Integration Systems, Inc. ("AIS"). AIS is a wholly owned subsidiary of Aerwav Holdings, LLC. As consideration for the integrated systems business, we received a $4.1 million collateralized note due in two years and a warrant for approximately 2.5% of AIS. We have recorded a loss of $366,000 on the sale.

On November 26, 2003, we announced that we completed the sale of ArmorGroup, our security services division, for $33,660,000 in consideration to a group of private investors led by Granville Baird Capital Partners of London, England and Management. We received $31,360,000 in cash at closing and are scheduled to receive another $2,300,000 by the end of 2004, of which $375,000 has been received through March 6, 2004. We have recorded a loss of $8.8 million on the sale in the fourth quarter of 2003. In accordance with generally accepted accounting principles, unrealized gains and losses, which are included in equity as accumulated other comprehensive income or loss, are not recognized until the period in which the related assets and liabilities are disposed of.

At December 31, 2003, our litigation support services subsidiary remains as our only operating discontinued operations subsidiary. We are actively attempting to sell this business and expect to sell it during 2004.


ACCOUNTING POLICIES

Principles of consolidation. The consolidated financial statements include the accounts of the Company and its wholly owned subsidiaries. In consolidation, all material inter-company balances and transactions have been eliminated. Results of operations of companies acquired in transactions accounted for under the purchase method of accounting are included in the financial statements from the date of the acquisition.

Cash and cash equivalents. We consider all highly liquid investments purchased with maturities of three months or less, at date of purchase, to be cash equivalents.

Restricted cash. Restricted cash includes $2.6 million held in trust for the benefit of the Ontario Industrial Development Authority Variable Rate Demand Industrial Development Revenue Bonds, Series 1989 bondholders. On January 2, 2004, the restrictions were released and the funds were used to pay off the

bonds in full.

Concentration of credit risk. Financial instruments that potentially subject the Company to concentrations of credit risk consist primarily of cash and cash equivalents and trade accounts receivable. The Company maintains its cash and cash equivalents with what it believes to be various high quality banks. Amounts held in individual banks may periodically exceed, for brief time periods, federally insured amounts. Our accounts receivable consist of amounts due from customers and distributors located throughout the world. International product sales generally require cash in advance or confirmed letters of credit on United States ("U.S.") banks. We maintain reserves for potential credit losses. As of December 31, 2003 and 2002, management believes that we have no significant concentrations of credit risk excluding the U.S. military.

Inventories. Inventories are stated at the lower of cost or market determined on the first-in, first-out ("FIFO") method.

Fair value of financial instruments. The carrying value of cash and cash equivalents, accounts receivable, other receivables, accounts payable, and short and long-term debt approximates fair value at December 31, 2003 and 2002.

Derivative Instruments and Hedging Activities. We account for derivative instruments and hedging activities in accordance with Statement of Financial Accounting Standard No. 133, "Accounting for Derivative Instruments and Hedge Activities" (SFAS 133) as amended. All derivative instruments are

                                        F-8

<PAGE>

                    ARMOR HOLDINGS INC. AND SUBSIDIARIES
            NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (CONTINUED)

recorded on the balance sheet at fair value. Changes in the fair value of derivatives are recorded each period in current earnings or other comprehensive income, depending on whether a derivative is designated as part of a hedge transaction and, if it is, depending on the type of hedge transaction. For fair-value hedge transactions in which we hedge changes in an asset's, liability's, or firm commitment's fair value, changes in the fair value of the derivative instrument will generally be offset in the income statement by changes in the hedged item's fair value. We adopted SFAS 133 in the first quarter of 2001. However, we had no derivatives to be measured at the time of adoption. We do not hold or issue interest rate swap agreements or other derivative instruments for trading purposes.

Changes in the fair value of the interest rate swap agreements offset changes in the fair value of the fixed rate debt due to changes in the market interest rate. Accordingly, the other assets on the Condensed Consolidated Balance Sheet as of December 31, 2003 increased by $5.9 million, which reflected an increase in the fair value of the interest rate swap agreements. The corresponding increase in the hedge liability was recorded in long-term debt. The agreements are deemed to be a perfectly effective fair value hedge and therefore qualify for the short-cut method of accounting under SFAS 133. As a result, no ineffectiveness is expected to be recognized in our earnings associated with the interest rate swap agreements.

Property and equipment. Property and equipment are carried at cost less accumulated depreciation. Upon disposal of property and equipment, the appropriate accounts are reduced by the related cost and accumulated depreciation. The resulting gains and losses are reflected in consolidated earnings. Depreciation is computed using the straight-line method over the estimated lives of the related assets as follows:

|                            |            |
|----------------------------|------------|
| Buildings and improvements | 5 - 39 years |
| Machinery and equipment    | 3 - 7 years |

Goodwill. Goodwill represents the excess of the purchase price over the fair value of the net assets acquired in a purchase business combination. Goodwill and other intangible assets are stated on the basis of cost. The $122.9 million in goodwill resulting from acquisitions made by the Company subsequent to June 30, 2001 was immediately subjected to the non-amortization provisions of SFAS 142. See also Impairment and Recent Accounting Pronouncements which follows.

Patents, licenses and trademarks. Patents, licenses and trademarks were primarily acquired through acquisitions accounted for by the purchase method of accounting. Such assets are amortized on a straight-line basis over their remaining lives useful lives.

Impairment. Long-lived assets, including certain identifiable intangibles and goodwill, are reviewed for impairment annually or whenever events or changes in circumstances indicate that the carrying amount of the asset in question may not be recoverable including, but not limited to, a deterioration of profits for a business segment that has long-lived assets, and when other changes occur which might impair recovery of long-lived assets. Management has reviewed our long-lived assets and has taken impairment charges of $12.4 million in fiscal 2003 and $30.3 million in fiscal 2002 to reduce the carrying value of the Services Division to estimated realizable value. The method used to determine the existence of an impairment would be generally by undiscounted operating cash flows estimated over the remaining useful lives of the related long-lived assets or estimated realizable amounts on assets of discontinued operations. Impairment is measured as the difference between fair value and unamortized cost at the date impairment is determined.

Research and development. We engage in ongoing engineering, research and development activities to improve the reliability, performance and cost-effectiveness of our existing products. We also design and develop new

products in an ongoing effort to anticipate and meet our customers' evolving needs. Research and development costs are included in operating expenses as incurred and for the years ended December 31, 2003, 2002 and 2001, approximated $4,015,000, $2,968,000 and $2,353,000, respectively.

Estimates. The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts in the financial statements and accompanying notes. Significant estimates inherent in the preparation of the

F-9

<PAGE>

ARMOR HOLDINGS INC. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (CONTINUED)

accompanying consolidated financial statements include the carrying value of long-lived assets, valuation allowances for receivables, inventories and deferred income tax assets, liabilities for potential litigation claims and settlements, and contract contingencies and obligations. Actual results could differ from those estimates.

Income taxes. We account for income taxes pursuant to Statement of Financial Accounting Standards ("SFAS") No. 109, "Accounting for Income Taxes". Under the asset and liability method specified thereunder, deferred taxes are determined based on the difference between the financial reporting and tax bases of assets and liabilities. Deferred tax liabilities are offset by deferred tax assets relating to net operating loss carryforwards and deductible temporary differences. Future benefits obtained either from utilization of net operating loss carryforwards or from the reduction in the income tax asset valuation allowance existing on September 20, 1993 have been and will be applied to reduce reorganization value in excess of amounts allocable to identifiable assets. At December 31, 2003 and 2002, our consolidated foreign subsidiaries have unremitted earnings of approximately $9.0 million and $3.0 million, respectively, on which we have not recorded a provision for United States Federal income taxes since these earnings are considered to be permanently reinvested. Such foreign earnings have been taxed according to the regulations existing in the countries in which they were earned.

Revenue recognition. We record products revenue at the time of shipment. Returns are minimal and do not materially affect the financial statements.

We record revenue of the Mobile Security Division when the vehicle is shipped, except for larger commercial contracts typically longer than four months in length and the contract for the delivery of Up-Armored M1114 HMMWVs to the U.S. Government, which continues through 2005. Revenue from such contracts is recognized on the percentage of completion, units-of-work performed method. M1114 Up-Armored HMMWV units sold to the U.S. Government are considered sold when the onsite Department of Defense officer finishes the inspection of the M1114 Up-Armored HMMWV and approves it for delivery. Should such contracts be in a loss position, the entire estimated loss would be recognized for the balance of the contract at such time. Current contracts are profitable.

We record Simula revenues related to government contracts results principally from fixed price contracts and is recognized when persuasive evidence of an arrangement exists, delivery has occurred, the fee is fixed and determinable and collectibility is probable. Generally, all of these conditions are met when the Company ships products to its customers. Revenues related to nonrefundable license fees that are payable at the initiation of a licensing agreement are recognized immediately in income when received or when collectibility is reasonably assured, provided that there are no future obligations or performance requirements. Non-refundable license fees that are in essence, a prepayment of future royalties, are recognized as revenue on a straight-line basis over the term of the initial license.

We record service revenue as services are provided on a contract-by-contract basis. Revenues from service contracts are recognized over the term of the contract.

Advertising. We expense advertising costs as expense in the period in which they are incurred.

Earnings per share. Basic earnings per share is computed by dividing net income by the weighted-average number of common shares outstanding. Diluted earnings per share is computed by dividing net income by the weighted-average number of common shares outstanding compounding the effects of all potentially dilutive common stock equivalents, principally options, except in cases where the effect would be anti-dilutive.

Comprehensive income and foreign currency translation. In accordance with SFAS No. 130, "Reporting Comprehensive Income", assets and liabilities denominated in a foreign currency are translated into U.S. dollars at the current rate of exchange existing at year-end and revenues and expenses are translated at the average monthly exchange rates. The cumulative translation adjustment, net of tax, which represents the effect of translating assets and liabilities of our foreign operations is recorded as an increase of equity of $3,936,000 and a reduction of equity of $(4,169,000) for the years ended December 31, 2003 and 2002, respectively, and is classified as accumulated other comprehensive loss. The current year change in the accumulated amount, net of tax, is included as a component of comprehensive income.

F-10

<PAGE>

ARMOR HOLDINGS INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (CONTINUED)

Stock options and grants. SFAS No. 123, "Accounting for Stock-Based Compensation" ("SFAS 123") establishes a fair value based method of accounting for stock-based employee compensation plans; however, it also allows an entity to continue to measure compensation cost for those plans using the intrinsic value based method of accounting prescribed by Accounting Principles Board ("APB") Opinion No. 25, "Accounting for Stock Issued to Employees." Under the fair value based method, compensation cost is measured at the grant date based on the value of the award and is recognized over the service period, which is usually the vesting period. Under the intrinsic value based method, compensation costs is the excess, if any, of the quoted market price of the stock at the grant date or other measurement date over the amount an employee must pay to acquire the stock. We have elected to continue to account for its employee stock compensation plans under APB Opinion No. 25 with pro forma disclosures of net earnings and earnings per share, as if the fair value based method of accounting defined in SFAS No. 123 had been applied.

If compensation cost for stock option grants had been determined based on the fair value on the grant dates for 2003, 2002 and 2001 consistent with the method prescribed by SFAS No. 123, the Company's net earnings and earnings per share would have been adjusted to the pro forma amounts indicated below:

<TABLE>
<CAPTION>

| | 2003 | 2002 | 2001 |
|---|---|---|---|
| | (IN THOUSANDS, EXCEPT PER SHARE DATA) | | |
| <S> | <C> | <C> | <C> |
| Net income as reported | $ 10,886 | $ (17,689) | $10,128 |
| Deduct: Total stock-based employee compensation expense determined under fair value based method for all awards, net of related tax effects | (4,157) | (5,053) | (2,435) |
| | $ 6,729 | $ (22,742) | $ 7,693 |
| Earnings per share: | | | |
| Basic - as reported | $ 0.39 | $ (0.58) | $ 0.42 |
| Basic - pro forma | $ 0.24 | $ (0.75) | $ 0.32 |
| Diluted - as reported | $ 0.38 | $ (0.57) | $ 0.41 |
| Diluted - pro forma | $ 0.23 | $ (0.74) | $ 0.31 |

</TABLE>

Reclassifications. Certain reclassifications have been made to the 2002 and 2001 financial statements in order to conform to the presentation adopted for 2003. These reclassifications had no effect on net income or retained earnings.

F-11

<PAGE>

ARMOR HOLDINGS INC. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (CONTINUED)

Recent accounting pronouncements.

In June 2001, the Financial Accounting Standards Board issued SFAS No. 142, "Goodwill and Other Intangible Assets." SFAS No. 142 changes the accounting for goodwill from an amortization method to an impairment-only approach. Amortization of goodwill, including goodwill recorded in past business combinations, ceased upon adoption of this statement. In addition, this statement requires that goodwill be tested for impairment at least annually at the reporting unit level. We implemented SFAS No. 142 on January 1, 2002. In connection with the adoption of SFAS 142, we completed in the second quarter of 2002 the transitional goodwill impairment test that compared the fair value of each reporting unit to its carrying value and determined that no impairment existed. The goodwill resulting from acquisitions made by us subsequent to June 30, 2001, was immediately subject to the non-amortization provisions of SFAS 142. Had we been accounting for goodwill under SFAS 142 for 2001, our net income and earnings per share would have been as follows:

<TABLE>
<CAPTION>

| | DECEMBER 31, 2001 |
|---|---|
| | (in thousands, except per share data |
| <S> | <C> |
| Reported net income | $10,128 |
| Add back goodwill amortization, net of tax | 3,044 |
| Actual/pro forma adjusted net income | $13,172 |
| Basic earnings per share | |
| Reported basic income per share | $0.42 |
| Goodwill amortization, net of tax | 0.13 |

```
Actual/pro forma basic income per share              $0.55
                                                     =======
Diluted earnings per share
  Reported diluted income per share                  $0.41
  Goodwill amortization, net of tax                   0.12
                                                     -------
  Actual/pro forma diluted income  per share         $0.53
                                                     =======
```

</TABLE>

In November 2002, the FASB issued FASB Interpretation No. 45, "Guarantor's Accounting and Disclosure Requirements for Guarantees, Including Indirect Guarantees of Indebtedness of Others, and Interpretation of FASB Statements No. 5, 57 and 107 and Rescission of FASB Interpretation No. 34" ("FIN 45"). FIN 45 elaborates on the disclosures to be made by a guarantor in its interim and annual financial statements about its obligations under certain guarantees that it has issued. It also clarifies that a guarantor is required to recognize, at the inception of a guarantee, a liability for the fair value of the obligation undertaken in issuing the guarantee. The initial recognition and initial measurement provisions of FIN 45 are applicable on a prospective basis to guarantees issued or modified after December 31, 2002, irrespective of the guarantor's fiscal year-end. We adopted the provisions of this Statement on January 1, 2003, which did not have a significant impact on our consolidated financial statements.

In January 2003, the FASB issued FASB Interpretation No. 46, "Consolidation of Variable-Interest Entities - an Interpretation of ARB No. 51" ("FIN 46"). FIN 46 addresses consolidation by business enterprises of variable interest entities, which have one or both of the following characteristics: (1) the equity investment at risk is not sufficient to permit the entity to finance its activities without additional subordinated financial support from other parties, which is provided through other interests that will absorb some or all of the expected losses of the entity and (2) the equity investors lack one or more of the following essential characteristics of a controlling financial interest:

    o    The direct or indirect ability to make decisions about the entity's
         activities through voting rights or similar rights

    o    The obligation to absorb the expected losses of the entity if they
         occur, which makes it possible for the entity to finance its
         activities

                                   F-12

<PAGE>

                         ARMOR HOLDINGS INC. AND SUBSIDIARIES
                   NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (CONTINUED)

    o    The right to receive the expected residual returns of the entity if
         they occur, which is the compensation for the risk of absorbing the
         expected losses.

This Interpretation applies immediately to variable interest entities created after January 31, 2003, and to variable interest entities in which an enterprise obtains an interest after that date. It applies in the first fiscal year or interim period beginning after June 15, 2003, to variable interest entities in which an enterprise holds a variable interest that it acquired before February 1, 2003. The adoption of FIN 46 did not have a significant impact on our consolidated financial statements.

In December 2003, the FASB issued FASB Interpretation No. 46, "Consolidation of Variable Interest Entities" (revised December 2003) (FIN 46(R)). The provisions of FIN 46(R) are as follows:

    o    Provides that the condition that would preclude an enterprise
         from applying the scope exception of FIN 46 for certain entities
         that are businesses if that enterprise and/or its related parties
         participated significantly in the design or redesign of the
         entity should not apply if the entity is a franchise.

    o    An enterprise shall not consolidate a governmental organization
         and shall not consolidate a financing entity established by a
         governmental organization unless the financing entity (a) is not
         a governmental organization and (b) is used by the business
         enterprise in a manner similar to a variable interest entity in
         an effort to circumvent the provisions of Interpretation 46(R).

    o    A troubled debt restructuring, as defined in paragraph 2 of FASB
         Statement No. 15, Accounting by Debtors and Creditors for
         Troubled Debt Restructurings, as amended, shall be accounted for
         in accordance with that Statement and is not an event that
         requires the reconsideration of whether the entity involved is a
         variable interest entity or whether an enterprise with a variable
         interest in a variable interest entity is the primary beneficiary
         of that entity.

    o    Provide that an enterprise with an interest in an entity to which
         the provisions of FIN 46 have not been applied as of December 24,
         2003, shall apply FIN 46 or FIN 46(R) to that entity in
         accordance with the effective date provisions of FIN 46(R) as
         described below.

    o    FIN 46(R) should be applied no later than the end of the first
         reporting period that ends after March 15, 2004 (as of March 31,

2004 for the Company). However, prior to the required application
of FIN 46(R), the Company must apply FIN 46 or FIN 46(R) to those
entities that are considered to be special-purpose entities no
later than as of the end of the first reporting period that ends
after December 15, 2003 (as of December 31, 2003 for the
Company).

We do not have, nor have had, any interests in variable interest entities that
are subject to the provisions of FIN 46 or FIN 46(R).

In October 2001, the FASB issued Statement of Financial Accounting Standard No.
144, "Accounting for the Impairment or Disposal of Long-Lived Assets" (SFAS
144). SFAS 144 establishes a "primary-asset" approach to determine the cash flow
estimation period for a group of assets and liabilities that represents the unit
of accounting for a long-lived asset to be held and used. SFAS 144 requires that
a long-lived asset to be (1) owned, (2) exchanged for a similar productive
asset, or (3) distributed to owners in a spin-off be considered held and used
until it is abandoned, exchanged, or distributed. SFAS 144 requires (1) that
spin-offs and exchanges of similar productive assets be recorded at the lower of
carrying value or fair value, and that such assets be classified as held and
used until disposed of and (2) that any impairment loss resulting from a
spin-off or exchange of similar productive assets be recognized upon asset
disposition. SFAS 144 provides for total assets and total liabilities of
discontinued business segments to be presented in separate captions in assets
and liabilities and also provides that future losses, if any, of discontinued
business segments shall be reported as incurred. We adopted SFAS 144 effective
January 1, 2002,. The reclassification of the Services Division to discontinued
operations and subsequent reduction in its carrying value was in accordance with
the provisions of SFAS 144.

In April 2002, the FASB issued Statement of Financial Accounting Standard No.
145, "Rescission on FASB 4, 44 and 64, Amendment of FASB Statement No. 13 and
Technical Corrections" (SFAS 145). Under SFAS 145, gains and losses related to
the extinguishment of debt should no longer be segregated on the income
statement from continuing operations. The provisions of SFAS 145 are effective
for fiscal years beginning after May 15, 2002.

                                   F-13

<PAGE>

                     ARMOR HOLDINGS INC. AND SUBSIDIARIES
               NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (CONTINUED)

In June 2002, the FASB issued Statement of Financial Accounting Standard No.
146, "Accounting for Costs Associated with Exit or Disposal Activities" (SFAS
146). SFAS 146 addresses financial accounting and reporting for costs associated
with exit or disposal activities and nullifies Emerging Issues Task Force Issue
No. 94-3, "Liability Recognition for Certain Employee Termination Benefits and
Other Costs to Exit an Activity (including Certain Costs Incurred in a
Restructuring)." SFAS 146 is effective for exit or disposal activities initiated
on or after December 31, 2002. The effects of adopting this standard did not
have a material effect on us.

In December 2002, the FASB issued Statement of Financial Accounting Standard
148, "Accounting for Stock-Based Compensation - Transition and Disclosure" (SFAS
148). SFAS 148 provides alternative methods of transition for a voluntary change
to the fair value based method of accounting for stock-based employee
compensation. In addition, SFAS 148 amends the disclosure requirements of
Statement of Financial Accounting Standard 123, "Accounting for Stock-Based
Compensation" (SFAS 123), to require prominent disclosures in both annual and
interim financial statements about the method of accounting for stock-based
employee compensation and the effect of the method used on reported results. The
disclosures required by SFAS 148 are included in this document.

In April 2003, the FASB issued Statement of Financial Accounting Standard No.
149, " Amendment of Statement 133 on Derivative Instruments and Hedging
Activities" (SFAS 149). SFAS 149 amends and clarifies financial accounting and
reporting for derivative instruments, including certain derivative instruments
embedded in other contracts and for hedging activities under Statement of
Financial Accounting Standard No. 133, "Accounting for Derivative Instruments
and Hedging Activities" (SFAS 133). SFAS 149 is effective for contracts entered
into or modified and hedging relationships designated after June 30, 2003,
except for the provisions of SFAS 149 that relate to SFAS 133 Implementation
Issues that have been effective for fiscal quarters that began prior to June 15,
2003, which should continue to be applied in accordance with their respective
effective dates. Adoption of this standard had no effect on us.

In May 2003, the FASB issued Statement of Financial Accounting Standard No. 150,
"Accounting for Certain Financial Instruments with Characteristics of both
Liabilities and Equity" (SFAS 150). SFAS 150 establishes standards for how an
issuer classifies and measures certain financial instruments with
characteristics of both liabilities and equity. It requires that an issuer
classify a financial instrument that is within its scope as a liability (or an
asset in some circumstances). Many of those instruments were previously
classified as equity. SFAS 150 is effective for financial instruments entered
into or modified after May 31, 2003, and otherwise is effective at the beginning
of the first interim period beginning after June 15, 2003, except for
mandatorily redeemable financial instruments of nonpublic entities. Adoption of
this standard had no effect on us.

In May 2003, the FASB issued FASB Staff Position No. 146-1, "Determining Whether
a One-Time Termination Benefit Offered in Connection with an Exit or Disposal
Activity is, in Substance, an Enhancement to an Ongoing Benefit Arrangement."
This Staff Position states that in order to be considered an enhancement to an
ongoing benefit arrangement, the additional termination benefits must represent

a revision to the ongoing arrangement that is not limited to a specified
termination event or a specified future period. Otherwise the additional
termination benefits should be considered one-time termination benefits
accounted for under SFAS 146. The guidance in this Staff Position is effective
for exit or disposal activities initiated in interim or annual reporting periods
beginning after September 15, 2003. The adoption of this Staff Position is not
expected to have a material impact on our consolidated financial statements.

2.  DISCONTINUED OPERATIONS

In January 2001, our management approved a restructuring plan to close its U.S.
investigative businesses, realign the division's organization, eliminate excess
facilities and reduce overhead in its businesses worldwide. In connection with
this restructuring plan, the division performed a review of its long-lived
assets to identify potential impairments. Pursuant to this restructuring plan,
ArmorGroup i) eliminated 26 employees, primarily from its investigative
businesses, ii) eliminated an additional 24 employees from its security
business, iii) incurred lease and other exit costs as a result of the closure of

                                      F-14

<PAGE>

                        ARMOR HOLDINGS INC. AND SUBSIDIARIES
                  NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (CONTINUED)

its investigative businesses, and iv) wrote-down the value of both tangible and
intangible assets as a result of the impairment review. All of the significant
actions contemplated by the restructuring plan have been completed.

As a result of the restructuring plan, we recorded a pre-tax charge of $10.3
million. As of December 31, 2003, we had a remaining liability of $140,000 after
fiscal year 2003 utilization of $130,000 relating to lease termination costs.
The remaining liability has been classified in accrued expenses and current
liabilities of discontinued operations on the consolidated balance sheet.

On July 15, 2002, we announced plans to sell the Services division and the
retention of Merrill Lynch & Company to assist in the sale. In accordance with
Statement of Accounting Standards 144, Accounting for Impairment or Disposal of
Long-Lived Assets, the assets and liabilities of the Services division have been
classified as held for sale, with its operating results in the current and prior
periods reported in discontinued operations for the year ended December 31,
2003, 2002 and 2001. USDS, Inc., a subsidiary providing certain training
services, formerly reported as a part of the Services Division is not included
in the amounts classified as assets held for sale. The assets and liabilities as
well as the operating results of USDS, Inc. have been reclassified to the
Products Division where management oversight currently resides.

On April 17, 2003, we announced that we had completed the sale of our ArmorGroup
Integrated Systems business through the sale of 100% of the stock of ArmorGroup
Integrated Systems, Inc. and Low Voltage Systems Technologies, Inc. to Aerwav
Integration Systems, Inc. ("AIS"). AIS is a wholly owned subsidiary of Aerwav
Holdings, LLC. As consideration for the integrated systems business, we received
a $4.1 million collateralized note due in two years and a warrant for
approximately 2.5% of AIS. $375,000 of the balance due was paid in advance in
November 2003. In accordance with SFAS 144, we have recorded a loss of $366,000
on the sale.

Based upon our analysis and discussions with our advisors regarding the
estimated realizable value, net of selling costs, of the Services Division, we
reduced its carrying value and recorded net impairment charges of $12.4 million
and $30.3 million in fiscal 2003 and 2002, respectively. The 2003 impairment
charges consisted of a non-cash goodwill reduction. The fiscal 2002 impairment
charges consisted of approximately $6.1 million in estimated disposal costs and
a $24.2 million non-cash goodwill reduction. The benefit for income taxes for
discontinued operations was $8.3 million and $2.4 million for fiscal 2003 and
2002, respectively. The reductions in the carrying value of the Services
Division were management's best estimate based upon the information currently
available, including discussions with our investment bankers.

On November 26, 2003, we announced that we completed the sale of ArmorGroup, our
security service division, for $33,660,000 in total consideration to a group of
private investors led by Granville Baird Capital Partners of London, England and
Management. We received $31,360,000 in cash at closing and are scheduled to
receive another $2,300,000 by the end of 2004, of which we have received
$375,000 through March 6, 2004. We recorded a loss of $8.8 million on the sale
in the fourth quarter of 2003. In accordance with generally accepted accounting
principles, unrealized gains and losses, which are included in equity as
accumulated other comprehensive income or loss, are not recognized until the
period in which the related assets and liabilities are disposed of.

At December 31, 2003, our litigation support services subsidiary remains in
discontinued operations. The actual proceeds from the disposal of this business
may differ materially from our current estimates and therefore could result in
either a gain or a loss upon final disposal. We are actively attempting to sell
this business and expect to sell it during 2004.

                                      F-15

<PAGE>

                        ARMOR HOLDINGS INC. AND SUBSIDIARIES
                  NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (CONTINUED)

The following is a summary of the operating results of the discontinued

operations for the years ended December 31, 2003, 2002 and 2001.

| | DECEMBER 31, 2003 | DECEMBER 31, 2002 | DECEMBER 31, 2001 |
|---|---|---|---|
| | (IN THOUSANDS) | | |
| Revenue | $ 95,124 | $ 98,263 | $ 94,928 |
| Cost of sales | 66,780 | 75,779 | 65,021 |
| Gross profit | 28,344 | 22,484 | 29,907 |
| Operating expenses | 19,910 | 30,588 | 24,496 |
| Amortization expense | – | – | 1,519 |
| Charge for impairment of long-lived assets | 21,535 | 30,296 | – |
| Restructuring and related charges | – | – | 10,257 |
| Integration and other charges | 776 | 2,623 | 776 |
| Operating loss | (13,877) | (41,023) | (7,141) |
| Interest expense, net | 16 | 346 | 143 |
| Other expense (income), net | 479 | 99 | (218) |
| Loss from discontinued operations before benefit for income taxes | (14,372) | (41,468) | (7,066) |
| Benefit for income taxes (a) | (8,252) | (2,442) | (2,510) |
| Loss from discontinued operations | $ (6,120) | $(39,026) | $ (4,556) |

a)  Fiscal 2002 income taxes exclude additional expense of $1,475,000 per paragraphs 26 and 27 of SFAS No. 109 included in income from continuing operations on a consolidated basis. See Note 13.

The following is a summary of the assets and liabilities of our discontinued operations:

| | DECEMBER 31, 2003 | DECEMBER 31, 2002 |
|---|---|---|
| | (IN THOUSANDS) | |
| **Assets** | | |
| Cash and cash equivalents | $   76 | $ 3,638 |
| Accounts receivable, net | 549 | 16,228 |
| Other current assets | 128 | 8,959 |
| Total current assets | 753 | 28,825 |
| Property and equipment, net | 1,206 | 12,481 |
| Goodwill, net | 356 | 12,995 |
| Other assets | 41 | 4,809 |
| Total assets of discontinued operations | $2,356 | $ 59,110 |
| **Liabilities** | | |
| Current portion of long-term debt | $ 125 | $  186 |
| Short-term debt | – | 350 |
| Accounts payable | 5 | 2,405 |
| Accrued expenses and other current liabilities | 496 | 14,284 |
| Total current liabilities | 626 | 17,225 |
| Long-term debt | – | 168 |
| Total liabilities of discontinued operations | $ 626 | $ 17,393 |

F-16

ARMOR HOLDINGS INC. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (CONTINUED)

3.   COMPREHENSIVE INCOME

The components of comprehensive income (loss), net of tax benefits of zero, $364,000 and $713,000 for the years ended December 31, 2003, 2002 and 2001, are listed below:

| | DECEMBER 31, 2003 | DECEMBER 31, 2002 | DECEMBER 31, 2001 |
|---|---|---|---|
| | (IN THOUSANDS) | | |

<TABLE>

| <S> | <C> | <C> | <C> |
|---|---|---|---|
| Net income (loss) | $ 10,886 | $(17,689) | $10,128 |
| Other comprehensive income (loss): | | | |
| Sale of ArmorGroup | 3,231 | – | – |
| Foreign currency translations, net of tax | 4,874 | 304 | (2,789) |
| | ---------------- | ------------------ | ---------------- |
| Comprehensive income (loss) | $ 18,991 | $(17,385) | $ 7,339 |
| | ================ | ================== | ================ |

</TABLE>

In accordance with generally accepted accounting principles, unrealized gains
and losses, which are included in equity as accumulated other comprehensive
income or loss, are not recognized until the period in which the related assets
and liabilities are disposed of.

4.   BUSINESS COMBINATIONS

We have completed numerous purchase business combinations for cash and/or shares
of our common stock and assumption of liabilities in certain cases. In the three
years in the period ended December 31, 2003, the following acquisitions were
completed:

<TABLE>
<CAPTION>

| | TOTAL CONSIDERATION | SHARES ISSUED | VALUE OF SHARES |
|---|---|---|---|
| | ---------------------------------------------------- | | |
| | (IN THOUSANDS, EXCEPT SHARES ISSUED) | | |
| <S> | <C> | <C> | <C> |
| **2003** | | | |
| ---- | | | |
| Aggregate 2003 acquisitions (1) | $90,512 | – | – |
| Additional purchase price paid/issued for deferred consideration | 1,026 | – | – |
| | --------------- | -------------- | --------------- |
| | $91,538 | – | – |
| | =============== | ============== | =============== |
| **2002** | | | |
| ---- | | | |
| Aggregate 2002 acquisitions (2) | $ 8,818 | – | – |
| Additional purchase price paid/issued for acquisition earnouts | 9,375 | – | – |
| | --------------- | -------------- | --------------- |
| | $18,193 | – | – |
| | =============== | ============== | =============== |
| **2001** | | | |
| ---- | | | |
| Aggregate 2001 acquisitions (3) | $ 59,887 | 1,224,302 | $ 19,604 |
| Additional purchase price paid/issued for acquisition earnouts | 3,904 | 68,888 | 1,087 |
| | --------------- | -------------- | --------------- |
| | $63,791 | 1,293,190 | $ 20,691 |
| | =============== | ============== | =============== |

</TABLE>

(1)  Includes Simula, Inc. and Hatch Imports, Inc.

(2)  Includes Speedfeed, Inc., Foldable Products Group, B-Square, Inc., Evi-Paq,
     Inc., Trasco Breman and 911 Emergency Products.

(3)  Includes O'Gara-Hess & Eisenhardt Companies, Guardian and Identicator.

F-17

<PAGE>

ARMOR HOLDINGS INC. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (CONTINUED)

On December 9, 2003, we acquired all of the outstanding stock of Simula, for
approximately $84.8 million in cash including transaction costs. Simula is a
safety technology company that supplies human safety and survival systems to all
branches of the United States military, major aerospace and defense prime
contractors. Its core markets are military aviation safety, military personnel
safety, and land and marine safety. Simula is a provider of military helicopter
seating systems, aircraft and land vehicle armor systems, protective equipment
for military personnel and technologies used to protect humans in a variety of
life-threatening or catastrophic situations.

As a result of the acquisition, we expect to: (1) strengthen our position as a
leading mid-tier defense and security industry consolidator through increased
scale and scope; (2) increase our relevance to Department of Defense customers
and programs; (3) diversify our business mix by adding fixed-wing and rotorcraft
crashworthy seating; (4) combine body armor capabilities of Simula and PROTECH,
one of our subsidiaries, supplementing our position in the SAPI market; (5)
achieve cross-selling opportunities by leveraging our global sales force and
relationships; and (6) offer opportunities for cost reduction through
integration savings and rationalization of operations.

The acquisition was accounted for as a purchase business combination, and
accordingly, the results of operations were included in our financial statements
after December 9, 2003. The cost to acquire Simula has been allocated to the
assets acquired and liabilities assumed according to their estimated fair values
at the time of the acquisition as follows:

|  | (IN THOUSANDS) |
|---|---|
| Working capital | $ 5,027 |
| Property and equipment | 5,360 |
| Other long-term assets | 434 |
| Assumed note payable | (31,135) |
| Assumed long-term liabilities | (1,704) |
| Customer-related intangible | 25,140 |
| Technology-related intangible | 8,814 |
| Goodwill (Deductible) | 72,816 |
|  | ----------- |
|  | $ 84,752 |

The customer-related intangible asset relates to acquired customer relationships and is being amortized over a 14-year weighted-average useful life on a straight-line basis. The technology-related intangible asset relates to certain acquired technology and is being amortized over an eight-year weighted-average useful life on a straight-line basis.

During 2002, we completed the acquisitions of Speedfeed, Inc., Foldable Products Group, B-Square, Inc., Evi-Paq, Inc., Trasco Breman and 911 Emergency Products.

On August 23, 2001, we completed our acquisition of Security Products and Services Group of the Kroll-O'Gara Company, including the O'Gara-Hess & Eisenhardt subsidiary ("O'Gara"). O'Gara is the prime contractor to the U.S. Military for the supply of armoring and blast protection for HMMWVs and armors a variety of vehicles, including limousines, sedans, sport utility vehicles, and money transport vehicles, to protect against varying degrees of ballistic and blast threats.

F-18

<PAGE>

ARMOR HOLDINGS INC. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (CONTINUED)

Businesses acquired are included in consolidated results from the date of acquisition. Pro forma results of the 2003 acquisition of Hatch Imports, Inc. and the 2002 acquisitions are not presented, as they would not differ by a material amount from actual results. The following unaudited pro forma consolidated results are presented to show the results on a pro forma basis as if the 2003 acquisition of Simula had been made as of January 1, 2002:

<TABLE>
<CAPTION>

|  | 2003 | 2002 |
|---|---|---|
|  | (IN THOUSANDS, EXCEPT PER SHARE DATA) |  |
| <S> | <C> | <C> |
| Revenues from continuing operations | $443,881 | $ 379,521 |
| Net income from continuing operations | $ 20,212 | $ 19,935 |
| Basic earnings per share from continuing operations | $ 0.72 | $ 0.66 |
| Diluted earnings per share from continuing operations | $ 0.70 | $ 0.64 |
| Weighted average shares - basic | 28,175 | 30,341 |
| Weighted average shares - diluted | 28,954 | 30,957 |

</TABLE>

The changes in the carrying amount of goodwill for the year ended December 31, 2003, are as follows:

<TABLE>
<CAPTION>

|  | PRODUCTS | MOBILE SECURITY | SIMULA | TOTAL |
|---|---|---|---|---|
|  | -------------- | ------------------ | ---------- | -------------- |
|  | (IN THOUSANDS) |  |  |  |
| <S> | <C> | <C> | <C> | <C> |
| Balance at January 1, 2003 | $ 60,143 | $ 38,593 | $ - | $ 98,736 |
| Goodwill acquired during year | 4,262 | (107) | 72,816 | 76,971 |
|  | ------------- | ----------- | ------------ | ---------- |
| Balance at December 31, 2003 | $ 64,405 | $ 38,486 | $ 72,816 | $ 175,707 |
|  | ============= | =========== | ============ | ========== |

</TABLE>

F-19

<PAGE>

ARMOR HOLDINGS INC. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (CONTINUED)

5.  INVENTORIES

The components of inventory as of December 31, 2003 and 2002 are as follows:

<TABLE>
<CAPTION>

|  | 2003 | 2002 |
|---|---|---|
|  | ----------------- | -------------------- |
|  | (IN THOUSANDS) |  |
| <S> | <C> | <C> |

```
                Raw materials                         $ 40,397          $ 30,211
                Work-in-process                         25,422           15,733
                Finished goods                          14,708           16,386
                                                 -----------------  ------------------
                                                      $ 80,527          $ 62,330
                                                 =================  ==================
```

</TABLE>

6.   PROPERTY AND EQUIPMENT

Property and equipment as of December 31, 2003 and 2002 are summarized as
follows:

<TABLE>
<CAPTION>

|  | 2003 | 2002 |
|---|---|---|
|  | (IN THOUSANDS) | |
| <S> | <C> | <C> |
| Land | $ 5,940 | $ 5,557 |
| Buildings and improvements | 29,776 | 23,964 |
| Machinery and equipment | 40,906 | 30,534 |
| Total | 76,622 | 60,055 |
| Accumulated depreciation | (19,046) | (12,919) |
|  | $ 57,576 | $ 47,136 |

</TABLE>

Depreciation expense for the years ended December 31, 2003, 2002 and 2001 was
approximately $5,719,000, $4,953,000 and $3,031,000 respectively. In the
statement of operations of continuing operations for the years ended December
31, 2003, 2002 and 2001, depreciation expense has been reduced by $130,000 in
each year for the amortization of the proceeds received under an economic
development grant received from the Department of Housing and Urban Development.

7.   ACCRUED EXPENSES AND OTHER CURRENT LIABILITIES

Accrued expenses and other current liabilities as of December 31, 2003 and 2002
are summarized as follows:

<TABLE>
<CAPTION>

|  | 2003 | 2002 |
|---|---|---|
|  | (IN THOUSANDS) | |
| <S> | <C> | <C> |
| Accrued expenses | $40,787 | $16,988 |
| Customer deposits | 14,651 | 6,302 |
| Deferred consideration for acquisitions | 2,780 | 1,826 |
|  | $58,218 | $25,116 |

</TABLE>

F-20

<PAGE>

ARMOR HOLDINGS INC. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (CONTINUED)

8.   DEBT

<TABLE>
<CAPTION>

|  | 2003 | 2002 |
|---|---|---|
|  | (IN THOUSANDS) | |
| <S> | <C> | <C> |
| Credit facility (a) | $ – | $ – |
| Senior Subordinated Notes (b) | 147,600 | – |
| Senior Subordinated Convertible Notes (c) | 31,135 | – |
| Ontario Industrial Development Authority Variable Rate Demand Industrial Development Revenue Bonds, Series 1989 payable in annual installments of $200 to $300, through August 1, 2014, with interest paid monthly at varying rates | 2,600 | 2,800 |
| Note payable in scheduled installments through 2013, with an interest rate of 5%. | 1,508 | 1,582 |
| Economic Development Revenue Bonds, payable in scheduled installments through September 2016, with a variable interest rate approximating 85% of the bond equivalent yield of the 13 week U.S. Treasury bills (not to exceed 12%) which approximated 1.5% at December 31, 2002. | – | 1,075 |
| Note to former officer payable in monthly principal and interest installments of $7 through December 31, 2009 with an imputed interest rate of 9.25% | 359 | 399 |
| Minimum guaranteed royalty to former officer payable in monthly principal and interest installments of $4 through August 2005, with an imputed interest rate of 9.2% | 73 | 114 |
| Minimum guaranteed royalty to former officer payable in monthly principal and interest installments of $36 through April 2005, with an imputed interest rate of 7.35% | 542 | 915 |

<table>
<tr><td>Note payable in schedule installments through 2008, with an interest rate of 3%</td><td align="right">739</td><td align="right">-</td></tr>
<tr><td>Plus fair value of interest rate swaps (d)</td><td align="right">5,851</td><td align="right">-</td></tr>
<tr><td></td><td align="right">---------------</td><td align="right">------------</td></tr>
<tr><td></td><td align="right">$ 190,407</td><td align="right">$6,885</td></tr>
<tr><td>Less current portion</td><td align="right">(32,107)</td><td align="right">(1,813)</td></tr>
<tr><td></td><td align="right">---------------</td><td align="right">------------</td></tr>
<tr><td></td><td align="right">$ 158,300</td><td align="right">$5,072</td></tr>
<tr><td></td><td align="right">===============</td><td align="right">============</td></tr>
</table>

</TABLE>

(a) Credit Facility - On August 12, 2003, we terminated our existing credit facility and entered into a new collateralized revolving credit facility with Bank of America, N.A., Wachovia Bank, N.A. and Key Bank, N.A. The new credit facility is a five-year revolving credit facility and, among other things, provides for: 1) total maximum borrowings of $60 million; 2) a $25 million sub-limit for the issuances of standby and commercial letters of credit; 3) a $5 million sub-limit for swing-line loans; and 4) a $5 million sub-limit for multi-currency borrowings. All borrowings under the new credit facility will bear interest at either 1) a rate equal to LIBOR, plus an applicable margin ranging from 1.125% to 1.625%; 2) an alternate base rate which will be the higher of (a) the Bank of America prime rate and (b) the Federal Funds rate plus 0.50%; or 3) with respect to foreign currency loans, a fronted offshore currency rate, plus an applicable margin ranging from 1.125% to 1.625%, depending on certain conditions. The Credit Facility is guaranteed by certain of our direct and indirect domestic subsidiaries and is collateralized by, among other things, (i) a pledge of all of the issued and outstanding shares of stock or other equity interests of certain of our domestic subsidiaries, (ii) a pledge of 65% of the issued and outstanding voting shares of stock or other voting equity interests of certain of our direct and indirect foreign subsidiaries, (iii) a pledge of 100% of the issued and outstanding nonvoting shares of stock or other nonvoting equity interests of certain of our direct and indirect foreign subsidiaries, and (iv) a first priority perfected security interest on certain of our domestic assets and certain domestic assets of certain of our direct and indirect subsidiaries that will become guarantors of our obligations under the new credit facility, including, among other things, accounts receivable, inventory, machinery, equipment, certain contract rights, intellectual property rights and general intangibles.

(b) Senior Subordinated Notes - On August 12, 2003, we completed a private placement of $150 million aggregate principal amount of 8.25% senior subordinated notes due 2013 (the "Notes"). The Notes are guaranteed by all of our domestic subsidiaries, except USDS, Inc., on a senior subordinated basis (see

F-21

<PAGE>

ARMOR HOLDINGS INC. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (CONTINUED)

Note 20). The Notes have been sold to qualified institutional buyers in reliance on Rule 144A of the Securities Act of 1933, as amended, and to non-U.S. persons in reliance on Regulation S under the Securities Act of 1933, as amended. The Notes were rated B1/B+ by Moody's Investors' Service and Standard & Poor's Rating Services, respectively. During 2003, we used a portion of the funds to acquire Simula, Inc. and Hatch Imports, Inc., and we intend to use the remaining proceeds of the offering to fund acquisitions. repay a portion of our outstanding debt and for general corporate and working capital purposes, including the funding of capital expenditures. Interest on the Notes is payable semiannually on the fifteenth of February and August of each year. The Notes were issued at a discount of approximately $2.5 million to investors. The Notes may be redeemed at our option in whole or in part on a pro-rata basis, on and after August 15, 2008, at certain specified redemption prices plus accrued interest payable to the redemption date.

(c) Senior Subordinated Convertible Notes - On December 9, 2003, we purchased Simula. In 1997, Simula completed a public offering of $34.5 million of 8% Senior Subordinated Convertible Notes (the "8% Notes"). On January 5, 2004, the 8% Notes were paid-in-full. The balance of these notes is included in the current portion of long-term debt.

(d) Fair Value of Interest Rate Swaps - On September 2, 2003, we entered into interest rate swap agreements, designated as a fair value hedge as defined under Statement of Financial Accounting Standard No. 133, "Accounting for Derivative Instruments and Hedge Activities," (SFAS 133) with an aggregate notional amount totaling $150 million. The agreements were entered to exchange the fixed interest rate on the Notes for a variable interest rate equal to six-month LIBOR, set in arrears, plus a spread ranging from 2.735% to 2.75% fixed semi-annually on the fifteenth day of February and August. At December 31, 2003, the six-month LIBOR was 1.22%. The agreements are subject to other terms and conditions common to transactions of this type. In accordance with SFAS 133, changes in the fair value of the interest rate swap agreements offset changes in the fair value of the fixed rate debt due to changes in the market interest rate. The fair value of the interest rate swap agreements was approximately $5.9 million at December 31, 2003. The agreements are deemed to be a perfectly effective fair value hedge and therefore qualify for the short-cut method of accounting under SFAS 133. As a result, no ineffectiveness is expected to be recognized in earnings associated with the interest rate swap agreements on the Notes.

Maturities of long-term debt are as follows:

```
<TABLE>
<CAPTION>

                    YEAR ENDED          (IN THOUSANDS)
            ------------------------    ----------------
<S>                                     <C>
            2004                              $ 32,107
            2005                                   701
            2006                                   549
            2007                                   665
            2008                                   642
            Thereafter                        155,743
                                        ----------------
                                              $ 190,407
                                        ================

</TABLE>
```

9.   DERIVATIVE FINANCIAL INSTRUMENTS

We account for derivative instruments in accordance with SFAS 133, which
requires all freestanding and embedded derivative instruments to be measured at
fair value and recognized on the balance sheet as either assets or liabilities.
In addition, all derivative instruments used in hedging relationships must be
designated, reassessed and accounted for as either fair value hedges or cash
flow hedges pursuant to the provisions of SFAS 133.

We hedge the fair value of our Notes using interest rate swaps. We enter into
these derivative contracts to manage fair value changes that could be caused by
our exposure to interest rate changes. On September 2, 2003, we entered into
interest rate swap agreements, designated as fair value hedges as defined under
SFAS 133, with an aggregate notional amount totaling $150 million. The interest
rate

                                     F-22
<PAGE>

                      ARMOR HOLDINGS INC. AND SUBSIDIARIES
               NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (CONTINUED)

swaps mature on August 15, 2013. The agreements were entered into to exchange
the fixed interest rate of 8.25% on the Notes for a variable interest rate equal
to six-month LIBOR, set in arrears, plus a spread ranging from 2.735% to 2.75%
fixed semi-annually on the fifteenth of February and August. The six-month LIBOR
rate at December 31, 2003, was 1.22%. The agreements are subject to other terms
and conditions common to transactions of this type. These fair value hedges
qualify for hedge accounting using the short-cut method since the swap terms
match the critical terms of the Notes. Accordingly, changes in the fair value of
the interest rate swap agreements offset changes in the fair value of the Notes
due to changes in the market interest rate. As a result, no ineffectiveness is
expected to be recognized in our earnings associated with the interest rate swap
agreements on the Notes.

The fair values of our interest rate swap agreements are obtained from our
counter-parties and represent the estimated amount we would receive or pay to
terminate the agreement, taking into consideration the difference between the
contract rate of interest and rates currently quoted for agreements of similar
terms and maturities.

10. INTEGRATION AND OTHER CHARGES

We incurred integration and other charges of approximately $12.6 million, $5.9
million and $3.3 million for the years ending December 31, 2003, 2002 and 2001,
respectively. The charges for the year ended December 31, 2003 includes a $7.3
million non-cash charge for stock-based compensation for a performance plan for
certain key executives and a $3.3 million (including a $2.1 million non-cash
charge) severance charge related to the departure of our former Chief Executive
Officer. The remaining charges relate to the relocation of assets and personnel,
severance costs, systems integration, domestic and international tax
restructuring as well as integrating the sales and marketing functions for
acquired companies.

11. COMMITMENTS AND CONTINGENCIES

Employment contracts. We are party to several employment contracts as of
December 31, 2003 with certain members of management. Such contracts are for
varying periods and include restrictions on competition after termination. These
agreements provide for salaries, bonuses and other benefits and also specify and
delineate the granting of various stock options.

Legal/litigation matters.

In 1997 we terminated several agreements with a Dutch company, Airmunition
International, B.V. ("AMI"), and with a British company, Crown Limited
("Crown"). AMI and Crown started an action against us before the Netherlands
Arbitration Institute in Rotterdam, Holland claiming breach of contract,
unauthorized use of confidential information, inducing an AMI employee to leave
to work for us in competition with plaintiffs and further inducing him to breach
his confidentiality agreements with plaintiffs. Plaintiffs sought damages of
$20.5 million. On April 29, 2003, the Tribunal rendered an interim award in our
favor on the first three counts. However, it reserved the opportunity for

Plaintiffs to provide proof of damages noting that any damages AMI/Crown may have suffered on this remaining issue would be "limited based on the facts. On March 4, 2004, the arbitrators found that the plaintiffs had failed to offer any evidence of damages, and therefore, they dismissed all of the claims against us. Further the arbitrators directed AMI/Crown to pay us our costs. Unfortunately, AMI and Crown have filed for bankruptcy protection from creditors so recovery of our costs is doubtful.

On January 16, 1998, our Services Division ceased operations in Angola and subsequently became involved in various disputes with SHRM S.A. ("SHRM"), its minority joint venture partner relating to the Angolan joint venture known as Defense System International Africa ("DSIA"). On March 6, 1998, SIA (a subsidiary of SHRM) filed a complaint against Defense Systems France, SA ("DSF") before the Commercial Court of Nanterre (Tribunal de Commerce de Nanterre) seeking to be paid an amount of $577,286 corresponding to an alleged debt of DSIA to SIA. In October 2002, the Commercial Court of Nanterre stayed the proceedings before it, pending the decisions of the Court of Appeal and the Paris Commercial Court. In February 2003, the Court of Appeal ruled against SHRM and its parent entity, Compass Group, effectively ending all further proceedings on the merits of Compass' claims. Compass has appealed the decision before the French Court of Cassation, which reviews only matters of law.

F-23

<PAGE>

ARMOR HOLDINGS INC. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (CONTINUED)

In 1999 and prior to our acquisition of O'Gara-Hess & Eisenhardt Armoring Company (which has been converted to a limited liability company and is now known as O'Gara-Hess & Eisenhardt Armoring Company, L.L.C.) ("OHEAC") in 2001, O'Gara-Hess & Eisenhardt Armoring de Brasil Ltda. ("OHE Brazil") was audited by the Brazilian federal tax authorities and assessed over Ten Million Reals (US$3.4 million based on the exchange rate as of December 31, 2003). OHE Brazil has appealed the tax assessment and the case is pending. To the extent that there may be any liability resulting from the 2001 audit, we believe that we are entitled to indemnification from Kroll, Inc. under the terms of our purchase agreement dated April 20, 2001, despite the denial by Kroll, Inc. of any such liability, because the events occurred prior to our purchase of the O'Gara Companies from Kroll, Inc. However, to the extent that the appeal relating to 2001 activity results in an unfavorable ruling, we could be liable for unpaid taxes incurred subsequent to the acquisition from Kroll. At this time, we do not believe this matter will have a material impact on our financial position, operations or liquidity.

In 1999 and prior to our acquisition of OHEAC in 2001, several of the former employees of Kroll O'Gara Company de Mexico, S.A. de C.V. ("O'Gara Mexico"), a subsidiary of OHEAC, commenced labor claims against O'Gara Mexico seeking damages for unjustified termination. These cases are still pending before the labor board in Mexico City. The terminated employees are seeking back pay and benefits since the date of termination amounting to approximately US $2.9 million, and accruing at approximately US $50,400 per month. To the extent that there may be any liability, we believe that we are entitled to indemnification from Kroll, Inc. under the terms of our purchase agreement dated April 20, 2001, despite the denial by Kroll, Inc. of any such liability, because the events occurred prior to our purchase of the O'Gara Companies from Kroll, Inc. Although we do not have any insurance coverage for this matter, at this time, we do not believe this matter will have a material impact on our financial position, operations or liquidity.

In August 2001, Defense Technology Corporation of America ("DTC"), one of our subsidiaries, received a civil subpoena from the United States Environmental Protection Agency requesting information pursuant to Section 104(e) of the Comprehensive Environmental Response, Compensation and Liability Act regarding the possible impact of the Casper, Wyoming tear gas facility on the environment. DTC responded to the request, and to date the EPA has not taken any further action with respect to the matter. At this time, we do not believe this matter will have a material impact on our financial position, operations or liquidity.

In December 2001, O'Gara-Hess & Eisenhardt France S.A. ("OHE France") sold its industrial bodywork business operated under the name Labbe/Division de O'Gara Hess & Eisenhardt France/ Carrosserie Industriells to SNC Labbe. Subsequent to the sale, the Labbe Family Trust ("LFT"), owner of the leasehold interest upon which the Carrosserie business is operated, sued OHE France and SNC Labbe claiming that the transfer of the leasehold was not valid because the LFT had not given its consent to the transfer as required under the terms of the lease. Further, LFT seeks to have OHE France, as the sole tenant, maintain and repair the leased building. The approximate cost of renovating the building is estimated to be between US $3.2 and US $6.4 million, based on the exchange rate as of December 31, 2003. The case is currently pending, and while we are contesting the allegations vigorously, we are unable to predict the outcome of this matter. Although we do not have any insurance coverage for this matter, at this time, we do not believe this matter will have a material impact on our financial position, operations or liquidity.

On or about March 22, 2002, OHEAC received a civil subpoena from the Department of Defense ("DOD") requesting documents and information concerning various quality control documentation regarding parts delivered by its subcontractors and vendors in support of the High Mobility Multipurpose Wheeled Vehicles ("HMMWVs") armored at its Fairfield, Ohio facility for the period October 1, 1999 through May 1, 2001. OHEAC has complied fully with the subpoena. In early 2003, OHEAC was advised that the Department of Justice ("DOJ") was also investigating separate claims against OHEAC filed by individuals that involve the same time frame and issues covered by the DOD subpoena. OHEAC has learned

that the DOJ investigation relates to a certain unidentified action filed under the federal False Claims Act pursuant to which the United States government may intervene and recover damages. OHEAC has fully responded to, and cooperated with, the government's questions and investigation. The DOJ has since notified OHEAC that it has declined to intervene in the case. On September 30, 2003, the action filed under the federal False Claims Act was voluntarily withdrawn without prejudice.

F-24

<PAGE>

ARMOR HOLDINGS INC. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (CONTINUED)

On October 18, 2002, we were notified by the Internal Revenue Service that our tax return for the tax year ended December 31, 2000 had been selected for examination. Further, on January 30, 2003 we were notified that our tax return for the tax year ended December 31, 2001 had been selected for examination. The examinations are currently pending, and at this time we are unable to predict the outcome of these matters. However, we do not believe this matter will have a material impact on our financial position, operations or liquidity.

In October 2002, we were sued in the United States District Court for the District of Wyoming with respect to one of our subsidiaries' Casper, Wyoming tear gas plant. The plaintiffs in the lawsuit asserted various state law tort claims and federal environmental law claims under the Resource Conservation and Recovery Act and the Clean Air Act stemming from the tear gas plant. In February 2004, we agreed with the plaintiffs to settle the lawsuit for an amount of money that is not material to us and the plaintiffs have agreed to dismiss their lawsuit with prejudice.

In September 2003, Second Chance Body Armor, Inc., a body armor manufacturer and one of our competitors, has notified its customers of a potential safety issue with its Ultima(R) and Ultimax(R) models. Second Chance Body Armor has claimed that Zylon(R) fiber, which is made by Toyobo, a Japanese corporation, and used in the ballistic fabric construction of its Ultima(R) and Ultimax(R) models, degraded more rapidly than originally anticipated. Second Chance Body Armor has also stated that the Zylon(R) degradation problem affects the entire body armor industry, not just its products. Both private claimants and State Attorneys General have already commenced legal action against Second Chance Body Armor based upon its Ultima(R) and Ultimax(R) model vests and we have received investigative demands from state agencies in Texas and Connecticut. Second Chance Body Armor licenses from Simula a certain patented technology which is used in the body armor it manufactures, but to our knowledge, no lawsuit has yet been brought against Second Chance Body Armor based upon this licensed technology, although a letter was received by Simula from an attorney representing a police officer who was injured while wearing a Second Chance Body Armor vest alleging potential liability against Simula. In addition, the U.S. Attorney General has asked the U.S. Department of Justice to investigate the claims regarding the use of Zylon(R) in bulletproof vests, which we use in the manufacturing of certain of our body armor models for law enforcement personnel. As Simula has licensed its technology to Second Chance Body Armor, it may be impacted by the pending claims against Second Chance Body Armor and the investigation being conducted by the U.S. Department of Justice. If Simula is included in the claims pending against Second Chance Body Armor and the investigation being conducted by the U.S. Department of Justice, we cannot assure you that any judgment, settlement or resolution against Simula will not have a material impact on Simula's financial position, operations or liquidity.

The National Institute of Justice (NIJ) is engaged in an ongoing inquiry and investigation of bullet-resistant vests and the protocol for testing used vests, as well as the reliability of Zylon and other fibers. We have consulted with and cooperated fully with the NIJ in this endeavor. To date, the NIJ has embarked only in its first phase of testing, which entails vests that have been heavily worn or exposed to adverse conditions, and which involves the ballistic standard applicable to new vests. Although some of the vests tested, including ours, experienced some level of penetration, the NIJ specifically warned against the misuse and misinterpretation of these results, emphasizing that the data produced so far is preliminary in nature, applies to a very small sample size and therefore is it not possible to draw any statistically-based conclusions from these results. The NIJ will continue to conduct further testing and analyze these issues in order to determine if any conclusions can be reached as to the performance and reliability of aged vests. We have requested the NIJ to provide us with its testing data, and we intend to evaluate and review the NIJ results in our continuing effort to assist the NIJ in developing uniform standards for certification of new vests and the testing of used vests. The NIJ continues to encourage law enforcement officers to wear body armor, in light of the fact that "the lives of more than 2,700 law enforcement officers have been saved by the use of bullet-resistant body armor over the past 30 years."

In addition to the above, in the normal course of business, we are subjected to various types of claims and currently have on-going litigations in the areas of products liability and general liability. Our products are used in a wide variety of law enforcement situations and environments. Some of our products can cause serious personal or property injury or death if not carefully and properly used by adequately trained personnel. We believe that we have adequate insurance coverage for most claims that are incurred in the normal course of business. In such cases, the effect on our financial statements is generally limited to the amount of our insurance deductible or self-insured retention. Our annual insurance premiums and self insurance retention amounts have risen significantly over the past several years and may continue to do so to the extent we are able to purchase insurance coverage. At this time, we do not believe any such claims or pending litigation will have a material impact on our financial position, operations and liquidity.

F-25

<PAGE>

ARMOR HOLDINGS INC. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (CONTINUED)

12.   INFORMATION CONCERNING BUSINESS SEGMENTS AND GEOGRAPHICAL SALES

We are a leading manufacturer and provider of specialized security products;
training and support services related to these products; vehicle armor systems;
military helicopter seating system, aircraft and land vehicle safety systems;
protective equipment for military personnel; and other technologies used to
protect humans in a variety of life-threatening or catastrophic situations. Our
products and systems are used domestically and internationally by military, law
enforcement, security and corrections personnel, as well as governmental
agencies, multinational corporations and individuals. We are organized and
operated under three business divisions: Armor Holdings Products, also referred
to as our Products Division, Armor Mobile Security, also referred to as our
Mobile Security Division, and Simula Our Services division has been classified
as discontinued operations and is no longer included in this presentation (See
Note 2).

Armor Holdings Products. Our Armor Holdings Products division manufactures and
sells a broad range of high quality equipment marketed under brand names that
are well known and respected in the military and law enforcement communities.
Products manufactured by this division include concealable and tactical body
armor, hard armor, duty gear, less-lethal munitions, anti-riot products, police
batons, emergency lighting products, forensic products firearms accessories,
weapon maintenance products, foldable ladders, and specialty gloves. USDS, Inc.,
a small subsidiary providing certain training services formerly reported as a
part of the Services division, is not included in the amounts classified as
assets held for sale or discontinued operations and has been reclassified to our
Armor Holdings Products division where management oversight currently resides.

Armor Mobile Security. Our Armor Mobile Security division manufactures and
installs ballistic and blast protection armoring systems for military vehicles,
commercial vehicles, military aircraft and missile components. Under the brand
name O'Gara-Hess & Eisenhardt ("O'Gara"), we are the sole-source provider to the
U.S. military for the supply of armoring and blast protection systems as well as
maintenance services for the High Mobility Multi-purpose Wheeled Vehicle (HMMWV,
commonly known as the Humvee). Additionally, we have been subcontracted to
develop a ballistically armored and sealed truck cab for the High Mobility
Artillery Rocket System (HIMARS) currently in low-rate initial production for
the U.S. Army. We armor a variety of commercial vehicles including limousines,
sedans, sport utility vehicles, commercial trucks and cash-in-transit vehicles,
to protect against varying degrees of ballistic and blast threats. The Armor
Mobile Security division was created in connection with our acquisition of
O'Gara on August 22, 2001 (the "O'Gara acquisition").

Simula. Simula supplies human safety and survival systems to the U.S. military,
and major aerospace and defense prime contractors. Our core markets are military
aviation safety, military personnel safety, and land and marine safety. Through
Simula, we provide military helicopter seating systems, aircraft and land
vehicle armor systems, protective equipment for military personnel and
technologies used to protect humans in a variety of life-threatening or
catastrophic situations.

We have invested substantial resources outside of the United States and plan to
continue to do so in the future. The Armor Mobile Security division has invested
substantial resources in Europe and South America. These operations are subject
to the risk of new and different legal and regulatory requirements in local
jurisdictions, tariffs and trade barriers, potential difficulties in staffing
and managing local operations, currency risks, potential imposition of
restrictions on investments, potentially adverse tax consequences, including
imposition or increase of withholding and other taxes on remittances and other
payments by subsidiaries, and local economic, political and social conditions.
Governments of many developing countries have exercised and continue to exercise
substantial influence over many aspects of the private sector. Government
actions in the future could have a significant adverse effect on economic
conditions in a developing country or may otherwise have a material adverse
effect on us and our operating companies. We do not have political risk
insurance in the countries in which we currently conduct business. Moreover,
applicable agreements relating to our interests in our operating companies are
frequently governed by foreign law. As a result, in the event of a dispute, it
may be difficult for us to enforce our rights. Accordingly, we may have little
or no recourse upon the occurrence of any of these developments.

F-26

<PAGE>

ARMOR HOLDINGS INC. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (CONTINUED)

Revenues, operating income and total assets for each of our continuing segments
are as follows:

<TABLE>
<CAPTION>

| | 2003 | 2002 | 2001 |
|---|---|---|---|
| | ---------------- | ----------------- | ---------------- |
| | | (IN THOUSANDS) | |

<S>                                        <C>                 <C>                 <C>

Revenues:
   Products                $ 199,093           $ 179,946           $ 149,868
   Mobile Security          157,548             125,171              47,232
   Simula                     8,531                   –                   –
        Total revenues    $ 365,172           $ 305,117           $ 197,100

Operating income:
   Products                $  35,013           $  30,978           $  26,845
   Mobile Security           22,174              14,375               6,673
   Simula                     1,180                   –                   –
   Corporate                (22,638)             (6,988)             (6,845)
     Total operating income  $  35,729      $  38,365           $  26,673

Total assets:

   Products                $ 188,139           $ 179,367           $147,313
   Mobile Security          127,832             105,446             102,127
   Simula                   140,996                   –                   –
   Corporate                126,303              23,830              49,950
     Total assets   $ 583,270           $ 308,643           $299,390

</TABLE>

F-27

<PAGE>

ARMOR HOLDINGS INC. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (CONTINUED)

Financial information with respect to revenues, operating income from continuing operations (geographic operating income from continuing operations before amortization expense and integration and other charges) and total assets to principal geographic areas is as follows:

<TABLE>
<CAPTION>

|                                   | 2003      | 2002      | 2001      |
|-----------------------------------|-----------|-----------|-----------|
|                                   |           | (IN THOUSANDS) |      |
| <S>                               | <C>       | <C>       | <C>       |
| Revenues:                         |           |           |           |
|   North America         | $275,529  | $ 225,365 | $ 144,981 |
|   South America         | 15,007    | 19,879    | 6,449     |
|   Africa                | 1,420     | 1,219     | 582       |
|   Europe/Asia           | 73,216    | 58,654    | 45,088    |
|                                   | $365,172  | $ 305,117 | $ 197,100 |
| Geographic operating income:      |           |           |           |
|   North America         | $38,674   | $34,032   | $23,290   |
|   South America         | 882       | 1,702     | 473       |
|   Africa                | 345       | 428       | 192       |
|   Europe/Asia           | 8,890     | 8,374     | 8,156     |
|                                   | $ 48,791  | $44,536   | $32,111   |
| Total assets:                     |           |           |           |
|   North America         | $523,954  | $ 264,767 | $268,019  |
|   South America         | 6,433     | 5,456     | 5,811     |
|   Africa                | –         | –         | –         |
|   Europe/Asia           | 52,883    | 38,420    | 25,560    |
|                                   | $583,270  | $ 308,643 | $ 299,390 |

</TABLE>

A reconciliation of consolidated geographic operating income from continuing operations to consolidated operating income from continuing operations follows:

<TABLE>
<CAPTION>

|                                               | 2003     | 2002     | 2001     |
|-----------------------------------------------|----------|----------|----------|
|                                               |          | (IN THOUSANDS) |    |
| <S>                                           | <C>      | <C>      | <C>      |
| Consolidated geographic operating income      | $48,791  | $44,536  | $32,111  |
| Amortization                                  | (489)    | (245)    | (2,142)  |
| Integration and other charges                 | (12,573) | (5,926)  | (3,296)  |
|    Operating income            | $35,729  | $38,365  | $26,673  |

</TABLE>

F-28

<PAGE>

ARMOR HOLDINGS INC. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (CONTINUED)

13.    INCOME TAXES

Income tax expense (benefit) from continuing operations for the years ended
December 31, 2003, 2002, and 2001 consisted of the following:

<TABLE>
<CAPTION>

|  | 2003 | 2002 | 2001 |
|---|---|---|---|
|  | (IN THOUSANDS) | | |
| <S> | <C> | <C> | <C> |
| Current |  |  |  |
| Domestic | $ 10,387 | $13,306 | $ 7,017 |
| Foreign | 403 | 2,389 | 1,563 |
| Total current | 10,790 | 15,695 | 8,580 |
| Deferred |  |  |  |
| Domestic | 2,006 | (25) | (319) |
| Foreign | 1,407 | 384 | (54) |
| Total deferred | 3,413 | 359 | (373) |
| Total provision for income taxes | $ 14,203 | $16,054 | $8,207 |

</TABLE>

Significant components of our net deferred tax asset related to continuing
operations as of December 31, 2003 and 2002 are as follows:

<TABLE>
<CAPTION>

|  | 2003 | 2002 |
|---|---|---|
|  | (IN THOUSANDS) | |
| <S> | <C> | <C> |
| Deferred tax assets: |  |  |
| Reserves not currently deductible | $ 3,527 | $2,697 |
| Capital loss | 11,320 | – |
| Operating loss carryforwards | 2,811 | 1,769 |
| Patents | 22 | – |
| Accrued expenses | 954 | 220 |
| Foreign tax credits | 912 | 2,939 |
| Research and development and other credits | 150 | 206 |
| Tax on unremitted foreign earnings | – | 1,255 |
|  | 19,696 | 9,086 |
| Deferred tax asset valuation allowance | (11,395) | (75) |
| Deferred tax asset, net of valuation allowance | 8,301 | 9,011 |
| Deferred tax liability: |  |  |
| Goodwill not amortized for financial statement purposes under SFAS 142 | (2,418) | (954) |
| Property and equipment | (2,970) | (475) |
| Net deferred tax asset | $ 2,913 | $7,582 |

</TABLE>

Recognition of deferred tax assets is based on management's belief that it is
more likely than not that the tax benefit associated with temporary differences
and operating and capital loss carryforwards will be utilized. A valuation
allowance is recorded for those deferred tax assets for which it is more likely
than not that the realization will not occur.

Our valuation allowance at December 31, 2003, consisted of $11,320,000 for a
capital loss carryforward and $75,000 in net operating loss carryforwards.

As of December 31, 2003, we have federal, state, and foreign NOLs providing a
tax effected benefit of $2,811,000. The NOLs expire in varying amounts in fiscal
years 2006 to 2022. At December 31, 2003, we also have tax credits of $150,000
subject to certain limitations due to the acquisition of Safariland, Ltd. We
also have approximately $912,000 of foreign tax credits expiring in 2006.

We are subject to periodic review by federal, foreign, state, and local tax
jurisdictions in the ordinary course of business. During 2002, we were notified
by the Internal Revenue Service (IRS) that certain prior year income tax returns
would be examined. As of December 31, 2003, the IRS exam has not been concluded
nor do we believe that it will have any material impact on the financial
statements.

F-29

<PAGE>

ARMOR HOLDINGS INC. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (CONTINUED)

US taxes have not been provided for on unremitted foreign earnings of
approximately $9.0 million from continuing operations. These earnings are
considered to be permanently reinvested in non-US operations.

Net deferred tax assets described above have been included in the accompanying
consolidated balance sheets as follows:

|  | 2003 | 2002 |
|---|---|---|
|  | (IN THOUSANDS) | |
| Other current assets | $ 4,151 | $ 2,697 |
| Other assets | – | 4,885 |
| Other long-term liabilities | (1,238) | – |
| Total deferred tax assets | $ 2,913 | $ 7,582 |

The following reconciles the income tax expense computed at the Federal
statutory income tax rate to the provision for income taxes recorded in the
income statement for the years ended December 31, 2003, 2002 and 2001:

|  | 2003 | 2002 | 2001 |
|---|---|---|---|
| Provision for income taxes at statutory federal rate | 35.0% | 35.0% | 35.0% |
| State and local income taxes, net of Federal benefit | (0.5%) | 3.8% | 3.2% |
| Compensation subject to IRC Section 162(m) | 8.6% | – | – |
| Foreign income taxes | 2.1% | 0.7% | (0.1%) |
| Valuation allowances from discontinued operations | – | 3.8% | – |
| Other permanent items | 0.3% | (.4%) | (2.2%) |
|  | 45.5% | 42.9% | 35.9% |

14.   STOCKHOLDERS' EQUITY

Preferred stock. On July 16, 1996, our stockholders authorized a series of
preferred stock with such rights, privileges and preferences as the Board of
Directors shall from time to time determine. We have not issued any of this
preferred stock.

Stock options and grants. In 1994, we implemented an incentive stock plan and an
outside directors' stock plan. These plans collectively provide for the granting
of options to certain key employees as well as providing for the grant of common
stock to outside directors and to all full time employees. Pursuant to such
plans, 1,050,000 shares of common stock were reserved and made available for
distribution. The option prices of stock that may be purchased under the
incentive stock plan are not less than the fair market value of common stock on
the dates of the grants. Effective January 19, 1996, all stock options awarded
under the 1994 incentive stock plan were accelerated and considered fully
vested.

In 1996, we implemented an incentive stock plan and an outside directors' stock
plan. These plans collectively provide for the granting of options to certain
key employees and directors. Pursuant to such plans, as amended, 2,200,000
shares of common stock were reserved and made available for distribution. The
option prices of stock that may be purchased under the incentive stock plan are
not less than the fair market value of common stock on the dates of the grants.

During 1998, we implemented a new non-qualified stock option plan. Pursuant to
the new plan, 725,000 shares of common stock were reserved and made available
for distribution. On January 1, 1999, we distributed all 725,000 shares
allocated under the plan. In 1999, we implemented the 1999 Stock Incentive Plan
(the "1999 Plan"). We reserved 2,000,000 shares of our common stock for the 1999
Plan. The 1999 Plan provides for the granting of options to employees, officers,
directors, consultants, independent contractors and advisors of the Company. The
option prices of stock which may be purchased under the 1999 Plan are not less
than the fair market value of common stock on the dates of the grants.

F-30

<PAGE>

ARMOR HOLDINGS INC. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (CONTINUED)

During 2002, we implemented two new stock option plans. The 2002 Stock Incentive
Plan authorizes the issuance of up to 2,700,000 shares of our common stock upon
the exercise of stock options or in connection with the issuance of restricted
stock and stock bonuses. The 2002 Stock Incentive Plan authorizes the granting
of stock options, restricted stock and stock bonuses to employees, officers,
directors and consultants, independent contractors and advisors of Armor
Holdings and its subsidiaries. The 2002 Executive Stock Plan provides for the
grant of a total of 470,000 stock options and stock awards to our key employees.
The terms and provisions of the 2002 Executive Stock Plan are substantially the

same as the 2002 Stock Incentive Plan, except that we may only grant
non-qualified stock options under the 2002 Executive Stock Plan. The 2002
Executive Stock Plan was adopted on March 13, 2002 and all shares available for
grant under the 2002 Executive Stock Plan were granted to our executive officers
on March 13, 2002.

Under SFAS 123, the fair value of each option grant is estimated on the date of
grant using the Black-Scholes option-pricing model with the following
weighted-average assumptions for the years ended December 31, 2003, 2002 and
2001:

<TABLE>
<CAPTION>

|  | 2003 | 2002 | 2001 |
|---|---|---|---|
| <S> | <C> | <C> | <C> |
| Expected life of option | 4 yrs | 4 yrs | 4 yrs |
| Dividend yield | 0% | 0% | 0% |
| Volatility | 49.8% | 52.2% | 44.7% |
| Risk free interest rate | 2.51% | 3.94% | 4.52% |

</TABLE>

The increase in volatility in from fiscal 2001 to fiscal 2003 is primarily due
to the increase demand for the stock, which drove up the price and increased the
volatility.

The weighted average fair value of options granted during 2003, 2002 and 2001
are as follows:

<TABLE>
<CAPTION>

|  | 2003 | 2002 | 2001 |
|---|---|---|---|
|  | (IN THOUSANDS, EXCEPT PER SHARE DATA) | | |
| <S> | <C> | <C> | <C> |
| Fair value of each option granted | $ 6.21 | $10.08 | $ 6.17 |
| Total number of options granted | 898 | 1,895 | 892 |
| Total fair value of all options granted | $5,576 | $19,098 | $ 5,501 |

</TABLE>

Outstanding options, generally consisting of ten-year incentive and
non-qualified stock options, generally vest and become exercisable over a
three-year period from the date of grant. The outstanding options generally
expire ten years from the date of grant or upon retirement from the Company, and
are contingent upon continued employment during the applicable ten-year period.

F-31

<PAGE>

ARMOR HOLDINGS INC. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (CONTINUED)

A summary of the status of stock option grants as of December 31, 2003 and
changes during the years ending on those dates is presented below:

<TABLE>
<CAPTION>

|  | OPTIONS | WEIGHTED AVERAGE EXERCISE PRICE |
|---|---|---|
| <S> | <C> | <C> |
| Outstanding at December 31, 2000 | 3,294,839 | $ 9.91 |
| Granted | 892,159 | $15.24 |
| Exercised | (1,173,227) | $ 9.37 |
| Forfeited | (29,737) | $15.51 |
| Outstanding at December 31, 2001 | 2,984,034 | $11.60 |
| Granted | 1,894,660 | $22.96 |
| Exercised | (507,868) | $ 8.41 |
| Forfeited | (86,168) | $16.75 |
| Outstanding at December 31, 2002 | 4,284,658 | $ 7.81 |
| Granted | 898,347 | $16.62 |
| Exercised | (724,934) | $11.83 |
| Forfeited | (567,150) | $21.52 |
| Outstanding at December 31, 2003 | 3,890,921 | $17.00 |
| Options exercisable at December 31, 2003 | 2,036,417 | $15.21 |

</TABLE>

The following table summarizes information about stock options outstanding at
December 31, 2003:

<TABLE>

<CAPTION>

| EXERCISE PRICE RANGE | 12/31/2003 OPTIONS OUTSTANDING | OPTIONS EXERCISABLE | REMAINING LIFE IN YEARS |
|---|---|---|---|
| <S> | <C> | <C> | <C> |
| 0.97 - 3.75 | 75,166 | 75,166 | 2.0 |
| 7.50 - 9.94 | 230,084 | 230,084 | 3.8 |
| 10.00 - 10.63 | 17,836 | 17,836 | 5.5 |
| 11.00 - 11.63 | 340,008 | 340,008 | 5.0 |
| 13.19 - 14.00 | 335,500 | 228,665 | 6.8 |
| 14.17 - 14.70 | 811,161 | 370,538 | 8.6 |
| 15.05 - 15.90 | 362,590 | 203,240 | 8.1 |
| 16.31 - 16.50 | 26,002 | 6,000 | 7.0 |
| 17.00 - 17.54 | 368,072 | 46,392 | 9.3 |
| 21.75 - 21.75 | 125,000 | 41,666 | 8.1 |
| 23.09 - 23.93 | 649,502 | 315,156 | 8.4 |
| 24.07 - 25.80 | 550,000 | 161,666 | 8.5 |
| Total | 3,890,921 | 2,036,417 | |

</TABLE>

F-32

<PAGE>

ARMOR HOLDINGS INC. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (CONTINUED)

Remaining non-exercisable options as of December 31, 2003 become exercisable as follows:

| | |
|---|---|
| 2004 | 932,642 |
| 2005 | 441,522 |
| 2006 | 480,340 |

Earnings per share. The following details the earnings per share computations on a basic and diluted basis for the years ended December 31, 2003, 2002 and 2001:

<TABLE>
<CAPTION>

| | 2003 | 2002 | 2001 |
|---|---|---|---|
| | (IN THOUSANDS, EXCEPT PER SHARE DATA) | | |
| <S> | <C> | <C> | <C> |
| Numerator for basic and diluted earnings per share: | | | |
| Net income (loss) available to common shareholders | $ 10,886 | $ (17,689) | $10,128 |
| Denominator: | | | |
| Basic earnings per share weighted-average shares outstanding | 28,175 | 30,341 | 23,932 |
| Effect of dilutive securities: | | | |
| Effect of shares issuable under stock option and stock grant plans, based on the treasury stock method | 779 | 616 | 836 |
| Diluted earnings per share | | | |
| Adjusted weighted-average shares outstanding | 28,954 | 30,957 | 24,768 |
| Basic earnings (loss) per share | $ 0.39 | $ (0.58) | $ 0.42 |
| Diluted earnings (loss) per share | $ 0.38 | $ (0.57) | $ 0.41 |

</TABLE>

15. SUPPLEMENTAL CASH FLOW INFORMATION:

<TABLE>
<CAPTION>

| | 2003 | 2002 | 2001 |
|---|---|---|---|
| Cash paid during the year for: | (IN THOUSANDS) | | |
| <S> | <C> | <C> | <C> |
| Interest | $ 1,245 | $ 527 | $ 3,878 |
| Income taxes | $ 7,886 | $5,753 | $ 4,656 |

</TABLE>

<TABLE>
<CAPTION>

| | 2003 | 2002 | 2001 |
|---|---|---|---|
| | (IN THOUSANDS) | | |
| <S> | <C> | <C> | <C> |
| Acquisitions of businesses, net of cash acquired: | | | |
| Fair value of assets acquired | $72,132 | $ 16,134 | $57,932 |
| Goodwill | 76,802 | 8,478 | 37,578 |
| Liabilities assumed | (58,422) | (15,794) | (36,541) |
| Stock issued | - | - | (19,604) |

```
Total cash paid                                    $90,512        $ 8,818        $39,365
                                                   ==============  ==============  ============
```

</TABLE>

                                    F-33
<PAGE>


                    ARMOR HOLDINGS INC. AND SUBSIDIARIES
               NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (CONTINUED)


16. QUARTERLY RESULTS (UNAUDITED)

The following table presents summarized unaudited quarterly results of
operations for the Company for fiscal 2003 and 2002. We believe all necessary
adjustments have been included in the amounts stated below to present fairly the
following selected information when read in conjunction with the Consolidated
Financial Statements and Notes thereto included elsewhere herein. Future
quarterly operating results may fluctuate depending on a number of factors.
Results of operations for any particular quarter are not necessarily indicative
of results of operations for a full year or any other quarter.

<TABLE>
<CAPTION>

|  | FISCAL 2003 | | | |
| --- | --- | --- | --- | --- |
|  | FIRST QUARTER | SECOND QUARTER | THIRD QUARTER | FOURTH QUARTER |
|  | (IN THOUSANDS, EXCEPT PER SHARE DATA) | | | |
| <S> | <C> | <C> | <C> | <C> |
| Revenue from continuing operations | $80,474 | $81,659 | $90,882 | $112,157 |
| Gross profit from continuing operations | $23,312 | $24,378 | $28,929 | $ 34,967 |
| Net income (loss) | $ 5,087 | $ 4,613 | $ 6,115 | $ (4,929) |
| Basic earnings per share | $ 0.17 | $ 0.17 | $ 0.22 | $ (0.17) |
| Diluted earnings per share | $ 0.17 | $ 0.17 | $ 0.22 | $ (0.17) |

</TABLE>

<TABLE>
<CAPTION>

|  | FISCAL 2002 | | | |
| --- | --- | --- | --- | --- |
|  | FIRST QUARTER | SECOND QUARTER | THIRD QUARTER | FOURTH QUARTER |
|  | (IN THOUSANDS, EXCEPT PER SHARE DATA) | | | |
| <S> | <C> | <C> | <C> | <C> |
| Revenue from continuing operations | $69,604 | $ 71,605 | $ 80,557 | $ 83,351 |
| Gross profit from continuing operations | $21,974 | $ 22,701 | $ 24,610 | $ 25,087 |
| Net income (loss) | $ 5,960 | $ 4,075 | $(14,707) | $(13,017) |
| Basic earnings (loss) per share | $ 0.19 | $ 0.13 | $ (0.50) | $ (0.44) |
| Diluted earnings (loss) per share | $ 0.19 | $ 0.13 | $ (0.49) | $ (0.44) |

</TABLE>


17. EMPLOYEE BENEFITS PLAN

In October 1997, we formed a 401(k) plan, (the "Plan") which provides for
voluntary contributions by employees and allows for a discretionary contribution
by us in the form of cash. We made contributions of approximately $332,000,
$395,500 and $272,700 to the Plan in 2003, 2002 and 2001 respectively.

We acquired Simula's noncontributory defined benefit pension plan (the "Pension
Plan") for employees on December 9, 2003. The Pension Plan was originally
adopted as of November 1, 1980. Contributions were made to the Pension Plan
based upon actuarially determined amounts. Effective July 1, 1999, Simula froze
the Plan for new participants. Effective December 8, 2003, prior to our
acquisition of the Pension Plan, Simula froze the Pension Plan for future
service for all participants. We have elected to payout the Supplemental
Retirement Plan of Simula, which represents $1,067,000 of the net amount
recognized. This amount was paid out on February 25, 2004.

                                    F-34
<PAGE>


                    ARMOR HOLDINGS INC. AND SUBSIDIARIES
               NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (CONTINUED)


The Pension Plan's funded status and amounts recognized in our balance sheet at
December 31 are as follows:

<TABLE>
<CAPTION>

|  | 2003 |
| --- | --- |
|  | (IN THOUSANDS) |
| <S> | <C> |
| Actuarial present value of benefit obligation: |  |
| Accumulated benefit obligation | $ 8,810 |
| Effect of projected future compensation increases | - |
|  | ----------- |

```
Projected benefit obligation                                    8,810
Pension Plan assets at fair value                              (6,169)
Contributions after measurement date                             (183)
                                                             -----------
Unfunded status                                                 2,458
Unrecognized prior service cost                                     -
Unrecognized loss                                                   -
Unrecognized transition liability                                   -
                                                             -----------
Accrued benefit cost                                            2,458
Additional minimum liability                                        -
                                                             -----------
Accrued benefit liability                                       2,458
Intangible asset                                                    -
Accumulated other comprehensive income adjustments                 -
                                                             -----------
     Net amount recognized                               $      2,458
                                                             ===========
```

Reconciliation of the Pension Plan's projected benefit obligation is as follows:
<CAPTION>

```
                                                                2003
                                                             -----------
<S>                                                          <C>
Projected benefit obligation at beginning of year        $      8,774
     Service Cost                                                   -
     Interest Cost                                                 56
     Actuarial gain                                                -
     Benefits paid                                               (20)
                                                             -----------
Projected benefit obligation at end of year              $      8,810
                                                             ===========
```

Reconciliation of the fair value of plan assets is as follows:

<CAPTION>

```
                                                                2003
                                                             -----------
<S>                                                          <C>
Fair value of plan assets at beginning of year           $      6,006
     Employer contributions                                       183
     Actual loss                                                   -
     Benefits paid                                               (20)
                                                             -----------
Fair value of plan assets at end of year                 $      6,169
                                                             ===========
```

Net periodic pension cost includes the following:

<CAPTION>

```
                                                                2003
                                                             -----------
<S>                                                          <C>
Service Cost                                             $          -
Interest Cost                                                      56
Expected loss on assets                                            -
Transition asset recognition                                       -
Prior service cost                                                 -
Net loss recognition                                               -
                                                             -----------
Net periodic pension cost                                $         56
                                                             ===========
```

Assumptions at December 31 used in the accounting for the Pension Plan were as
follows:

<CAPTION>

```
                                                                2003
                                                             -----------
<S>                                                          <C>
Discount or settlement rate                                     6.00%
Rate of increase in compensation levels                         3.25%
Expected long-term rate of return on Plan assets                8.00%
</TABLE>
```

                                   F-35
<PAGE>

                    ARMOR HOLDINGS INC. AND SUBSIDIARIES
               NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (CONTINUED)


The Pension Plan's assets consist of money market accounts and investments in
common stocks, bonds and mutual funds.


18.  RELATED PARTY TRANSACTIONS

Effective as of January 1, 2002, Kanders & Company, Inc. ("Kanders & Co."), a
corporation controlled by Warren B. Kanders, the Chairman of our Board of
Directors and our Chief Executive Officer, entered into an agreement with us to
provide certain investment banking, financial advisory and related services for
a five year term that expires on December 31, 2006. Kanders & Co. will receive a
mutually agreed upon fee on a transaction-by-transaction basis during the term
of this agreement. The aggregate fees under this agreement will not exceed

$1,575,000 during any calendar year. We also agreed to reimburse Kanders & Co.
for reasonable out-of-pocket expenses including Kanders & Co.'s expenses for
office space, an executive assistant, furniture and equipment, travel and
entertainment, reasonable fees and disbursements of counsel, and consultants
retained by Kanders & Co. In April 2003, in connection with Mr. Kanders being
appointed Chief Executive Officer of Armor Holdings, Armor Holdings and Kanders
& Co. agreed to terminate the agreement pursuant to which Kanders & Co. provided
certain services to Armor Holdings. We paid Kanders & Co. $143,000 for
investment banking services during fiscal 2003 (through and including April 2003
only). We also reimbursed Kanders & Co. for out-of-pocket expenses in the
aggregate amount of $61,000 during the fiscal year ended December 31, 2003
(through and including April 2003 only).

Effective as of January 1, 2003, we entered into a Transportation Services
Agreement with Kanders Aviation, LLC, an entity controlled by Mr. Kanders, our
Chairman of the Board and Chief Executive Officer. Pursuant to the terms of the
Transportation Services Agreement and upon our request, Kanders Aviation may, in
its sole discretion, provide us with airport to airport air transportation
services via certain aircraft. The Transportation Services Agreement will remain
in effect indefinitely until terminated by written notice by either party
thereto to the other party thereto. During the term of the Transportation
Services Agreement, we will reimburse Kanders Aviation in an amount equal to the
fair market value of the air transportation services provided by Kanders
Aviation to us and any additional expenses incurred by Kanders Aviation in
connection with such air transportation services.

Nicholas Sokolow, one of our directors, is a member of the law firm Sokolow,
Dunaud, Mercadier & Carreras located in Paris, France. We have retained Sokolow,
Dunaud, Mercadier & Carreras during the fiscal year ended December 31, 2003 and
may retain Sokolow, Dunaud, Mercadier & Carreras during the fiscal year ending
December 31, 2004. During the fiscal year ended December 31, 2003, we paid
Sokolow, Dunaud, Mercadier & Carreras $124,000 for legal services in connection
with various acquisitions.

19. OPERATING LEASES

We are party to certain real estate, equipment and vehicle leases. Several
leases include options for renewal and escalation clauses. In most cases,
management expects that in the normal course of business leases will be renewed
or replaced by other leases. Approximate total future minimum annual lease
payments under all non-cancelable leases of continuing operations are as
follows:

| YEAR | (IN THOUSANDS) |
| --- | --- |
| 2004 | $3,417 |
| 2005 | 2,249 |
| 2006 | 1,659 |
| 2007 | 1,593 |
| 2008 | 1,480 |
| Thereafter | 9,321 |
| | $19,719 |

We incurred rent expense of approximately $1,467,000, $1,200,000 and $765,000
during the years ended December 31, 2003, December 31, 2002 and December 31,
2001, respectively.

                                F-36

<PAGE>

                    ARMOR HOLDINGS INC. AND SUBSIDIARIES
              NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (CONTINUED)

20.  GUARANTOR AND NONGUARANTOR FINANCIAL STATEMENTS

On August 12, 2003 we sold $150 million of Senior Subordinated Notes in private
placements pursuant to Rule 144A and Regulation S. The Senior Subordinated Notes
are uncollateralized obligations and rank junior in right of payment to our
existing and future senior debt. The Senior Subordinated Notes are guaranteed,
jointly and severally on a senior subordinated and uncollateralized basis, by
all of our domestic subsidiaries except USDS, Inc.

The following consolidating financial information presents the consolidating
balance sheets as of December 31, 2003 and 2002 and the related statements of
income and cash flows for each of the three years in the period ended December
31, 2003 for:

       o    Armor Holdings, Inc., the parent,

       o    the guarantor subsidiaries,

       o    the nonguarantor subsidiaries, and

       o    Armor Holdings, Inc. on a consolidated basis

The information includes elimination entries necessary to consolidate Armor
Holdings, Inc., the parent, with the guarantor and nonguarantor subsidiaries.

Investments in subsidiaries are accounted for by the parent using the equity
method of accounting. The guarantor and nonguarantor subsidiaries are presented
on a combined basis. The principal elimination entries eliminate investments in

subsidiaries and intercompany balances and transactions. Separate financial statements for the guarantor and nonguarantor subsidiaries are not presented because management believes such financial statements would not be meaningful to investors.

F-37

<PAGE>

ARMOR HOLDINGS INC. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (CONTINUED)

ARMOR HOLDINGS, INC. AND SUBSIDIARIES
CONSOLIDATING BALANCE SHEETS

<TABLE>
<CAPTION>

| | | | DECEMBER 31, 2003 | | |
| | PARENT | GUARANTOR SUBSIDIARIES | NONGUARANTOR SUBSIDIARIES | ELIMINATIONS | CONSOLIDATED TOTAL |
| | | | (IN THOUSANDS) | | |
| <S> | <C> | <C> | <C> | <C> | <C> |
| ASSETS | | | | | |
| Current Assets: | | | | | |
| Cash and cash equivalents | $90,764 | $ 11,084 | $10,002 | $ - | $ 111,850 |
| Restricted cash | 2,600 | - | - | - | 2,600 |
| Accounts receivable, net | 1,201 | 59,470 | 11,964 | - | 72,635 |
| Costs and earned gross profit in excess of billings | - | - | - | - | - |
| Intercompany receivables | 60,974 | 2,600 | 38,352 | (101,926) | - |
| Inventories | -- | 61,494 | 19,033 | - | 80,527 |
| Prepaid expenses and other current assets | 20,241 | 1,844 | 2,600 | (2,653) | 22,032 |
| Current assets of discontinued operations | - | 753 | - | - | 753 |
| Total Current Assets | 175,780 | 137,245 | 81,951 | (104,579) | 290,397 |
| Property and equipment, net | 2,122 | 34,853 | 20,601 | - | 57,576 |
| Goodwill, net | - | 173,640 | 2,067 | - | 175,707 |
| Patents, licenses and trademarks, net | - | 43,991 | 183 | - | 44,174 |
| Long-term assets of discontinued operations | - | 1,603 | - | - | 1,603 |
| Other assets | 14,092 | 1,924 | 153 | - | 16,169 |
| Investment in subsidiaries | 320,034 | 10,038 | - | (330,072) | - |
| Total Assets | $512,028 | $ 403,294 | $104,955 | $ (434,651) | $ 585,626 |
| LIABILITIES AND STOCKHOLDERS' EQUITY | | | | | |
| Current Liabilities: | | | | | |
| Current portion of long-term debt | $ - | $ 31,960 | $  147 | $ - | $  32,107 |
| Short-term debt | - | - | 498 | - | 498 |
| Accounts payable | 1,584 | 20,941 | 7,779 | - | 30,304 |
| Accrued expenses and other current liabilities | 12,403 | 27,113 | 18,702 | - | 58,218 |
| Income taxes payable | - | - | - | - | - |
| Intercompany payables | 44,251 | 47,073 | 9,933 | (101,257) | - |
| Current liabilities of discontinued operations | - | (35,714) | 37,009 | (669) | 626 |
| Total Current Liabilities | 58,238 | 91,373 | 74,068 | (101,926) | 121,753 |
| Long-term debt, less current portion | 153,452 | 4,257 | 591 | - | 158,300 |
| Other long-term liabilities | 4,973 | 4,008 | 1,227 | - | 10,208 |
| Long-term liabilities of discontinued operations | - | 2,653 | - | (2,653) | - |
| Total Liabilities | 216,663 | 102,291 | 75,886 | (104,579) | 290,261 |
| Stockholders' Equity: | | | | | |
| Preferred stock | - | 1,450 | - | (1,450) | - |
| Common stock | 344 | 4,143 | 7,854 | (11,997) | 344 |
| Additional paid in capital | 318,460 | 191,781 | 46,095 | (237,876) | 318,460 |
| Retained earnings (accumulated deficit) | 44,942 | 103,629 | (24,880) | (78,749) | 44,942 |
| Accumulated other comprehensive income | 3,936 | - | - | - | 3,936 |
| Treasury stock | (72,317) | - | - | - | (72,317) |
| Total Stockholders' Equity | 295,365 | 301,003 | 29,069 | (330,072) | 295,365 |
| Total Liabilities and Stockholders' Equity | $512,028 | $ 403,294 | $104,955 | $ (434,651) | $ 585,626 |

</TABLE>

F-38

<PAGE>

ARMOR HOLDINGS INC. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (CONTINUED)

ARMOR HOLDINGS, INC. AND SUBSIDIARIES
CONSOLIDATING BALANCE SHEETS

<TABLE>
<CAPTION>

| | | DECEMBER 31, 2002 | | | |
| | PARENT | GUARANTOR SUBSIDIARIES | NONGUARANTOR SUBSIDIARIES | ELIMINATIONS | CONSOLIDATED TOTAL |
| | | | (IN THOUSANDS) | | |
| <S> | <C> | <C> | <C> | <C> | <C> |
| ASSETS | | | | | |
| Current Assets: | | | | | |
| Cash and cash equivalents | $ 7,152 | $ 3,556 | $ 2,205 | $ – | $ 12,913 |
| Restricted cash | – | – | – | – | – |
| Accounts receivable, net | – | 44,864 | 13,649 | – | 58,513 |
| Costs and earned gross profit in excess of billings | – | 234 | – | – | 234 |
| Intercompany receivables | 123,744 | 33,165 | 3,800 | (160,709) | – |
| Inventories | – | 46,591 | 15,739 | – | 62,330 |
| Prepaid expenses and other current assets | 12,490 | 21,999 | 2,368 | (24,645) | 12,212 |
| Current assets of discontinued operations | – | 10,351 | 18,474 | – | 28,825 |
| Total Current Assets | 143,386 | 160,760 | 56,235 | (185,354) | 175,027 |
| Property and equipment, net | 2,456 | 27,250 | 17,430 | – | 47,136 |
| Goodwill, net | – | 96,903 | 1,833 | – | 98,736 |
| Patents, licenses and trademarks, net | – | 7,326 | 195 | – | 7,521 |
| Other assets | 916 | 6,872 | 1,260 | – | 9,048 |
| Long-term assets of discontinued operations | – | 6,910 | 23,375 | – | 30,285 |
| Investment in subsidiaries | 161,805 | 10,078 | – | (171,883) | – |
| Total Assets | $308,563 | $ 316,099 | $ 100,328 | $ (357,237) | $ 367,753 |
| LIABILITIES AND STOCKHOLDERS' EQUITY | | | | | |
| Current Liabilities: | | | | | |
| Current portion of long-term debt | $ – | $ 1,813 | $ – | $ – | $ 1,813 |
| Short-term debt | – | – | 599 | – | 599 |
| Accounts payable | 828 | 15,751 | 7,191 | – | 23,770 |
| Accrued expenses and other current liabilities | 1,790 | 11,324 | 12,002 | – | 25,116 |
| Income taxes payable | 4,831 | (148) | 1,230 | – | 5,913 |
| Intercompany payables | 13,037 | 115,658 | 10,434 | (139,129) | – |
| Current liabilities of discontinued operations | – | 14,267 | 24,538 | (21,580) | 17,225 |
| Total Current Liabilities | 20,486 | 158,665 | 55,994 | (160,709) | 74,436 |
| Long-term debt, less current portion | – | 5,072 | – | – | 5,072 |
| Other long-term liabilities | – | – | – | – | – |
| Long-term liabilities of discontinued operations | – | 13,022 | 11,791 | (24,645) | 168 |
| Total Liabilities | 20,486 | 176,759 | 67,785 | (185,354) | 79,676 |
| Stockholders' Equity: | | | | | |
| Preferred stock | – | 1,450 | – | (1,450) | – |
| Common stock | 336 | 5,681 | 26,318 | (31,999) | 336 |
| Additional paid in capital | 307,487 | 73,836 | 10,016 | (83,852) | 307,487 |
| Retained earnings (accumulated deficit) | 34,056 | 58,373 | (3,791) | (54,582) | 34,056 |
| Accumulated other comprehensive loss | (4,169) | – | – | – | (4,169) |
| Treasury stock | (49,633) | – | – | – | (49,633) |
| Total Stockholders' Equity | 288,077 | 139,340 | 32,543 | (171,883) | 288,077 |
| Total Liabilities and Stockholders' Equity | $308,563 | $ 316,099 | $ 100,328 | $ (357,237) | $ 367,753 |

</TABLE>

F-39

<PAGE>

ARMOR HOLDINGS INC. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (CONTINUED)

ARMOR HOLDINGS, INC. AND SUBSIDIARIES
CONSOLIDATING STATEMENTS OF OPERATIONS

<TABLE>
<CAPTION>

| | | YEAR ENDED DECEMBER 31, 2003 | | | |
| | PARENT | GUARANTOR SUBSIDIARIES | NONGUARANTOR SUBSIDIARIES | ELIMINATIONS | CONSOLIDATED TOTAL |
| | | | (IN THOUSANDS) | | |
| <S> | <C> | <C> | <C> | <C> | <C> |
| REVENUES: | | | | | |
| Products | $ – | $ 163,117 | $ 35,976 | $ – | $199,093 |
| Mobile Security | – | 93,038 | 62,853 | 1,657 | 157,548 |
| Simula | – | 8,531 | – | – | 8,531 |
| Total revenues | – | 264,686 | 98,829 | 1,657 | 365,172 |
| COSTS AND EXPENSES: | | | | | |
| Cost of sales | – | 172,089 | 79,840 | 1,657 | 253,586 |

| | | | | |
|---|---|---|---|---|
| Operating expenses | 11,602 | 40,598 | 10,595 | – | 62,795 |
| Amortization | | 478 | 11 | – | 489 |
| Integration and other charges | 10,886 | 1,687 | – | – | 12,573 |
| Related party management fees (income), net | 12,823 | – | 7,598 | (20,421) | – |
| | -------- | --------- | ------------ | ----------- | ----------- |
| OPERATING (LOSS) INCOME | (35,311) | 49,834 | 785 | 20,421 | 35,729 |
| Interest expense, net | 3,313 | 497 | 202 | – | 4,012 |
| Other expense, net | – | 117 | 391 | – | 508 |
| Equity in losses (earnings) of subsidiaries | (42,600) | 38,790 | | 3,810 | |
| Related party interest expense (income), net | 16 | (255) | – | 239 | – |
| | -------- | --------- | ------------ | ----------- | ----------- |
| (LOSS) INCOME FROM CONTINUING OPERATIONS BEFORE PROVISION FOR INCOME TAXES | 3,960 | 10,685 | 192 | 16,372 | 31,209 |
| (BENEFIT) PROVISION FOR INCOME TAXES | (6,926) | 18,399 | 2,730 | – | 14,203 |
| | -------- | --------- | ------------ | ----------- | ----------- |
| (LOSS) INCOME FROM CONTINUING OPERATIONS | 10,886 | (7,714) | (2,538) | 16,372 | 17,006 |
| DISCONTINUED OPERATIONS: | | | | | |
| NET INCOME (LOSS) FROM DISCONTINUED OPERATIONS, NET OF INCOME TAX BENEFIT | – | 34,882 | (20,820) | (20,182) | (6,120) |
| | -------- | --------- | ------------ | ----------- | ----------- |
| NET INCOME (LOSS) | $ 10,886 | $ 27,168 | $ (23,358) | $ (3,810) | $10,886 |
| | ======== | ========= | ============ | =========== | =========== |

</TABLE>

F-40

<PAGE>

ARMOR HOLDINGS INC. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (CONTINUED)

ARMOR HOLDINGS, INC. AND SUBSIDIARIES
CONSOLIDATING STATEMENTS OF OPERATIONS

<TABLE>
<CAPTION>

| | YEAR ENDED DECEMBER 31, 2002 | | | | |
|---|---|---|---|---|---|
| | PARENT | GUARANTOR SUBSIDIARIES | NONGUARANTOR SUBSIDIARIES | ELIMINATIONS | CONSOLIDATED TOTAL |
| | ---------- | ------------ | ------------- | -------------- | ------------- |
| | | | (IN THOUSANDS) | | |
| <S> | <C> | <C> | <C> | <C> | <C> |
| REVENUES: | | | | | |
| Products | $ – | $ 154,466 | $ 25,480 | $ – | $ 179,946 |
| Mobile Security | – | 75,276 | 49,895 | – | 125,171 |
| Simula | – | – | – | – | – |
| | -------- | -------- | -------- | --------- | ---------- |
| Total revenues | – | 229,742 | 75,375 | | 305,117 |
| | -------- | -------- | -------- | --------- | ---------- |
| COSTS AND EXPENSES: | | | | | |
| Cost of sales | – | 148,208 | 62,537 | – | 210,745 |
| Operating expenses | 6,034 | 36,161 | 7,641 | – | 49,836 |
| Amortization | | 243 | 2 | – | 245 |
| Integration and other charges | 800 | 5,126 | – | – | 5,926 |
| Related party management fees (income), net | 2,487 | (171) | (616) | (1,700) | – |
| | -------- | --------- | ----------- | --------- | ---------- |
| OPERATING (LOSS) INCOME | (9,321) | 40,175 | 5,811 | 1,700 | 38,365 |
| Interest expense, net | 450 | 275 | 198 | – | 923 |
| Other (income) expense, net | (2) | (22) | 75 | – | 51 |
| Equity in losses (earnings) of subsidiaries | 8,237 | (1,220) | – | (7,017) | – |
| Related party interest income, net | – | (239) | – | 239 | – |
| | -------- | --------- | ----------- | --------- | ---------- |
| (LOSS) INCOME FROM CONTINUING OPERATIONS BEFORE PROVISION FOR INCOME TAXES | (18,006) | 41,381 | 5,538 | 8,478 | 37,391 |
| (BENEFIT) PROVISION FOR INCOME TAXES | (317) | 14,313 | 2,058 | – | 16,054 |
| | -------- | --------- | ----------- | --------- | ---------- |
| (LOSS) INCOME FROM CONTINUING OPERATIONS | (17,689) | 27,068 | 3,480 | 8,478 | 21,337 |
| DISCONTINUED OPERATIONS: | | | | | |
| NET LOSS FROM DISCONTINUED OPERATIONS, NET OF INCOME TAX BENEFIT | – | (16,894) | (20,671) | (1,461) | (39,026) |
| | -------- | --------- | ----------- | --------- | ---------- |
| NET (LOSS) INCOME | $ (17,689) | $ 10,174 | $ (17,191) | $ 7,017 | $ (17,689) |
| | ========= | ========= | =========== | ========= | ========== |

</TABLE>

F-41

<PAGE>

ARMOR HOLDINGS INC. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (CONTINUED)

ARMOR HOLDINGS, INC. AND SUBSIDIARIES
CONSOLIDATING STATEMENTS OF OPERATIONS

<TABLE>
<CAPTION>

| | | YEAR ENDED DECEMBER 31, 2001 | | | |
|---|---|---|---|---|---|
| | PARENT | GUARANTOR SUBSIDIARIES | NONGUARANTOR SUBSIDIARIES | ELIMINATIONS | CONSOLIDATED TOTAL |
| | | | (IN THOUSANDS) | | |
| <S> | <C> | <C> | <C> | <C> | <C> |
| REVENUES: | | | | | |
| Products | $ - | $ 134,006 | $ 15,862 | $ - | $ 149,868 |
| Mobile Security | - | 25,221 | 22,011 | - | 47,232 |
| Simula | - | - | - | - | - |
| Total revenues | - | 159,227 | 37,873 | - | 197,100 |
| | | | | | |
| COSTS AND EXPENSES: | | | | | |
| Cost of sales | - | 95,831 | 30,499 | - | 126,330 |
| Operating expenses | 5,451 | 30,418 | 2,790 | - | 38,659 |
| Amortization | - | 2,059 | 83 | - | 2,142 |
| Integration and other charges | 1,205 | 2,079 | 12 | - | 3,296 |
| Related party management income, net | (47) | - | (1,112) | 1,159 | - |
| | | | | | |
| OPERATING (LOSS) INCOME | (6,609) | 28,840 | 5,601 | (1,159) | 26,673 |
| Interest expense, net | 3,452 | 360 | 52 | - | 3,864 |
| Other income, net | - | (28) | (54) | - | (82) |
| Equity in earnings of subsidiaries | (14,269) | (1,513) | - | 15,782 | - |
| Related party interest income, net | - | (1,310) | - | 1,310 | - |
| | | | | | |
| INCOME FROM CONTINUING OPERATIONS BEFORE PROVISION FOR INCOME TAXES | 4,208 | 31,331 | 5,603 | (18,251) | 22,891 |
| (BENEFIT) PROVISION FOR INCOME TAXES | (5,920) | 12,215 | 1,912 | - | 8,207 |
| INCOME FROM CONTINUING OPERATIONS | 10,128 | 19,116 | 3,691 | (18,251) | 14,684 |
| DISCONTINUED OPERATIONS: | | | | | |
| NET LOSS FROM DISCONTINUED OPERATIONS, NET OF INCOME TAX BENEFIT | - | (1,890) | (5,135) | 2,469 | (4,556) |
| NET INCOME (LOSS) | $10,128 | $ 17,226 | $ (1,444) | $(15,782) | $ 10,128 |

</TABLE>

F-42

<PAGE>

ARMOR HOLDINGS INC. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (CONTINUED)

ARMOR HOLDINGS, INC. AND SUBSIDIARIES
CONSOLIDATING STATEMENTS OF CASH FLOWS

<TABLE>
<CAPTION>

| | | YEAR ENDED DECEMBER 31, 2003 | | | |
|---|---|---|---|---|---|
| | PARENT | GUARANTOR SUBSIDIARIES | NONGUARANTOR SUBSIDIARIES | ELIMINATIONS | CONSOLIDATED TOTAL |
| | | | (IN THOUSANDS) | | |
| <S> | <C> | <C> | <C> | <C> | <C> |
| CASH FLOWS FROM OPERATING ACTIVITIES: | | | | | |
| Income (loss) from continuing operations | $ 10,886 | $ (7,714) | $ (2,538) | $ 16,372 | $ 17,006 |
| Adjustments to reconcile income from continuing operations to cash provided by (used in) operating activities: | | | | | |
| Depreciation and amortization | 1,326 | 4,270 | 2,012 | - | 7,608 |
| Deferred income taxes | (3,008) | 5,389 | 2,644 | - | 5,025 |
| Loss on disposal of fixed assets | - | 68 | 259 | - | 327 |
| Non-cash termination charge | 2,093 | - | - | - | 2,093 |
| Non-cash restricted stock unit award | 7,266 | - | - | - | 7,266 |
| Changes in operating assets and liabilities, net of acquisitions: | | | | | |
| (Increase) decrease in accounts receivable | - | (2,680) | 1,685 | - | (995) |
| Decrease (increase) in intercompany receivables & payables | 83,092 | (78,887) | 15,977 | (20,182) | - |
| Decrease (increase) in inventory | - | 793 | (3,294) | - | (2,501) |
| Decrease (increase) in prepaid expenses and other assets | 12,267 | (13,758) | (890) | - | (2,381) |
| Increase (Decrease) in accounts payable, accrued expenses and other current liabilities | 10,775 | (1,020) | 7,288 | - | 17,043 |
| (Decrease) increase in income taxes payable | (22,583) | 23,826 | (882) | - | 361 |

Case 2:06-cr-00550-JS-AKT   Document 1115-2   Filed 06/13/10   Page 83 of 86 PageID #:
9102

| | | | | |
|---|---|---|---|---|
| Net cash provided by (used in) operating activities | 102,114 | (69,713) | 22,261 | (3,810) | 50,852 |

| | PARENT | GUARANTOR SUBSIDIARIES | NONGUARANTOR SUBSIDIARIES | ELIMINATIONS | CONSOLIDATED TOTAL |
|---|---|---|---|---|---|
| **CASH FLOWS FROM INVESTING ACTIVITIES:** | | | | | |
| Purchase of property and equipment | (200) | (5,894) | (2,590) | – | (8,684) |
| Purchase of patents and trademarks | – | (185) | – | – | (185) |
| Increase in restricted cash | (2,600) | – | – | – | (2,600) |
| Additional consideration for purchased businesses | – | (1,026) | – | – | (1,026) |
| Investment in subsidiaries | (85,243) | 45,403 | 36,030 | 3,810 | – |
| Proceeds from the sale of business | 31,361 | – | – | – | 31,361 |
| Purchase of businesses, net of cash acquired | (90,512) | – | – | – | (90,512) |
| Net cash (used in) provided by investing activities: | (147,194) | 38,298 | 33,440 | 3,810 | (71,646) |
| **CASH FLOWS FROM FINANCING ACTIVITIES:** | | | | | |
| Proceeds from exercise of stock options | 8,471 | – | – | – | 8,471 |
| Cash paid for financing costs | (4,599) | – | – | – | (4,599) |
| Repurchase of treasury stock | (22,684) | – | – | – | (22,684) |
| Proceeds from the issuance of long-term debt | 147,504 | – | 774 | – | 148,278 |
| Repayments of long-term debt | – | (1,688) | – | – | (1,688) |
| Borrowings under lines of credit | 30,406 | – | 1,424 | – | 31,830 |
| Repayments under lines of credit | (30,406) | (114) | (1,578) | – | (32,098) |
| Net cash provided by (used in) financing activities | 128,692 | (1,802) | 620 | – | 127,510 |
| Effect of exchange rate on cash and cash Equivalents | – | 3,890 | (3,057) | – | 833 |
| Net cash provided by (used in) discontinued operations | – | 36,855 | (45,467) | – | (8,612) |
| NET INCREASE IN CASH AND CASH EQUIVALENTS | 83,612 | 7,528 | 7,797 | – | 98,937 |
| CASH AND CASH EQUIVALENTS, BEGINNING OF PERIOD | 7,152 | 3,556 | 2,205 | – | 12,913 |
| CASH AND CASH EQUIVALENTS, END OF PERIOD | $ 90,764 | $ 11,084 | $ 10,002 | $ – | $ 111,850 |

  </TABLE>

F-43

<PAGE>

ARMOR HOLDINGS INC. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (CONTINUED)

ARMOR HOLDINGS, INC. AND SUBSIDIARIES
CONSOLIDATING STATEMENTS OF CASH FLOWS

<TABLE>
<CAPTION>

| | YEAR ENDED DECEMBER 31, 2002 | | | | |
|---|---|---|---|---|---|
| | PARENT | GUARANTOR SUBSIDIARIES | NONGUARANTOR SUBSIDIARIES | ELIMINATIONS | CONSOLIDATED TOTAL |
| | | | (IN THOUSANDS) | | |
| <S> | <C> | <C> | <C> | <C> | <C> |
| **CASH FLOWS FROM OPERATING ACTIVITIES:** | | | | | |
| (Loss) income from continuing operations: | $(17,689) | $27,068 | $ 3,480 | $8,478 | $ 21,337 |
| Adjustments to reconcile (loss) income from continuing operations to cash (used in) provided by operating activities: | | | | | |
| Depreciation and amortization | 854 | 3,583 | 1,143 | – | 5,580 |
| Deferred income taxes | (364) | 321 | 402 | – | 359 |
| Loss on disposal of fixed assets | – | 66 | 134 | – | 200 |
| Changes in operating assets and liabilities, net of acquisitions: | | | | | |
| (Increase) decrease in accounts receivable | – | (3,829) | 1,275 | – | (2,554) |
| Decrease (increase) in intercompany receivables & payables | 6,151 | (5,266) | 576 | (1,461) | – |
| Increase in inventory | – | (5,125) | (4,256) | – | (9,381) |
| Decrease (increase) in prepaid expenses and other assets | 492 | (2,459) | (279) | – | (2,246) |
| (Decrease) increase in accounts payable, accrued expenses and other current liabilities | (1,405) | 7,215 | (9,564) | – | (3,754) |
| Increase (decrease) in income taxes payable | 5,663 | (148) | 1,230 | – | 6,745 |
| Net cash (used in) provided by operating activities | (6,298) | 21,426 | (5,859) | 7,017 | 16,286 |
| **CASH FLOWS FROM INVESTING ACTIVITIES:** | | | | | |
| Purchase of property and equipment | (506) | (3,671) | (1,725) | – | (5,902) |
| Purchase of patents and trademarks | – | (69) | – | – | (69) |
| Additional consideration for purchased businesses | – | (9,375) | – | – | (9,375) |
| Investment in subsidiaries | (3,347) | 1,643 | 8,721 | (7,017) | – |

| | | | | | |
|---|---|---|---|---|---|
| Purchase of businesses, net of cash acquired | - | (8,818) | - | - | (8,818) |
| | --------- | ----------- | ----------- | ---------- | --------- |
| Net cash (used in) provided by investing activities: | (3,853) | (20,290) | 6,996 | (7,017) | (24,164) |
| | --------- | ----------- | ----------- | ---------- | --------- |
| CASH FLOWS FROM FINANCING ACTIVITIES: | | | | | |
| Proceeds from exercise of stock options | 4,227 | - | - | - | 4,227 |
| Proceeds from of sale of put options | 525 | - | - | - | 525 |
| Cash paid for offering costs | (326) | - | - | - | (326) |
| Repurchase of treasury stock | (26,054) | - | - | - | (26,054) |
| Repayments of long-term debt | - | (620) | (110) | - | (730) |
| Borrowings under lines of credit | 32,372 | - | - | - | 32,372 |
| Repayments under lines of credit | (32,372) | (75) | - | - | (32,447) |
| | ---------- | ----------- | ----------- | ---------- | ---------- |
| Net cash used in financing activities | (21,628) | (695) | (110) | - | (22,433) |
| | ---------- | ----------- | ----------- | ---------- | ---------- |
| Effect of exchange rate on cash and cash equivalents | 304 | 342 | (772) | - | (126) |
| Net cash used in discontinued operations | - | (2,763) | (1,376) | - | (4,139) |
| | ---------- | ----------- | ----------- | ---------- | ----------- |
| NET INCREASE IN CASH AND CASH EQUIVALENTS | (31,475) | (1,980) | (1,121) | - | (34,576) |
| CASH AND CASH EQUIVALENTS, BEGINNING OF PERIOD | 38,627 | 5,536 | 3,326 | - | 47,489 |
| | ---------- | ----------- | ----------- | ---------- | ----------- |
| CASH AND CASH EQUIVALENTS, END OF PERIOD | $ 7,152 | $ 3,556 | $ 2,205 | $ - | $ 12,913 |
| | =========== | =========== | =========== | ========== | =========== |

</TABLE>

F-44

<PAGE>

ARMOR HOLDINGS INC. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (CONTINUED)

ARMOR HOLDINGS, INC. AND SUBSIDIARIES
CONSOLIDATING STATEMENTS OF CASH FLOWS

<TABLE>
<CAPTION>

| | | YEAR ENDED DECEMBER 31, 2001 | | | |
|---|---|---|---|---|---|
| | PARENT | GUARANTOR SUBSIDIARIES | NONGUARANTOR SUBSIDIARIES | ELIMINATIONS | CONSOLIDATED TOTAL |
| | ------------- | -------------- | -------------- | ------------ | ------------- |
| | | | (IN THOUSANDS) | | |
| <S> | <C> | <C> | <C> | <C> | <C> |
| CASH FLOWS FROM OPERATING ACTIVITIES: | | | | | |
| Income from continuing operations: | $ 10,128 | $19,116 | $3,691 | $(18,251) | $14,684 |
| Adjustments to reconcile income from continuing operations to cash (used in) provided by operating activities: | | | | | |
| Depreciation and amortization | 694 | 4,578 | 342 | - | 5,614 |
| Deferred income taxes | 76 | (407) | (42) | - | (373) |
| Loss on disposal of fixed assets | - | 21 | 170 | - | 191 |
| Changes in operating assets and liabilities, net of acquisitions: | | | | | |
| Increase in accounts receivable | - | (11,880) | (3,000) | - | (14,880) |
| (Increase) decrease in intercompany receivables & payables | (67,323) | 62,878 | 1,976 | 2,469 | - |
| (Increase) decrease in inventory | - | (12,044) | 8,096 | - | (3,948) |
| Decrease (increase) in prepaid expenses and other assets | 162 | (92) | 979 | - | 1,049 |
| Increase (decrease) in accounts payable, accrued expenses and other current liabilities | 4,632 | 6,317 | (3,768) | - | 7,181 |
| Increase (decrease) in income taxes payable | 6,667 | 272 | (272) | - | 6,667 |
| | ---------- | --------- | ----------- | ---------- | ----------- |
| Net cash (used in) provided by operating activities | (44,964) | 68,759 | 8,172 | (15,782) | 16,185 |
| | ---------- | --------- | ----------- | ---------- | ----------- |
| CASH FLOWS FROM INVESTING ACTIVITIES: | | | | | |
| Purchase of property and equipment | (1,140) | (3,984) | (520) | - | (5,644) |
| Proceeds from sale of equity investment | 843 | - | - | - | 843 |
| Additional consideration for purchased businesses | (1,913) | (1,357) | - | - | (3,270) |
| Investment in subsidiaries | (6,739) | (15,360) | 6,317 | 15,782 | - |
| Purchase of businesses, net of cash acquired | - | (39,365) | - | - | (39,365) |
| | ---------- | --------- | ----------- | ---------- | ----------- |
| Net cash (used in) provided by investing activities: | (8,949) | (60,066) | 5,797 | 15,782 | (47,436) |
| | ---------- | --------- | ----------- | ---------- | ----------- |
| CASH FLOWS FROM FINANCING ACTIVITIES: | | | | | |
| Proceeds from exercise of stock options | 10,160 | - | - | - | 10,160 |
| Proceeds from issuance of common stock | 117,979 | - | - | - | 117,979 |
| Cash paid for offering costs | (545) | - | - | - | (545) |
| Repurchase of treasury stock | (723) | - | - | - | (723) |
| Proceeds from issuance of treasury shares for | | | | | |

| | | | | |
|---|---|---|---|---|
| stock options | 686 | – | – | – | 686 |
| Repayments of long-term debt | – | (676) | – | – | (676) |
| Repayments of debt assumed in acquisitions | – | (1,315) | – | – | (1,315) |
| Borrowings under lines of credit | 98,000 | – | 286 | – | 98,286 |
| Repayments under lines of credit | (130,981) | – | – | – | (130,981) |
| Net cash provided by (used in) financing activities | 94,576 | (1,991) | 286 | – | 92,871 |
| Effect of exchange rate on cash and cash equivalents | (2,789) | 2,703 | (1,373) | – | (1,459) |
| Net cash used in discontinued operations | – | (3,453) | (10,883) | – | (14,336) |
| NET INCREASE IN CASH AND CASH EQUIVALENTS | 37,874 | 5,952 | 1,999 | – | 45,825 |
| CASH AND CASH EQUIVALENTS, BEGINNING OF PERIOD | 753 | (416) | 1,327 | – | 1,664 |
| CASH AND CASH EQUIVALENTS, END OF PERIOD | $ 38,627 | $ 5,536 | $ 3,326 | $ – | $ 47,489 |

</TABLE>

F-45

<PAGE>

ARMOR HOLDINGS INC. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (CONTINUED)


21. SUBSEQUENT EVENTS

On January 2, 2004, the Ontario Industrial Development Authority Variable Rate
Demand Industrial Development Revenue Bonds, Series 1989 was paid-in full with
restricted cash of $2.6 million.

On January 5, 2004, $31.1 million of 8% Senior Subordinated Convertible Notes
plus accrued interest was paid-in full.

On February 25, 2004, we paid $1,067,000 to fully satisfy the Supplemental
Retirement Plan of Simula, Inc., which we acquired on December 9, 2003 with the
acquisition of Simula.

On March 5, 2004, we acquired a majority of the assets and assumed certain
liabilities of Vector Associates, Inc. (dba ODV, Inc.), a leading manufacturer
and distributor of field drug test kits and crime scene products. The purchase
price was $3,289,000 including $2,739,000 in cash at closing, an additional
$275,000 plus interest payable on December 31, 2004, subject to certain
adjustments, and an additional $275,000 plus interest payable on April 30, 2005,
subject to certain adjustments.


F-46

<PAGE>


SIGNATURES


Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange
Act of 1934, the registrant has duly caused this report to be signed on its
behalf by the undersigned, thereunto duly authorized.

ARMOR HOLDINGS, INC.

/s/ Warren B. Kanders
-----------------------------------------
Warren B. Kanders
Chairman of the Board of Directors and Chief
  Executive Officer
Dated: March 12, 2004


Pursuant to the requirements of the Securities Exchange Act of 1934, this report
has been signed below by the following persons on behalf of the registrant and
in the capacities and on the dates indicated:

/s/ Warren B. Kanders
-----------------------------------
Warren B. Kanders
Chairman of the Board of Directors
and Chief Executive Officer
March 12, 2004

/s/ Glenn J. Heiar                        /s/ Nicholas Sokolow
-----------------------------------       -----------------------------------
Glenn J. Heiar                            Nicholas Sokolow
Chief Financial Officer                   Director
March 12, 2004                            March 12, 2004

Case 2:06-cr-00550-JS-AKT   Document 1115-2   Filed 06/13/10   Page 86 of 86 PageID #:
9105

```
/s/ Burtt R. Ehrlich                    /s/ Thomas W. Strauss
-------------------------------         -------------------------------
Burtt R. Ehrlich                        Thomas W. Strauss
Director                                Director
March 12, 2004                          March 12, 2004

/s/ Alair A. Townsend                   /s/ Deborah A. Zoullas
-------------------------------         -------------------------------
Alair A. Townsend                       Deborah A. Zoullas
Director                                Director
March 12, 2004                          March 12, 2004




</TEXT>
</DOCUMENT>
```