```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------X
UNITED STATES OF AMERICA,

        -against-                          MEMORANDUM AND ORDER
                                           06-CR-0550 (JS)

SANDRA HATFIELD and DAVID H. BROOKS,

                Defendants.
------------------------------------X
APPEARANCES:
For Government:     Richard Thomas Lunger, Jr., Esq.
                    Christopher Allen Ott, Esq.
                    Christopher Caffarone, Esq.
                    James Halleron Knapp, Esq.
                    James M. Miskiewicz, Esq.
                    United States Attorneys Office
                    610 Federal Plaza
                    Central Islip, NY 11722-4454
For Defendants:

Sandra Hatfield     Roland G. Riopelle, Esq.
                    Maurice H. Sercarz, Esq.
                    Sercarz & Riopelle, LLP
                    152 West 57th Street, 24th Floor
                    New York, NY 10019

David Brooks        John C. Meringolo, Esq.
                    Meringolo and Associates, P.C.
                    1790 Broadway, Suite 1501
                    New York, NY 10019

                    Zaki I. Tamir, Esq.
                    Gofer Tamir and Assoc.
                    55 Broad Street
                    New York, NY 10004

                    James M. LaRossa, Esq.
                    240 West End Avenue
                    New York, NY 10023

                    Kenneth Ravenell, Esq.
                    William H. Murphy, Jr., Esq.
                    The Murphy Firm
                    1 South Street, 23rd Floor
                    Baltimore, MD 21202
```

Richard Ware Levitt, Esq.
Yvonne Shivers, Esq.
Law Offices of Richard W. Levitt
148 E. 78th Street
New York, NY 10021

Roger V. Archibald, Esq.
William C. Thompson, Esq.
16 Court Street
Brooklyn, NY 11241

SEYBERT, District Judge:

In connection with the upcoming criminal forfeiture trial, Defendant David H. Brooks has raised certain evidentiary issues (Docket No. 1269 at p. 1 n. 1; Docket No. 1308 at p. 4-5), which he apparently wants the Court to construe as a motion in limine (see Docket No. 1340 at p. 2).  Specifically, Mr. Brooks argues that he cannot be required to forfeit assets he supposedly obtained through the Interceptor Vest Inventory and R&D Schemes, because the Court largely acquitted him of insider trading in connection with those allegations.  For purposes of clarifying and advancing these proceedings, the Court agrees to treat Mr. Brooks' evidentiary arguments as a motion in limine. Having done so, the Court DENIES this motion as premature.

BACKGROUND

I. The Superseding Indictment and Trial

In 2006, the Government charged Mr. Brooks and co-Defendant Sandra Hatfield with, among other things, insider trading, securities fraud, conspiracy to commit securities

fraud, conspiracy to commit mail and wire fraud, mail fraud, wire fraud, and obstruction of justice.

At trial, the Government crystallized its case as six separate schemes. Four of those schemes related to the Superseding Indictment's insider trading counts: (1) the "R&D Scheme," whereby the Defendants allegedly inflated DHB Inc.'s gross profit margins by fraudulently reclassifying expenses from "cost of goods sold" to "research and development," and manipulated those reclassifications to enable the Company to hit specific gross profit margin targets; (2) the "Inceptor Vest Inventory Scheme," whereby the Defendants allegedly inflated the value of the Company's inventory of bulletproof vests, causing DHB to materially overstate its profits and earnings;[1] (3) the "Unauthorized Compensation Scheme," whereby the Defendants received compensation from DHB that was not authorized (i.e., stolen) and was not disclosed to the public; and (4) the "TAP Scheme," whereby the Defendants caused DHB to not fully disclose all material information concerning its dealings with Tactical Armor Products, a company that Mr. Brooks' wife owned and that he allegedly controlled.

---

[1] The Superseding Indictment alleged two other inventory schemes. But, because these schemes post-dated the Defendants' stock sales, they did not relate to the insider trading counts.

3

II. The Rule 29(a) Motions

At the close of the Government's case, both Defendants filed Fed. R. Crim. P. 29(a) motions. In early July, the Court largely denied those motions, although it found that the Government could not proceed to verdict on certain theories.[2] (See Docket Nos. 1155, 1162). However, and crucially relevant here, the Court found that Defendants raised serious arguments concerning whether the Government had sufficiently proven all of the Superseding Indictment's allegations concerning the R&D and Interceptor Vest Inventory Schemes, particularly for insider trading purposes. The Court discusses what happened to each of those schemes below:

A. The R&D Scheme

The Superseding Indictment described the R&D Scheme in Paragraphs 19-22. In her motion to dismiss, Ms. Hatfield requested, as an alternative remedy to acquittal, that the Court strike the narrative portions of the Superseding Indictment that the Government failed to prove at trial. Paragraphs 19-21 alleged, essentially, that Ms. Hatfield manipulated DHB's financial results to generate the "27 percent to 28 percent" gross profit margin that professional stock market analysts

---

[2] Among other things, the Court found that, in light of Skilling v. U.S., __ U.S. __, 130 S. Ct. 2896, 177 L. Ed. 2d 619 (2010), the Government's mail and wire fraud counts could no longer depend upon an "honest services fraud" theory.

4

expected. The paragraphs alleged that she did so by fraudulently reclassifying costs of goods sold as research and development expenses, in whatever amount DHB needed to hit its gross profit margin targets. Construing the evidence in the light most favorable to the Government, the Court found enough in the record to justify keeping Paragraphs 19-21 in the Superseding Indictment, because the Government did evidence a few incidents in which the Defendants conspired to increase R&D for the purpose of hitting a gross profit margin, or, during a particularly good quarter, conspired to _not_ book R&D that the Company actually performed, because they did not want to "highlight" the Company's strong financial results.

The Court did not view Paragraph 22 as kindly. That paragraph alleged that DHB fraudulently reclassified $22 million as R&D between 2003 and 2005. The parties agreed that DHB had reclassified $22 million from cost of goods sold to R&D during that time frame. But they disagreed as to whether these reclassifications were fraudulent. In this regard, Defendants cited significant testimony from the Government's own witnesses establishing that: (1) DHB lacked internal controls sufficient to keep track of how much they actually spent on R&D; (2) in light of those non-existent internal controls, Ms. Hatfield instructed DHB's Chief Financial Officer, Dawn Schlegel, to reclassify a percentage of gross sales each month as R&D, with

5

this percentage supposedly reflecting Ms. Hatfield's estimate of the R&D that DHB actually performed (later a consistent 3% each month); and (3) DHB did a significant amount of R&D, which it did not otherwise account for in its financial statements because of these weak internal controls. In light of this evidence, the Court concluded that, although the Government had sufficiently evidenced a few fraudulent "acts," they did not provide the Court with sufficient evidence of the "larger fraudulent scheme" alleged in the Superseding Indictment. 2010 WL 2710616, at *3; see also 2010 WL 2793806, at *3-4. Specifically, the Government had not shown that each of the monthly reclassifications were intrinsically fraudulent, "much less that [the reclassifications were] fraudulent in the amounts the Superseding Indictment specifies." 2010 WL 2710616, at *3. Rather than strike Paragraph 22 then, however, the Court ordered the Government to show cause why Paragraph 22 should not be struck. Specifically, the Court ordered the Government to bring to its attention evidence in the record that "support[ed] Ms. Hatfield's involvement in a larger fraudulent scheme (beyond sloppy recordkeeping)." Id.

The Government responded to this order to show cause, but failed to present any persuasive argument. Among other things, the Court found that the Government failed to present any evidence that reflected the total amounts DHB actually spent

on R&D during this time period, or, evidence suggesting that Ms. Hatfield typically reclassified expenses as R&D for fraudulent purposes. See 2010 WL 2816326, at *1-3. And, in the absence of such evidence, the Court concluded that the Government had failed to prove a "larger fraudulent scheme, covering several other fiscal quarters" beyond those reflected in the few identified fraudulent incidents. Rather, the Court held, the evidence suggested that – for most fiscal quarters – the reclassifications reflected only a "crude," "negligent" attempt to account for R&D not tracked by DHB's "woefully inadequate internal controls," not a fraudulent attempt to manufacture R&D expenses that never occurred. Id. at *2 n. 2. The Court noted, in passing, that because DHB did not adequately disclose its nearly nonexistent internal controls, or use of estimates to track R&D expenses,[3] and the Defendants traded while knowing this

---

[3] Among other things, the relevant public filings that pre-dated Defendants' trades listed R&D figures without qualifying that these amounts represented crude estimates. See DHB Industries Inc., Fiscal Year 2003 Annual Report on Form 10-K/A (March 30, 2004) ("2003 10-K") at p. 4. These public filings disclose the use of estimates in calculating assets, liabilities and contingent assets and liabilities, but not in reporting R&D figures. Id. at p. 18; DHB Industries Inc., Form 10-Q (November 9, 2004) ("November 10-Q") at p. 11. And, though the filings disclose certain internal control problems as of August 2003 (causing the Company's former auditor to resign), the filings represent that "the Chief Executive Officer and Chief Financial Officer concluded that the Company's disclosure controls and procedures are effective in timely alerting them to material information relating to the Company (including its consolidated subsidiaries) required to be included in the

material non-disclosed information, the Government's proof did establish a securities fraud – just not the one pled in Paragraph 22. Id. The Government did not seek reconsideration of this Order.

By the time of the charge conference, it became clear that the parties had significantly different interpretations of the Court's Orders. At the charge conference, Mr. Brooks argued that the Court held that "there was no R&D scheme." (Tr. 19401). The Government, for its part, appeared to understand the Court's Orders as limited to Paragraph 22, and did not interpret them as impacting its ability to argue that Ms. Hatfield typically ordered reclassifications to meet specified financial targets. (See Tr. 20308-20346).[4] The Court did not entirely agree with either side. The Court noted that, although it found insufficient evidence of the larger scheme alleged in the Superseding Indictment (i.e., fraudulent reclassifications in nearly every quarter, with the amount calculated to bring gross profit margin to a desired level), the Government had adduced evidence of at least two fraudulent acts, and "two acts can make up a scheme." (Tr. 19404; see also 19426). But the

---

Company's periodic Securities and Exchange Commission filings."
2003 10-K at 25; November 10-Q at 17.

[4] For instance, the Government argued that, notwithstanding the Court's Order, it was proper to argue that Ms. Hatfield ordered reclassifications "quarter by quarter as needed" to hit financial targets. (Tr. 20313).

8

Court instructed the jury that they could not consider reclassifications "based on a fixed percentage of sales to have been part of a fraudulent scheme," though they could consider two specific incidents evidenced at trial and brought to the Court's attention in a timely fashion. (Tr. 20726). The Court also permitted the Government to mention a third incident (when Defendants declined to book R&D that was actually done) for purposes of showing intent. (Tr. 20318).

    B.    <u>The Interceptor Vest Inventory Scheme</u>

The Superseding Indictment alleged that DHB overvalued its Interceptor Vest Inventory during the 2003 and 2004 fiscal years, spanning the calendar years 2003-2005. Superseding Indictment ¶¶ 25-27. The Superseding Indictment alleged that the overvalued inventory inflated earnings from $19.6 million to $26.2 million in 2003, and from $34.2 million to $48.2 million in 2004. <u>Id.</u> at ¶ 27. The Superseding Indictment similarly alleged that the overvaluation inflated gross profit margin from 21% to 28% in both fiscal years. <u>Id.</u> at ¶ 27. And the Superseding Indictment further alleged that a DHB employee (identified at trial as Travis Brooks) "repeatedly informed" Ms. Hatfield in November 2004 that the inventory was overvalued, but that Ms. Hatfield refused to take action. <u>Id.</u> at ¶ 25.

After considering the Defendants' Rule 29(a) motions, the Court agreed that the Government had sufficiently evidenced

9

that DHB materially inflated the value of its Interceptor Vest Inventory.  See 2010 WL 2793806 at *5.  However, the Court noted that the Government's opposition to Mr. Brooks' motion "point[ed] to no testimony indicating that Mr. Brooks had knowledge of the allegedly overvalued inventory before his 2004 trades."  Id.[5]  Accordingly, the Court ordered the Government to show cause "why the insider trading theory predicated on Mr. Brooks' alleged knowledge of overvalued inventory should not be dismissed."  Id.

In response to the Court's Order, the Government provided no direct evidence that Mr. Brooks knew about the Interceptor Vest Inventory inflation before his 2004 trades. Instead, the Government argued that the jury could infer Mr. Brooks' knowledge because: (1) in early 2005, after Travis Brooks informed DHB's auditors about the inventory problems without first informing him, Mr. Brooks called him a "fucking snake" and said "Why didn't you come to me? You should have come to me?"; (2) in September 2005, he referred to the inventory overvaluation as Ms. Hatfield's "little problem of $14 million"; and (3) in 2006, Mr. Brooks tried to cover up Travis Brooks'

---

[5] Ms. Hatfield, unlike Mr. Brooks, was directly involved in valuing the Interceptor Vest Inventory.  And Travis Brooks had specifically brought the inventory valuation problems to her attention both "before and after" her 2004 trades. (Tr. 2548). Thus, there was no difficulty in permitting the Government's insider trading claims against Ms. Hatfield to go to the jury on the Interceptor Vest Inventory Scheme.

10

findings by deleting his inventory summaries from the Company's computer server; and (4) Mr. Brooks was a "hands on" CEO who actively involved himself in the Company's business (though the Government provided no evidence indicating that Mr. Brooks involved himself in valuing inventory). (Tr. 1170). The Court concluded that this evidence did not permit the jury to infer "beyond a reasonable doubt, that Mr. Brooks knew about the overvalued inventory when he traded." 2010 WL 2838525, at *1.[6] The Government sought reconsideration of this Order, arguing that Mr. Brooks' September 2005 comments about Ms. Hatfield's "little problem" permitted an inference about what he knew in November and December 2004. The Court rejected this argument, and denied the Government's reconsideration motion.

### C. Verdict & Forfeiture

On September 14, 2010, the jury convicted Mr. Brooks and Ms. Hatfield of insider trading, securities fraud, conspiracy to commit securities fraud, conspiracy to commit mail and wire fraud, and obstruction of justice. In addition, the jury convicted Mr. Brooks of mail fraud, wire fraud, and lying

---

[6] Mr. Brooks comments to Travis Brooks, on their face, are ambiguous about whether he was mad that Travis Brooks had complained about DHB's inventory valuation, or merely upset at Travis Brooks' perceived disloyalty in going to the auditors before first informing him (i.e., "Why didn't you come to me?"). The remaining evidence dated to long after Mr. Brooks' trades, and therefore permitted only purely speculative inferences about what Mr. Brooks might have known in November and December 2004.

11

to auditors. The jury acquitted Ms. Hatfield of the (non-conspiracy) mail and wire fraud counts against her. No party requested a special verdict form. Thus, it cannot be said with any factual certainty that the jury found the Defendants guilty of any particular scheme.

Following the verdict, the parties all agreed to waive their rights to a jury trial on criminal forfeiture, and consented to the Court deciding those issues. In connection with those upcoming forfeiture proceedings, the Government filed certain exhibits that it intends to introduce to supplement the testimony of its expert, Professor Larry Harris. As these exhibits indicate, Professor Harris has attempted to determine Defendants' ill-gotten gains from insider trading by comparing the stock price at the time of the trades to an estimated "true value" the stock would have had if investors had known DHB's "true accounting results." (Harris Ex. at p. 3, 8). To estimate this true value, Professor Harris has examined the relevant facts using four separate methods: (1) a forward-looking events study; (2) a backward-looking events study; (3) the discounted cash flow method; and (4) a method that looks at price-to-earnings ratios.

The exhibits the Government has provided to the Court do not give a full picture concerning what information Professor Harris used to reach his conclusions. But it does appear that

Professor Harris focused on how investors would have reacted if they had known DHB's "correct gross profit margins" and "correct earnings." (Harris Ex. at p. 8). To this end, Professor Harris estimated "the gross profit margins that the company should have reported each quarter in 2003 and 2004." (Harris Ex. at p. 14). In addition, Professor Harris "corrected" DHB's earnings. (Harris Ex. at pp. 29-30).

Mr. Brooks argues that, through Professor Harris' testimony, the Government is attempting to seek forfeiture based on the R&D and Interceptor Vest Inventory Schemes, even though the Court largely "acquitted" him of this conduct for insider trading purposes. (Docket No. 1308 at p. 4). Indeed, Mr. Brooks posits, because of the Court's rulings, it is impossible for the Government to even show his liability by a preponderance of the evidence, as needed to justify forfeiture. (Id. at p. 5). The Government contends that "[t]he law is both clear and well-established that when a defendant is convicted of a scheme or a conspiracy, the proceeds of the entire scheme or conspiracy are subject to forfeiture." (Docket No. 1282 at p. 3).

DISCUSSION

I. Standard of Review

"As soon as practical after a verdict or finding of guilty . . . the court must determine what property is subject to forfeiture under the applicable statute. If the government

13

seeks forfeiture of specific property, the court must determine whether the government has established the requisite nexus between the property and the offense. If the government seeks a personal money judgment, the court must determine the amount of money that the defendant will be ordered to pay." FED. R. CRIM. P. 32.2(b)(1)(A). "The court's determination may be based on evidence already in the record . . . and on any additional evidence or information submitted by the parties and accepted by the court as relevant and reliable." FED. R. CRIM. P. 32.2(b)(1)(B). The Court or jury must reach its determination by a preponderance of the evidence. See U.S. v. Capoccia, 503 F.3d 103, 115 (2d Cir. 2007).

## II. Mr. Brooks' Motion In Limine is Premature

Mr. Brooks asks the Court to preclude or disregard Professor Harris' conclusions to the extent they rely on the portions of the R&D and Interceptor Vest Inventory Schemes that the Court found were inapplicable to the insider trading counts. In this regard, he appears to attribute some kind of res judicata or collateral estoppel effect to the Court's rulings. For instance, Mr. Brooks argues that "[b]ased on the Court's rulings regarding these allegations, the jury[7] could never determine by a preponderance of the evidence . . . that these

---

[7] At the time, Mr. Brooks had not yet waived his right to a jury trial.

14

schemes generated proceeds of the alleged offenses." (Docket No. 1308 at 5).

Mr. Brooks is mistaken. The Court did not make any findings of factual innocence. The Court held only that the Government had not introduced sufficient evidence at the liability phase to permit the jury to find him guilty. But, at the forfeiture stage, the Government gets a second bite at the apple. At this stage, the Government may introduce "any additional evidence or information" it wants. FED. R. CRIM. P. 32.2(b)(1)(B). And the Government may also bring to the Court's attention material that is already in evidence but not cited in response to the Defendants' Rule 29(a) motions or the Court's order to show cause.[8] Thus, the Government's failure to sufficiently support certain portions of the R&D and Interceptor Vest Inventory Schemes during the liability phase does not foreclose the Government's ability to prove that conduct now.

---

[8] During summations, the Government brought Gov. Ex. 4587 to the Court's attention, and argued that this document showed that Ms. Hatfield used the R&D reclassifications to back-into a desired gross profit margin. (Tr. 20324). The Government had not previously mentioned Government Exhibit 4587 during briefing on the Defendants' Rule 29(a) motions, or in response to the Order to Show Cause. Thus, as the document's claimed significance is not apparent on its face (see Tr. 20331), and there were thousands of exhibits in evidence, the Court did not sua sponte consider this document when making its rulings on the R&D Scheme. And by the time the Government brought it to the Court's attention, it was too late for the Court to fairly reconsider its previous decisions. Nevertheless, this document remains in evidence and is fair game on forfeiture.

Likewise, the Government can also seek forfeiture of proceeds derived from "uncharged executions" of Defendants' fraudulent schemes. See U.S. v. Boesen, 473 F. Supp. 2d 932, 952-53 (S.D. Iowa 2007); see also Capoccia, 503 F.3d at 115-18 (strongly suggesting, in dicta, that the Government can obtain forfeiture of proceeds from uncharged acts committed pursuant to a convicted fraudulent scheme). And this even includes the proceeds of "acquitted conduct," if the Government can now prove these violations by a preponderance of the evidence. U.S. v. Castello, 611 F.3d 116, 122 n. 5 (2d Cir. 2010); U.S. v. Peters, 257 F.R.D. 377, 387 (W.D.N.Y. 2009) (conspiracy to commit bank fraud enables consideration of acquitted conduct during forfeiture phase).

So Mr. Brooks' motion in limine must be DENIED as premature.

III. The Court's Concerns

This motion's premature posture does not entirely negate the Court's concerns that it has some potential merit. Indeed, the Court has evidentiary concerns with respect to both parties. In the interests of advancing these proceedings and reaching a fair result, the Court believes it would be best to place the parties on notice of at least a few of these concerns right now:

A. The Government's Gross Profit Margin Estimates

The Court has previously held that the Government did not prove a total amount of fraud (i.e., Paragraph 22), because it failed to adduce sufficient evidence at trial concerning the amount of R&D that DHB actually performed. By estimating the "correct gross profit margins," Professor Harris' proposed testimony apparently incorporates assumptions regarding the proper R&D amount. During the forfeiture phase, the Court will require the Government to submit evidence that supports those assumptions. Absent evidence, the Court will not infer that the R&D reclassifications, in their entirety, reflected R&D that was never performed. There is simply too much evidence that DHB performed considerable R&D, which it did not otherwise account for in its financial statements.

B. Mr. Brooks' Knowledge

As the Court previously instructed the jury, insider trading requires the Government to prove that the Defendants traded while possessing "undisclosed material information." (Tr. 20764). The Court previously acquitted Mr. Brooks of the insider trading charges to the extent those charges were predicated on the Interceptor Vest Inventory Fraud, because the Government had failed to show that Mr. Brooks knew about the fraud when he traded. Yet, because he relies on assumptions regarding DHB's true profits and earnings, Professor Harris

17

apparently incorporated the Interceptor Vest Inventory Fraud into his opinion. If the Government seeks forfeiture against Mr. Brooks based on the Interceptor Vest Inventory Scheme, it will not be sufficient for it to show that DHB materially inflated the value of its Interceptor Vest Inventory. The Government must also prove by a preponderance of the evidence, through either new evidence and/or evidence currently in the record, that Mr. Brooks knew about the fraud when he traded.

    C.   The Unauthorized Compensation and TAP Schemes

Based on the exhibits the Government has submitted so far, Professor Harris will testify primarily on the effects of the R&D and Interceptor Vest Inventory Schemes. It is unclear, at best, if the Government will adduce evidence concerning what effect, if any, the Unauthorized Compensation and TAP Schemes had on DHB's stock price.

This might be short-sighted. There was considerable testimony indicating that the investing community would have reacted negatively if they had known about the Unauthorized Compensation and TAP Schemes. (Tr. 12879-881, 12885-86, 13999-14002, 14005-07, 14256, 14266-74). For instance, DHB investor Michael Adair testified that, if he had known about DHB paying Mr. Brooks' personal expenses, he "would probably have just left as an investor and gone somewhere else." (Tr. 14274). And the Court takes judicial notice that the market can impose a

18

reputation premium or discount on a company's share price based on management's presumed integrity. Thus, if DHB's stock price was inflated in November and December 2004 because investors did not know that Mr. Brooks was, in effect, stealing from the Company, this price inflation is relevant to the forfeiture proceedings.

    D.    <u>Information Concerning Faulty Body Armor</u>

Recently, the Second Circuit decided <u>Cohen v. Viray</u>, __ F.3d __, 2010 WL 3785243 (2d Cir. Sep. 30, 2010), vacating a settlement agreement that Mr. Brooks had entered into to resolve a related civil case. In that opinion, the Second Circuit recounted that "[i]n the fall of 2005, [DHB's] stock price plummeted following revelations that the body armor manufactured by the company contained an inferior material prone to rapid deterioration." 2010 WL 3785243 at *1.

At trial, the parties did not introduce any evidence concerning the quality of DHB's products. This is understandable. DHB's "inferior" product quality was relevant, if at all, only as a defense to the materiality of the alleged material misstatements and omissions. And the Court can certainly understand why Defendants did not want this information in front of the jury. Nevertheless, liability has now been decided, the jury has been dismissed, and the Court must decide the proper amount subject to forfeiture. And the

Court cannot ignore the Second Circuit's statement that DHB's stock price "plummeted" in response to quality problems not related to Defendants' criminal violations.  To that end, the Court wants to confirm that Professor Harris' testimony, and any expert testimony that Defendants intend to submit, will properly account for other causes of DHB's stock price decline that were unrelated to the Defendants' criminal conduct.

                                        SO ORDERED.

                                      /s/ JOANNA SEYBERT
                                      Joanna Seybert, U.S.D.J.

Dated:    Central Islip, New York
           October  18 , 2010