UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------X
UNITED STATES OF AMERICA,

                                  <u>MEMORANDUM & ORDER</u>

        -against-                 06-CR-0550(JS)(AKT)

DAVID H. BROOKS,

                         Defendant.
----------------------------------------X

APPEARANCES
For the Government: James Halleron Knapp, Esq.
                   Richard Thomas Lunger, Jr., Esq.
                   Christopher Charles Caffarone, Esq.
                   Christopher Allen Ott, Esq.
                   James M. Miskiewicz, Esq.
                   Kathleen Anne Nandan, Esq.
                   Marshall L. Miller, Esq.
                   United States Attorney's Office
                   Eastern District of New York
                   610 Federal Plaza
                   Central Islip, NY 11722

For Brooks:           Kenneth Ravenell, Esq.
                   The Murphy Firm
                   One South Street, 23rd Floor
                   Baltimore, MD 21202

                   Roger V. Archibald, Esq.
                   16 Court Street, Suite 2400
                   Brooklyn, NY 11241

                   David M. Goldstein, Esq.
                   David M. Goldstein, P.A.
                   286 NE 39th Street
                   Miami, FL 33137

                   Gerald L. Shargel, Esq.
                   Law Office of Gerald Shargel
                   570 Lexington Avenue
                   New York, NY 10022

                   Ira Lee Sorkin, Esq.
                   Dickstein Shapiro
                   1177 Avenue of the Americas
                   New York, NY 10036

James M. LaRossa, Esq.
200 East 64th Street, Apt 14D
New York, NY 10065

Jeffrey H. Lichtman, Esq.
Law Offices of Jeffrey Lichtman
750 Lexington Ave, 15th Floor
New York, NY 10022

John C. Meringolo, Esq.
Meringolo and Associates, P.C.
375 Greenwich Street, 7th Floor
New York, NY 10013

Judd Burstein, Esq.
Judd Burstein, P.C.
1790 Broadway, Suite 1501
New York, NY 10019

Laurence S. Shtasel, Esq.
Blank Rome LLP
The Chrysler Building, One Logan Square
Philadelphia, PA 19103

Mauro Michael Wolfe, Esq.
Duane Morris LLP
1540 Broadway
New York, NY 10036

Richard A. Greenberg, Esq.
Newman Schwartz & Greenberg
950 Third Avenue
New York, NY 10022

Richard Ware Levitt, Esq.
Levitt & Kaizer
40 Fulton Street, 23rd Floor
New York, NY 10038

Yvonne Shivers, Esq.
Law Offices of Richard Ware Levitt
148 East 78th Street
New York, NY 10075

Zaki I. Tamir, Esq.
Gofer Tamir and Associates
55 Broad Street, 26th Floor
New York, NY 10004

SEYBERT, District Judge:

Presently pending before the Court is Defendant David H. Brooks' ("Defendant" or "Brooks") motion for a new trial under Rule 33 of the Federal Rules of Criminal Procedure. For the following reasons, Brooks' motion is DENIED.

<u>BACKGROUND</u>

On October 24, 2007, Brooks was charged in a twenty-one count Superseding Indictment. He was arrested and confined to Nassau County Correctional Center ("NCCC") until January 2008 when the parties agreed to a bail package and Brooks was released. While incarcerated at NCCC, Brooks was provided with Klonopin, a benzodiazepine used to treat panic and anxiety disorder, at the direction of his long-term psychiatrist, Dr. Michael R. Liebowitz. Brooks remained released on bail until January 14, 2010 when, in anticipation of trial, he was remanded and again taken to NCCC. This time, NCCC refused to provide Brooks with any benzodiazepines to treat his panic and anxiety disorders.

Jury selection began on January 19, 2010, at which time Brooks' counsel informed the Court that he had not received any benzodiazepines since being arrested five days earlier. The

Court, after verifying that the prescription was valid, allowed Brooks to take Ativan, the benzodiazepine prescribed by Dr. Liebowitz that Brooks had been taking prior to his remand, in the courtroom.

Jury selection continued on January 20, 2010. Brooks' counsel informed the Court that NCCC was not providing Brooks with any benzodiazepines. Thus, the Court issued an Order stating that the prescription was "lawfully filled" and "medically necessary" and directing NCCC to administer Ativan to Brooks. (Docket Entry 761.) Notwithstanding the Court's Order, Brooks did not receive any Ativan at NCCC. However, he continued to self-medicate with the Court's permission while in the courtroom. Jury selection concluded on January 21, 2010.

The trial commenced on January 25, 2010. From January 25 through January 27, 2010, Brooks received no Ativan while at NCCC but took Ativan as needed while in the courtroom. Upon returning to NCCC after leaving court on January 27, NCCC staff caught Brooks hiding twenty-five Ativan tablets in the waistband of his pants. They determined that his smuggling contraband into the facility was a security risk, and on January 29, 2010, NCCC transferred Brooks to the Queens Private Detention Facility ("QPDF"), a contract vendor of the United States Marshals Service.

The trial resumed on February 1, 2010, at which time defense counsel informed the Court that QPDF was also refusing to provide Brooks with any benzodiazepines,[1] so the Court permitted Brooks to continue to self-medicate with Ativan in the courtroom. This continued until February 3, 2010 when the Court decided that it would no longer permit Brooks to take any medication in the courtroom.[2]

The trial continued on February 4. On February 8, this Court referred the parties to Magistrate Judge A. Kathleen Tomlinson for an immediate hearing regarding "Defendant David Brooks' prescribed medications, issues arising from changes to that regime, and the impact, if any, on Brooks' ability to assist his attorneys in his defense." United States v. Hatfield ("Tomlinson R&R"), No. 06-CR-0550, 2010 WL 550392, at *1 (E.D.N.Y. Feb. 16, 2010). Dr. Liebowitz and Jason Mafia, the health services administrator at QPDF, testified at the hearing. Judge Tomlinson reserved decision, and the trial continued on February 9, 2010.

---

[1] Brooks was, however, receiving three other drugs that QPDF's psychiatrist determined were appropriate to treat his panic and anxiety disorders.

[2] The Court based its decision on information received from QPDF that Brooks was likely being overmedicated as a result of his unsupervised use of Ativan in the courtroom. (Trial Tr. 1839-40.)

There were no Court proceedings from February 10 through February 15, 2010. Brooks received no benzodiazepines during this period.[3] In the interim, on February 13, 2010, Judge Tomlinson issued a Report and Recommendation ("R&R") concluding that: (1) QPDF's withholding benzodiazepines did not violate Brooks' Eighth Amendment right to adequate medical treatment and (2) there was no reasonable cause to question Brooks' competence to stand trial, and, as such, no competency hearing was required. Nonetheless, Judge Tomlinson recommended that Brooks either be provided adequate doses of benzodiazepines or placed on a protocol to appropriately wean him off of benzodiazepines. On February 15, 2010, Defendant submitted a letter advising the Court that "Mr. Brooks has no objections to the Report and Recommendation of Magistrate Judge Tomlinson" and "request[ing] that the Court enter an Order adopting the Report and Recommendation in its entirety." (Docket Entry 841, at 2.)

The trial resumed on February 16, 2010. That afternoon, the Court advised counsel that QPDF agreed to administer Klonopin--another benzodiazepine used to treat panic and anxiety disorder--to Brooks going forward, and the Court permitted Brooks to take two Ativan in the courtroom. The Court

---

[3] The Court must qualify this statement: While Brooks was not permitted to take any medications in the courtroom and QPDF was not providing Brooks with any benzodiazepines, it is unclear whether he received medication from an unauthorized source during this period.

subsequently adopted Judge Tomlinson's R&R and ordered QPDF to "provide medication to David H. Brooks as directed by prescriptions written by Dr. Michael R. Liebowitz." (Docket Entry 843, at 2.) Notwithstanding QPDF's representation and the Court's Order, Brooks did not begin receiving Klonopin until February 19, 2010.

The trial continued for another five months. The jury began deliberating on August 2, 2010 and returned a verdict on September 14, 2010, finding Brooks guilty of counts 1-11 and 15-17 of the Superseding Indictment. After the jury delivered its verdict, Brooks' counsel asked the Court to deem post-trial motions to have been made in contemplation of the Court establishing a briefing schedule after the forfeiture phase of the trial. (Trial Tr. 21649-50.)

At a conference on February 10, 2011, the Court set a briefing schedule for Brooks to submit a motion related to his competence to stand trial. On April 15, 2011, he filed a Rule 33 motion seeking a new trial on the grounds that: (1) the Court failed to recognize its statutory obligation to sua sponte order a competency hearing if there was reasonable cause to doubt Brooks' competence to stand trial; (2) the Court failed to order a competency hearing despite having reasonable cause to believe that he was incompetent to stand trial; (3) Brooks was actually tried while incompetent; and (4) Brooks' counsel

rendered constitutionally ineffective assistance of counsel by failing to request a competency hearing. In support of his motion, Brooks submitted a 161-page psychiatric evaluation completed by Park Dietz, M.D., M.P.H., Ph.D. Dr. Dietz concluded, after spending over fifty hours with Brooks, that he was incompetent to stand trial from at least January 14, 2010 until February 18, 2010, the period when he was not consistently receiving benzodiazepines to treat his panic and anxiety disorders. On July 27, 2011, Brooks submitted a supplemental psychiatric evaluation completed by James C. Ballenger, M.D., who also concluded that Brooks was incompetent during that period as a result of the mismanagement of his medication. Brooks also submitted declarations of Mr. Aaron Hendel, one of his legal consultants, Brooks' son Andrew, his daughter Elizabeth, and Dwayne Brown, an inmate at QPDF, regarding Brooks' demeanor out-of-court during the trial.

The Government submitted its opposition on August 11, 2011.[4] In support, it provided the Court with a psychiatric evaluation completed by Mark J. Mills, J.D., M.D. Dr. Mills concluded that, although Brooks was likely suffering with

---

[4] The Government argues that the pending Rule 33 motion is not timely because it was made more than fourteen days after the verdict in violation of Rule 33(b)(2). The Court finds this argument to be without merit. All post-verdict motions were deemed made on September 14, 2011, and, as such, the pending motion was timely filed.

symptoms of benzodiazepine withdrawals during the period in question, he was competent throughout the trial. Dr. Mills based his conclusion on the results of psychiatric tests[5] which revealed that Brooks was embellishing, malingering, or feigning symptoms when he believed doing so was in his best interest. Dr. Mills also criticized the conclusions of Dr. Dietz and Dr. Ballenger, stating that they "incorrectly portray various of Mr. Brooks' behaviors as psychopathological, when alternative explanations are more convincing." (Mills Report at 12.) Dr. Mills' report is somewhat limited, however, because Brooks refused to discuss his underlying behaviors with Dr. Mills at the direction of his lawyers. (See Gov't Ex. D.; Mills Report at 1.)

Brooks filed his reply brief on August 26, 2011. In support, he submitted a forensic report completed by Kirk Heilbrun, Ph.D., criticizing Dr. Mills' evaluation, in part, because the psychological tests performed only provide information about an individual's present functioning. According to Dr. Heilbrun, these tests cannot detect whether someone was exaggerating or malingering at a previous time.

---

[5] These tests included the Validity Indicator Profile, the Minnesota Multiphasic Personality Inventory, Second Edition, Restructures Form, the Personality Assessment Inventory, and the Structured Interview of Reported Symptoms, Second Edition.

The Court has reviewed all of the materials submitted in support of and in opposition to the pending Rule 33 motion. The Court has also reviewed its own notes from the trial along with the relevant portions of the trial transcript.

DISCUSSION

The Court will first discuss the standard governing Rule 33 motions. It will then address the merits of Brooks' motion.

I.   Standard for Granting Motion for a New Trial under Rule 33

"The burden of proving the need for a new trial lies with the defendant." United States v. Ferguson, 49 F. Supp. 2d 321, 323 (S.D.N.Y. 1999) (citing United States v. Soblen, 203 F. Supp. 542 (S.D.N.Y. 1961)), aff'd, 301 F.2d 236 (2d Cir. 1962)) see also United States v. Sasso, 59 F.3d 341, 350 (2d Cir. 1995). The decision whether to grant or deny a motion for a new trial is firmly within the discretion of the trial judge. See Sasso, 59 F.3d at 350; see also Ferguson, 49 F. Supp. 2d at 323 (citing United States v. Rodriguez, 738 F.2d 13, 17 (1st Cir. 1984)); United States v. Zane, 507 F.2d 346, 347 (2d Cir. 1974) (reviewing a trial court's denial of a Rule 33 motion for abuse of discretion); United States v. Madeoy, 912 F.2d 1486, 1490 (D.C. Cir. 1990) (decision to grant post-trial relief is within trial court's sound discretion). "[I]n deciding whether to grant a Rule 33 motion, a judge may weigh the evidence and

determine the credibility of witnesses." Ferguson, 49 F. Supp. 2d at 323 (citing United States v. Sanchez, 969 F.2d 1409, 1413 (2d Cir. 1992)). Moreover, on a Rule 33 motion, "[t]he Court is not required to view the evidence in the light most favorable to the Government." Id. (citing United States v. Lincoln, 630 F.2d 1313, 1319 (8th Cir. 1980)). Nevertheless, the Court's discretion is limited to the extent that Rule 33 motions for a new trial are "not favored and should be granted only with great caution." United States v. Stofsky, 527 F.2d 237, 243 (2d Cir. 1975) (internal quotation marks and citation omitted).

II.  Competency

"It has long been accepted that a person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to a trial." Drope v. Missouri, 420 U.S. 162, 171, 95 S. Ct. 896, 43 L. Ed. 2d 103 (1975). "Indeed, 'conviction of an accused person while he is legally incompetent violates due process.'" United States v. Auen, 846 F.2d 872, 877 (2d Cir. 1988) (quoting Pate v. Robinson, 383 U.S. 375, 378, 86 S. Ct. 836, 15 L. Ed. 2d 815 (1966)).

Here, Brooks raises both procedural and substantive claims related to his alleged incompetency to stand trial. First, he argues that his procedural due process rights were

violated because this Court failed to order a competency hearing _sua sponte_ when there was a reasonable basis to believe that he was incompetent. <u>Second</u>, he argues that his substantive due process rights were violated because he was tried while incompetent. The Court will address each claim separately.[6]

## A.   Duty to Order a Hearing

The Supreme Court has held that "the failure to observe procedures adequate to protect a defendant's right not to be tried or convicted while incompetent to stand trial deprives him of his due process right to a fair trial." <u>Drope</u>, 420 U.S. at 172 (citing <u>Pate</u>, 383 U.S. at 385). The procedural safeguards are codified in 18 U.S.C. § 4241(a), which provides as follows:

> At any time after the commencement of a prosecution for an offense and prior to the sentencing of the defendant . . . the defendant or the attorney for the Government may file a motion for a hearing to determine the mental competency of the defendant. The court shall grant the motion, <u>or shall order such a hearing on its own motion, if there is reasonable cause to believe that the</u>

---

[6] Brooks also argues that he is entitled to a new trial because the Court was not aware of its own duty to order a hearing <u>sua sponte</u> under 18 U.S.C. § 4241(a). While Brooks is correct that a court's ignorance of its obligation under § 4241 could warrant a new trial, <u>see</u> <u>United States v. Arenburg</u>, 605 F.3d 164, 169-70 (2d Cir. 2010), the Court was fully aware of its obligation to be vigilant for reasonable cause and remained so throughout the course of the trial, frequently inquiring of Brooks, his counsel, and the United States Marshal Service about his physical and mental health as well as his competence to stand trial. (<u>See</u>, <u>e.g.</u>, Trial Tr. 1850, 2132-33, 2679-80, 2912.)

> defendant may presently be suffering from a
> mental disease or defect rendering him
> mentally incompetent to the extent that he
> is unable to understand the nature and
> consequences of the proceedings against him
> or to assist properly in his defense.

18 U.S.C. § 4241(a) (emphasis added). There is, therefore, an "affirmative obligation on the part of the trial court to order a competency hearing when warranted by the evidence." Nicks v. United States, 955 F.2d 161, 168 (2d Cir. 1992).

In determining whether there was "reasonable cause" to believe that a defendant was incompetent, "only the evidence before the court at the time its decision was made is pertinent." Nicks, 955 F.2d at 168; see also Drope, 420 U.S. at 174-75 (stating that the issue is "whether, in light of what was then known, the failure to make further inquiry into petitioner's competence to stand trial, denied him a fair trial" (emphasis added)); United States v. Gabb, 80 F. App'x 142, 145 (2d Cir. 2003) ("[T]he question of competency and reasonable cause to doubt it must focus upon the defendant's abilities at the time of trial, not any conduct discovered or analyzed after the fact" (emphasis added) (citing United States v. Vamos, 797 F.2d 1146, 1150-51 (2d Cir. 1986)). As such, "deference is owed to the district court's determinations based on observation of the defendant during the proceedings." Vamos, 797 F.2d at 1150.

In the present case, Brooks argues that the evidence before the Court during the period in question raised sufficient doubt as to his competency to stand trial to warrant a hearing. Specifically, Defendant argues that "the mismanagement of Brooks' medication by NCCC and QPDF, and the abrupt deprivation of benzodiazepines during the first five weeks of trial, standing alone, should have been enough to trigger the Court's statutory obligation." (Def. Mem. 46.) The Court disagrees.

Although the improper administration of psychiatric medicine <u>may</u> render a defendant temporarily incompetent, <u>see</u> <u>United States v. Quintieri</u>, 306 F.3d 1217, 1233 (2d Cir. 2002) (citing <u>Riggins v. Nevada</u>, 504 U.S. 127, 137, 112 S. Ct. 1810, 118 L. Ed. 2d 479 (1992)), evidence that Brooks was not properly medicated does not, without more, mandate a hearing. <u>See, e.g.</u>, <u>United States v. Jones</u>, 336 F.3d 245, 258 (3d Cir. 2003) ("[W]e do not hold that [defendant]'s sporadic compliance [with his medication regime], standing alone, is necessarily cause to question [his] competency."); <u>cf.</u> <u>Drope</u>, 420 U.S. at 180 ("There are, of course, no fixed or immutable signs which invariably indicate the need for further inquiry to determine fitness to proceed."). Rather, the Court "must consider many factors when determining whether it has 'reasonable cause' to order a competency hearing." <u>Quintieri</u>, 306 F.3d at 1233. And here, the evidence of which the Court was aware at the time (in

14

addition to the mismanagement of Brooks' medication) did not give the Court reasonable cause to doubt Brooks' competence.

### 1.  Medical Opinions

While the Court was fully aware that Brooks was not consistently or appropriately medicated during the period in question, Brooks' health was the main cause for concern--not his competency to stand trial.  Prior to being remanded in January 2010, Brooks was taking as much as twenty milligrams per day of Ativan--a "very large dose," according to Dr. Liebowitz (Docket Entry 112-3, at 42), and significantly more than the FDA/DEA recommended daily dosage (Tomlinson Hr'g Tr. 42; Gov't Ex. B, at QPDF-000107).  Then, after Brooks was remanded, the Court received inconsistent and contradictory opinions from medical professionals regarding Brooks' use of Ativan.  On the one hand, the Court was being told by medical personnel at both the NCCC and the QPDF that Brooks had been prescribed "dangerously high amounts of at van [sic]," (Trial Tr. 980 (emphasis added); see also, e.g., Trial Tr. 1918 ("potentially toxic levels")), had developed anxiolytic dependence for the substance, and needed to be detoxed (see, e.g., Trial Tr. 711-12, 1921-22).  On the other hand, Dr. Liebowitz advised the Court that Brooks had serious health issues, that high doses of Ativan were medically necessary to treat his severe panic disorder (see, e.g., Order, Docket Entry 761), and that abruptly discontinuing the drug

15

could lead to withdrawal symptoms including "shakes, tremors, increased anxiety, increased heart rate, increased blood pressure," a relapse of the underlying illness (here, vulnerability to panic attacks), seizures, and convulsions, see Tomlinson R&R, 2010 WL 550392, at *4.

Yet both the NCCC and QPDF medical personnel and Dr. Liebowitz were concerned primarily about Brooks' health and safety--not his competence to stand trial. (See, e.g., Liebowitz Ltr., February 3, 2010, at 1 ("Stopping the Ativan, as was done to Brooks following his recent incarceration, is highly dangerous to his health. . . . Depriving him of such treatment represents severe medical neglect."); Trial Tr. 712 (NCCC medical and psychiatric staff were closely monitoring him during his detoxification). There was no medical evidence before the Court that any potential withdrawal symptoms were affecting Brooks' competence to stand trial or that gave the Court reasonable cause to doubt his competence. Dr. Liebowitz testified before Judge Tomlinson that he had last examined Brooks eight to twelve weeks before he was taken off the benzodiazepines and, thus, had no way of knowing "what kind of shape he's in now to be able to" work on his case. (Tomlinson Hr'g Tr. 72.) Rather, he merely expressed his concern regarding "what might happen if the medication issue is not resolved in the short term." Tomlinson R&R, 2010 WL 550392, at *13. And

the medical personnel at both NCCC and QPDF, although noting Brooks' increased anxiety and irritability and benzodiazepine-seeking behavior, repeatedly observed his cognitive functioning to be unimpaired and no decline in his mental status. (See, e.g., Gov't Ex. B., at QPDF-000106 ("Detainee was attentive, demonstrated intact abstraction and calculation, and had good insight and judgment."); Gov't Ex. A. (stating that Brooks displayed no signs of mania, psychosis, delusions, hallucinations or suicidal ideation).)

Although Brooks may have been suffering from benzodiazepine withdrawals, including increased anxiety and vulnerability to panic attacks, "some degree of mental illness cannot be equated with incompetence to stand trial." Vamos, 797 F.2d at 1150. In nearly all of the cases cited by Brooks where the court held that a competency hearing was required, the defendant was suffering from a severe form of psychosis.[7] In

---

[7] Arenburg, 605 F.3d at 171 (finding that there was reasonable cause to doubt the pro se defendant's competence to stand trial for assaulting a federal officer when the defendant was a diagnosed paranoid schizophrenic who, in front of the jury, accused the government of conspiring with MGM Studios to broadcast his thoughts on the radio and, in his closing statement, admitted to the crime but asked the jury to find the government guilty for its role in "the drug trade"); Maxwell v. Roe, 606 F.3d 561, 565-576 (9th Cir. 2010) (finding that the trial court erred in failing to conduct a competency hearing when there was evidence before the court that the defendant had a history of mental illness, refused to take his prescribed anti-psychotic medication, was involuntarily confined to a mental hospital during portions of the trial because he was

contrast, there was no medical evidence before the Court that
Brooks was psychotic or suffering from a mental condition that
affected his faculties to the extent that he was unable to
assist in his own defense or understand the nature and
consequences of the proceedings.[8]

---

unable or unwilling to control his disruptive and violent
outbursts, and had attempted suicide during the trial); Jones,
336 F.3d at 249-250, 255-259 (finding that the district court
erred in failing to conduct a competency hearing when there was
evidence before the court that the defendant had been diagnosed
with schizoaffective disorder, had been prescribed anti-
psychotic medications to address his "visions" of his deceased
mother but was not taking them; and became so upset with his
lawyer that he physically attacked him in court); McGregor v.
Gibson, 248 F.3d 946, 955-60 (10th Cir. 2001) (finding that
there was a bona fide doubt as to the defendant's competence
when there was evidence before the court that the defendant had
a "long and tortured history of mental illness" and was a
diagnosed paranoid schizophrenic who experienced delusions and
hallucinations, that he did not consistently take his prescribed
anti-psychotic medication during the course of the trial even
though doctors testified that he was competent only if properly
medicated, and that his lawyer "was adamant throughout trial
that [he] was incompetent").

[8] Vamos, 797 F.2d at 1149-51 (finding that no hearing was
required notwithstanding evidence before the trial court that
the defendant was suffering from "a serious psychiatric
disorder, viz MAJOR DEPRESSION" and defense counsel's assertions
that she was unable to assist in the preparation of her
defense); Quintieri, 306 F.3d at 1233-34 (no hearing required
notwithstanding evidence that the defendant told the court that
he felt "dizzy" and not well-enough to proceed because his
psychiatric medications had been "mix[ed] up"); United States v.
Grimes, 173 F.3d 634, 636 (7th Cir. 1999) ("[The defendant] has
the kind of mild psychiatric disturbance that afflicts a
substantial fraction of the population.  He sees a psychiatrist;
he is depressed but taking Prozac, the antidepressant medicine,
and so far as appears his depression is under control; he is
suspicious of his lawyers (nothing unusual about that!); and he
has trouble concentrating.  These symptoms fall short of

## 2.   Representations by Defense Counsel

"[S]ince incompetency involves an inability to assist in the preparation of a defense or rationally to comprehend the nature of the proceedings, failure by trial counsel to indicate the presence of such difficulties provides substantial evidence of the defendant's competence."   Vamos, 797 F.2d at 1150; see also Drope, 420 U.S. at 177 n. 13; United States v. Sandoval, 365 F. Supp. 2d 319, 328-26 (E.D.N.Y. 2005).   Here, Brooks' own lawyers--who had been working with Brooks daily for over nine months--adamantly and repeatedly denied that Brooks was incompetent during the period in question.   (See, e.g., Trial Tr. 716 (January 27, 2010:  "I want to make it clear.  I'm not expressing a competency issue.  I was not suggesting he is not competent . . . ."); Trial Tr. 2381 (February 9, 2010:  "None of us want to get in a situation where we are telling the court he's not competent to help. . . .  We are not looking for him to be incompetent."); Trial Tr. 2379 ("We are not looking for the court to do anything other than to help us get Mr. Brooks the medication that he needs.").)   See also Tomlinson R&R, 2010 WL 550392, at *13 ("Defendant's counsel has not stated at any time

---

creating reasonable cause for thinking that [the defendant] was incompetent to follow the proceedings in this case."); United States v. Gabb, 80 F. App'x 142, 146 (2d Cir. 2003) ("[T]he district court very well could have found that the pain, depression, and withdrawal symptoms did not render [the defendant] incompetent during the course of the trial.").

before this Court that Defendant is currently unable to assist in his defense."). Rather they were concerned primarily, as the Court previously stated, with Brooks' health and safety and the possibility that his condition could, at some unknown point in the future, deteriorate to the point that he would be incompetent. There was no evidence before the Court that Brooks ever reached that point.

### 3. The Court's Observations

Finally, "deference is owed to the district court's determinations based on observation of the defendant during the proceedings." Vamos, 797 F.2d at 1150; see also United States v. Oliver, 626 F.2d 254, 258-59 (2d Cir. 1980) (stating that district court "justifiably relied on [its] extended observations" of defendant in assessing his competency to stand trial); United States v. Hemsi, 901 F.2d 293 (2d Cir. 1990). Here, the Court was able to observe Brooks at over forty court appearances in both this matter and the pending civil matters prior to the start of the trial, as well as almost daily over the course of the seven-and-a-half month trial, and at no point did the Court observe any unusual behavior by Brooks that would provide a basis for doubting his competence. Judge Tomlinson also had the opportunity to observe Brooks and concluded that "there [was] no evidence before the Court that the Defendant

[was] incompetent or unable to assist in his own defense." Tomlinson R&R, 2010 WL 550392, at *13.

In fact, Brooks' behavior actually evidenced his ability to consult with counsel and assist in his own defense during the period in question. The Court regularly observed Brooks taking notes (see, e.g., Trial Tr. 3537-38) and discussing his case with counsel (see, e.g., Jury Selection Tr. 728 (counsel sought twenty minute recess to consult with Brooks during jury selection); Trial Tr. 4311 (counsel sought ten minute recess to consult with Brooks during his cross examination of Irving Villalon because Brooks wanted him "to focus on something"); Trial Tr. 2501 (counsel requested that Brooks remain in the courtroom during the lunch break to review documents).). At one point, Brooks asked the Court if he could be transferred to a satellite unit within the NCCC because "there's more space and he can actually work and they actually keep the lights on where you can work versus the other place." (Jury Selection Tr. 739.) The Court even noted the extent of Brooks' participation on February 9, 2010, stating that:

> Mr. Brooks, throughout this entire proceeding, including jury selection, has been alert, has been engaged with counsel, from what I can see, has turned to various deputies when he's noticed someone come into the courtroom, has contact with the paralegals. So in terms of what I can observe from a distance, it would appear that Mr. Brooks is, up until this point, has

21

> been able to discuss with counsel and
> participate in his defense.

(Trial Tr. 2380.) Such evidence of Brooks' consulting with and assisting counsel and contributing to his defense negate any minimal doubt that may have been caused by the mismanagement of his medication. See Vamos, 797 F.2d at 1150; United States v. Sovie, 122 F.3d 122, 128 (2d Cir. 1997) (finding no error in district court's decision not to conduct a competency hearing when there was evidence that the defendant "took notes, conversed with counsel, and reacted reasonably to the admission of evidence").

Defendant, however, makes light of these observations and focuses instead on the February 8 and 16, 2010 colloquies between the Court and Brooks where the Court asked Brooks how he was feeling and if he was able to proceed with the trial and Brooks responded that he was not feeling well (see, e.g., Trial Tr. 2132 (stating that he did not sleep and suffered "[a]bsolute tortures" over the weekend because he had not been given any Ativan); Trial Tr. 2679 (stating that he felt "shaky" and "had a very rough morning"), but would "do the best [he] c[ould]," (Trial Tr. 2132). While such a colloquy may have been insufficient to establish Brooks' competence--i.e., that he understood the nature of the proceedings and could assist in his own defense, see Hemsi, 901 F.2d at 295 ("[I]t is not sufficient

merely that the defendant can make a recitation of the charges or the names of witnesses, for proper assistance in the defense requires an understanding that is 'rational as well as factual.'" (quoting <u>Dusky v. United States</u>, 362 U.S. 402, 402, 80 S. Ct. 788, 4 L. Ed. 2d 824 (1960))--the Court is only required to hold a competency hearing if there is reasonable cause to doubt Defendant's competence. Brooks responses did not raise any doubt as to his competence. <u>See</u> <u>Quinteri</u>, 306 F.3d at 1233 (finding that a defendant's statement that he was "dizzy" and not well enough to proceed as a result of the mismanagement of his psychiatric medications did not give the court reasonable cause to doubt his competence because "while he appeared to be suffering unfortunate effects from the medicine, he was lucid and able to understand the proceedings").

Defendant also asserts that there were certain incidents that should have alerted the Court to Brooks' incompetence. <u>First</u>, on January 27, 2010, Brooks was caught hiding twenty three tablets of Ativan in the waistband of his pants and a five-and-a-half inch pen in his anus. (Trial Tr. 977.) However, defense counsel stated that Brooks took the pen "out of desperation to be involved in his case"--"he didn't have a pen to write with" so he secreted a pen so he could "make notes to give to [counsel]." (Trial Tr. 980-81.) And while the Court does not approve of this type of behavior, the Court finds

23

nothing out of the ordinary about a criminal defendant attempting to smuggle drugs into jail.

Second, on the morning of February 16, 2010, Brooks suffered a panic attack at QPDF (the "Code Blue" incident).[9] This occurred around 4:30 a.m. However, by 6:15 a.m., QPDF medical personnel reported that Brooks was calm and stable and that all of his vital signs were normal (with the exception of his blood pressure which was elevated). (Trial Tr. 2808-09.) Notwithstanding the panic attack, Brooks reported to Court on time that morning, and although he was more jittery and less talkative than normal, the Court did not observe any unusual behavior. In fact, the Court was not made aware of the Code Blue until that afternoon when it received a letter from QPDF. Neither Brooks nor his lawyers mentioned the Code Blue that morning even though the Court asked Brooks how he was feeling and if he was able to proceed. (Trial Tr. 2807.) And upon inquiring of counsel, Mr. Ravenell stated that he did not believe there was an issue regarding Brooks' competency and that Brooks would be able to proceed so long as the Court allowed him to take extra breaks throughout the afternoon. (Trial Tr. 2815.) There was no indication that the Code Blue affected his

---

[9]  Defense counsel asserts that Brooks' panic attack included a seizure; however, there was no evidence before the Court at the time indicating that he had a seizure.

mental faculties to the extent that he was unable to understand the proceeding or consult with counsel.

Third, later that afternoon, Brooks unexpectedly ran out of the courtroom. Defendant asserts that he was having another panic attack, yet Deputy United States Marshal George Murphy told the Court that Brooks was "having some stomach issues": He was "on the toilet" and "had to go right away." (Trial Tr. 2841.) Although the Court recognizes that his stomach issues may have been caused by the mismanagement of his medication, there was no indication that his stomachache affected his ability to consult with counsel or understand the proceedings, nor was his fleeing the courtroom in the presence of the jury disruptive to the point that it impacted his defense, see Maxwell, 606 F.3d at 569; McGregor, 248 F.3d 946.[10]

Finally, shortly thereafter, Brooks dozed off at counsel table. (Trial Tr. 2912-13; 2973.) However, falling asleep during the trial is not dispositive of Brooks' competence. See Watts v. Singletary, 87 F.3d 1282, 1287 (11th Cir. 1996) (stating that defendant's sleeping through the

---

[10] The Court notes that after returning from the bathroom, Brooks' counsel stated that he could "not continue in the current state" and asked if the Court would grant him permission to take two Ativan in the courtroom. (Trial Tr. 2845.) After confirming with Dr. Liebowitz that such request was both safe and medically necessary, the Court granted Brooks' request, allowed him to take two Ativan, and took a short recess to allow the medication to take effect. (Trial Tr. 2846-51.)

majority of his murder trial was insufficient to establish incompetency). "Rather, to establish incompetency, [Brooks] must show that his sleepiness rendered him unable to understand the trial proceedings or to assist his attorneys in his defense." Colburn v. Cockrell, 37 F. App'x 90, 2002 WL 1021891, at *6 (5th Cir. 2002) (citing Woods v. Johnson, 75 F.3d 1017, 1038 n.33 (5th Cir. 1996)). There is no evidence that his dozing off affected his competence. Rather, defense counsel commented that, just prior to his falling asleep, he had been taking notes and engaged in the proceedings. (Trial Tr. 2913.)

The Court's overall impression of Brooks was as follows: an intelligent, controlling, and highly successful businessman who was suffering from increased levels of anxiety due to a number of factors, including his arrest and incarceration, the magnitude of the pending trial, and the sudden and unexpected change in his medication. And while the Court recognizes that the increased anxiety may have made it more difficult to pay attention during portions of the trial, "there is no constitutional prohibition against the trial and conviction of a defendant who fails to pay attention in court-- whether out of indifference, fear, confusion, boredom, or sleepiness--unless that defendant also cannot understand the nature of the proceedings against him or adequately assist counsel in conducting a defense." Watts, 87 F.3d at 1287

26

(stating that even if a defendant "admitted in open court that he could not stay awake at trial because he was up all night smoking crack, this would not necessarily be sufficient to require a [competency] hearing"). As the Court explained above, there was no evidence before the Court, aside from mere speculation, that Brooks' increased anxiety at all affected his ability to understand the proceedings or assist in his own defense. Further, there was little, if any, evidence to support that Brooks was even suffering from increased anxiety, as his demeanor and interactions with the Court were consistent throughout the entire trial, including the period when his medications were changed, as well as at each court appearance in this matter and the pending civil matters prior to trial. Accordingly, the Court finds that there was no procedural due process violation and DENIES Brooks' motion for a new trial on that ground.

B.    Tried While Incompetent

Defendant also asserts a substantive due process violation, arguing that even if the Court did not err in failing to order a competency hearing, Brooks was nonetheless tried and convicted while actually incompetent.[11]    In asserting a substantive incompetency claim, "the defendant bears the burden

_____

[11] The Government did not address this claim in its opposition brief.

of proving by a preponderance of the evidence that he was incompetent at the time of trial." <u>Watts</u>, 87 F.3d at 1290. The standard for incompetence is the same: a defendant who "lacks the capacity to understand the nature of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to a trial." <u>Drope</u>, 420 U.S. at 171; <u>Dusky</u>, 362 U.S. at 402 ("[T]he test [is] whether he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding--and whether he has a rational as well as factual understanding of the proceedings against him"). The only significant difference between substantive and procedural incompetence claims is the evidence that the Court can consider. In determining whether Brooks was actually incompetent, the Court is not limited to the information available at the time of trial. <u>Watts</u>, 87 F.3d at 1290; <u>James v. Singletary</u>, 957 F.2d 1562, 1572 (11th Cir. 1992).

Defendant provided the Court with the following information not available to the Court during the trial: the forensic psychiatric evaluations completed by Dr. Dietz and Dr. Ballenger, and the declarations from a member of Brooks' legal team, his children, and an inmate at QPDF. The Court also has before it the psychiatric evaluation completed by Dr. Mills on behalf of the Government, and the forensic consultation

completed by Dr. Heilbrun on behalf of Brooks evaluating Dr. Mills' conclusions.

Before evaluating the substance of this new information, the Court must emphasize two points. <u>First</u>, "[a]lthough retrospective determinations of competency are not prohibited, they are disfavored, and the Court will give considerable weight to the lack of contemporaneous evidence of [Brooks'] incompetence." <u>Williams v. Calderon</u>, 48 F. Supp. 2d 979, 990 (C.D. Cal. 1998); <u>accord</u> <u>Weisberg v. Minnesota</u>, 29 F.3d 1271, 1278 (8th Cir. 1994). <u>Second</u>, because of the difficulty in making retrospective competency determinations, Defendant's burden in establishing a substantive competency claim is higher than his burden in establishing a procedural competency claim: The Court should not consider a substantive incompetencey claim "where the facts are not sufficient to positively, unequivocally, and clearly generate a real, substantial, and legitimate doubt as to the [defendant's] mental capacity." <u>Watts</u>, 87 F.3d at 1290 (internal quotation marks and citations omitted). With these principles in mind, the Court reviews the new evidence.

Brooks' experts, Dr. Dietz and Dr. Ballenger, diagnose Brooks with: (i) panic disorder with agoraphobia, (ii) bipolar disorder, (iii) obsessive compulsive disorder, (iv) Asperger's disorder, and (v) paranoid personality disorder. In addition,

Dr. Dietz diagnoses Brooks with suffering from post-traumatic stress disorder as a result of the Code Blue. Notwithstanding the impeccable credentials of these experts, the Court has reason to question their diagnoses. First, Dr. Mills, the Government's expert, reviewed their reports and concluded that alternative non-psychopathological explanations are more convincing. (Mills Report at 4 n.9 ("Drs. Dietz and Ballenger appear at times to conflate oddity and/or self-indulgence with psychopathology."), id. at 13.) Second, Dr. Liebowitz, who had been treating Brooks for over twenty years, only diagnosed him with panic disorder and anxiety disorder. Similarly, the doctors at NCCC and QPDF did not diagnose Brooks with these additional psychological disorders. Third, Dr. Dietz and Dr. Ballenger first examined Brooks more than ten months after he was allegedly incompetent, and thus the contemporaneous evaluations of Dr. Liebowitz and the NCCC and QPDF medical staff are to be given more weight. And finally, Brooks' experts' relied exclusively on information provided by Brooks, his family and friends, and his trial team, "[a]nd this information, either consciously or unconsciously, may have been tailored to support a finding of incompetency." United States v. Barbaran, 599 F. Supp. 1171, 1178 (D.C. Fla. 1984). (Mills Report at 4 n.9.) Accordingly, the Court finds the value of Brooks' experts' opinions in this case to be minimal.

Even if the Court credits these psychiatrists' diagnoses, a finding that Brooks was suffering from additional psychological disorders does not necessarily require a finding of incompetence. See, e.g., United States v. Pope, 146 F. App'x 536, 539 (2d Cir. 2005) (finding that a defendant suffering from panic disorder and depression was competent to enter a guilty plea); United States v. Arthur, 432 F. App'x 414, 427 (5th Cir. 2011) (finding a defendant competent to stand trial even though two psychologists diagnosed him with "bipolar disorder and chronic, severe post-traumatic stress disorder"); Bundy v. Dugger, 850 F.2d 1402, 1408-09 (11th Cir. 1988) (finding a defendant suffering from bipolar disorder competent to stand trial); United States v. Oren, 622 F. Supp. 936, 937 (D.C. Mich. 1985) (finding a defendant suffering from obsessive compulsive personality disorder to be competent to stand trial); Edwards v. Roper, No. 06-CV-1419, 2009 WL 3164112, at *21 (E.D. Mo. Sept. 28, 2009) (finding that a habeas petitioner diagnosed with Asperger's was competent to stand trial); United States v. Saingerard, 621 F.3d 1341, 1343 (11th Cir. 2010) (finding a defendant suffering from paranoid personality disorder competent to stand trial); United States v. Mitchell, 706 F. Supp. 2d 1148, 1220 (D. Utah 2010) (finding that a defendant's narcissistic personality disorder did not affect his competency to stand trial). Rather, Brooks must prove by a preponderance

of the evidence that his psychological disorders rendered him unable to assist in his own defense, consult with counsel, and understand the proceedings against him. The Court finds that Brooks failed to do that here.

His experts conclude that his mental condition, which was exacerbated by the mismanagement of his medication, likely rendered him incompetent during the period in question. They base their respective opinions on the following evidence: statements from Brooks' legal team that he was difficult to work with because he was easily distracted, would focus on minutia, would often ramble and go off topic, and was paranoid and distrustful of the government and often his own counsel; Brooks own statements that he was unable to pay attention during the trial because he was too focused on not looking foolish or nervous (or dying) in front of the jury and that he was unable to work on his case and could not remember portions of the trial during the period in question; and evidence of his turning to "bizarre advisors" and the influence that these individuals had over his decision-making. However, these facts "are not sufficient to positively, unequivocally, and clearly generate a real, substantial, and legitimate doubt as to [Brooks'] mental capacity." Watts, 87 F.3d at 1290 (internal quotation marks and citations omitted).

First, being a difficult client is not the same as being unable to consult with counsel and assist in one's own defense. To be incompetent to stand trial, Brooks must have been unable "to consult with his lawyer[s] with a reasonable degree of rational understanding." Dusky, 362 U.S. at 402. This has been defined as "the capacity to provide whatever assistance counsel requires in order to explore and present an adequate defense." United States v. Salley, 246 F. Supp. 2d 970, 977 (N.D. Ill. 2003) (internal quotation marks and citation omitted). Although Brooks' lawyers may have had trouble keeping him focused and on topic, there is no evidence that Brooks was unable to provide them with any pertinent information. See Doughty v. Grayson, 397 F. Supp. 2d 867, 878 (E.D. Mich. 2005) ("That the petitioner's mental illness caused him some diminished ability to concentrate in general does not mean that he was not competent."); see also, e.g., United States v. Chiappetta, 289 F.3d 995, 1000 (7th Cir. 2002) (stating that an inability to communicate effectively and being easily distracted by irrelevant material "fall far short of legal incompetence"); United States v. Yono, No. 06-CV-20479, 2008 WL 5111907, at *6 (E.D. Mich. 2008) (finding defendant competent even though "he was unable to concentrate or focus sufficiently," and "often interrupted counsel by asking the same questions over and over

again, or making the same comments over and over again, and demanding answers to the same questions over and over again").

Second, Brooks' turning to "bizarre advisors"--specifically African witch doctors, an Indian spiritualist, a Rabbi, and a Kabbalist--for guidance does not support the conclusion that Brooks was rendered incompetent as a result of benzodiazepine withdrawals. Brooks was intimately involved with these individuals before he was remanded and was nonetheless capable of successfully running multiple businesses and supporting his family. (See Mills Report at 5.) And he remained in close contact with them throughout the trial, both during the period of alleged incompetency and after. Yet none of the multitude of attorneys on Brooks' payroll thought that the influence of these "advisors" was pervasive and damaging enough to raise with the Court during the trial. Further, it is not uncommon for a criminal defendant to turn to alternative sources of guidance--be it religion, prayer, or other form of spirituality--and the Court will not find that Brooks' decision to embrace nontraditional spiritual beliefs (including bathing in urine and animal sacrifice) rendered him incompetent. See, e.g., United States v. Montoya, 85 F.3d 641, 1996 WL 229188, at *2 (10th Cir. 1996) (finding defendant competent to stand trial even though he testified that spirits who visited him through a

medicine man told him not to accept a plea bargain and go to trial).

Further, some of the new information presented by Brooks' experts actually evinces his understanding of the proceedings. For example, Brooks asserts that he was actively and purposefully controlling his facial expressions and nervous ticks during the period in question so as not to negatively influence the jury. This demonstrates an understanding of the jury's role in the trial and the seriousness of the charges against him. See Robidoux v. O'Brien, 643 F.3d 334, 339 (1st Cir. 2011) ("The 'understanding' required is of the essentials-- for example, the charges, basic procedure, possible defenses-- but not of legal sophistication."). Dr. Ballenger even concedes that Brooks, throughout the entire trial, understood the nature of the proceedings against him. (Ballenger Report at 34.)

Finally, and most importantly, the Court's contemporaneous observations are to be given considerable weight, and, as discussed in detail above, there was nothing before the Court at the time that indicated that Brooks was unable to consult with counsel, assist in his own defense, and understand the nature of the proceedings against him. Accordingly, the Court finds that Brooks was not incompetent during the period in question and DENIES his request for a new trial on that ground.

III. <u>Ineffective Assistance of Counsel</u>

Brooks also seeks a new trial on the ground that he was denied effective assistance of counsel. To establish a claim for ineffective assistance of counsel, a defendant must demonstrate that counsel provided deficient performance that resulted in prejudice--in other words, that (1) counsel's performance fell below an "objective standard of reasonableness" and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Strickland v. Washington</u>, 466 U.S. 668, 687-88, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). Brooks must satisfy both prongs of the <u>Strickland</u> test to be entitled to relief. <u>Id.</u>

Brooks argues that his former trial counsel rendered constitutionally ineffective assistance by failing to request a competency hearing. Failure to move for a competency hearing constitutes ineffective assistance of counsel when "there are sufficient indicia of incompetence to give objectively reasonable counsel reason to doubt the defendant's competency, and there is a reasonable probability that the defendant would have been found incompetent to stand trial had the issue been raised and fully considered." <u>Jermyn v. Horn</u>, 266 F.3d 257, 283 (3d Cir. 2001); <u>accord</u> <u>Stanley v. Cullen</u>, 633 F.3d 852, 862 (9th Cir. 2011). As the Court already determined that Brooks was, in

fact, competent to stand trial, this claim necessarily fails. See <u>Cowens v. Bagley</u>, 639 F.3d 241, 250 (6th Cir. 2011); <u>Moore v. Kirkpatrick</u>, No. 09-CV-0457T, 2011 WL 1233124, at *15 (W.D.N.Y. Mar. 30, 2011).

Brooks also asserts in a footnote that his trial lawyers were constitutionally ineffective for failing to investigate further the extent of his mental illness because "without a full and detailed diagnosis, Brooks' attorneys could not have made a reasoned decision about what his potential trial defenses were." (Brooks Ex. K, at 2 n.1.) He argues that had Dr. Dietz' diagnoses been discovered earlier, "a psychiatric defense at trial would have been at least reasonable to contemplate." (Brooks Ex. K., at 2 n.1.) However, this is insufficient to establish a claim for ineffective assistance of counsel. Even if counsel's decision not to investigate further was not objectively reasonable, Brooks has failed to establish a "reasonable probability" that the outcome of the proceeding would have been different had his lawyers more fully investigated his psychiatric condition. In fact, Brooks fails to mention the prejudice prong of the <u>Strickland</u> standard at all,[12] and, accordingly, has failed to meet his burden.

---

[12] Rather, Brooks, purportedly quoting <u>Wiggins v. Smith</u>, 539 U.S. 510, 533, 123 S. Ct. 2527, 156 L. Ed. 2d 471 (2002), states: "'That defense counsel in this case would ultimately have chosen not to present a psychiatric defense to the jury at trial is

<u>CONCLUSION</u>

For the foregoing reasons, Defendant's motion is DENIED.

SO ORDERED.

/s/ JOANNA SEYBERT_____
Joanna Seybert, U.S.D.J.

Dated:   June __4__, 2012
         Central Islip, New York

---

irrelevant.'" (Brooks Ex. K, at 2 n.1 (quoting <u>Wiggins</u>, 539 U.S. at 533).) Not only is this quote not from <u>Wiggins</u>, the Court was unable to find a single case containing this language, likely because it is not an accurate statement of the applicable law.