UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------X
UNITED STATES OF AMERICA,

                Plaintiff,                          Case No. 06-cr-550 (JS)

v.

SANDRA HATFIELD and DAVID H. BROOKS,      SWORN DECLARATION OF
                                                                 GARY D. SESSER

                Defendants.
---------------------------------------------------------------X

Pursuant to 28 U.S.C. § 1746, Gary D. Sesser declares under penalty of perjury:

1. I am a member of the New York bar and the law firm of Carter Ledyard & Milburn LLP ("CLM"), counsel for D. David Cohen ("Mr. Cohen"), former General Counsel and shareholder of DHB Industries, now known as SS Body Armor I, Inc. (the "Company" or "DHB"). Since 2007, CLM has represented Mr. Cohen: (1) in connection with his objections to the proposed settlement of class action and derivative lawsuits involving DHB and the conduct of its former CEO David H. Brooks ("Brooks"), and Mr. Cohen's related application for payment of legal fees and expenses based on those objections; (2) in successfully appealing from the district court's approval of the settlement in the U.S. Court of Appeals for the Second Circuit; (3) in participating as necessary in the DHB bankruptcy proceedings in Delaware in order to preserve Mr. Cohen's claims and protect his rights arising out of the decision of the Second Circuit; (4) in attempting to participate in the mediation in this Court relating to the so-called "global settlement term sheet" in light of the fact that the issue of Mr. Cohen's fees and expenses was remanded by the Second Circuit to be reexamined in the context of a revised settlement or

1

the outcome of further litigation; and (5) in preparing his claim for restitution in this Court for his legal fees and expenses.

2. As a victim of the crimes of Brooks, Mr. Cohen is also asserting claims for restitution arising out of his termination as General Counsel and his ownership of certain warrants and restricted stock rendered worthless as a result of Brooks' misconduct. Because CLM has not represented Mr. Cohen in connection with those personal claims, Mr. Cohen is separately preparing his own submission in support of his personal claims.

## BACKGROUND

3. In the fall of 2005, a number of derivative and class action lawsuits were brought in the Eastern District of New York, alleging that certain officers and directors of DHB had unjustly enriched themselves and caused over $700 million in damages through, among other things, massive fraud, habitual self-dealing and insider trading. These lawsuits were consolidated into a single class action captioned *In re DHB Industries, Inc. Class Action Litigation* (Case No. 2:05-cv-04296) (the "Class Action") and a single derivative action captioned *In re DHB Industries, Inc. Derivative Litigation* (Case No. 2:05-cv-04345) (the "Derivative Action").

4. In the summer of 2006, the Company, the individual defendants, and the lead derivative and class-action plaintiffs agreed to a combined settlement of the derivative and class-action lawsuits (the "Settlement"). The Settlement required, among other things, the Company to (i) pay $35,200,000, (ii) release all claims against Company's officers and directors, and (iii) release and indemnify former CEO Brooks and former CFO Dawn Schlegel ("Schlegel") for their obligation to reimburse the Company for amounts they may owe under § 304 of the Sarbanes-Oxley Act of 2002 ("SOX 304"), 15 U.S.C. § 7243. These amounts are estimated to exceed $186 million.

2

5. SOX 304 mandates that when a public company such as DHB is forced to restate its financial reports as a result of misconduct, the company must be reimbursed for certain incentive and equity-based compensation and trading profits obtained by its CEO and CFO during the relevant period. As noted above, the Company's obligation to indemnify Mr. Brooks alone forced the Company to assume a potential liability, or forego a potential recovery, of more than $186 million.

6. Mr. Cohen, a shareholder of the Company, objected to the Settlement, arguing that the release and indemnification of the former CEO and CFO of DHB, Brooks and Schlegel, violated SOX 304 and was against public policy, and that the settlement as a whole was not fair, reasonable and adequate from the Company's perspective. Moreover, the Settlement failed to adequately compensate the shareholder victims for the losses they suffered as a result of Brooks' criminal acts.

7. Over the objection of Mr. Cohen (joined by the Department of Justice ("DOJ") at the behest of Mr. Cohen), the Court approved the settlement on June 25, 2008. The Court also denied Mr. Cohen's application for his fees and expenses and overruled his objection to the fees and expenses awarded to counsel for the lead derivative plaintiff.

8. Following entry of judgment, Mr. Cohen was the *only* party to appeal from the decision approving the Settlement. Mr. Cohen secured the support of DOJ and the Securities and Exchange Commission ("SEC") as *amicus curiae* in arguing that the SOX 304 indemnification in the Settlement was illegal and unenforceable. CLM represented Mr. Cohen on appeal, as it had in the District Court, with respect to his objections to the Settlement.

9. The appeal was argued on January 15, 2010. On September 30, 2010, the Second Circuit agreed with Mr. Cohen and held that the Settlement impermissibly released and indemnified Mr. Brooks and Ms. Schlegel against liability arising under § 304 of SOX:

> On appeal, *intervenor-appellant* [Cohen] *argues* principally that the district court erred by approving the settlement of the shareholders' derivative litigation brought on behalf of DHB Industries, Inc. against a number of its former officers and directors because the settlement agreement impermissibly releases and indemnifies DHB's former Chief Executive Officer and Chief Financial Officer against all liability arising under § 304 of the Sarbanes-Oxley Act, 15 U.S.C. § 7243. *We agree.*

*Cohen v. Viray, et al.,* 622 F.3d 188, 190, emphasis supplied.

10. The Second Circuit vacated the judgment in both the Class Action and Derivative Action and remanded the case to the District Court. *See Cohen v. Viray, et al.,* 622 F.3d 188 (2d Cir. 2010) (the "Second Circuit Decision"). The Second Circuit also remanded the issue of Mr. Cohen's legal fees and expenses to reexamine "either in the context of a revised settlement or the outcome of further litigation." 622 F.3d at 196.

11. The Second Circuit Decision notes that Cohen's appeal raised "novel issues of law" and that "no court ha[d] previously addressed whether a company may indemnify an officer subject to a § 304 remedy." *Id.* at 193, 195. It also noted that SOX 304 "furthers important public purposes" as "an enforcement mechanism that ensures the integrity of the financial markets."

12. Following argument of the Second Circuit appeal on January 15, 2010, but prior to the Second Circuit Decision, the Company filed for bankruptcy protection in Delaware under Chapter 11 of the Bankruptcy Code. CLM represented Mr. Cohen in attempting to lift the automatic stay (over the opposition of the Company) so that the Second Circuit could render its decision (which proved unnecessary, as the Second Circuit rendered its decision anyway). CLM

4

also represented Mr. Cohen in preparing and filing a protective claim in the bankruptcy, as well as in his attempts to participate in the mediation before Magistrate Judge Tomlinson relating to the so-called "global settlement" (from which Mr. Cohen was excluded) and attempts to obtain access to the "global settlement term sheet" which was provided to the Court.

13. In the meantime, Mr. Brooks was tried, convicted, and sentenced in this Court in a criminal prosecution raising many of the same issues that were raised in the Derivative Action and the Class Action. After his prosecution, the DOJ instituted MVRA restitution proceedings against Brooks to recover money to compensate the victims of his crimes. Approximately $160 million of Brooks' assets have been restrained. As noted, CLM is now representing Mr. Cohen with respect to his restitution claims for legal fees and expenses.

## LEGAL FEES AND RESTITUTION

14. In its submission to the Court dated November 25, 2013, the DOJ asks the Court to enter a $117.42 million restitution order in favor of the Company. Of that amount, $14.429 million represents the Company's own legal fees and $13.666 million represents legal fees advanced by the Company to Brooks and others. DOJ Submission at 2, 4-6. In addition, DOJ supports the Company's claim to $39.906 million in "Bankruptcy Costs." According to DOJ, "a substantial portion of the Company's bankruptcy expenses are legal fees . . ." *Id.* at 18.

15. The stated theory behind the Company's restitution claim for "Bankruptcy Costs" is that the bankruptcy was caused by Brooks' criminal conduct. DOJ argues that Brooks' criminal conduct caused a $75 million "cash drain" from the Company, and that the Company would not have had to file for bankruptcy if it did not have those expenses. *Id.* at 15-16.

16. Significantly, the DOJ Submission mentions nothing about Brooks' mandatory obligation under SOX 304 to reimburse the Company more than $186 million based on his trading profits during 2003-2006. As stated, SOX 304 requires the CEO to reimburse the public

5

company for any bonuses, incentive-based compensation, or trading profits obtained during the period for which the company was required to restate its financial reports as a result of misconduct. The obligation is mandatory. The statute provides that the CEO and CFO *"shall reimburse"* the company. 15 U.S.C. § 7243(a), emphasis supplied.

17. As far as I am aware, there is no dispute that all of the elements for SOX 304 liability were met in the case of Brooks; nor is there any dispute that Brooks' trading profits were more than $186 million for that relevant period. Finally, there is no question, under DOJ's analysis, that had Brooks met his mandatory obligation under SOX 304 to reimburse the Company $186 million, the Company would not have had to file for bankruptcy.

18. Although I have not seen the Company's unfiled restitution claim (only DOJ's defense of that claim), it is clear that the Company must have omitted the SOX 304 claim from its submission. That omission is not because a claim under SOX 304 cannot properly be part of a restitution claim against Brooks. In fact, DOJ's Submission notes that courts have the "authority to order a participant in a conspiracy to pay restitution even on uncharged or acquitted counts." *Id.* at 6, citing *United States v. Boyd*, 222 F.3d 47, 51 (2d Cir. 2000). The Company's restitution claim does in fact include conduct which was not the subject of Brooks' criminal conviction, such as $2.2 million for Brooks' personal use of the Company airplane. *See* DOJ Submission at 6.

19. The $186 million in trading profits for which Brooks was required to reimburse the Company under SOX 304 resulted from the same transactions for which Brooks was criminally convicted of insider trading. The fact that the SOX 304 claim does not require proof of criminal conduct by Brooks -- only "misconduct" is required under the statute -- does not mean that this debt cannot be part of a restitution claim, as DOJ's own analysis clearly suggests.

6

7336969.3

20. Of course, the reason for this curious omission should be obvious: the Company and its lawyers negotiated and argued for the release and indemnification of Brooks and Schlegel from any liability under SOX 304 as part of the Settlement of the Class Action and Derivative Action. The very lawyers for whom DOJ supports millions of dollars in restitution fought Cohen all the way through the Second Circuit to preserve the illegal release and indemnification of Brooks. Furthermore, DOJ supports restitution to pay many millions of dollars more to pay the Company's bankruptcy lawyers, even though the bankruptcy would have been entirely avoided had Brooks met his legal obligation to reimburse the Company $186 million, as Cohen consistently urged over the *opposition* of the Company and its lawyers, not to mention the opposition of the lawyers for the class and derivative plaintiffs.

21. In this context, DOJ's support for tens of millions of dollars in restitution to pay lawyers who argued for the illegal release and indemnification of Brooks, and DOJ's apparent refusal to support Cohen's relatively modest restitution claim for legal fees and expenses in preserving a $186 million asset, raising a novel issue of first impression in the Second Circuit, and successfully vindicating an important principle to the enforcement of the securities laws (as clearly acknowledged in the Second Circuit Decision), is nothing short of perverse.

22. Indeed, DOJ was able to express the Government's views to the Second Circuit on the important SOX 304 indemnification issue *only* because Cohen had the courage and commitment to pursue an appeal. While DOJ initially filed a notice of appeal from the Court's approval of the Settlement, its appeal was withdrawn following the Company's and other appellees' motions to dismiss the Government's appeal as untimely. DOJ and the SEC ultimately filed an *amicus* brief in support of Cohen's appeal on the SOX 304 issue.

23. For DOJ to support restitution for the legal fees of the losing side, and not to support Cohen's claim, seems utterly inconsistent with the purpose and intent of the MVRA.

24. Mr. Cohen's actions – objecting to and then appealing the approval of the Settlement – and the instant restitution proceeding are two paths to the same goal – recovering proceeds of Brooks' illegal conduct to compensate his victims. It should be emphasized that the Second Circuit *directed* that Cohen's claim for legal fees and expenses be reexamined on remand, either in the context of a revised settlement of the derivative case or "the outcome of further litigation." *Cohen v. Viray, et al.*, 622 F.3d at 196. In light of the MVRA proceeding, it is highly likely that the derivative claims will not be pursued by the Company if the Company receives a substantial restitution recovery, as DOJ urges. In fact, the Company sought and obtained a stay of all adversary proceedings from the bankruptcy court on the basis of these restitution proceedings, and has taken no steps to pursue the derivative claims. Likewise, all indications are that the SEC will not pursue its pending SOX 304 claim against Brooks in Florida in view of the restitution and forfeiture proceedings in this Court. Thus, *this* restitution proceeding represents the appropriate forum and opportunity to address Cohen's claims and award Cohen his reasonable fees and expenses incurred in his successful litigation efforts to assure that Brooks pays for his misconduct and victims are fairly compensated.

25. Merely because restitution pursuant to the MVRA (and not SOX 304) will be the procedural vehicle for recovery should not preclude Mr. Cohen from recovering on his claim for his losses and expenses, including his legal fees and costs. Indeed, there can be no doubt that Mr. Cohen's actions resulted in a benefit to the shareholder victims because even under the DOJ's flawed reasoning, the shareholder victims would share in an approximately $45.2 million

7336969.3

fund, which would be a nearly 30% increase in recovery when compared to the funds that would have been available under the Settlement.[1]

## CLM'S FEES

26. Attached hereto as Exhibit A is a summary of all the invoices for legal services CLM has sent to Mr. Cohen for the time period from February 2007, through November 30, 2013. The actual invoices are not attached in view of their volume and the need to extensively review and redact the invoices to protect privileged material. However, CLM will provide all invoices to the Court for *in camera* review upon request, as well as update Mr. Cohen's claim for fees and expenses for the period after November 30, 2013.

27. Through November 30, 2013, the total fees billed are $821,010.36 and total disbursements are $91,395.29, for a total of $912,405.65. Of that amount, Mr. Cohen has paid $139,406.30, and $772,999.35 is unpaid. In addition, Mr. Cohen separately paid $9,424.95 to bankruptcy counsel in Delaware.

28. At the time CLM agreed to represent Mr. Cohen in appealing from the District Court's approval of the Settlement, CLM agreed that Mr. Cohen would not have to pay out of pocket more than approximately $131,000, as CLM agreed to make application to the Court for fees above that amount. CLM agreed to assume that risk because it was convinced that the appeal had substantial merit, that the issue was important, and that the amount at stake – at least $186 million – made the appeal worthwhile. The Second Circuit Decision confirmed both the merit of Cohen's appeal and the importance of the issue presented. Of course, the participation of DOJ and the SEC as *amicus curiae* also demonstrated the importance of the issue to the Government.

---

[1] In addition to cash, the class-action and derivative plaintiffs were also to receive approximately 3 million shares of DHB common stock. As set forth above, the Company thereafter filed for bankruptcy protection.

9

29. Typically, in circumstances such as this, counsel would be entitled significant "multiplier" of fees calculated on the basis of normal hourly rates based on the risks involved, the novelty and importance of the issue, and the result achieved. In the Class Action, for example, lead plaintiff's counsel was awarded nearly $10 million on the basis of an overall Settlement (since vacated as a result of Mr. Cohen's appeal) of about $35 million.

30. The two most common methods of determining a reasonable award of attorneys' fees are the "lodestar" method and the "percentage" method. While both methods are available, "the trend in [the Second] Circuit is toward the percentage method." *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 121 (2d Cir. 2005). Factors courts consider in determining the appropriate percentage include (i) the time and labor expended by counsel, (ii) the magnitude and complexities of the litigation, (iii) the risk of the litigation, (iv) the quality of representation, (v) the requested fee in relation to the settlement, and (vi) public policy considerations. *Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 50 (2d Cir. 2000). The lodestar method multiplies hours reasonably expended against a reasonably hourly rate. *See, e.g., Wal-Mart*, 396 F.3d at 121. Once that initial computation has been made, the court may increase the lodestar by applying a multiplier based on the same factors that are used to determine the appropriate percentage. *Id.* The Second Circuit has found that where the risk of litigation is high – as it necessarily must be on a case of first impression – and counsel's work resulted in significant benefits for the class – such as a $10 million increase in the settlement fund (under the most conservative analysis) – a lodestar with a 3.5 multiplier is reasonable. *Id.* Each of the factors enumerated above weigh heavily in favor of awarding fees well in excess of the amounts actually billed to Mr. Cohen.

7336969.3

## CONCLUSION

31. There can be no question that Mr. Cohen incurred legal fees and expenses in connection with the criminal misconduct of Brooks and his attempt to require Brooks to pay for his misconduct. Thus, an award of legal fees and expenses to Cohen as a victim of Brooks' crimes is well-deserved in the circumstances of this case. Indeed, DOJ's recommendation of restitution to the Company for tens of millions of dollars of legal fees it paid or incurred to attorneys who *opposed* Cohen's successful effort to hold Brooks responsible for his misconduct demonstrates that Cohen is clearly entitled to restitution for legal fees and expenses. In view of the risks, duration of time such fees have been outstanding, importance of the legal issues, and amount at stake, the restitution award of legal fees to Cohen should not be less than $3 million.

I declare under penalty of perjury that the foregoing is true and correct. Executed on December 27, 2013.

*[signature]*
Gary D. Sesser

7336969.3