13-3213-cr (L)
*United States v. Brooks*

# In the
# United States Court of Appeals
## For the Second Circuit

---

August Term, 2016

No. 13-3213-cr (L), 13-4288-cr(CON), 14-2577-cr(CON), 14-2682-cr(CON), 15-1156-cr(CON), 15-2058-cr(CON), 13-3672-cr(XAP)

UNITED STATES OF AMERICA,
*Appellee-Cross-Appellant,*

*v.*

DAVID H. BROOKS,
*Defendant-Appellant-Cross-Appellee,*

DAWN SCHLEGEL, PATRICIA LENNEX,
*Defendants,*

TERRY BROOKS, VICTORIA BROOKS, ANDREW BROOKS, ELIZABETH BROOKS,
*Appellants.*[*]

---

Appeal from the United States District Court
for the Eastern District of New York.
No. 6-cr-550 — Joanna Seybert, *Judge.*

---

ARGUED: MAY 19, 2017
DECIDED: SEPTEMBER 20, 2017

---

[*] The Clerk of Court is directed to amend the caption as set forth above.

CERTIFIED COPY ISSUED ON 09/20/2017

1    Before: WINTER and DRONEY, *Circuit Judges*, and DONNELLY, *District Judge*.†

2

3    Appeal from a judgment of the United States District Court for the Eastern
4    District of New York (Seybert, *J.*) entered following a jury verdict finding
5    defendant David Brooks guilty of offenses related to fraud and securities laws
6    violations, and Brooks's guilty plea to tax evasion. After Brooks filed his appeal,
7    he died while incarcerated and his estate and members of his family moved to
8    abate his convictions. We conclude that Brooks's counts of conviction resulting
9    from the verdict abated with his death, but not the counts resulting from his
10   guilty plea; the bail bond subscribed by Brooks and his family remains forfeited;
11   and the order of restitution related to the fraud and securities laws counts is
12   abated but not the order of restitution related to the tax counts. Accordingly, the
13   estate-appellant's motion for abatement is GRANTED in part and DENIED in
14   part, Brooks's judgment of conviction for the non-tax counts is VACATED, the
15   motion by Brooks's family members for abatement of the bail bond forfeiture is
16   DENIED, the order denying the motion to set aside bond forfeiture is
17   AFFIRMED, the Government's cross-appeal is DISMISSED, and the case is
18   REMANDED for the dismissal of the non-tax counts of the indictment.

19   _____

20

21                    RICHARD C. KLUGH, Law Offices of Richard C.
22                    Klugh, (Joseph A. DiRuzzo, III, Fuerst Ittleman
23                    David & Joseph, PL, *on the brief*) Miami, FL, *for*
24                    *Defendant-Appellant-Cross-Appellee.*

25                    JUSTINE A. HARRIS, Sher Tremont LLP, (Lisa H.
26                    Bebchick, Fried, Frank, Harris, Shriver &
27                    Jacobson LLP, *on the brief*), New York, NY, *for*
28                    *Appellant Terry Brooks.*

29                    JUDD BURSTEIN, Judd Burstein, P.C., New York,
30                    NY, *for Appellants Andrew, Victoria, & Elizabeth*
31                    *Brooks.*

_____

† Judge Ann M. Donnelly, United States District Court for the Eastern District of New York,
sitting by designation.

(Michael J. Gilbert, (Andrew J. Levander, *on the brief*), Dechert LLP, New York, NY, *for Appellants Andrew, Victoria, & Elizabeth Brooks*.)

DAVID K. KESSLER & LAURA D. MANTELL, Assistant United States Attorneys (David C. James, Amy Busa, Christopher A. Ott, Christopher C. Caffarone, Assistant United States Attorneys *on the brief*) *for* Robert L. Capers, United States Attorney for the Eastern District of New York, Brooklyn, NY, *for Appellee-Cross-Appellant.*

DRONEY, *Circuit Judge*:

On September 14, 2010, David H. Brooks was convicted in the United States District Court for the Eastern District of New York (Seybert, *J.*) after a jury trial on multiple counts of offenses relating to securities fraud, mail and wire fraud, and obstruction of justice. He was also convicted of related tax offenses based on his guilty pleas, which occurred after the jury's verdict. Shortly before trial, the district court found that Brooks had violated the terms of his release conditions and ordered the forfeiture of a substantial cash security on the bond executed by Brooks and members of his family as sureties.

Following his convictions, Brooks was sentenced to 204 months' imprisonment, ordered to pay restitution and a fine, and ordered to forfeit assets. He appealed his convictions based on the jury verdict but not the tax counts.

3

1    After the verdict, Brooks's ex-wife and their children moved to set aside the

2    forfeited bail bond security.  The district court denied the motion and the family

3    members appealed that decision. Brooks died while he was incarcerated and

4    while these appeals were pending.[1]

5         As a result of Brooks's death, his estate has now moved for abatement of

6    his convictions, the order of forfeiture, the orders of restitution, the fine, and the

7    special assessment that accompanied the judgment of conviction.[2] His estate, as

8    well as his ex-wife and their children, have also moved for abatement of the bail

9    bond forfeiture.[3] The Government does not oppose the abatement of Brooks's

10   convictions on the non-tax counts and accompanying order of forfeiture, fine,

---

[1] Brooks's appeal was consolidated with the appeal filed by his family members. We address both in this opinion, and refer to them as one appeal.

[2] We refer to both Brooks and his estate in this opinion without concluding which is the proper party for this appeal. We note that no motion to substitute the estate for Brooks has been filed, and it appears that no substitution is necessary for us to consider the appeal. *See United States v. Volpendesto*, 755 F.3d 448, 451–52 (7th Cir. 2014) (concluding substitution of the estate not necessary to consider abatement *ab initio*); *see also United States v. Libous*, 858 F.3d 64, 65 n.1 (2d Cir. 2017) (granting Fed. R. App. P. 43(a)(1) motion to substitute executrix of appellant's estate for appellant).

[3] These appellants did not file a motion to abate, but requested that relief in a supplemental brief.  Appellants' Suppl. Br., Docket No. 13-3213-cr, ECF No. 533.  We treat that request as a motion for abatement.

1    and special assessment, but opposes the abatement of the restitution obligations

2    and the forfeiture of his bail bond.

3         We conclude that the counts of conviction based on the jury verdict must

4    abate as well as the orders of forfeiture, fine, special assessment, and restitution

5    for the offenses Brooks contested at trial. We also hold, though, that the forfeiture

6    of the bail bond does not abate, nor do the convictions and order of restitution

7    imposed on the tax counts. Accordingly, Brooks's motion for abatement is

8    GRANTED in part and DENIED in part, Brooks's judgment of conviction is

9    VACATED in part, the motion for abatement by the other appellants is DENIED,

10   the order denying the motion to set aside the bond forfeiture is AFFIRMED, the

11   Government's cross-appeal is DISMISSED,[4] and the case is REMANDED for the

12   dismissal of the indictment as to counts I-XI, XV-XVII.

13

14

15

---

[4] The Government filed a notice of cross-appeal of the district court's Amended Preliminary Order of Forfeiture, *see* Notice of Crim. Appeal, Docket No. 13-3213-cr, ECF No. 23, but the Government did not file its response brief to Brooks's direct appeal until after Brooks's death and so submitted no brief on the merits of the cross-appeal. *See* Appellee-Cross-Appellant United States' Br., Docket No. 13-3213-cr, ECF No. 542. The Government's brief withdrew the Government's cross-appeal and addressed the requests for abatement.

1                                   **BACKGROUND**

2      **I.      Brooks's Offense Conduct**

3              David Brooks was the founder, Chair of the Board of Directors, and CEO

4      of DHB Industries, Inc., a publicly traded company that manufactured and sold

5      body armor to law enforcement agencies and the U.S. military.[5]

6              In October 2007, Brooks was indicted in a superseding indictment on

7      charges of participating in several schemes to defraud shareholders, including

8      overvaluing inventory of DHB and its subsidiaries, reclassifying costs to inflate

9      DHB's profitability, falsely adding non-existent inventory to the company's

10     books, and obstructing a Securities and Exchange Commission ("SEC")

11     investigation.

12             In addition to the allegations concerning manipulation of the DHB books

13     and false SEC disclosures, the indictment alleged that Brooks also defrauded

14     DHB shareholders by diverting DHB assets for the benefit of Brooks, the Brooks

15     family, and other DHB executives. Brooks routinely used DHB funds to pay

16     expenses for his personal horse-racing business, and gave company credit cards

---

[5] DHB shares were traded on the American Stock Exchange from 2002-2005, and on the "over-the-counter" market following this period.

6

1    and checks to his family to cover their personal expenses including clothing,

2    home renovations, plastic surgery, vacations and airfare, automobiles,

3    entertainment, and gifts. These personal expenses totaled millions of dollars.

4         Brooks also sold substantial shares of DHB stock while the stock price was

5    artificially inflated, making hundreds of millions of dollars in profit. Finally, the

6    indictment alleged that Brooks paid himself millions of dollars through DHB that

7    were not reported as income to the Internal Revenue Service, and did not pay

8    income taxes on those payments.

9         A second superseding indictment (the "indictment") was returned in July

10   2009, with the same charges directed at Brooks.[6]

11        The district court entered a pre-trial restraining order on fourteen bank

12   and investment accounts held by Brooks and his family that the court found

13   would be subject to forfeiture in the event of a conviction.

14        Brooks pled not guilty to all of the charges. The court later granted

15   Brooks's motion to sever the tax counts. Brooks proceeded to trial on the non-tax

16   counts in January 2010.[7]

---

[6] Co-defendants were also named in the indictments.

1    **II.     Brooks's Forfeiture of Bail Bond**

2           After Brooks's arrest in October 2007, the Government sought to have

3    Brooks detained or his release be subject to a substantial bond and the full

4    disclosure of his financial holdings, and on Brooks returning all of his assets from

5    overseas back to the United States. The district court held a hearing and

6    determined that Brooks was a flight risk on the basis of his considerable wealth

7    and the potential for access to foreign accounts if he fled the country. The district

8    court was also concerned that undisclosed and unmonitored accounts could be

9    used to facilitate witness tampering. The district court issued a Bail Release

10   Order (the "Order") on January 3, 2008, granting Brooks's motion for pre-trial

11   release. The Order included such restrictions as home detention monitored by a

12   private security firm, monitored conversations, independent auditing of bank

13   accounts and assets, and a prohibition on liquid assets being held overseas

14   without the approval of the U.S. Attorney's office.

---

[7] There were three other codefendants: Sandra Hatfield (DHB's Chief Operating Officer), Dawn Schlegel (DHB's Chief Financial Officer), and Patricia Lennex (an officer of a DHB-related company).  Schlegel and Lennex pled guilty before trial and Hatfield was tried with Brooks and was convicted of all but two counts directed against her. She and Brooks jointly appealed their convictions. After Brooks's death, this Court granted the Government's motion to unconsolidate Hatfield's appeal, which has been heard and resolved by this Court. *See United States v. Schlegel*, 687 F. App'x 26 (2d Cir. 2017), *petition for cert. filed*, No. 16-9701 (June 23, 2017).

1    Brooks and his family sureties also provided $48 million in cash as security

2    for the $400 million bond the court ordered.[8] The Order provided that if Brooks

3    concealed assets, that conduct would be grounds for revocation of Brooks's bail

4    and for the forfeiture of the $48 million cash security.[9]

5    The district court reviewed the terms of the Order with Brooks and the

6    family sureties prior to its approval at a December 21, 2007, hearing. In

7    particular, the district court asked at the hearing about "failure to disclose assets"

8    and Brooks's counsel confirmed that any such failure "subjects him to immediate

9    remand, and it subjects him to the loss of the . . . [security]." J.A. 481.[10] The

10   district court canvassed Terry Brooks (Brooks's wife), Jeffrey Brooks (Brooks's

---

[8] The cash was held in a segregated account and was posted by two entities, Wildfire Holdings LLC and Perfect World Partners LLC. Brooks's now ex-wife Terry Brooks owns approximately 36% of Wildfire LLC through her interests in member entities of that LLC, and 3% of Perfect World, and the Brooks children own approximately 41% of Perfect World.

[9] Specifically, the Order stated that "[a]ny knowing violation of this agreement, including . . . an attempt . . . to conceal assets . . . will be grounds for revocation of his bail release and for forfeiture of the $[48] million in bond security." J.A. 421. The entire $400 million personal recognizance bond was only enforceable against the sureties if Brooks attempted to leave home confinement without approval, to escape from his security monitor, or to commit the crime of witness tampering defined at 18 U.S.C. § 1512. The parties characterized the Order as having a two-tier violation system, with lesser violations triggering forfeiture of the bond security and greater violations triggering forfeiture of the $400 million.

[10] "J.A." references are to the Joint Appendix filed by Terry Brooks.  "App." references are to the Appendix filed by David Brooks.

1   brother), Victoria Brooks (Brooks's 23-year-old daughter), and Andrew Brooks

2   (Brooks's 19-year-old son), who executed the bond along with Brooks. The court

3   later modified the Order upon subsequent motions by Brooks, but these

4   modifications did not affect the asset disclosure terms or the restriction on

5   maintaining funds overseas.

6       In January 2010, shortly before trial, the Government moved to revoke

7   Brooks's bail on the basis that Brooks and his family had hidden substantial

8   assets in violation of the terms of the Order. The Government sought forfeiture of

9   the entire $400 million bond. The district court revoked Brooks's bail and

10   ordered his detention, but ordered forfeiture of only the cash security of $48

11   million.

12       The district court did not hold an evidentiary hearing for the forfeiture,

13   over the objections of defense counsel, and proceeded by Government proffer.[11]

---

[11] It is well established that the Government may proceed by proffer at a bail revocation hearing. *United States v. LaFontaine*, 210 F.3d 125, 130–31 (2d Cir. 2000); *see also United States v. Galanis*, 656 F. App'x 560, 562–63 (2d Cir. 2016) (summary order); *United States v. Bartok*, 472 F. App'x 25, 27 (2d Cir. 2012) (summary order). While "Congress did intend to give defendants an opportunity to testify and to present evidence on their own behalf," *United States v. Davis*, 845 F.2d 412, 415 (2d Cir. 1988), this Court has also concluded that bail revocation hearings are "typically informal." *LaFontaine*, 210 F.3d at 131 (quoting *United States v. Acevedo-Ramos*, 755 F.2d 203, 206 (1st Cir. 1985)); *see also United States v. Martir*, 782 F.2d 1141, 1145 (2d Cir. 1986). This Court has acknowledged the district courts' wide discretion in evaluating the type of proceeding to hold and the accuracy of the evidence presented by the Government. *See Martir*,

1    The district court credited the extensive affidavit (with numerous exhibits) of FBI

2    Special Agent Angela Jett, which described the results of her investigation into

3    Brooks's concealment of assets abroad.

4          According to the affidavit, prior to the entry of the bail bond Order, a

5    confidential source had met with David and Jeffrey Brooks as well as other

6    family members to create various corporations and bank accounts around the

7    world to conceal millions of dollars in assets. The source set up a scheme called

8    "Czerny Kot" (Polish for "black cat") using the passports of Jeffrey Brooks,

9    Elizabeth Brooks, Andrew Brooks, and Victoria Brooks to open nominee

10   accounts. Special Agent Jett also pointed to Grand Jury testimony of Brooks's

11   personal pilot to show that Brooks, Jeffrey, and other family members (including

12   Terry Brooks and the children) flew to Switzerland in a private plane to deposit

13   assets in Swiss safe deposit boxes.

---

782 F.2d at 1147. However, a presiding judicial officer should include "a clear record of the district court's findings and its reasons for revocation and detention, which may be embodied in a transcript of the proceedings." *Davis*, 845 F.2d at 415. After review of the hearing undertaken in this case, we conclude that Brooks had adequate notice and opportunity to present his own witnesses and that the district court appropriately conducted the hearing and thoroughly explained its reasoning in accepting the Government's proffer. This hearing was also not a case where the Government proceeded *ex parte. See, e.g., United States v. Abuhamra*, 389 F.3d 309, 323–24 (2d Cir. 2004) (noting that bail hearings should be public proceedings). We are also satisfied with Terry Brooks's and the children's notice and opportunity to participate in the hearing.

1    Based principally on Special Agent Jett's affidavit, the district court found

2    that David and Jeffrey Brooks violated the conditions of Brooks's release by clear

3    and convincing evidence. Specifically, the court found that (1) the two Brooks

4    brothers conspired to hide assets through the Czerny Kot scheme in the Republic

5    of San Marino,[12] (2) that Jeffrey Brooks had concealed over $3 million in currency

6    in a London safe deposit box, and (3) that David Brooks secretly transported an

7    unknown amount of currency to Switzerland.

8    Concluding that these actions constituted a violation of the Order, the

9    district court ordered the forfeiture of the cash security. The amount of cash

10   remaining as security on that bond (after the prior withdrawals, as permitted by

11   the court) totaled approximately $22.5 million, of which Terry Brooks and the

12   children claimed ownership of $17.7 million and Brooks claimed $1.8 million (the

13   remaining $3 million went to legal fees, as permitted by the court). Brooks filed

14   an emergency motion with this Court to reverse the district court's revocation of

15   bond, which this Court denied.

16

17

---

[12] The Republic of San Marino is a "microstate" surrounded by Italy.

1   **III.    Convictions and Post-Trial Events**

2          On September 14, 2010, after an eight-month trial, a jury returned a guilty

3   verdict against Brooks on all counts. Brooks subsequently pled guilty to one

4   count of conspiracy to defraud the IRS and two counts of tax evasion in August

5   2011. Brooks also agreed, in his plea agreement regarding the tax counts, to pay

6   $2.8 million in restitution to the IRS and waived his appeal rights as to the tax

7   convictions and the sentence for them.

8          On August 22, 2013, judgment was entered against Brooks, and he was

9   sentenced to 204 months' imprisonment for all his counts of conviction. The

10  August 2013 judgment also reflected the imposition of a special assessment of

11  $1,700, a fine of $8.7 million, restitution of $2.8 million on the tax counts, and also

12  made final a preliminary order of forfeiture. Restitution on the fraud and

13  securities laws counts of conviction was to be subsequently determined by the

14  district court.

15         **a.  Restitution Order on Fraud and Securities Laws Violations**

16         In March 2015, the district court issued an extensive opinion and

17  accompanying final order of restitution, pursuant to the Mandatory Victim's

18  Restitution Act ("MVRA"), for the non-tax counts. The amended judgment that

13

1    followed reflected the imposition of $53.9 million in restitution to Point Blank

2    Solutions (the then-successor to DHB, Inc.), plus $37.6 million to individual

3    victims identified by the Government, as well as the previously-ordered $2.8

4    million to the IRS for the tax counts.[13]

5         Brooks filed a timely appeal of the fraud and securities laws convictions

6    and the restitution order based on those counts.  He also appealed the revocation

7    and forfeiture of his bail bond.

8         On May 16, 2015, Brooks moved in the district court to stay disbursement

9    of the assets that had been previously deposited with the clerk of court. The

10   district court granted the stay, and noted that it was restraining approximately

11   $160 million in assets. App. 2783–84. The court reasoned that if these assets were

12   disbursed to victims prior to the resolution of the appeal, it would be difficult to

13   recover that money from the victims if Brooks was ultimately successful on

14   appeal.[14] App. 2783–84.

---

[13] The judgment set forth special instructions that the restitution was payable "at the rate of $25 quarterly while the defendant is incarcerated, then 20 per cent of his gross income monthly during [the] term of supervised release," with any outstanding balance to be the subject of a civil judgment in the future. J.A. 1406.

[14] These assets are also currently the subject of a parallel civil forfeiture action, and Terry Brooks and her children have filed as claimants in that contested action. *See United States v. All Assets Listed on Schedule I Attached Hereto and All Proceeds Traceable Thereto* (No. CV-10-4750 E.D.N.Y.).

1    **b. Motion to Set Aside Bail Forfeiture**

2    In April 2015, Terry Brooks and the children filed a motion with the

3    district court under Fed. R. Crim. P. 46(f)(2) to set aside the earlier bail forfeiture

4    and release the cash security. The two bases of their motion were that (1) the

5    equitable reasons for the bail bond no longer applied as Brooks was in custody

6    and (2) the indictment upon which the bond was based was a nullity because the

7    grand jury that returned that superseding indictment had not been properly

8    empaneled.[15] The district court denied the motion in June 2015.

---

David Brooks was also named as a defendant in a class action and derivative shareholder action and was the subject of an SEC investigation and enforcement action. *See In Re DHB Indus., Inc. Derivative Litigation* (05-cv-4345 E.D.N.Y.) (derivative litigation); *In Re DHB Indus., Inc. Class Action Litigation* (05-cv-4296 E.D.N.Y.) (class action); *see also S.E.C. v. Brooks* (07-61526 S.D. Fla.).

[15] In August 2012, well after his trial, Brooks discovered that the first superseding indictment was returned by a grand jury whose term had expired. At the time that first superseding indictment was returned, the Government was not aware that the grand jury's term had expired. Without the Government's knowledge of the issue as to the first superseding indictment, a new grand jury was empaneled and a second superseding indictment was returned, and it was this indictment that was in effect at the time of Brooks's trial. At the arraignment for the second superseding indictment, the district court reimposed the bond and its conditions. In this appeal Brooks contested numerous proceedings below on the basis of the invalidly-returned first superseding indictment, and pressed a similar argument with respect to the return of his forfeited bail security. All of these arguments are foreclosed by this Court's decision in *United States v. Schlegel*, 687 F. App'x 26 (2d Cir. 2017), *petition for cert. filed*, No. 16-9701 (June 23, 2017), in which the Court concluded that the "district court properly declined to dismiss the second superseding indictment." *Id.* at 29. Brooks contested the application of *United States v. Schlegel* in a Fed. R. App. P. 28(j) letter on April 27, 2017, but his arguments fail.

15

1    Terry Brooks and the children filed a timely appeal of the district court's

2    decision not to set aside the forfeiture of the cash security on the bail bond.

3    On October 27, 2016, David Brooks died while serving his term of

4    imprisonment, and while this appeal was pending.

5    **DISCUSSION**

6    In this appeal Brooks's estate has moved for an abatement of his

7    convictions, restitution and forfeiture orders, fines, forfeited bail bond security,

8    and special assessments. Terry Brooks and the Brooks children appeal the denial

9    of their motion by the district court for the return of the forfeited cash security

10   under Fed. R. Crim. P. 46, and also argue that the forfeiture of their bail bond

11   security should abate with Brooks's death.

12   "[W]hen a convicted defendant dies while his direct appeal as of right is

13   pending, his death abates not only the appeal but also all proceedings had in the

14   prosecution from its inception." *United States v. Libous*, 858 F.3d 64, 66 (2d Cir.

15   2017) (quoting *United States v. Wright*, 160 F.3d 905, 908 (2d Cir. 1998)); *see also*

16   *Durham v. United States*, 401 U.S. 481, 483 (1971) (per curiam), *overruled on other*

17   *grounds by Dove v. United States*, 423 U.S. 325 (1976) (per curiam). This general

18   rule, almost unanimously followed by the federal Courts of Appeals, has its roots

16

1   in the common law doctrine of abatement *ab initio*: "everything associated with

2   the case is extinguished, leaving the defendant as if he had never been indicted

3   or convicted." *Libous*, 858 F.3d at 66 (quoting *United States v. Estate of Parsons*, 367

4   F.3d 409, 413 (5th Cir. 2004) (en banc)); *United States v. Logal*, 106 F.3d 1547, 1551–

5   52 (11th Cir. 1997).

6        We must consider the application of the abatement *ab initio* doctrine to

7   three specific parts of this appeal: the convictions, the orders of restitution, and

8   the forfeiture of the bail bond.

9   **I.    Abatement of Convictions**

10       Brooks's convictions based on the jury verdict must abate because he died

11   while his direct appeal was pending. *See Libous*, 858 F.3d at 66. As this Court has

12   recently recognized, a defendant's conviction must be abated upon his death

13   during appeal for two reasons: the interests of finality and just punishment. *Id.*

14   Finality requires that "a defendant not stand convicted without resolution of the

15   merits of an appeal," and recognition of the purposes of just punishment leads to

16   the conclusion that "to the extent that the judgment of conviction orders

17   incarceration or other sanctions that are designed to punish the defendant, that

18   purpose can no longer be served." *Id.* (quoting *Wright*, 160 F.3d at 908).

17

1    We note, however, that the application of the doctrine of abatement is not

2    indivisible; many defendants (like Brooks) are charged with multiple counts and

3    may be convicted by a jury on some counts and by a plea of guilty on others.

4    Those convictions may become final at different times, and a defendant may

5    choose not to appeal every conviction. The doctrine of abatement leaves the

6    deceased defendant "as if he had never been indicted or convicted," *Libous*, 858

7    F.3d at 66, *only as to those counts* as to which the conviction has not yet become

8    final.

9    We recognize that courts have often considered abatement to be justified by

10    the finality and just punishment principles stated above, and that by not abating

11    all of the convictions, some of the resulting punishments may continue even

12    though the purpose of those punishments can no longer be served. In weighing

13    the two principles, we conclude that finality is the paramount consideration.

14    "[A]batement *ab initio* is premised at least as much, if not more, on the fairness of

15    allowing a conviction and penalties to stand when a defendant dies pending an

16    appeal as of right as it is on the futility of punishing the deceased." *Libous*, 858

17    F.3d at 67. Otherwise, we would abate all convictions, even if such convictions

18    were final and unappealed, upon the death of a convicted defendant who had

18

1    not yet completed her term of imprisonment, paid her entire fine, or completed

2    restitution to her victims. Therefore, when faced with a multi-count indictment,

3    where a defendant is convicted on some or all counts but appeals only certain

4    convictions, the defendant's death shall only abate the appealed convictions and

5    the resulting punishments or consequences that relate to those convictions.

6         Brooks's convictions on the counts that were decided by the jury and the

7    associated forfeiture order, fine, and special assessment are abated upon his

8    death. As Brooks pled guilty to the tax evasion counts, waived his right to appeal

9    as to those counts, and did not appeal them, his convictions on those counts do

10   not abate. The case shall be remanded to the district court for dismissal of the

11   indictment on the non-tax counts and those related sanctions. *See Krantz v. United*

12   *States*, 224 F.3d 125, 126 (2d Cir. 2000) (per curiam).

13        We now turn to whether abatement applies to the restitution orders and the

14   bail bond forfeiture.

15   **II.    Abatement of Restitution**

16        We have not yet decided whether restitution abates upon the death of a

17   criminal defendant while his direct appeal is pending. *See Wright*, 160 F.3d at 909

18   ("[W]e conclude that in the circumstances of the present case, we need not

1    determine whether an order of restitution should be abated as a general matter,

2    for here, retention of the restitutionary order would be a futile act."). Although

3    the federal Courts of Appeals generally follow the doctrine of abatement *ab initio*,

4    there is a split as to its application to restitution. *See Volpendesto*, 755 F.3d at 453.

5    The Courts of Appeals that hold that restitution abates with the death of a

6    defendant typically do so because restitution depends on a valid, final

7    conviction, *see, e.g., id.* at 453–54, while the Courts of Appeals that hold that

8    restitution does not abate with the death of a defendant do so because they

9    consider restitution to be compensatory, not punitive in nature, *see, e.g., United*

10   *States v. Christopher*, 273 F.3d 294, 299 (3d Cir. 2001) (concluding that although

11   restitution may be "compensatory, punitive, or a combination of both," the order

12   of restitution in that case was "more compensatory in nature than penal").

13          Brooks's restitution was imposed both for his offenses for which he was

14   convicted by a jury (and appealed) and for the tax-related offenses to which he

15   pled guilty (but did not appeal). We address these orders of restitution

16   separately.

17

18

20

1          **a.  Restitution for Offenses Following Return of Jury Verdict**

2          "Federal courts have no inherent power to order restitution, which is

3    traditionally a civil remedy." *United States v. Zangari*, 677 F.3d 86, 91 (2d Cir.

4    2012). "A sentencing court's power to order restitution, therefore, depends upon,

5    and is necessarily circumscribed by, statute." *Id.* Brooks's order of restitution was

6    imposed pursuant to the Mandatory Victim's Restitution Act, which provides:

7                    Notwithstanding any other provision of law, when sentencing a
8                    defendant convicted of an offense described in subsection (c), the
9                    court shall order, in addition to, or in the case of a misdemeanor,
10                   in addition to or in lieu of, any other penalty authorized by law,
11                   that the defendant make restitution to the victim of the offense or,
12                   if the victim is deceased, to the victim's estate.

13   18 U.S.C. § 3663A(a)(1).

14         Following the recent guidance of the U.S. Supreme Court, we hold that

15   when a criminal conviction abates upon the death of a defendant, any restitution

16   ordered as a result of that conviction must also abate. "When a criminal

17   conviction is invalidated by a reviewing court and no retrial will occur," the state

18   must "refund fees, court costs, *and restitution* exacted from the defendant upon,

19   and as a consequence of, the conviction." *Nelson v. Colorado*, 137 S. Ct. 1249, 1252

20   (2017) (emphasis added).

21

1    In *Nelson*, the Supreme Court concluded that a Colorado state law violated

2    due process where that law required defendants whose convictions have been

3    reversed or vacated to additionally prove their innocence in a subsequent civil

4    proceeding by clear and convincing evidence in order to obtain a refund of funds

5    paid to the state, including restitution payments. *Nelson*, 137 S. Ct. at 1254–58. In

6    *Nelson*, one of the two defendants had his conviction reversed on direct appeal

7    and the other had one count reversed on direct appeal and the other on post-

8    conviction review. *Id.* at 1253. The former was acquitted on retrial, and the state

9    chose not to retry the other defendant. *Id.* The state court had imposed costs, fees,

10   and restitution on both defendants as part of their original sentences. *Id.* The

11   Court stated that "once those convictions were erased, the presumption of their

12   innocence was restored," and a state "may not presume a person, adjudged

13   guilty of no crime, nonetheless guilty *enough* for monetary exactions," including

14   costs, fees, and restitution. *Id.* at 1255–56.

15   *Nelson* was resolved on the basis of due process violations rather than the

16   application of the abatement *ab initio* doctrine. Nevertheless, the reasoning of

17   *Nelson* also compels abating monetary penalties where a defendant dies during

18   his direct appeal, as "there is no longer a valid conviction to support the

22

1    government's retention of the [penalty]." *Libous*, 858 F.3d at 68. The statutory

2    predicate for restitution under the MVRA is a conviction, and once that

3    conviction has been vacated—even by abatement upon the death of the

4    defendant—there is no longer a basis to require payment of restitution.

5        We recognize that this result may work to frustrate the purpose of

6    Congress to compensate victims through restitution. *See Christopher*, 273 F.3d at

7    299 (reasoning that restitution was an "equitable remedy . . . intended to

8    reimburse a person wronged by the actions of another" and "[t]o absolve the

9    estate from refunding the fruits of the wrongdoing would grant an undeserved

10    windfall"); *see also United States v. Johnson*, 937 F.2d 609 (6th Cir. 1991)

11    (unpublished opinion); *United States v. Dudley*, 739 F.2d 175, 177–78 (4th Cir.

12    1984). Such "consequences of abatement can be unsettling" and "can surely be

13    devastating to those affected by the defendant's conduct." *Libous*, 858 F.3d at 68.

14    Congress's purpose may seem especially frustrated by the abatement *ab initio*

15    doctrine for restitution ordered under the MVRA, which *requires* restitution to be

16    ordered for victims of certain crimes who have suffered as a result of a

17    defendant's conduct. 18 U.S.C. § 3663A(a)(1). Yet, because the language of the

18    statute requires restitution in cases only where a defendant has been "convicted

1   of an offense," we cannot separate restitution from conviction. *Id.* Without a

2   valid conviction, the statute-based restitution order must be vacated.[16]

3   　　　　In so concluding, we join a number of our sister circuits. *See Volpendesto*,

4   755 F.3d at 453 (concluding that "[r]estitution ordered under [the MVRA], we

5   believe, cannot be disentangled from the criminal conviction that underlies the

6   sentence" because the statute states "in addition to . . . any *other* penalty

7   authorized by law" (quoting 18 U.S.C. § 3663A(a)(1)); *United States v. Rich*, 603

8   F.3d 722, 729 (9th Cir. 2010) ("Just as it is inappropriate to impose restitution on a

9   living individual who was never indicted or convicted, so it is inappropriate to

10  impose restitution on the estate of a deceased individual who, in the eyes of the

11  law, was never indicted or convicted. Abatement *ab initio* means what it says.");

12  *see also Estate of Parsons*, 367 F.3d at 416. Furthermore, the Supreme Court's

13  specific inclusion in *Nelson* of restitution in a list of vacated "monetary exactions"

14  imposed "by reason of the conviction" directs us to that conclusion.  *Nelson*, 137

15  S. Ct. at 1256.

---

[16] Victims of criminal offenses may also be compensated through a civil action against the estate of the defendant, and there are multiple such actions pending against Brooks's estate. *See Volpendesto*, 755 F.3d at 454.

24

1    The Government contends that because Brooks's funds were available to

2    the Government at the time that he was convicted—and are still in the district

3    court's control as restrained assets—those proceeds were available to

4    compensate the victims immediately upon the imposition of the order and prior

5    to Brooks's death. Thus, the situation is unlike the one in *Wright*, 160 F.3d at 907,

6    where the defendant died before his monthly restitution payments were to begin

7    upon his release from prison. Had the restitution been already paid, the

8    Government argues, then such payment and punishment would have been

9    complete, and would have been irretrievable as of the time that Brooks began

10   serving his prison sentence while his appeal was pending.

11    We need not decide that issue here. The district court stayed the payment

12   of Brooks's restitution while this case was on appeal. The disbursement of the

13   restitution by the district court in this case was dependent on a *final* conviction,

14   not on an earlier availability of funds as the Government suggests.[17]

---

[17] At Brooks's sentencing, the district court stated that restitution was "due immediately," while the final judgment provided that Brooks was to pay $25 quarterly during his period of incarceration to be followed by payments of 20% of his gross income during his term of supervised release. Any potential tension between these two statements is addressed by the district court's stay of restitution payment and by the abatement of Brooks's convictions and restitution order.

25

1    We have recently applied the doctrine of abatement *ab initio* in a similar

2    context. In *Libous*, relying on the Supreme Court's ruling in *Nelson*, we held that

3    the Government could not retain a fine previously paid by a defendant when

4    that defendant died while his appeal was pending. *Libous*, 858 F.3d at 67. We

5    reached this conclusion because we treated Libous "as if he never had been

6    indicted or convicted," and thus there was "no legal basis on which the state

7    [could] retain a fine exacted from Libous." *Id.* (internal quotation marks omitted).

8    Similarly, here, since Brooks's convictions have abated and will therefore never

9    be final, the Government lacks the authority to keep the funds related to those

10   abated convictions.[18] *See id.* at 67 ("Once Libous's conviction is vacated, the state

11   is as much entitled to retain the fine as if Libous had been acquitted."); *United*

12   *States v. Hayes*, 385 F.3d 1226, 1229–30 (9th Cir. 2004) (holding "that if the

13   government still retains funds . . . it must return those amounts" upon

14   successful collateral attack of a conviction).

---

[18] We also need not decide in this appeal whether a defendant's estate is entitled to recover restitution that has already been disbursed to victims. The Supreme Court's majority opinion in *Nelson v. Colorado* does not directly address this issue, as it indicated that the restitution was in the control of the state, not the victims. *Nelson*, 137 S. Ct. at 1256. *But see Nelson*, 137 S. Ct. at 1262–63 (Alito, J., concurring in the judgment) (noting potential problems recovering payments made to victims and suggesting that "at least in some circumstances[,] refunds of restitution payments made under later reversed judgments are not constitutionally required").

26

1    The Government also contends that the Supreme Court's decision in

2    *Kokesh v. S.E.C.* distinguishes restitution from penalties or punishments, and

3    therefore Brooks's restitution payments should not abate because they are not in

4    the nature of punishment. In *Kokesh*, the Supreme Court held that disgorgement

5    ordered as a consequence of a violation of securities laws was a "penalty" for

6    purposes of 28 U.S.C. § 2462, which imposes a five-year statute of limitation on

7    "enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise."

8    137 S. Ct. 1635, 1639 (2017) (quoting 28 U.S.C. § 2462). The Supreme Court

9    concluded that a pecuniary sanction such as disgorgement constitutes a penalty

10   under § 2462 only if its purpose is punishment and deterrence, "as opposed to

11   compensating a victim for his loss." *Id.* at 1642. Our holding here is not to the

12   contrary. We agree that restitution's goal is victim compensation, not

13   punishment. Yet, a court may only order restitution as a consequence of a valid

14   conviction pursuant to statutory authority. Whether restitution is compensatory

15   rather than in the nature of punishment is irrelevant to this inquiry when the

16   conviction underlying the order of restitution has abated. Brooks's restitution

17   order is therefore vacated for those counts on which he was convicted by a jury.

18

27

1      **b.  Restitution for Convictions Obtained by Guilty Pleas**

2          Brooks pled guilty to three counts of certain tax offenses following a plea

3 agreement and plea proceeding in August 2011. In that plea agreement, he

4 waived his right to appeal the convictions or sentence imposed by the district

5 court if the term of imprisonment for the three counts was below 63 months and

6 ran concurrently to any other sentence. The court imposed a 60-month sentence

7 on one of the counts and concurrent 36-month sentences for the other two

8 counts. The court also imposed restitution of $2.8 million, to be paid to the IRS.

9 Brooks did not appeal this sentence or convictions.

10          Because these counts of conviction were resolved by a guilty plea and he

11 did not appeal them, those convictions became final prior to Brooks's death. Any

12 restitution imposed as a result of the convictions on those counts, therefore, does

13 not abate because those convictions do not abate.

14     **III.   Abatement and Forfeiture of Bail Bond**

15          Federal criminal defendants facing trial may be released on their own

16 recognizance. 18 U.S.C. § 3142(a)(1), (b). When a district court imposes a bail

17 bond order, however, the court has determined that an unsecured appearance

1    bond "will not reasonably assure the appearance of the person as required or will

2    endanger the safety of any other person or the community." 18 U.S.C. § 3142(c).

3         As noted above, following Brooks's sentencing (and before his death) the

4    family sureties moved to return the forfeited cash security under Fed. R. Crim. P.

5    46(f). Rule 46(f) governs bail forfeiture and provides that "the court must declare

6    the bail forfeited if a condition of the bond is breached," but also states that "[t]he

7    court may set aside in whole or in part a bail forfeiture upon any condition the

8    court may impose if . . . it appears that justice does not require bail forfeiture."

9    Fed. R. Crim. P. 46(f)(1), (2)(B). "[A] bail bond and its collateral may be forfeited

10   not only for the defendant's failure to appear, but also for other violations of

11   bond conditions, including the defendant's commission of a crime." *United States*

12   *v. Gigante*, 85 F.3d 83, 85 (2d Cir. 1996) (per curiam).  The district court denied the

13   motion of the family members to return the cash security.

14        The district court must evaluate the following factors in deciding a

15   remission of bond motion:

16             whether the defendant's breach of the bond conditions was
17             willful; the cost, inconvenience and prejudice suffered by the
18             government as a result of the breach; . . . any explanation or
19             mitigating factors presented by the defendant; . . . whether the
20             surety has assisted in the apprehension of the defendant; and

29

1       whether the surety is a professional or a friend or member of the

2       defendant's family.

3 *United States v. Gambino*, 17 F.3d 572, 574 (2d Cir. 1994) (quoting *United States v.*

4 *Carvajal*, 674 F. Supp. 973, 974 (E.D.N.Y. 1987)). We review a district court's

5 denial of remission of forfeited bail security for abuse of discretion. *See id.*

6       In *Gambino*, two sureties appealed a district court's granting of a motion

7 for forfeiture of bail bond posted for the defendant who had been charged with

8 narcotics and racketeering violations. *Id.* at 573–74. Before trial, Gambino fled in

9 violation of his bail conditions, and was found after an extensive search at a hotel

10 in Florida. *Id.* The Government obtained forfeiture of the bail bond, but the

11 sureties later moved for remission of the bond under Fed. R. Crim. P. 46. *Id.* The

12 district court denied that motion, and upon review of the district court's orders

13 for abuse of discretion, this Court affirmed. In particular, we noted that in the

14 *Gambino* prosecution, which was a "high-profile narcotics and racketeering

15 case[]," the "deterrence value served by total forfeiture is especially important."

16 *Id.* at 575.

17       In this appeal, Terry Brooks and the Brooks children contest the district

18 court's denial of their motion to set aside the forfeited bail bond, and also

19 contend that Brooks's death abates the forfeiture of the cash security. Brooks's

1    estate contends that Brooks's death abates the forfeiture of the portion of the cash

2    security posted by Brooks personally. Brooks also argued in his direct appeal

3    that his cash portion of the bond should be returned to him because of the defect

4    in the prior indictment, and the lack of clear and convincing evidence of his

5    violations of his bond conditions.[19]

6        **a.  The Claim for Abatement of the Forfeited Bond Security**

7        First, we must decide whether the death of a criminal defendant while his

8    case is pending on appeal abates the previous forfeiture of a bond security where

9    the defendant violated pre-trial release orders and conditions. The Brooks family

10   and estate argue that because "death abates not only the appeal but also all

11   proceedings had in the prosecution from its inception," *Libous*, 858 F.3d at 66

12   (quoting *Wright*, 160 F.3d at 908), the doctrine of abatement must also apply to

13   the forfeiture of the bail bond. We disagree. Although the district court's finding

14   of Brooks's violation of the terms of his bail bond order was a "proceeding," that

---

[19] As noted in footnote 15, *supra*, Brooks's argument regarding the defective indictment is foreclosed by this Court's decision in *United States v. Schlegel*, 687 F. App'x 26 (2d Cir. 2017), *petition for cert. filed*, No. 16-9701 (June 23, 2017). Brooks's appeal of the district court's revocation of his bond and the forfeiture of his security for lack of clear and convincing evidence is foreclosed by this Court's denial of his prior interlocutory appeal. *See* No. 10-225-cr, *United States v. Brooks.* In any event, for the reasons discussed above, the district court did not clearly err in concluding that Brooks had violated the terms of his bail release order and ordering his bail revoked. Brooks did not join his family's Rule 46 motion, nor did he file such a motion on his own behalf.

31

1    conclusion was not made to adjudicate Brooks's guilt or innocence for the

2    charged offenses. Rather, the bail forfeiture hearing was collateral to the

3    determination of guilt or innocence in Brooks's criminal case, arising out of a

4    violation of separate orders and conditions entered by the court and agreed to by

5    Brooks and his family members.

6         At Brooks's bond hearing, the district court was primarily concerned with

7    Brooks having access to financial resources to flee the country, following its

8    conclusion that he was a serious flight risk. In order to satisfy the district court

9    that Brooks would not flee, the conditions of Brooks's release included

10   surrendering his passport, returning all foreign assets to the United States,

11   subjecting his financial dealings to court oversight, disclosing all assets, and

12   posting a considerable cash security and an even higher bond. After the district

13   court approved the bond and its conditions, the Government subsequently

14   demonstrated that Brooks was violating these terms of the Order.

15        The Government did not argue that these actions were evidence of

16   independent criminal conduct or related to conduct for which Brooks was on

17   trial. Rather, the Government's extensive proffer showed violations of the terms

18   of the Order that were put in place to assure the district court that Brooks would

1   not flee. The terms of the Order were not part of the direct prosecution of the

2   case, but were part of the district court's responsibility to assure the appearance

3   of a criminal defendant separate from the ultimate—and subsequent—

4   determination of the criminal defendant's ultimate guilt or innocence.

5       We have also long held that a bail bond is interpreted "within the general

6   framework of suretyship and contract law." *United States v. Martinez*, 151 F.3d 68,

7   73 (2d Cir. 1998) (quoting *United States v. Martinez*, 613 F.2d 473, 476 (3d Cir.

8   1980)). In other words, "[a] bail bond is a civil contractual agreement between the

9   government and the surety on behalf of the criminal defendant, and, if a

10  forfeiture is ordered the surety becomes the debtor of the government." *United*

11  *States v. Santiago*, 826 F.2d 499, 502 (7th Cir. 1987). Even though the contract is

12  formed in relation to an adjunct criminal proceeding, "[w]hat a court can do to a

13  defendant and what it can do to a bail bond are quite different matters." *United*

14  *States v. Beard*, 960 F.2d 153 (9th Cir. 1992) (unpublished opinion). The forfeiture

15  of a bail bond functions as damages for breach of the civil contract, not as a

16  punishment for the commission of a criminal offense. *See, e.g., United States v.*

17  *Barger*, 458 F.2d 396, 396 (9th Cir. 1972) (per curiam) ("This penalty [forfeiture of

18  bail bond] is one for damages and is deemed civil, not criminal, in nature.");

1    *United States v. Roher*, 706 F.2d 725, 726 (5th Cir. 1983) ("[A] bond forfeiture

2    motion is a civil matter." (quoting *United States v. Cervantes*, 672 F.2d 460, 461 n.2

3    (5th Cir. 1982)). Because bail bonds are an independent and collateral matter, the

4    forfeiture of a bail bond does not abate with the death of a criminal defendant

5    under the doctrine of abatement *ab initio*. Indeed, this Court, as well as others,

6    has concluded that the death of a defendant subject to a forfeited bail bond does

7    not by itself require return of the security. *United States v. Agueci*, 379 F.2d 277,

8    278 (2d Cir. 1967) (per curiam) (affirming district court forfeiting bond of

9    defendant who had died while on bail); *see also United States v. Parr*, 594 F.2d 440,

10   442 (5th Cir. 1979) ("The fact that [defendant] later died and the criminal

11   proceeding against him abated does not constitute a defense to [surety] in the

12   forfeiture proceeding."); *Detroit Fid. & Sur. Co. v. United States*, 59 F.2d 565, 568

13   (8th Cir. 1932) ("[I]f the appellant was legally liable under the facts or conditions

14   as they existed at the time of the forfeiture, the fact that subsequently the

15   principal died and the criminal proceeding was therefore dismissed, would not

16   constitute a defense in a proceeding of this nature."). These decisions recognize

17   that the doctrine of abatement *ab initio*—focused on avoiding improper *criminal*

34

1    consequences for a deceased defendant—does not apply in the context of bond

2    forfeiture proceedings.

3        Further, bond forfeiture also does not implicate the two principles

4    underlying the doctrine of abatement *ab initio* (finality and punishment). Brooks

5    previously filed a interlocutory appeal of the revocation of his bail to this Court,

6    and we affirmed the revocation. We address the family's later motion for return

7    of the forfeited bail security pursuant to Fed. R. Crim. P.  46(f) below. But in

8    neither case is there a non-final matter to abate, one that is tied to the ultimate

9    determination of guilt or innocence. Similarly, a forfeited bail bond is not a

10   punishment for a criminal offense that ceases to have purpose after a defendant's

11   death, but instead is a remedy for a breach of the terms of the bail release order.

12       It is also noteworthy that the *Gambino* factors do not specifically include

13   determining whether the defendant's conviction remained valid. *See Gambino*, 17

14   F.3d at 574. As a result, if a defendant is later acquitted or his conviction is

15   vacated, a district court is not required to return a forfeited bail bond. *See, e.g.,*

16   *Cervantes*, 672 F.2d at 461 n.2 (rejecting argument that acquittal is a basis for

1    setting aside forfeiture); *United States v. Nordenholz*, 95 F.2d 756, 758 (4th Cir.

2    1938) (denying return of forfeited bond after Government had case dismissed).[20]

3          While it is true that "but-for" the prosecution of the case against him,

4    Brooks would not have been subject to the bail bond and the resulting forfeiture,

5    this argument fails. When the district court in this case imposed the terms of pre-

6    trial release on Brooks, it did so for reasons independent of the determination of

7    his guilt or innocence. These terms and conditions were not determined by the

8    outcome of the offenses prosecuted, and therefore the principles of abatement do

9    not apply.

10         **b.  The Denial of the Motion to Set Aside under Fed. R. Crim. P. 46**

11         Having concluded that the bail forfeiture does not abate with Brooks's

12   death, we now turn to whether the district court erred in its conclusion that, in

13   applying the *Gambino* factors, the interests of justice did not require the return of

14   the security. Brooks's family members particularly dispute the district court's

15   finding that Terry Brooks and the children were involved in the Czerny Kot

16   scheme.

---

[20] We have found no cases in which a defendant whose conviction has been vacated has subsequently obtained the return of forfeited bail under Fed. R. Crim. P. 46(f). If the validity of the forfeiture depended only on the validity of the conviction, then such motions under Fed. R. Crim. P. 46 would be commonplace and successful.

1    The district court concluded that forfeiture was proper because, during the

2    course of his pre-trial release, "Brooks <u>repeatedly</u> misrepresented to the Court

3    that he was compliant with the financial monitoring terms of his bail agreement"

4    while "he was working feverishly to secret [sic] his assets in nearly every corner

5    of the world." J.A. 1439–40 (emphasis in original). The ruling recounted the facts

6    detailed in the Jett affidavit, and noted that the court had been presented "with

7    sufficient evidence that Brooks ha[d] violated the terms of the Court's Bail

8    Release Order" and therefore revoked bail. J.A. 1441.

9    In denying the motion, the district court considered the willfulness of

10    Brooks's breaches "heavily against" him, J.A. 1443, and noted that "[m]ovants do

11    not offer any explanation for the violations or mitigating circumstances," J.A.

12    1444. The district court noted that the Government presented evidence that other

13    family members than David and Jeffrey had taken a plane to Switzerland to

14    bring assets to a bank and that the passports of David's children were used to set

15    up the Czerny Kot scheme. The court cited other district court rulings for the rule

16    that the costs and efforts made to apprehend a defendant who had fled were not

17    the only considerations in revoking bail, but that forfeiture can be a sanction for

18    any violation of the terms of a bail order. The district court termed movants'

37

1    argument that "they did not participate in violations of Brooks'[s] bail agreement

2    because their involvement in Czerny Kot predated the execution of Brooks'[s]

3    bail agreement" as "senseless" because movants do not dispute that they helped

4    form Czerny Kot.[21] J.A. 1445.

5          The Appellants' arguments to the contrary fail for two reasons. First, Fed.

6    R. Crim. P. 46 does not require that sureties be involved in the violation of the

7    terms of the bond order to forfeit their interests. All that is required for the

8    security (or the bond) to be forfeited is that the defendant violate one of the

9    terms. Even if the district court erred in determining the extent of the family's

10    involvement, they were still liable as sureties for Brooks's breach. Second, the

11    district court's findings of facts were not clearly erroneous as to the sureties'

12    involvement, given the Government's extensive investigation and presentation to

13    the district court regarding the family's direct involvement in the concealment

14    and manipulation of the funds.

15          Upon review, the district court's application of the *Gambino* factors here

16    did not constitute an abuse of discretion. *See Gambino*, 17 F.3d at 574. First, the

17    district court correctly found that Brooks's breach of the bond conditions was

---

[21] The Government admits that the Appellants did not concede their involvement, but contends that the family does not dispute that they were involved in setting up the scheme.

1    willful, as Brooks had multiple opportunities to disclose the existence and

2    concealment of his overseas assets and did not. Second, Brooks presented no

3    adequate explanation or mitigating factors for his lack of disclosure. Third, in the

4    context of this bail security forfeiture—where the defendant subject to the bail

5    did not flee but rather violated terms of the order related to disclosure of assets—

6    the sureties' assistance in recovering the defendant is not dispositive. As for the

7    final *Gambino* factor, in this case the sureties were members of the defendant's

8    family, which would usually weigh in favor of returning the forfeited security.

9    However, given the nature of the sureties' obligations under the Order and the

10   nature of the breach—and their involvement in it—the district court did not

11   commit error in denying the motion to set aside the forfeited security to the

12   sureties.

13          These appellants also challenge the limited expenses and efforts incurred

14   by the Government as a result of this breach. Because Brooks did not flee, they

15   assert that the forfeiture was not necessary to deter future violations of the Order

16   for lack of disclosure, and also assert that the forfeited amount was excessive in

17   comparison to other cases. These arguments also fail after applying the *Gambino*

18   factors. Further, they do not diminish the valid concerns of the district court in

1    imposing the bail bond Order under the terms that it did, given the unusual

2    circumstances of this case and Brooks's extensive assets at the time of his arrest.

3         The amount of the entire bond was $400 million, apparently the largest

4    ever imposed on an individual defendant, and the cash security posted was

5    originally $48 million, also an extraordinary cash security. These amounts were

6    required by the district court because of the nature of the crime, the amounts

7    allegedly involved in the crimes, and Brooks's wealth. They arose out of a

8    concern that Brooks would be able to flee and access those accounts to aid his

9    flight.[22]

10        The fact that Brooks did not actually flee does not outweigh the other

11   factors that favored forfeiture of the security under the specific terms of this

12   Order. The district court did not order the entire bail bond forfeited—only the

13   cash security—because the Order's terms "did not include attempts to conceal

14   assets within the category of violations that would result in [the] forfeiture of the

15   entire personal recognizance bond" under the two-tier arrangement. J.A. 1260.

16   *See* footnote 9, *supra*. Also, as the Government demonstrated, it expended

---

[22] The district court was also concerned in 2008, well prior to the evidence submitted before trial in 2010, that Brooks and his brother Jeffrey had a history of financial regulatory violations and undertaking actions that appeared to be secreting assets.

40

1   significant resources in investigating Brooks's concealment and transfer of assets.

2   Finally, in light of the scope of the fraudulent scheme and wealth of Brooks, the

3   amount of the bail security forfeited was not excessive.

4       For these reasons, the district court did not abuse its discretion in denying

5   the motion to set aside their forfeited security.

6                                   **CONCLUSION**

7       The death of David Brooks abates all of his convictions that were pending

8   appeal at the time of his death and any corresponding restitution. His death does

9   not abate the other convictions or restitution nor the order of bail bond forfeiture

10  for the cash security imposed as a result of his violations of the terms of his

11  release on bond. For the foregoing reasons, the motion to abate by Brooks is

12  **GRANTED** in part and **DENIED** in part, Brooks's judgment of conviction is

13  **VACATED** in part, the motion for abatement by the other appellants is

14  **DENIED**, the order denying the motion to set aside the bail forfeiture is

15  **AFFIRMED**, the Government's cross-appeal is **DISMISSED**, and the case is

16  **REMANDED** for the dismissal of the indictment as to counts I-XI, XV-XVII.

A True Copy

Catherine O'Hagan Wolfe, Clerk

United States Court of Appeals, Second Circuit

41